## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------------x
                                          :
In re:                                    :  Chapter 11
                                          :
TRUMP ENTERTAINMENT RESORTS,              :  Case No. 14–12103 (___)
INC., et al.,¹                            :
                                          :  (Joint Administration Requested)
                 Debtors.                 :
                                          :
------------------------------------------------------------------x
```

### DECLARATION OF ROBERT GRIFFIN IN SUPPORT OF DEBTORS'
### CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS AND APPLICATIONS

I, Robert Griffin, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge:

1.      I am the Chief Executive Officer of Trump Entertainment Resorts, Inc. ("TER"), and have served in that position since October 2010.  In my role as Chief Executive Officer, I am familiar with the day-to-day operations, business, and financial affairs of the Debtors.

2.      My extensive gaming experience spans more than twenty years.  Prior to my appointment as Chief Executive Officer of TER in October of 2010, I held senior management positions at the Debtors' former property, the Trump Marina Hotel Casino (the "Marina"), from 1992 through 1998.  From 1999 through 2003, I served as Vice President and General Manager for several properties owned and operated by Isle of Capri Casinos, Inc. ("ICCI").  Between 2004 and 2008, I served as Senior Vice President of Operations of ICCI, where I was responsible for the operations of sixteen casinos and racing facilities throughout the United States, Grand

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Trump Entertainment Resorts, Inc. (8402), Trump Entertainment Resorts Holdings, L.P. (8407), Trump Plaza Associates, LLC (1643), Trump Marina Associates, LLC (8426), Trump Taj Mahal Associates, LLC (6368), Trump Entertainment Resorts Development Company, LLC (2230), TER Development Co., LLC (0425) and TERH LP Inc. (1184).  The mailing address for each of the Debtors is 1000 Boardwalk at Virginia Avenue, Atlantic City, NJ 08401.

Bahamas and the United Kingdom.  From 2008 to September of 2010, I served as President and CEO of MTR Gaming Group, Inc. ("MTR"), which owns and operates casino and racetrack facilities in West Virginia, Pennsylvania and Ohio.  In March of 2010, I became a member of MTR's Board of Directors.

3.      On September 9, 2014 (the "Petition Date"), TER and its affiliated debtors and debtors in possession (collectively, the "Debtors," or the "Company") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), thereby commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases").

4.      The Debtors own and operate two casino hotels located in Atlantic City, New Jersey: the Trump Taj Mahal Casino Resort (the "Taj Mahal") and the Trump Plaza Hotel and Casino (the "Plaza").  Since emerging from their prior bankruptcy cases in 2010, the Debtors continued to face significant challenges due to the prolonged economic downturn, increased competition from within the Atlantic City market and from neighboring states, and the lingering effects of Superstorm Sandy, all of which contributed to declining revenues.  These factors, coupled with the seasonal and capital-intensive nature of the Debtors' businesses, high debt load, significant labor costs and double-digit real estate tax increases, hindered the Debtors' ability to operate successfully and negatively impacted the Debtors' liquidity position.  Consequently, as described in more detail below, the Debtors determined to commence these Chapter 11 Cases. The Debtors believe that the commencement of these Chapter 11 Cases is in the best interests of the Debtors' creditors and stakeholders.

5.      In order to enable the Debtors to mitigate the potential adverse impact of the chapter 11 filing, the Debtors have filed motions and pleadings seeking approval of various types

of "first-day" relief that are intended to allow the Debtors to perform and meet all of the obligations necessary to fulfill their duties as debtors-in-possession.  The relief sought therein is necessary to operate the Debtors' businesses in chapter 11 with minimum disruption or loss of value.

6.      I submit this declaration (the "Declaration") to assist the Court and other parties-in-interest in understanding the circumstances that preceded the commencement of these Chapter 11 Cases, and in support of the Chapter 11 Cases and the relief requested through the various first-day motions and applications (collectively, the "First-Day Motions") filed by the Debtors. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information provided to me by certain of the Debtors' employees and the Debtors' professionals, my review of relevant documents or my opinion based upon my experience, knowledge and information concerning the operations and financial affairs of the Debtors and their businesses and the gaming industry.  If I were called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

7.      This Declaration is divided into two sections.  Section I provides general background information, including a description of the Debtors' current organizational structure, operations, capital structure and events giving rise to these Chapter 11 Cases.  Section II sets forth those facts that are most germane to this Court's consideration of the Debtors' First-Day Motions, and is intended to supplement any other declarations submitted in direct support of any given motion or application.

# I.    GENERAL BACKGROUND

### A.    Organizational Structure

8.    TER, the ultimate parent company of the Debtors, is a Delaware corporation that holds a 99% interest in, and is a general partner of, Trump Entertainment Resorts Holdings, L.P. ("TER Holdings"), a Delaware limited partnership.[2]    The remaining one percent of TER Holdings is held by TERH LP Inc., a Delaware corporation, as a limited partner.    As the sole general partner of TER Holdings, TER has the exclusive rights, responsibilities and discretion as to the management and control of TER Holdings and its subsidiaries.    TER Holdings, in turn, holds 100% of the equity interests in each of the various subsidiaries of the Debtors, including (a) Trump Plaza Associates LLC ("Plaza Associates"), a New Jersey limited liability company, which owns the Plaza, and (b) Trump Taj Mahal Associates LLC ("Taj Associates"), also a New Jersey limited liability company, which owns the Taj Mahal.[3]    The Debtors derive revenue primarily from casino operations, room rental, food and beverage sales and/or entertainment revenue.

### B.    Operations

#### i.    *Taj Mahal*

9.    The Taj Mahal is located on the northern end of Atlantic City's boardwalk and is situated on 35.9 acres of beachfront property.    The Taj Mahal features over 2,000 hotel rooms, including the 782-room Chairman Tower (which includes 66 suites and 8 penthouse suites) and

---

[2]  A chart depicting the organizational structure of the Debtors is attached hereto as Exhibit A.

[3]  Until May 24, 2011, the Debtors owned and operated the Marina, which was located on approximately 14 acres in Atlantic City's marina district and featured a 27-story hotel with approximately 728 guest rooms, approximately 79,000 square feet of gaming space (including approximately 1,980 slot machines and 70 table games), approximately 30,500 square feet of convention, ballroom and meeting space and other amenities.  On May 24, 2011, the Marina was sold to Golden Nugget Atlantic City, LLC, an affiliate of Landry's Restaurants, Inc., for gross cash proceeds of approximately $37.3 million.  Although the Marina was sold in 2011, as of the Petition Date, Trump Marina Associates, LLC, the legal entity that owned the Marina, is inactive and has not been dissolved.

the original 1,228-room hotel tower (which includes 243 suites and 7 penthouse suites), sixteen dining locations (including Il Mulino New York), and five cocktail lounges.  The Taj Mahal also features approximately 162,000 square feet of gaming space that includes approximately 2,500 slot machines and 180 table games (including poker tables), a high-end gaming salon, an approximately 12,500 square-foot Poker and Keno room and an Asian-themed table game area offering popular Asian table games.   The Taj Mahal also features the following: an approximately 20,000 square foot multi-purpose entertainment complex known as the "Xanadu Theater," with seating capacity for up to approximately 1,200 people, which can be used as a theater, concert hall, boxing arena or exhibition hall; a 35,000 square-foot Scores gentlemen's club; the Casbah nightclub; the Mark G. Etess Arena, featuring approximately 63,000 square feet of exhibition and entertainment space which can accommodate over 5,000 people; and a health club, spa and fitness center with an indoor pool.  The Taj Mahal also has a parking garage for approximately 6,750 cars, a six-bay bus terminal and a roof-top helipad.

10.    The Taj Mahal's net revenues for the 2013 fiscal year were approximately $257.9 million, and the unaudited net revenues for the six months ended June 30, 2014 were approximately $108.5 million.

### ii.    *Plaza*

11.    The Plaza is located at the center of the boardwalk at the end of the Atlantic City Expressway (the main highway into the city), and is situated on 10.9 acres with direct access to Boardwalk Hall (an entertainment and sporting venue owned and operated by the New Jersey Sports and Exposition Authority that can accommodate up to approximately 13,000 people). The Plaza features approximately 906 hotel rooms (including 140 suites) and approximately 87,000 square feet of casino space with approximately 1,600 slot machines and 63 table games.

The Plaza also features approximately 18,000 square feet of conference space, a 750-seat cabaret theater, two cocktail lounges, seven restaurants, a players club, a seasonal beach bar and restaurant, health spa, an indoor pool, and retail outlets.  Additionally, the Plaza has a parking garage that can accommodate thirteen buses and approximately 2,700 cars.

12.    The Plaza's net revenues for the 2013 fiscal year was approximately $76.3 million, and the unaudited net revenues for the six months ended June 30, 2014 were approximately $28.1 million.

### iii.    *Gaming Regulations*

13.    The ownership and operation of each of the Debtors' casinos is subject to extensive regulation under the statutes and regulations of the State of New Jersey, including the New Jersey Casino Control Act, as enforced and implemented by the New Jersey Casino Control Commission (the "CCC") and the New Jersey Division of Gaming Enforcement ("DGE").  As of the Petition Date, the Debtors are in compliance with the rules and regulations of the CCC and the DGE.

### iv.    *Online Gaming*

14.    In 2013, the New Jersey Legislature passed, and Governor Christie signed, a bill legalizing online gambling in the State of New Jersey and restricting the operation of the on-line gaming websites to Atlantic City's casinos.  In October 2013, the DGE issued an internet gaming permit to each of Taj Associates and Plaza Associates to conduct internet gaming in the State of New Jersey.

15.    On June 24, 2013, Taj Associates entered into a ten-year online gaming operation agreement (the "UG Online Gaming Agreement") with Fertitta Acquisitionsco LLC, doing business as Ultimate Gaming ("UG").  On June 27, 2013, Plaza Associates also entered into a

ten-year online gaming operation agreement (the "Betfair Online Gaming Agreement," and together with the UG Online Gaming Agreement, the "Online Gaming Agreements") with Betfair Interactive US LLC ("Betfair").

16.    Pursuant to the Online Gaming Agreements, each of UG and Betfair agreed to host, manage, operate, and support internet gambling games in New Jersey under the internet gaming permits granted to the Company.  In exchange, each of UG and Betfair agreed to share certain percentages of the online gaming revenues (after the deduction of certain player-related costs, gaming taxes and obligations owed to the Casino Reinvestment Development Authority) with the Company.  In addition, UG and Betfair each contributed $8 million and $7.5 million, respectively, to the Company.

### *v.*    *Employees*

17.    As of July 31, 2014, the Debtors employed approximately 2,800 full-time equivalent employees and approximately 1,300 part-time, on call or seasonal employees.

18.    Certain of the Debtors' casino hotel employees are subject to collective bargaining agreements ("CBAs") with various unions operating in Atlantic City, New Jersey. The largest of these unions is UNITE HERE, Local 54 ("Local 54"), whose CBA covers 446 employees at the Plaza and 1,140 employees at the Taj Mahal.   Pursuant to their CBAs, the Debtors have an obligation to contribute to multiemployer pension plans.  For the year ending December 31, 2013, the Debtors contributed, in the aggregate, approximately $5.4 million on account of these pension plans.  In addition, the CBAs require the Debtors to provide various health, welfare and other benefits to all employees covered by the CBAs.  For the year ending December 31, 2013, the Debtors' total cost associated with health, welfare and other benefits was approximately $14.9 million.

C.    **Prior Bankruptcy Filings**

19.    On November 21, 2004, TER's predecessor entity, Trump Hotels & Casino Resorts, Inc., together with 28 affiliates and subsidiaries (collectively, the "2004 Debtors"), filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the District of New Jersey (Case No. 04-46898 (JHW)) (the "2004 Chapter 11 Cases").  On April 5, 2005, the Bankruptcy Court entered an order confirming a chapter 11 plan of reorganization with respect to the 2004 Debtors, and on May 20, 2005 the plan became effective.  On March 17, 2009, the Bankruptcy Court issued its final decree and order closing the 2004 Chapter 11 Cases.

20.    The 2004 Debtors emerged from the 2004 Chapter 11 Cases with an unsustainable balance sheet, including a $500 million secured credit facility and $1.25 billion in principal amount of second lien notes issued by TER's predecessor-in-interest ("Second Lien Notes"). Moreover, following their emergence from bankruptcy, the 2004 Debtors' operating results were negatively affected by the global recession, intense competition within the Atlantic City market and adjoining states, and certain other factors.

21.    Consequently, on February 17, 2009, TER and its direct and indirect subsidiaries (collectively, the "2009 Debtors") filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the District of New Jersey (Case No. 09-13654 (JHW)) (the "2009 Cases").  On May 7, 2010, the Bankruptcy Court entered an order (the "2010 Confirmation Order") confirming a chapter 11 plan of reorganization with respect to the 2009 Debtors (the "2010 Plan"), and on July 16, 2010 the 2010 Plan became effective.  On January 10, 2012, the Bankruptcy Court issued its final decree and order closing the 2009 Cases.

22.    Pursuant to the 2010 Plan, TER received $225 million in new capital in connection with an equity rights offering backstopped by former holders of the Second Lien

Notes. Additionally, five percent of the newly issued and outstanding stock of TER was distributed to holders of the Second Lien Notes on a pro-rata basis, and, five percent of the newly issued and outstanding stock of TER, together with warrants to acquire an additional five percent of TER's stock, were issued to Donald J. Trump. The holders of approximately $486.3 million in first lien debt previously issued by TER's predecessor-in-interest received a cash payment of $125 million as well new debt (as described below).

### D.    Capital Structure of the Debtors

23.    The Debtors' current capital structure arises from the 2010 Plan, and is generally described below:

### i.    *First Lien Credit Agreement*

24.    Pursuant to the 2010 Plan, on July 16, 2010, each of TER, TER Holdings and certain subsidiaries of TER (the "Subsidiary Guarantors") entered into that certain Amended and Restated Credit Agreement with Beal Bank, SSB, as the initial collateral agent and administrative agent (the "First Lien Agent"), and Icahn Partners LP, Icahn Partners Master Fund LP, Icahn Partners Master Fund II LP and Icahn Partners Master Fund III LP (collectively, the "First Lien Lenders"), as initial lenders, pursuant to which TER issued $356.4 million principal amount of first lien debt (the "First Lien Debt") to the First Lien Lenders. In connection with a settlement of certain disputes between the Company and the First Lien Lenders, on September 21, 2010, the Amended and Restated Credit Agreement was subsequently amended (as amended, supplemented or modified from time to time prior to the date hereof, the "First Lien Credit Agreement"), retroactive to July 16, 2010, to reduce the total principal amount outstanding as of such date from approximately $356.4 million to approximately $346.5 million, and to provide

that interest would be payable on all principal amounts outstanding.  In April 2012, Beal Bank

was replaced as collateral agent and administrative agent by Icahn Agency Services, LLC.

25.     The First Lien Credit Agreement requires quarterly principal amortization

payments in the amount of $866,000, and requires the Debtors to pay interest on the unpaid

principal amount outstanding at an annual rate of 12%, payable quarterly in arrears.  Under the

First Lien Credit Agreement, the Company is subject to certain affirmative and negative

covenants, and is required to make mandatory prepayments of the First Lien Debt under certain

circumstances.  Amounts outstanding under the First Lien Credit Agreement are guaranteed by

the Subsidiary Guarantors, and are secured by first priority liens on and security interests in all of

the Debtors' assets.  The 2010 Confirmation Order provides, in part, as follows:

> Notwithstanding anything to the contrary in the Plan, the Plan
> Documents, or this Order, on the Effective Date, the First Lien
> Agent(s) and/or Lenders shall continue to have valid, perfected and
> first priority liens on, and pledges and security interests in, all of
> the Debtors' and Reorganized Debtors' assets (of every kind and
> nature whatsoever), including, for the avoidance of doubt, cage
> cash, and all proceeds of any and all of the foregoing and this
> Order shall be sufficient and conclusive evidence of the first
> priority, perfection and validity of such liens, pledges and security
> interests without the need for any further action including, without
> limitation, the filing or recording any financing statements or other
> documents that may otherwise be required under federal or state
> law in any jurisdiction.

2010 Confirmation Order at § 19(b).  All indebtedness outstanding under the First Lien Credit

Agreement matures on December 31, 2015.  As of the Petition Date, the aggregate principal

amount total outstanding under the First Lien Credit Agreement was approximately $285.6

million plus accrued but unpaid interest of approximately $6.6 million.

### ii. *Trade Debt*

26.    As of the Petition Date, the Debtors' books and records reflected accounts payable due and owing in the amount of approximately $13.5 million.

### iii. *Equity*

27.    As of August 20, 2014, there were approximately 200 holders of record of TER's common stock, many of whom may include former holders of the Second Lien Notes who received common stock under the 2010 Plan (as described above).  Upon information and belief, Donald J. Trump holds approximately 5% of the TER common stock as well as warrants to purchase approximately 5% of TER common stock.

### E.    Management's Efforts to Increase Revenue and Decrease Costs

28.    Upon the Company's emergence from bankruptcy in 2010, a new Board of Directors was appointed pursuant to the 2010 Plan.  In September 2010, the Board of Directors selected Robert F. Griffin as the new chief executive officer and, subsequently, hired a new chief financial officer and various other members of senior management.

29.    Despite the significant reduction in debt under the 2010 Plan, the Company still faced approximately $346.5 million in First Lien Debt.  In addition, it soon became clear that the Company needed to reduce its footprint in order to stem the losses associated with underperforming assets such as the Marina, rationalize its cost structure and invest in its properties in order to remain competitive.  Accordingly, since 2010, the Company's management team has undertaken a number of initiatives in an attempt to restore the Company's financial footing.

i.    _Sale of Non-Core and Under-Performing Assets_

30.    As noted above, the Marina had experienced sustained operational losses and was in need of substantial cap-ex funding.  Consequently, on May 24, 2011, the Company completed the sale of the Marina to Golden Nugget Atlantic City, LLC (an affiliate of Landry's, Inc.) for approximately $38 million in cash and the assumption of certain liabilities.  The Company also agreed to remove a deed provision restricting the development of gaming activities on real property previously sold by the Company to Boardwalk Florida Enterprises, LLC in exchange for a payment of approximately $5.5 million in cash.  Since 2011, the Company has sold other non-core assets, including (a) the Steel Pier, an approximately 425,000 square feet pier located across the boardwalk from the Taj Mahal, for approximately $4.3 million in cash; (b) the "skybridge," which extends over the boardwalk and connects the Taj Mahal to the Steel Pier, for approximately $250,000 in net cash proceeds; (c) the off-site warehouse located in Egg Harbor Township, New Jersey, for approximately $1.9 million in net cash proceeds; (d) the Company's former corporate offices for approximately $3.1 million in cash; and (e) the sale of an unused parcel of land located near the Plaza for approximately $1.3 million in cash.

31.    The Company also attempted to sell the Plaza due to its sustained under-performance and substantial capital expenditure needs.  Beginning in July 2011 the Company retained CBRE Richard Ellis to conduct a marketing process in an effort to sell the Plaza. Approximately 150 prospective purchasers or investors were contacted; approximately fifteen parties were provided access to a datasite;  four parties submitted bids (including one bid for the purchase of the Plaza as a non-casino); and only one party submitted a formal bid, though the bidder did not enter into a formal purchase agreement until February 2013.  However, the

Company was unable to consummate a sale transaction with respect to the Plaza because of its inability to obtain a release of the security interests in the Plaza.

### ii.     *Realization of Cost-Savings and Cost Containment*

32.     The Company also took steps to reduce operational expenses, including staffing reductions, improving labor and other operational efficiencies, varying the availability of certain amenities to match current demand, and certain other cost-cutting measures, in order to realign operations to appropriately function within reduced business volumes in light of the then-current economic and competitive conditions.  In addition, in 2011, the Debtors successfully negotiated with several unions to achieve significant concessions in the form of approximately $4 million of annual wage reductions (though such wage concessions have proven insufficient given the Debtors' extremely challenging market and industry).  Also, in June 2012, the Company settled with the City of Atlantic City with respect to the Company's challenges to the real estate tax assessments for its casino properties for the tax years 2008 through 2012, which provided the Company with an estimated $41.7 million in net present value savings as it related to the Debtors' continuing operations.

### iii.     *Property Improvements*

33.     Remaining competitive with other casino hotels located in Atlantic City and neighboring states requires substantial capital expenditures in the properties and amenities offered by the Company.  Thus, the Company embarked upon a number of capital projects and obtained significant tenant and state-funded investments in the Company's properties.  In order to compete with the other casino hotels located in Atlantic City and neighboring states on the basis of customer service, quality and extent of amenities and promotional offers, during 2011 the Company added several new amenities to their properties, including the addition of the

famous White House Sub Shop and a Panda Express on the Taj Mahal's Spice Road.  In addition, the Taj Mahal entered into lease agreements for the tenant-funded development of a 35,000 square-foot Scores gentlemen's club, the first of its kind in an Atlantic City casino, as well as a Robert's Steak House, a high-end restaurant.

34.    The Company also undertook several other construction projects, including: (i) a $7 million, state-funded project to restore the Taj Mahal's facade; and (ii) a $500,000 upgrade to the Taj Mahal's computer room, including enhancements to its HVAC system, electrical capacity and sprinkler systems.  In an effort to increase boardwalk traffic, the Company contracted with a new operator for its seasonal Beach Bar at the Plaza that permitted the establishment to remain open every day in 2014 summer season (rather than only on select days during the summer season).

### iv.    *Online Gaming Agreements*

35.    As noted above, in order to boost revenue, the Company sought to capitalize on recently enacted New Jersey legislation authorizing online gaming in New Jersey, and entered into two Online Gaming Agreements, with each of UG and Betfair.  Pursuant to the Online Gaming Agreements, UG and Betfair contributed $8 million and $7.5 million, respectively, to the Company, and agreed to share certain percentages of online gaming revenues with the Company.

### F.    **Circumstances Leading To The Debtors' Chapter 11 Filings**

36.    The Debtors had hoped that the aforementioned measures would restore the Debtors to profitability and long-term stability.  Unfortunately, the Debtors' operating results and financial condition continued to decline due to a variety of factors, including those described below.

### i.    *High Debt Burden*

37.    Although the Debtors were able to significantly reduce the principal balance of the First Lien Debt through asset sale pay downs and amortization payments, the Debtors remain highly leveraged, with a current principal balance of $285.6 million and annual debt service expense of approximately $38 million (as compared with negative LTM EBITDA).

### ii.    *Declining Atlantic City Market*

38.    Since 2010, the Atlantic City gaming market has experienced significant contractions.  Total 2013 gross gaming revenues in the Atlantic City market (as reported to the DGE) was down over 6.2% from 2012 levels.  These declines are a result of a variety of factors, including (a) increased competition within the Atlantic City market (*i.e.*, the opening of the Revel casino in April 2012, which resulted in decreased market share for the Debtors' properties, the significant property improvements made by the Golden Nugget in 2011, and the recent expansion and rebranding of Resorts Casino Hotel as Jimmy Buffet's Margaritaville), (b) competition from adjoining states (*i.e.*, the opening of casinos in Pennsylvania, Maryland, Delaware and New York), (c) the general economic decline in Southern New Jersey and surrounding areas, and (d) the change in spending patterns in the region due to decreased disposable income.  This decline is likely to be further exacerbated by, among other things, the legislative effort currently underway to legalize gambling in New Jersey outside of Atlantic City.

39.    Indeed, this market decline has resulted in significant over-supply in the Atlantic City casino market, as evidenced by the recently-announced closures or bankruptcies of several other casinos, including the Showboat Casino Hotel (the "Showboat"), the Atlantic Club, and, most notably, the Revel Casino Hotel (the "Revel") after less than two years in operation.

40.     Additionally, initial operational results following the Showboat and Revel closures suggest that the closures will result in decreased foot traffic to the north end of the boardwalk, where the Taj Mahal is located, and that any "bounce" for the Taj Mahal may be muted, non-existent or even negative as a result of the closures.

### iii.     *Lingering Effects of Superstorm Sandy and Other Storms*

41.     During late October 2012, an unusual mix of a hurricane and winter storm ("Superstorm Sandy") caused widespread property damage and flooding to numerous regions along the Eastern United States.  On October 27, 2012, in anticipation of Superstorm Sandy, the Governor of New Jersey ordered the closure of all businesses and the evacuation of Atlantic City, New Jersey.  On October 28, 2012, the DGE ordered the temporary suspension of all twelve Atlantic City gaming licenses.  The DGE vacated its order on November 2, 2012.  The Taj Mahal and the Plaza closed to the public on October 28, 2012.  Superstorm Sandy caused some physical damage to the Debtors' casinos, which were able to reopen on November 2, 2012.

42.     Furthermore, in June 2012, a fast moving, severe thunderstorm (derecho) tracked into the mid-Atlantic states.  Sections of Virginia, Maryland, Pennsylvania, Washington, DC, Delaware and southern New Jersey suffered overturned trees, roof damage and power outages.  Over 200,000 people in southern New Jersey lost power.

43.     Finally, in August 2011, Hurricane Irene made landfall in New Jersey and continued up the east coast.  Mandatory evacuation of certain of the Debtors' feeder markets began on August 24, 2011.  A state of emergency was declared for New Jersey on August 25, 2011 and a mandatory evacuation was ordered for Atlantic County shore communities.  Atlantic City casinos closed on August 26, 2011 and reopened with limited services on August 29, 2011.  The Taj Mahal and the Plaza sustained minimal physical damage.

44.    The Debtors' results of operations were negatively impacted due to the closure and the extensive damage sustained within its primary feeder markets in the Mid-Atlantic Region in the wake of these storms.  Additionally, as a result of the effects of Superstorm Sandy, the Debtors submitted a $14 million business interruption claim to its insurance company, but the insurance company has disputed this claim, and the Debtors cannot predict when (if at all) the payment will be recovered.

### iv.    *Disappointing Internet Gaming Results*

45.    As noted above, the Debtors became licensed to conduct online gaming in 2013. Initially thought to be a major boon to Atlantic City casino operators, actual results have thus far fallen short of expectations.

### v.    *Declining Performance*

46.    As a result of the foregoing, the Debtors have experienced significant EBITDA declines since their emergence from the prior bankruptcy cases.   EBITDA, including discontinued operations, for the 2013 fiscal year was negative $5.1 million.   The Debtors' gaming revenues declined from approximately $394.8 million in 2012 to approximately $330 million in 2013 (representing a 16.4% decline); hotel room revenues declined from approximately $73.3 million in 2012 to approximately $67.2 million in 2013 (representing an 8.3% decline); and food and beverage sales declined from approximately $57.1 million in 2012 to approximately $44.3 million in 2013 (representing a 22.5% decline).

47.    The Debtors' declining performance continued into 2014.  EBITDA, including discontinued operations, for the first six months of the 2014 fiscal year was negative $25.7

million.[4]  The Debtors' gaming revenues declined from approximately $164.6 million in the first half of 2013 to approximately $134.6 million in the first half of 2014 (representing an 18.2% decline); hotel room revenues declined from approximately $30.8 million in the first half of 2013 to approximately $30.2 million in the first half of 2014 (representing a 1.9% decline); and food and beverage sales declined from approximately $21 million in the first half of 2013 to approximately $16 million in the first half of 2014 (representing a 23.8% decline).

48.    Notably, while nearly all Atlantic City casinos reported a decline in net revenue across the board, the Debtors' casinos in particular have suffered greater revenue declines than their peers.  The Atlantic City casino industry has experienced an average annual decrease in net revenue of 4.7% over the past two fiscal years (as reported to the DGE), whereas the Plaza and Taj Mahal have experienced average annual net revenue decreases of 24.7% and 12.7%, respectively, over the same time period.

49.    Entering fiscal year 2014, the Debtors were optimistic that their strong brand name and the pent up gaming demand due to Superstorm Sandy would result in a meaningful earnings recovery.  Unfortunately, the first eight months of 2014 have resulted in EBITDA below management's projections, due to a variety of factors, including the abnormally cold 2014 winter weather, frequent snowstorms in the Mid-Atlantic United States, increased utility costs related to the cold, intense competition in the Atlantic City market and surrounding regional gaming markets, and current economic conditions in southern New Jersey and elsewhere.

---

[4]  This amount includes a $7.8 million expense related to Casino Reinvestment Development Authority asset donation.

### vi.    *Inflexible Cost Structure*

50.     The Debtors' flexibility in its cost structure is limited by high taxes and labor costs.  In July 2014, Atlantic City announced a *29% increase* in property tax rates.  Moreover, the CBAs covering the Debtors' businesses require pension plan contributions of approximately $5 million each year, coupled with $15 million in health, welfare and other benefit payments each year, thus imposing an unsustainable cost structure upon the Debtors given their current size and financial condition.

### vii.    *Default Notices and Third Party Litigation*

51.     In the weeks prior to the commencement of the Chapter 11 Cases, the Debtors were confronted with third-party litigation and notices of default with respect to certain of its material contracts.

### a.    *Online Gaming Agreements*

52.     On July 16, 2014 and July 30, 2014, Betfair purported to deliver written notices of default under the Betfair Online Gaming Agreement (though Betfair stopped short of terminating such agreement).  Thereafter, Betfair unilaterally took steps to sweep into a new bank account controlled by Betfair certain online gaming revenue collected by the Company pursuant to the Betfair Online Gaming Agreement, and, on September 4, 2014, Betfair purported to terminate the Betfair Online Gaming Agreement.

53.     Separately, on August 22, 2014, UG delivered a written notice of default under the UG Online Gaming Agreement.  Thereafter, through a letter dated September 3, 2014, UG purported to terminate the UG Online Gaming Agreement.

### b.    *Trademark Litigation*

54.    In connection with the Company's emergence from the 2009 Cases (as described below), on July 16, 2010, each of TER, TER Holdings and certain of its subsidiaries (collectively, the "Licensee Entities") entered into the Second Amended and Restated Trademark License Agreement (the "Trademark License Agreement") with Donald J. Trump and Ivanka Trump (the "Trump Parties"), which amended and restated the previous trademark license agreement that the Company had entered into with Mr. Trump in 2005.    Pursuant to the Trademark License Agreement, the Trump Parties granted the Licensee Entities a perpetual royalty-free license to use certain trademarks, service marks, names, domain names and related intellectual property associated with the name "Trump" and the Trump Parties in connection with TER Holdings' casino and gaming activities related to the Company's three then-existing casino properties in Atlantic City, New Jersey, subject to certain terms and conditions.    On July 1, 2011, the Licensee Entities entered into the First Amendment to the Trademark License Agreement, pursuant to which, among other things, that Trump Parties were replaced as "Licensors" with Trump AC Casino Marks LLC, a Delaware limited liability company.    Upon information and belief, Trump AC Casino Marks LLC is controlled by one or more of the Trump Parties.

55.    On August 5, 2014, Trump AC Casino Marks LLC commenced a lawsuit in state Superior Court in Atlantic County, New Jersey (Case No. C00005014), against the Company and the First Lien Agent (the "DJT Action") alleging various breaches of the Trademark License Agreement.    Plaintiff also seeks the imposition of a mandatory injunction to compel the Licensee Entities to cure the alleged breaches under the Trademark License Agreement or, in the

alternative, a declaratory judgment that the Trademark License Agreement has already terminated by reason of the alleged breaches.

56.     The Debtors dispute the assertions made in the DJT Action.  The termination of the Trademark License Agreement, or the entry of an injunction or similar order against any of the Licensee Entities, would constitute an event of default under the First Lien Credit Agreement and might otherwise have an adverse impact on the Debtors' businesses.

### c.     *Levine Staller Litigation*

57.     On August 5, 2014, the law firm that previously assisted the Company with respect to the Company's settlement of the real property tax assessments for the TER Casinos for the tax years 2008 through 2012, filed a motion with the Tax Court of New Jersey seeking to enforce an attorney's charging lien with respect to a $1.25 million contingency fee allegedly owed to the firm, and to issue a judgment and writ of execution in its favor against the assets of the Debtors.  On August 26, 2014, the Tax Court of New Jersey granted the motion, but limited its enforcement to just the proceeds of the tax settlement.  The Debtors may appeal that judgment, but in any event, believe that such "proceeds" no longer exist as they were fully expended in the Company's business.  The judgment constituted an event of default under the First Lien Credit Agreement, and the attachment of the Debtors' funds would further exacerbate the Debtors' liquidity position.

### G.     *Exploration of Strategic Alternatives*

58.     Collectively, the above factors have had a severe, negative impact on the Company's liquidity.  Due to the seasonality of the Debtors' businesses, the Debtors were unable to generate excess cash flows during the 2014 summer season sufficient to subsidize non-peak seasons, and the Debtors are now entering a period of several months where significant operating

losses are expected.  The Debtors missed their third quarter property tax payment, initially due on August 28, 2014, in the amount of $10.8 million (although that amount is disputed), and do not expect to have sufficient liquidity to make the $9.5 million interest payment due to the First Lien Lenders on September 30, 2014.

59.    On April 24, 2014, the Debtors' board of directors (the "Board") determined to explore strategic and restructuring alternatives that may be available to the Debtors.  The Board determined to proceed on a parallel track, whereby the Debtors and their professionals would undertake efforts to solicit third party investments in the Debtors while simultaneously engaging in discussions with its secured lenders concerning the possibility of a comprehensive balance sheet restructuring (either in or out of bankruptcy).  The Board also appointed a special sub-committee (the "Special Committee") to spearhead that effort.

60.    In May 2014, the Debtors retained Houlihan Lokey Capital Inc. ("Houlihan Lokey"), as financial advisor, to assist the Special Committee and the Board in identifying alternatives that may be available to the Debtors.  Houlihan Lokey contacted the Debtors' key stakeholders, including the Debtors' secured lenders, online gaming partners, significant equity holders and other parties-in-interest, in an attempt to gauge interest in an investment in, or a strategic transaction with, the Debtors.  However, none of the parties contacted expressed an interest in making an investment in or advancing credit to the Debtors or purchasing either of the Debtors' casinos.

### H.    *Plaza Closure*

61.    Over the past several years, the Plaza has experienced negative EBITDA, with performance worsening each year.  The Plaza experienced EBITDA losses of approximately $7.6 million and $11.8 million in 2012 and 2013, respectively, prior to deductions for unallocated

corporate costs.  Performance has continued to deteriorate in 2014 due to worsening market conditions.  Year-to-date through July 2014, the Plaza experienced EBITDA losses of approximately $9.6 million, which reflects an increase in losses of approximately $6.8 million over the same period from the prior year.  Moreover, the Plaza's cash burn rate is expected to dramatically increase once the summer season ends.  When combined with capital expenditures to maintain the property, these cash flow losses made the Plaza's ongoing operations unsustainable.

62.    Consequently, on August 8, 2014, the Board determined that a closure of the Plaza was necessary and in the best interests of the Debtors' enterprise as a whole.  In anticipation of that decision, on July 14, 2014, the Debtors issued notices pursuant to the Worker Adjustment and Retraining Notification Act, notifying Plaza employees of the expected closure of the Plaza.

63.    In order to complete the closure of the Plaza, on August 25, 2014, Plaza Associates filed a petition with the DGE, seeking declaratory rulings related to the termination of casino operations, including the surrender of its casino license and the amendment and surrender of its operation certificate and its internet gaming permit.  Thereafter, on August 29, 2014, the Debtors received the necessary conditional approvals from the DGE to close the Plaza.  The Debtors intend to cease operations at the Plaza on September 16, 2014.

## I.    *Discussions with the First Lien Lenders*

64.    Additionally, beginning in the Spring of 2014, the Debtors initiated discussions with their secured lenders, the First Lien Lenders, concerning the terms of a potential restructuring of the Debtors' capital structure.  To facilitate those discussions, the Debtors furnished extensive non-public financial and operational information to the First Lien Lenders

and their professionals.    In connection with those negotiations, the Debtors entered into a forbearance agreement with the First Lien Lenders, dated June 28, 2014 (the "Forbearance Agreement"), as subsequently amended on August 15, 2014 and August 20, 2014, pursuant to which the First Lien Lenders agreed to refrain from exercising certain rights and remedies related to certain defaults arising under the First Lien Credit Agreement.

**J.    *Discussions with Local 54 and Potential Closure of the Taj Mahal***

65.    In addition, the Debtors and their representatives initiated good faith negotiations with their largest union, Local 54.   However, to date, these negotiations have not yielded any consensual modifications to Local 54's CBA.   Specifically, representatives of the Debtors met with representatives of Local 54 and provided a proposal that would facilitate a feasible business plan premised upon certain modifications to be made to the CBA with Local 54.   The Company was subsequently informed by representatives of Local 54 that they were unwilling to make the proposed concessions.

66.    Additionally, as described above, initial results following the closure of the Showboat and the Revel indicate that the Taj Mahal may have significant difficulty in attracting activity to its section of the boardwalk, and any increase in revenue as a result of those closures may be offset by the decrease in foot-traffic at the northern end of the boardwalk.   In light of these results, the Debtors' limited liquidity and the stalled negotiations with Local 54, on September 5, 2014, the Board authorized the Company to issue notices pursuant to the Worker Adjustment and Retraining Notification Act, notifying its Taj Mahal employees of a potential closure of the Taj Mahal.   The Debtors expect to continue negotiations with Local 54.   Absent expense reductions, particularly concessions from their unions, the Debtors expect that the Taj

Mahal will close on or shortly after November 13, 2014 and that all operating units will be terminated between November 13, 2014 and November 27, 2014.

67.    Based on the foregoing, the Debtors determined to commence these Chapter 11 Cases.  The Debtors intend to utilize the Chapter 11 Cases in order to, among other things, (a) protect the Debtors' estates from the potential adverse impact to the Debtors' businesses resulting from certain third party litigation, (b) restructure outstanding indebtedness and claims, (c) seek to preserve the value of certain executory contracts that the Debtors may elect to assume, (d) attempt to address their cost structure by, among other things, reducing their labor costs, and (e) maximize value for the benefit of the Debtors' estates.

## II.    SUMMARY OF FIRST-DAY MOTIONS[5]

68.    As Chief Executive Officer of TER, I have formed opinions as to:  (a) the urgency and necessity for obtaining the relief sought by the Debtors in their First-Day Motions (including the exhibits attached thereto) listed on Exhibit B attached hereto and filed on the Petition Date; (b) the need for the Debtors to continue to effectively operate and, as seamlessly as possible, embark upon these Chapter 11 Cases; (c) the deleterious effects upon the Debtors and their estates if the Debtors do not obtain the relief requested in the First-Day Motions; and (d) the immediate and irreparable harm that the Debtors and their estates will be exposed to in the event that the Court does not approve such relief.  My opinions are based upon my first-hand experience as Chief Executive Officer of TER, my experience in the gaming industry, and as the result of my review of various materials and information and discussions with other personnel of

---

[5]  Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to such terms in the First-Day Motions, as applicable.

the Debtors and their professional advisors.  This Declaration is submitted in support of the Court's entry of orders approving the relief requested in the First-Day Motions.

69.     The relief sought in the First-Day Motions will minimize the adverse impact of these Chapter 11 Cases on, and preserve and maximize the value of, the Debtors' estates.  I believe that the relief sought is necessary and essential to enable the Debtors to operate effectively as debtors-in-possession.  The Debtors, in consultation with their professional advisors, carefully designed the relief requested so that the Debtors will not suffer any immediate and irreparable harm as a result of the commencement of these Chapter 11 Cases.

70.     Accordingly, for the reasons stated herein and in the First-Day Motions, I respectfully request that each of the First-Day Motions be granted in its entirety.  Set forth below are facts in support of the First-Day Motions, summarized for the convenience of the Court.

**A.** **Administrative First-Day Motions**

***i.*** ***Debtors' Motion for an Order, Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion")***

71.     The Debtors request entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only.  Given the integrated nature of the Debtors' operations, joint administration will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings and orders that will be filed in these Chapter 11 Cases will almost certainly affect each of the Debtors.  Among other things, the entry of an order directing joint administration of these Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections, and will allow the United States Trustee and all parties in interest to monitor these Chapter 11 Cases with greater ease and efficiency.

72.    Accordingly, on behalf of the Debtors, I respectfully request that the Joint Administration Motion be approved.

        ii.    ***Debtors' Application for an Order, Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f), and Local Rule 2002-1(f), Appointing Prime Clerk LLC as Clams and Noticing Agent, Nunc Pro Tunc to the Petition Date (the "Prime Clerk Retention Application".***

73.    The Debtors request entry of an order, pursuant to section 156(c) of title 28 of the United States Code, and Local Rule 2002-1(f), authorizing the retention and appointment of Prime Clerk LLC as claims and noticing agent in these Chapter 11 Cases.  I believe that the relief requested in the Prime Clerk Retention Application will ease the administrative burden on the Clerk of the Court in connection with these Chapter 11 Cases.  In addition, I have been advised by counsel that Prime Clerk's retention is required by the Local Rules in light of the anticipated number of creditors.

74.    Therefore, on behalf of the Debtors, I respectfully request that the Prime Clerk Retention Application be approved.

**B.    Operational First-Day Motions**

        i.    ***Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Setting a Final Hearing Related Thereto (the "Utilities Motion")***

75.    The Debtors request through the Utilities Motion the entry of interim and final orders, among other things: (a) prohibiting the Debtors' Utility Companies from altering, refusing, or discontinuing Utility Services on account of pre-petition invoices; (b) deeming the Utility Companies adequately assured of future payment; (c) establishing procedures for

determining additional adequate assurance of future payment and authorizing the Debtors to provide additional adequate assurance of future payment to the Utility Companies; and (d) setting a final hearing related to the relief requested in the Utilities Motion.

76.     The Utility Companies provide the Debtors with natural gas, heat, electricity, cable, telephone, internet connectivity, water, waste disposal and/or other similar services that the Debtors' facilities are dependent on.  Any interruption of the Utility Services would severely disrupt the Debtors' day-to-day operations and be extremely harmful to their business, as the Debtors' facilities need to be fully operational 24 hours a day in order to meet the needs of their casino and hotel customers.  Also, although the Debtors intend to cease normal business operations at the Plaza, the Debtors' continued receipt of certain of the Utility Services will nevertheless be essential to the maintenance of the Plaza and to ensure that the facility remains safe and secure.  Maintaining Utility Services will also be necessary to satisfy certain of the conditions imposed by the DGE, namely that the Debtors maintain security personnel at the Plaza for a period of time.

77.     In general, the Debtors have established a good payment history with many of their Utility Companies, making payments on a regular and timely basis.  The Debtors pay on average approximately $2.9 million per month on account of the Utility Services.  Approximately $950,000 of that amount is attributable to the Plaza and the remainder is attributable to the Taj Mahal.  To provide adequate assurance to the Utility Companies, as required under section 366 of the Bankruptcy Code, the Debtors propose to deposit a sum of $1,470,000, which represents 50% of the Debtors' estimated monthly cost of the Utility Services subsequent to the Petition Date, into a segregated account to be maintained during the pendency

of these Chapter 11 Cases in the manner provided for in the Proposed Interim Order and the Proposed Final Order.

78.    I believe and am advised that the Assurance Procedures are necessary, because if such procedures were not approved, the Debtors could be forced to address numerous additional adequate assurance requests by the Utility Companies in a disorganized manner during the critical first weeks of these Chapter 11 Cases.  Moreover, a Utility Company could unilaterally determine, on or after the 30th day following the Petition Date, that it is not adequately assured of future payment and discontinuing service or making an exorbitant demand for payment to continue service.

79.    Accordingly, on behalf of the Debtors, I respectfully request that the Utilities Motion be approved.

> ii.    *Debtors' Motion for an Order, Pursuant to Sections 105(a), 363(b), 507(a)(8), 541, 1107(a) and 1108 of the Bankruptcy Code, (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto (the "Taxes and Fees Motion")*

80.    The Debtors request authority to pay certain prepetition taxes and fees that, in the ordinary course of business, accrued or arose before the Petition Date.  In the ordinary course of business, the Debtors incur or collect certain Taxes and Fees and remit such Taxes and Fees to various Authorities.  Any failure to pay the Taxes and Fees could impair the Debtors' ability to continue their business operations.  Any unexpected or inopportune interruption of the Debtors' operations during the course of these Chapter 11 Cases could greatly diminish estate value and frustrate the Debtors' chapter 11 efforts.  In addition, certain of the Authorities may take precipitous action against the Debtors' directors and officers for certain unpaid Taxes and Fees

that undoubtedly would distract those individuals from their duties related to the Debtors' prosecution of these cases.  Finally, based on my knowledge and conversations with the Debtors' professional advisors, it is my understanding that certain of the Taxes and Fees are entitled to priority status under the Bankruptcy Code and, as a result, must be paid in full before any general unsecured obligations may be satisfied.

81.    Therefore, on behalf of the Debtors, I respectfully request that the Taxes and Fees Motion be approved.

> iii.    ***Debtors' Motion for an Order, Pursuant To Sections 105(a), 363 and 364 of the Bankruptcy Code, (I) Authorizing (A) Payment of Prepetition Obligations Incurred In the Ordinary Course of Business In Connection With Liability, Property, and Other Insurance Programs, Including Payment of Policy Premiums, and (B) Continuation of Insurance Premium Financing Programs; and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto (the "Insurance Motion")***

82.    The Debtors request the entry of an order authorizing, but not directing, the Debtors to (a) continue and, to the extent necessary, renew liability, property and other insurance programs and pay policy premiums arising thereunder or in connection therewith, including prepetition obligations arising in the ordinary course of business, and (b) continue the Debtors' insurance premium financing programs and renew or enter into new premium financing programs, as necessary, under substantially similar terms.

83.    In the ordinary course of business, the Debtors have maintained, and continue to maintain, a number of insurance programs for directors and officers, general liability, property, umbrella and crime.  Continuation of the Insurance Programs is essential for preserving the value of the Debtors' assets and, in most cases, such coverage is required by the various contracts and laws that govern the Debtors.  Furthermore, it is my understanding that, pursuant to the chapter

11 operating guidelines issued by the United States Trustee for Region 3 pursuant to 28 U.S.C. § 586, the Debtors are obligated to maintain certain insurance coverage, which coverage is provided by the policies included in the Insurance Programs.

84.      Because it is not economically advantageous for the Debtors to pay the premiums on each of their Insurance Programs on an annualized basis, from time to time, in the ordinary course of business, the Debtors finance the premiums on certain of the Insurance Programs.  If the Debtors are unable to continue making payments under the PFAs, First Insurance may be permitted to terminate the Financed Programs.  The Debtors would then be required to obtain replacement insurance on an expedited basis and likely at a significantly increased cost.

85.      Accordingly, on behalf of the Debtors, I respectfully request that the Insurance Motion be approved.

> **iv.      *Debtors' Motion for Entry of Interim and Final Orders, Pursuant To Sections 105(a), 363(b), 503(b), 1107(a) and 1108 of the Bankruptcy Code, (I) Authorizing the Debtors to Pay Certain Prepetition Claims (A) Arising Under the Perishable Agricultural Commodities Act, (B) of Lien Vendors, (C) Arising Under Section 503(b)(9) of the Bankruptcy Code and (D) of Critical Vendors and Service Providers, (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto and (III) Granting Certain Related Relief (the "Vendor Motion")***

86.      Through the Vendor Motion, the Debtors request authority, in their discretion, to pay, in the ordinary course of business, (a) prepetition claims (i) arising under PACA or PASA, (ii) upon which a lien may arise as a result of a mechanic's lien, artisan's lien, materialman's lien or any other similar lien, and (iii) of certain critical vendors and service providers, and (b) claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

87.      The Debtors rely on several vendors which supply the Debtors with, among other things, fruits and vegetables protected by PACA, and these vendors may be eligible to assert

PACA claims, in priority ahead of all other creditors in these Chapter 11 Cases.  The Debtors also regularly use service providers to repair, maintain, and improve their properties.  These vendors could potentially assert liens against the Debtors' property for amounts that the Debtors owe to them.  In addition, the Debtors have received certain goods within the twenty-day period prior to the Petition Date that may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.  Finally, to maintain consistency, the Debtors rely heavily on a number of key vendors that supply the Debtors with goods and services that are critical to the Debtors' business.  It is essential that the Debtors are able to maintain their business relationships with, and honor outstanding payment obligations to, these key vendors given the role that they play in the Debtors' business.

88.    The goods and services provided by the Vendors are necessary to ensure that there are not any unexpected or inopportune interruptions to the Debtors' operations, because the Vendors are the most cost-efficient and, in many cases, the only source from which the Debtors can procure critical goods and services within a timeframe that would permit the Debtors to avoid unanticipated interruptions, delays or shutdowns in operations.  Any failure to pay the Vendor Claims would, in the Debtors' business judgment, result in the Vendors refusing to provide necessary goods and services to the Debtors.  Any unexpected or inopportune interruption, delay or shutdown in the Debtors' operations resulting from a refusal by the Vendors to do business with the Debtors on a post-petition basis would have disastrous effects on the Debtors' business and undermine the Debtors' ability to preserve and maximize the value of their estates.

89.    Moreover, the PACA/PASA Vendors will be eligible to assert PACA/PASA Claims, likely granting them priority ahead of all other secured, priority and unsecured creditors

in these Chapter 11 Cases, and the Lien Vendors may assert and perfect construction, materialman's, mechanic's or other similar statutory liens on the Debtors' assets, thereby jeopardizing the Debtors' ability to prosecute these Chapter 11 Cases in a timely and efficient manner.  Also, the Debtors' payment of the 503(b)(9) Claims merely affects the timing of such payments, and not the amount to be received by the 503(b)(9) Vendors on account of their claims which, based on my knowledge and conversations with the Debtors' professional advisors, are afforded administrative expense priority under section 503(b)(9) of the Bankruptcy Code.  With respect to the Critical Vendor Claims, the Debtors have reviewed their accounts payable and undertaken a process to identify those vendors which are essential to avoid any unexpected or inopportune interruptions to their operations.  I believe that the authority to pay the Critical Vendor Claims is vital to their efforts to preserve and maximize the value of their estates.

90.    Therefore, on behalf of the Debtors, I respectfully request that the Vendor Motion be approved.

        *v.*    ***Debtors' Motion for an Order, Pursuant To Sections 105(a), 363(c), 503(b)(1), 1107(a), and 1108 of the Bankruptcy Code, Authorizing (I) the Debtors to Honor Prepetition Obligations Related to Customer Programs and Otherwise Continue Customer Programs In the Ordinary Course of Business and (II) Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto (the "Customer Programs Motion")***

91.    The Debtors request the authority, in their discretion, to continue, maintain, implement new, and/or terminate, and to pay, honor, and otherwise satisfy prepetition obligations related to, their prepetition customer practices and programs, in the ordinary course of business and in a manner consistent with past practice through the Customer Programs Motion.  In an effort to attract new customers and to earn and maintain the goodwill and loyalty of their existing customers, the Debtors over the course of time have developed the Customer Programs.

Honoring and supporting the Customer Programs will enable the Debtors to retain, maintain, and create valuable customer relationships, which will strengthen the Debtors' business and their prospects for successfully prosecuting these Chapter 11 Cases. The necessity of the Customer Programs in the Debtors' highly competitive industry cannot be overstated and many of the programs are standard practice. If the Debtors' obligations under the Customer Programs cannot be honored in the ordinary course of business, it is likely that the Debtors' customers would choose to go elsewhere, thereby adversely impacting the Debtors' business and thus their ability to maximize the value of their assets.

92.     The Debtors cannot risk even the perception that their business during these Chapter 11 Cases will offer anything but high quality casino entertainment and hospitality experiences to their customers. To that end, absent the ability to satisfy the Trump One and Room Account Vendor Claims, the Debtors run the significant risk that the Trump One Vendors and Room Account Vendors will refuse, among other things, to honor Comp Dollars and allow Room Charges. Such a result would adversely impact the Debtors' customers' overall experience by significantly limiting (or potentially eliminating) the options available to redeem Comp Dollars and have convenient access to restaurants, retail stores and beauty salons. Simply put, the Debtors are not the only choice in Atlantic City for gaming or entertainment and thus, any impairment of the customers' overall experience will adversely affect the Debtors' efforts to maximize the value of their assets for the benefit of all stakeholders.

93.     Accordingly, on behalf of the Debtors, I respectfully request that the Customer Programs Motion be approved

> ### vi. Debtors' Motion for an Order, Pursuant to Sections 105(a), 345, 363, 1107(a) and 1108 of the Bankruptcy Code, Bankruptcy Rule 2015, and Local Rule 2015-2, (I) Authorizing and Approving Continued Use of Cash Management System, (II) Authorizing Use of Prepetition Bank Accounts and Business Forms, (III) Authorizing Payments of Prepetition Costs and Fees Associated With Customer Credit and Debit Card Transactions, (IV) Waiving the Requirements of Section 345(b) on an Interim Basis, (V) Granting Administrative Expense Status to Post-Petition Intercompany Claims, and (VI) Granting Certain Related Relief (the "Cash Management Motion")

94.     Through the Cash Management Motion, the Debtors request the authority to, among other things: (a) continue to use their Bank Accounts; (b) treat such accounts for all purposes as accounts of the Debtors as debtors in possession; (c) open new debtor-in-possession accounts, if needed; and (d) use, in their present form, all correspondence and business forms existing immediately before the Petition Date, without reference to the Debtors' status as debtors-in-possession.   In addition, the Debtors request that the Court authorize the Cash Management Banks to: (a) to continue to service and administer the Bank Accounts as accounts of the Debtors as debtors-in-possession; (b) receive, process, honor, and pay any and all checks, drafts, wires, or other electronic transfer requests issued, payable through, or drawn on, the Bank Accounts after the Petition Date by the holders or makers thereof or other parties entitled to issue instructions with respect thereto, as the case may be; and (c) debit from the Bank Accounts ordinary course of business bank fees and charges.  The Debtors also seek authority to pay or otherwise satisfy prepetition obligations on account of the Card Processing Fees, and to allow pre-petition chargebacks to be taken by the Processors against post-petition deposits to the Card Depository Accounts.

95.     In the ordinary course of business, the Debtors utilize a centralized cash management system with respect to the Hotel Properties and with respect to TER Holdings.  The

Debtors seek authority to continue utilizing the Cash Management System because it is critical that they be able to consolidate management of cash and centrally coordinate transfers of such funds in order to efficiently and effectively operate their business.  Maintenance of the existing system will prevent undue disruption to the Debtors' operations while protecting their cash for the benefit of their estates.  Requiring the Debtors to change the Cash Management System at this critical time would cause unnecessary disruption to the Debtors and their business affairs.

96.     The Cash Management System provides significant benefits to the Debtors, including the ability to:  (i) closely track, and thus control, all corporate funds; (ii) ensure cash availability; and (iii) reduce administrative expenses.  The Debtors will ensure that appropriate procedures are in place so that checks issued prior to the Petition Date, but presented after the Petition Date, will not be honored absent approval from the Court.  The Debtors will also maintain records of post-petition transfers within the Cash Management System, so that transfers and transactions will be documented in their books and records to the same extent such information was maintained to the Petition Date.  Only if the Bank Accounts are continued in their current form can the Debtors proceed through chapter 11 efficiently and cost-effectively.

97.     Furthermore, if enforced, the U.S. Trustee Guidelines would cause significant disruption to the Debtors' business and impair their chapter 11 efforts.  I believe that maintaining the Bank Accounts is necessary to avoid delays in paying debts incurred post-petition, and to ensure as smooth a transition to chapter 11 as possible.  If the Debtors are required to transfer their existing bank accounts, it will be disruptive, time consuming, and expensive.  Also, if the Debtors were required to change their correspondence and business forms, it would be costly and disruptive.

98.     Finally, the success of the Debtors' chapter 11 efforts is dependent upon, among other things, the ability to process customer credit and debit card transactions.  The ability to pay the Card Processing Fees, including any related pre-petition amounts, is critical to the successful prosecution of these Chapter 11 Cases, as any inability to continue to satisfy pre-petition obligations with respect to such fees I believe threatens the Debtors' ability to maximize value.

99.     Therefore, on behalf of the Debtors, I respectfully request that the Cash Management Motion be approved.

> **_vii.      Debtors' Motion for an Order, Pursuant to Sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of the Bankruptcy Code, (A) Authorizing (I) Payment of Prepetition Employee Wages, Salaries and Other Compensation; (II) Reimbursement of Prepetition Employee Business Expenses; (III) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (IV) Payment of Workers' Compensation Obligations; (V) Payments for Which Prepetition Payroll Deductions Were Made; (VI) Payment of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (VII) Payment to Third Parties of All Amounts Incident to the Foregoing Payments and Contributions and (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto (the "Employee Wages Motion")_**

100.    The Debtors request the authority, in their discretion, to pay prepetition claims, honor obligations, and to continue programs, in the ordinary course of business, on account of the Employee Wages and Benefits.

101.    As of August 30, 2014, the Debtors employed: 2,963 employees at the Taj Mahal, of which approximately 2,000 were full-time, and the remainder of which were part-time, seasonal, on call or on a leave of absence; 1,105 employees at the Plaza, of which 766 were full-time, and the remainder of which were part-time, seasonal, on call or on a leave of absence; 138 employees that serve in an administrative capacity supporting the Debtors' operations at the Taj Mahal and the Plaza, of which 128 were full-time, and the remainder of which were part-time,

seasonal, on call or on a leave of absence; and eight employees that serve at the executive and management level for the Debtors and which are employed by TER Holdings.  The Debtors also supplement their workforce with certain independent contractors.

102.    However, as previously discussed, the Debtors issued notices pursuant to the Worker Adjustment and Retraining Notification Act to the Trump Plaza Employees on July 14, 2014, and subsequent to the Petition Date, the Debtors intend to cease normal business operations at the Plaza.  Although the Debtors' continued employment of certain of the Trump Plaza Employees will be essential to the maintenance and the orderly wind-down of the Plaza, to ensure that the facility remains safe and secure subsequent to its closing, and to satisfy certain of the conditions imposed by the DGE, the number of Trump Plaza Employees will decrease significantly once normal operations have ceased at the Plaza.

103.    The vast majority of the Employees rely exclusively on their full compensation or reimbursement of their wages or expenses to continue to pay their daily living expenses, and these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to pay the Unpaid Wages and Reimbursable Expenses.  Additionally, if the Debtors are unable to pay or otherwise honor the Employee Wages and Benefits, the morale and loyalty of the Employees will be jeopardized at a time when such support is critical to, among other things, the Debtors' chapter 11 efforts and ability to effectively prosecute these Chapter 11 Cases.  The Employees have an intimate knowledge of the Debtors' infrastructure and operations, and any deterioration in the Employees' morale and welfare at this critical time undoubtedly would adversely impact the Debtors and the success of these Chapter 11 Cases.  Finally, maintaining the Workers' Compensation Program is justified because applicable state law mandates this coverage, and the risk that eligible claimants will not receive timely payments with respect to

employment-related injuries could have a devastating effect on the financial well-being and morale of the Employees and their willingness to remain in the Debtors' employ.

104. Accordingly, on behalf of the Debtors, I respectfully request that the Employee Wages Motion be approved.

### ***viii. Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 362 and 541 of the Bankruptcy Code, Establishing Notification Procedures for Transfers of or Claims of Worthless Stock Deductions with Respect to Common Stock (the "NOL Motion")***

105. Through the NOL Motion, the Debtors request entry of an order establishing notification procedures that must be satisfied before certain transfers of, or claims of worthless stock deductions with respect to, equity securities in TER or of any Beneficial Ownership thereof are deemed effective.

106. The Debtors have incurred significant NOLs, which may have substantial future value to the Debtors' successors (and, indirectly, to the estates). Specifically, the Debtors estimate that as of December 31, 2013 they will have total federal NOL carryovers of approximately $450 million and New Jersey NOL carryovers of approximately $840 million, which would expire on a rolling basis beginning in 2029. Based upon current federal and New Jersey income tax rates, such estimated NOL carryovers, subject to certain restrictions and limitations, could provide significant future federal and state cash tax savings.

107. The problem facing the Debtors, which the NOL Motion seeks to resolve, is that unrestricted trading of TER's Common Stock and claims of worthlessness with respect to TER's Common Stock could severely limit or even eliminate the Debtors' ability to use such NOLs. I have been informed that under section 382 of the Internal Revenue Code of 1986, as amended,

the Debtors' ability to use their NOLs as well as certain other tax credits will be severely limited

if and when TER undergoes an "ownership change" for purposes of section 382 of the IRC.

108.     Accordingly, in order to protect the Debtor's ongoing ability to make use of the

NOLs, on behalf of the Debtors, I request that the NOL Motion be approved.

> ix.      ***Debtors' Motion for Interim and Final Orders (A) Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection to the Secured Parties, (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b), and (D) Granting Related Relief (the "Cash Collateral Motion")***

109.     Through the Cash Collateral Motion, the Debtors request entry of an order:

(a) authorizing the Debtors to use Cash Collateral; (b) providing adequate protection with respect

to the diminution in value, if any, of the interests of the Secured Parties as may result from the

use of Cash Collateral; (c) scheduling, pursuant to Bankruptcy Rule 4001, a Final Hearing

granting the relief requested in the Cash Collateral Motion on a final basis pursuant to a Final

Order; and (d) granting related relief.

110.     The Debtors require immediate access to Cash Collateral to ensure that they are

able to continue the operation of their businesses.  To date, the Debtors have been unable to

obtain commitments for postpetition financing, such that the Cash Collateral is the Debtors' sole

source of funding for their operations and the costs of administering the chapter 11 process.

Absent authority to immediately use Cash Collateral, the Debtors would suffer irreparable harm

because the Debtors would immediately cease operations, which, in turn, would cause an

immediate and pronounced deterioration in the value of the Debtors' business.  Thus, the

Debtors' access to Cash Collateral is absolutely necessary to preserve and maximize value for

the benefit of all of the Debtors' stakeholders.  The Debtors believe that they will be able to

satisfy the operational expenses of the Debtors and the administrative costs associated with these Chapter 11 Cases during the Budget period.

111.     Access to existing Cash Collateral on an interim basis will provide the Debtors with the liquidity necessary to ensure that the Debtors have sufficient working capital and liquidity to operate their business and thus preserve and maintain the going concern value of the Debtors' estates.  Without such access to liquidity, the Debtors' ability to navigate through the chapter 11 process will be jeopardized, to the detriment of the Secured Parties and all of the Debtors' other stakeholders.  As a result, the Debtors have an immediate need to use Cash Collateral to ensure sufficient liquidity throughout the pendency of these Chapter 11 Cases.

112.     For the reasons noted above, the Debtors have determined, in the exercise of their sound business judgment, that they require the use of Cash Collateral for the maintenance, preservation and operation of their businesses, the expenses relating thereto, and the expenses of administering these estates.  Entry of the proposed Interim Order is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

113.     Accordingly, on behalf of the Debtors, I respectfully request that the Cash Collateral Motion be approved.

*Remainder of page intentionally left blank*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: September 9, 2014

By: _____
    Robert Griffin
    Trump Entertainment Resorts, Inc.
    Chief Executive Officer

# **EXHIBIT A**

Organizational Structure



**EXHIBIT B**

1.   Debtors' Motion for an Order, Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases

2.   Debtors' Application for an Order, Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f), and Local Rule 2002-1(f), Appointing Prime Clerk LLC as Clams and Noticing Agent, *Nunc Pro Tunc* to the Petition Date

3.   Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Setting a Final Hearing Related Thereto

4.   Debtors' Motion for an Order, Pursuant to Sections 105(a), 363(b), 507(a)(8), 541, 1107(a) and 1108 of the Bankruptcy Code, (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto

5.   Debtors' Motion for an Order, Pursuant to Sections 105(a), 363 and 364 of the Bankruptcy Code, (I) Authorizing (A) Payment of Prepetition Obligations Incurred In the Ordinary Course of Business In Connection With Liability, Property, and Other Insurance Programs, Including Payment of Policy Premiums, and (B) Continuation of Insurance Premium Financing Programs; and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto

6.   Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 503(b), 1107(a) and 1108 of the Bankruptcy Code, (I) Authorizing the Debtors to Pay Certain Prepetition Claims (A) Arising Under the Perishable Agricultural Commodities Act, (B) of Lien Vendors, (C) Arising Under Section 503(b)(9) of the Bankruptcy Code and (D) of Critical Vendors and Service Providers, (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto and (III) Granting Certain Related Relief

7.   Debtors' Motion for an Order, Pursuant to Sections 105(a), 363(c), 503(b)(1), 1107(a), and 1108 of the Bankruptcy Code, Authorizing (I) the Debtors to Honor Prepetition Obligations Related to Customer Programs and Otherwise Continue Customer Programs In the Ordinary Course of Business and (II) Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto

8.   Debtors' Motion for an Order, Pursuant to Sections 105(a), 345, 363, 1107(a) and 1108 of the Bankruptcy Code, Bankruptcy Rule 2015, and Local Rule 2015-2, (I) Authorizing and Approving Continued Use of Cash Management System, (II) Authorizing Use of Prepetition Bank Accounts and Business Forms, (III) Authorizing Payments of Prepetition Costs and Fees Associated With Customer Credit and Debit Card Transactions, (IV) Waiving the Requirements of Section 345(b) on an Interim Basis, (V)

Granting Administrative Expense Status to Post-Petition Intercompany Claims, and (VI) Granting Certain Related Relief

9.      Debtors' Motion for an Order, Pursuant to Sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of the Bankruptcy Code, (A) Authorizing (I) Payment of Prepetition Employee Wages, Salaries and Other Compensation; (II) Reimbursement of Prepetition Employee Business Expenses; (III) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (IV) Payment of Workers' Compensation Obligations; (V) Payments for Which Prepetition Payroll Deductions Were Made; (VI) Payment of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (VII) Payment to Third Parties of All Amounts Incident to the Foregoing Payments and Contributions and (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto

10.     Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 362 and 541 of the Bankruptcy Code, Establishing Notification Procedures for Transfers of or Claims of Worthless Stock Deductions with Respect to Common Stock

11.     Debtors' Motion for Interim and Final Orders (A) Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection to the Secured Parties, (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b), and (D) Granting Related Relief