## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| TRUMP ENTERTAINMENT | ) | Case No. 14-12103(KG) |
| RESORTS, INC., *et al.*, | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | **Re Dkt No. 134** |

## <u>OPINION</u>

## INTRODUCTION

On September 9, 2014 (the "Petition Date"), Trump Entertainment Resorts, Inc., and its affiliated Debtors, including Trump Taj Mahal Associates, LLC (the "Debtors") filed for bankruptcy pursuant to Chapter 11 of the Bankruptcy Code. The Debtors have now filed Debtors' Motion for Entry of an Order (I) Rejecting Collective Bargaining Agreement Between, Trump Taj Mahal Associates, LLC and UNITE HERE Local 54, Pursuant to 11 U.S.C. § 1113(c) and (II) Implementing Terms of the Debtors' Proposal under 11 U.S.C. § 1113(b) (the "Motion"), filed on September 26, 2014. D.I. 134. Hereafter, the Court will refer to the November 11, 2011, collective bargaining agreement as "the CBA," Trump Taj Mahal Associates, LLC as "Taj Mahal," UNITE HERE Local 54 as the "Union," and the Proposal by Taj Mahal to the Union, dated September 17, 2014, as amended on October 10, 2014, as the "Proposal." The Motion reflects the Debtors' claim that Taj Mahal cannot maintain its labor costs given its financial extremis and that Debtors will be forced to liquidate if the Court does not grant the request to reject the CBA.

The Court conducted an evidentiary hearing on October 2, 2014 and October 14, 2014, at which Debtors presented witnesses and introduced numerous exhibits in support of the Motion[1].  The Union cross examined the Debtors' witnesses and introduced a few exhibits into evidence, but did not call any witnesses on its behalf.

## JURISDICTION AND VENUE

The Court's jurisdiction to consider the Motion is premised upon 28 U.S.C. §§ 157 and 1334; this is a core matter pursuant to 28 U.S.C. § 157(b)(2); and venue lies in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTS

The Court makes the following factual findings, which are uncontroverted except as noted.

Debtors operated two casinos, now one casino in Atlantic City, New Jersey.  While for many years the Atlantic City casinos enjoyed little competition for gambling and related recreational activities on the East Coast of the United States, times have changed dramatically.  Surrounding states now permit casino gambling and there is an online gambling industry.  The Atlantic City casinos have seen their revenues fall by approximately half since 2006, and three casinos out of twelve are now closed. Ex. 1.  One of the three closed is Trump Plaza Hotel and Casino, which the Debtors operated through Debtor Trump Plaza Associates, LLC.  Since 2011, Debtors' EBITDA has fallen from $32

---

[1] The Court will reference the transcript of the October 2, 2014 hearing as "10/2 Tr.," and the October 14, 2014 continued hearing as the "10/14 Tr.."

million to negative $6.1 million in 2013, with last twelve months EBITDA of negative $25.7 million as of June 30, 2014. The Debtors' financial situation is desperate. Not only are their losses large, but they have been unable to obtain debtor in possession financing for their bankruptcy cases and are operating with cash collateral. Debtors' cash will run out in less than two months. The Debtors have taken steps to reduce their severe losses. They have sold significant assets to raise much needed cash and to reduce their obligations, and they have closed the Trump Plaza Hotel and Casino. 10/2 Tr. 22-24.

The Motion at issue pertains solely to Taj Mahal, which operates the Taj Mahal Casino Hotel, which the Court will refer to as the "Casino." The Casino is at the North End of the famous boardwalk. The Casino is situated on 35.9 acres of beachfront property. It has over 2,000 hotel rooms, five cocktail lounges, approximately 162,0000 square feet of space for gaming, a large entertainment complex, a gentlemen's club, an exhibition hall, other recreational facilities, several restaurants and parking for almost 7,000 cars, plus a bus terminal and roof-top helipad. Ex. 1.

William H. Hardie of Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), Debtors' investment banker, testified in support of the Motion. The Court qualified Mr. Hardie as an expert witness and he also testified as a fact witness. The Debtors, through Mr. Hardie, provided the Court with extensive financial data on the Debtors, including Taj Mahal. Ex. 1, Ex. 5, 10/2 Tr. 22-24. The evidence confirmed the Debtors' serious losses. From 2012 to 2013, gaming revenues declined 16.4%; hotel room revenues declined 8.3%; and food and beverage sale revenues declined 22.5%. Ex. 1, Attachment E. The trend continued

into the first six months of 2014.  Additionally, Debtors' casinos performed worse than other casinos.  For Taj Mahal individually, EBITDA declined from a positive $37.3 million for fiscal year 2011 to a negative $5.3 million for the last twelve months.  *Id.* As of September 5, 2014, Debtors' available working capital cash for its operations was limited to approximately $12 million, which will permit Debtors to operate less than two months – and then, only without paying interest on its secured debt of approximately $286 million. 10/2 Tr. 22.  The pension costs alone are $75,000 per week.  10/2 Tr. 24.  Mr. Hardie, whose testimony the Court finds was highly credible and was based upon his expertise and specific knowledge of the details of Debtors' finances and operations, testified without qualification that Debtors must have relief from the CBA without which they can not avoid closing the Casino and liquidating their businesses. 10/14 Tr. 142.  Mr. Hardie further testified that the situation is so grim that without the Court granting the Motion and Debtors obtaining other concessions, Debtors would have to give notice to the New Jersey Department of Gaming Enforcement not later than October 20, 2014, that Taj Mahal will close the Casino. 10/14 Tr. 149.  These concessions include: savings from the payments to employees under the CBA of $14.6 million per year; assistance from the first lien secured creditor in the form of converting $286 million of outstanding secured debt and making an equity investment of $100 million; property tax relief from Atlantic City and the State of New Jersey; and $25 million of tax credits[2].  Mr. Hardie also testified that all of these

---

[2]  The tax concessions are a work-in-progress with Debtors seeking alternatives to the original requests of Atlantic City and the State of New Jersey.

concessions are necessary to avoid liquidation.  10/14 Tr. 139-40, 148-50.

Taj Mahal has 2,953 employees working at the Casino, 2,041 of whom are full time and the remainder are part-time, seasonal or temporary employees. 1,486 of the employees are non-unionized and 1,467 are unionized.  The Union is the largest of the employee unions, and is a party to the CBA, with 1,136 Taj Mahal employees under its umbrella. Ex. 2.

The evidence, which again is uncontroverted, is that Taj Mahal is on the brink of running out of cash to fund its operations and its financial health is poor and deteriorating. 10/14 Tr. 136.  Mr. Hardie's testimony is unequivocal – the onerous terms of the CBA must be changed to avoid liquidation.  Such closure would mean all employees will lose their jobs and, of course, salary and benefits.  Under the terms of the CBA, Debtors are required to make pension contributions of more than $4 million every year, and $12 million to $15 million per year in health and welfare contributions.  The payments applicable to Taj Mahal are $3.5 million for  pension contributions and $10 to $12 million for the health and welfare contributions.  The Debtors have also incurred potential liabilities to the pension fund of nearly $197 million for withdrawal because the fund is underfunded.  Exs. 2, Attachment A, 3.

Faced with the financial pressures of the CBA, Debtors made a determined effort to engage the Union in discussions.  The testimony of Mr. Hardie and Craig Keyser, Debtors' lead negotiator for the collective bargaining agreements, and the documents admitted into evidence reveal the following attempts and the Unions's response.  The correspondence

5

admitted into evidence is alarming in showing the Debtors were literally begging the

Union to meet while the Union was stiff-arming the Debtors.

- By letter, dated March 7, 2014, Debtors asked the Union to begin negotiations for a new CBA which was due to expire in September 2014. The Union responded that it was not ready and would "contact you within the next several months." Ex. 2, Attachments B, C & D.

- In June 2014, Debtors through Mr. Keyser, again asked to and did meet with the Union. The Union told Debtors that it would instead negotiate with two other casino operators.  10/2 Tr. 63.

- On August 20, 2014, at Debtors' request, the Debtors and Mr. Hardie met with the Union to discuss terms for a new CBA.  Although Debtors described the worsening financial situation for Taj Mahal, the Union was not receptive to negotiations.

- The Debtors again requested a meeting with the Union and a meeting was held on August 28, 2014, between the Debtors, including Mr. Hardie, and the Union.  At the meeting, Debtors proposed modifications to the CBA.  The Debtors' proposal included elimination of the pension contributions to be replaced by a 401k program; and substituting the health and welfare program with (Affordable Care Act) Obamacare coverage which Debtors would subsidize.  On September 3, 2014, the Union responded that it was prepared to work with Debtors on the pension but not on the health and welfare proposal.

- Debtors and the Union met again on September 24 and 30, 2014.  The Union requested additional information from Debtors which Debtors promptly provided.  10/14 Tr. 23, Ex. 22, Ex. 25, Ex. 29.  Debtors had created a data room for the Union, which the Union utilized only briefly.  Indeed, the Union stipulated at the hearing that Debtors fully and promptly responded to all requests for information.

- On October 3, 2014, the Debtors again requested another bargaining session with the Union.  The Union advised Debtors that it was not available to meet until October 10, 2014, and then only for four hours, this despite the hearing on the Motion scheduled for October 14, 2014. Ex. 24. At this meeting, the Union raised for the first time the possibility of a new pension program but without documents or more information.  The Union also made counterproposals concerning several of Debtors' work related proposals, and asked Debtors for additional information.

It is significant that while Debtors were imploring the Union to engage with them in discussions, offering to meet "24/7" (10/14 Tr. 28), the Union was engaging in picketing, a program of misinformation (Exs. 38-43) and, most egregiously, communicating with customers who had scheduled conferences at the Casino to urge them to take their business elsewhere (Ex. 44-47).  It is thus clear that the Union was not focusing its efforts on negotiating to reach agreement with Debtors.

The Proposal (which contains some work-related concession by the Debtors, 10/14 Tr. 136) for a new or modified CBA is as follows (Exs. 10, 11, 12, 35, see Attachment A hereto):

| Proposals | Annual Savings |
|---|---|
| Pension Termination<br>*(replaced by 401k with some matching)* | $3.7 million |
| Amended Health and Welfare Benefit<br>*(utilizing Obamacare coverage, Debtors providing $2,000 subsidy)* | $5.1 million |
| Work Rule Changes | $5.8 million |
| **Total Savings** | **$14.6 million** |

It was not until the October 10 meeting that the Union provided Debtors with a partial counter proposal for further discussion, and a series of questions and requests for information. 10/14 Tr. 47, 137-138. They did so knowing that the hearing on the Motion was scheduled to take place in four days and that Debtors were obligated to advise the New Jersey Division of Gaming Enforcement immediately thereafter if they intended to close. The Casino would close unless agreement could be reached on the terms of the CBA or, in the absence of a negotiated agreement, the Court approved rejection.

Debtors have filed a Chapter 11 Plan of Reorganization with the Court (D.I. 165) and Disclosure Statement (D.I. 166). The Plan is contingent on the rejection of the CBA, property tax relief, the conversion of the secured creditor's debt to equity and a capital infusion from the secured creditor of $100 Million. The secured creditor has made it clear that it will perform only if the CBA and tax relief contingencies are achieved because the business will not succeed without the relief. Debtors' reorganization is therefore dependent on rejection of the CBA and the other required relief.

## DISCUSSION

A debtor's assumption or rejection of a collective bargaining agreement is governed entirely by Section 1113 of the Bankruptcy Code. Such action is permissible "only in accordance with the provisions of [Section 1113]." The first question the Court must address in this case is whether Debtors have the authority to reject an expired collective bargaining agreement. Here, the CBA expired on September 14, 2014, after the Petition Date but before Debtors filed the Motion. If the Court determines that the Debtors have

such authority, the Court's analysis will turn to whether the Debtors have satisfied the requirements delineated in Sections 1113(b), and (c) of the Bankruptcy Code.

## A.  The Court's Authority Post-Expiration of the CBA

As an initial matter, the Court must determine whether it has jurisdiction to decide the Debtors' Motion. It is undisputed that the CBA expired by its own terms on September 14, 2015, just five days after the Petition Date.  The Debtors filed the Motion on September 26, 2014.

Under the National Labor Relations Act ("NLRA"), employers are required to maintain the *status quo* after the expiration of a collective bargaining agreement while the employer and the union negotiate the terms of a new collective bargaining agreement. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198 (1991) (citing 29 U.S.C. §§ 158(a)(5), (d)). In most instances, the *status quo* is defined by the terms of the expired collective bargaining agreement. "[A]n employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment." *Id.* Here, the Debtors do not assert that they have bargained to an impasse with the Union over a new agreement. So, the parties' relationship continues to be governed by most, if not all, of the terms of the recently expired CBA. For example, the Debtors are still required to make pension fund contributions on behalf of union employees and provide health insurance to union employees, both obligations defined by the CBA.

The Union argues that the Debtors' obligations under the expired CBA which remain in effect are statutory, as opposed to contractual, in nature because they arise only

by virtue of the Debtors' *status quo* obligations under the NLRA. Since Section 1113 only provides for rejection of a collective bargaining agreement, i.e. an executory contract, the Union argues that this Court has no authority to approve an application to reject the Debtors' statutory *status quo* obligations. The Union concludes that since the Bankruptcy Code provides no mechanism to alter the Debtors' statutory *status quo* obligations, the Court must defer to the National Labor Relations Board's ("NLRB") exclusive jurisdiction on these matters.

Courts are divided on the question of whether Section 1113 applies in a situation where a collective bargaining agreement has expired but the terms of the agreement remain in effect by virtue of the employer's *status quo* obligations under the NLRA. Compare *San Rafael Baking Co. v. N. California Bakery Drivers Sec. Fund (In re San Rafael Baking, Co.)*, 219 B.R. 860 (B.A.P. 9th Cir. 1998), *In re Hostess Brands, Inc.*, 477 B.R. 378 (Bankr. S.D.N.Y. 2012), *In re Sullivan Motor Delivery, Inc.*, 56 B.R. 29 (Bankr. E.D. Wis. 1985), and *In re Chas. P. Young Co.*, 111 B.R. 410 (Bankr. S.D.N.Y. 1990) (all finding that Section 1113 does not apply to expired collective bargaining agreements), with *In re 710 Long Ridge Road Operating Company, II, LLC*, 2014 WL 407528 (Bankr. D.N.J. 2014), *In re Karykeion*, 435 B.R. 663 (Bankr. C.D. Cal. 2010), *United Food & Commercial Workers Union, Local 770 v. Official Unsecured Creditors Comm. (In re Hoffman Brothers Packing Co.)*, 173 B.R. 177 (B.A.P. 9th Cir. 1994), and *In re Ormet Corp.*, 316 B.R. 662 (Bankr. S.D. Ohio 2004) (all finding that Section 1113 does apply to expired collective bargaining agreements).

In *Hostess*, a case on which the Union relies, the court found that Section 1113 does not apply to an expired collective bargaining agreement.  The court reasoned in a bench ruling as follows:

> I believe if I were to extend the language of "collective bargaining agreement" to "collective bargaining agreement in effect" or "collective bargaining agreement as it covers the relations between the parties," I would be basing that conclusion on, first, a policy that is not well-articulated or found in the statute itself. Secondly, I'm of a view that as a factual matter I do not believe it has been established that the post-expiration regime would so interfere with whatever the congressional policy is behind Section 1113 as to the negate, Congress's policy. . . . And, finally, I believe it would stretch the statute's language too far.

477 B.R. at 383.  The court noted that the reference in Section 1113(e) to a collective bargaining agreement which "continues in effect" merely creates an exception to the general rule that Section 1113 does not apply to expired collective bargaining agreements. *Id.* at 382.  The court further noted that in his view a debtor in possession could not assume an expired collective bargaining agreement under Section 1113 and so it would logically follow that a debtor in possession could not reject an expired collective bargain agreement pursuant to Section 1113.  *Id.* at 383.

The Court, though, is more persuaded by the reasoning found in the cases the Debtors cite. For the reasons that follow, the Court finds that the language and legislative purpose of Section 1113 establishes that the Court has jurisdiction to enter an order approving the rejection of obligations that continue in effect under the NLRA in the wake of an expired collective bargaining agreement.

11

First, Section 1113(e) allows for the modification, on an interim basis, of a collective bargaining agreement "during a period when [it] continues in effect" so long as the debtor shows that the modification is essential to the continuation of the debtor's business or to avoid irreparable damage to the estate. The *Karykeion* court noted that "continues in effect" is a term of art regularly used in labor law to refer to the employer's post-expiration *status quo* obligations. 435 B.R. at 674 (citing *Litton*, 501 U.S. at 200). The *Karykeion* court further observed that Congress enacted Section 1113 in response to the Supreme Court's *Bildisco* decision, at a time when "the intersection of the Bankruptcy Code and the NLRA was under heated discussion." *Id.* Congress did not use the word "executory" anywhere in Section 1113 but instead selected the phrase "continues in effect" in Section 1113(e). There is a good reason why  Congress made this selection as it could have very easily used the word "executory" to mirror Section 365 of the Bankruptcy Code.

The Court is persuaded that Congress selected the phrase "continues in effect" in Section 1113(e) with the intention of giving debtors the authority to modify the continuing effects of an expired collective bargaining agreement. It follows that the concept that a post-expiration collective bargaining agreement which "continues in effect" may be rejected is implicit in Section 1113(c) since there is "no logic to support Congressional intent allowing interim modifications to an expired CBA if essential to a Debtor's business or to avoid irreparable harm to the estate as permitted by [Section] 1113(e) but not allowing the rejection of the expired CBA terms if necessary to further the purpose of reorganization provided the conditions of Section 1113(c) are satisfied." *710 Long Ridge*, 2014 WL 407528,

at *13. It is incumbent upon the Court to read the statute so as to avoid such an absurd result. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("It is true that interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 330 (3d Cir. 2006).

Interpreting Section 1113(c) to allow for the rejection of a post-expiration collective bargaining agreement also comports with the legislative policies underlying Section 1113 and the Bankruptcy Code generally. While the legislative history of Section 1113 has been described to consist of "little more than self-serving statements by opposing partisans," *In re Mile Hi Metal Sys., Inc.*, 889 F.2d 887, 890 (10th Cir. 1990), the words of the statute and the context in which Congress enacted it are instructive as to its purpose.

As referenced above, Congress enacted Section 1113 in response to the Supreme Court's *Bildisco* decision. In *Bildisco*, the Supreme Court held that that a collective bargaining agreement was subject to rejection by a debtor in possession pursuant to Section 365(a) of the Bankruptcy Code, so long as the debtor could "show that the collective-bargaining agreement burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 525-26 (1984). The *Bildisco* court also found that a debtor in possession is not required to bargain to an impasse prior to rejection and "while a debtor-in-possession remains obligated to bargain in good faith under NLRA § 8(a)(5) over the terms and conditions of a possible new contract, it is not guilty of an unfair labor practice by unilaterally breaching

13

a collective-bargaining agreement before formal Bankruptcy Court action." *Id.* at 533-34 (emphasis added). Section 1113 codifies certain parts *Bildisco* and rejects others. *Karykeion*, 435 B.R. at 675.

In Section 1113, Congress struck a balance between affording debtors the flexibility to restructure their labor costs on a comparatively expedited basis, *see Bildisco*, 465 U.S. at 532 (referencing the Bankruptcy Code's "overall effort to give a debtor-in-possession some flexibility and breathing space"), while interposing a certain level of court oversight and requirements for good faith bargaining, see Section 1113(f) ("No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section"). But, Section 1113 does not require debtors to bargain to an impasse, as is required under the NLRA. It is clear that Congress intended for rejection under § 1113 to be a far more expedited process than collective bargaining under the NLRA. Section 1113(d)(1) requires that the Court hold a hearing on a debtor's application for rejection within 14 days of its filing. Section 1113(d)(2) further requires that the Court render a ruling on the application for rejection within thirty days of the hearing. While a debtor would likely need to commence bargaining with the union prior to filing its application for rejection in order to satisfy the requirements of Section 1113, the statute clearly contemplates a much quicker process than the relatively more protracted process contemplated by the NLRA[3].

---

[3] In their letter brief of October 1, 2014 (D.I. 167), the Debtors assert that if they were to invoke the procedures contemplated by the NLRA, the process could take "years" to resolve. In support of this proposition the Debtors cite the NLRB fiscal year 2013 Performance and Accountability Report, which states that it is the NLRB's "goal" to resolve unfair labor practices cases within 365 days, which does not take into

Further, the Bankruptcy Code gives debtors broad powers to restructure their affairs and preserve value as a going concern. *Karykeion*, 435 B.R. at 675; *710 Long Ridge*, 2014 WL 407528, at *13. Subjecting the Debtors to a complex and time consuming process overseen by another administrative body in the midst of their restructuring efforts would surely thwart this overriding policy.  Which is not to say that the Union is not afforded any of the protections it would otherwise have in a traditional collective bargaining process under the NLRA. Congress provided several checks in Section 1113 to ensure that a debtor is not proceeding too expeditiously with the restructuring of its labor costs. Among these protections, discussed in more detail below, are the requirements that the debtor bargain in good faith, that any changes be necessary to allow reorganization, that the union be treated fairly and equitably in comparison to other stakeholders, and that the balance of the equities clearly favor rejection.

Although they ultimately adopted different standards, both Congress and the Supreme Court in *Bildisco* recognized the need for an expedited process by which debtors could restructure labor obligations in bankruptcy.  In many cases, time is the enemy of a successful restructuring. This concern applies with equal force in a situation where the debtor is bound by the terms of a recently expired collective bargaining agreement pursuant to its *status quo* obligations under the NLRA.  The concern applies with special

---

account the time it would take to bargain to an impasse. (D.I. 167-1, pp. 18-19). The Union did not refute the Debtors' assertion as to the length of the process under the NLRA or the Debtors' interpretation of the NLRB Report. The Court is convinced that the process contemplated the by NLRA would most likely take significantly longer than the weeks-long process contemplated by Section 1113 and certainly too long for the relief the Debtors require .

force here, where the uncontroverted evidence demonstrates that the Debtors have months, perhaps weeks, to strike a deal in order to avoid liquidation. If the CBA were set to expire the day after the issuance this opinion, there is no doubt that the Court would have jurisdiction to enter an order approving rejection. But, if the Union is correct, because the CBA expired only a few weeks ago, the Court has no such authority, even though the terms of the expired CBA continue to impose the exact burden on the Debtors' restructuring efforts that Section 1113 is meant to relieve. This result makes little sense. *See Karykeion*, 435 B.R. at 675-76; *710 Long Ridge*, 2014 WL 407528, at *13-14. Again, the Court must read the statute, when possible, to avoid such an illogical result. *Griffin*, 458 U.S. at 575; *Kaiser*, 456 F.3d at 330.

If the Court were to adopt the Union's view, it is certain, based on the uncontroverted evidence before the Court, that the Debtors would be forced to close the Casino and liquidate, resulting in the loss of approximately 3,000 jobs, including those of the Union employees. In contrast to the facts before the court in *Hostess*, the evidence here demonstrates that there is simply no way that the Debtors could complete the collective bargaining process contemplated by the NLRA and avoid liquidation. The CBA is of no force or effect if the Casino closes and the Union employees lose their jobs. This, too, would be an absurd result. Reading Section 1113 to grant the Court jurisdiction to approve rejection of the terms of an expired collective bargaining agreement "avoids an absurd result and promotes consistency with the legislative purpose of the statute and the Bankruptcy Code as a whole." *Long Ridge*, 2014 WL 417528, at *14. *See also Karykeion*, 435

16

B.R. at 676.

Further, this result does not intrude on the exclusive jurisdiction of the NLRB to enforce and interpret the provisions of the NLRA, as the Union suggests. The Court merely reads Section 1113 to apply with equal force in a situation where the terms of an expired collective bargaining agreement remain in effect due to the employer's *status quo* obligations under the NLRA. In applying Section 1113 to the facts of this case, the Court will interpret and enforce only Section 1113, and not any provision of the NLRA. This is a no greater intrusion on the NLRB's jurisdiction than if the Court were to apply Section 1113 to a collective bargaining agreement which has not expired by its terms. *See Karykeion*, 435 B.R. at 675.

The practical impact of the Court's finding that Section 1113 applies to expired collective bargaining agreements is slight, especially when compared  to the violence adopting the Union's position would do to the legislative purpose of Section 1113 and the Bankruptcy Code generally, which is to facilitate and promote reorganization. *See Bildisco*, 465 U.S. 513, 528 ("The fundamental purpose of [chapter 11] reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."). Labor unions are on notice that in the event of a bankruptcy, their collective bargaining agreements are subject to rejection pursuant to Section 1113. Reading Section 1113 to apply to the narrow class of expired collective bargaining agreements which remain in effect post-petition due to the employer's *status quo* obligations under the NLRA does not alter and in fact preserves the pre-existing union-employer power

17

dynamic.

The Union's position, if given credence, would effectively give labor unions the power to hold up a debtor's bankruptcy case until the union's demands were met, but only in cases where there is an expired but still controlling collective bargaining agreement. The Court cannot think of nor has the Union offered a good reason for such a distinction between an expired and unexpired collective bargaining agreement. While allowing the Union that sort of hold-up power may be appropriate or even necessary outside of bankruptcy, in a bankruptcy case it wholly ignores the policy and bargaining power balances Congress struck in Section 1113 and exalts form over substance.

Accordingly, the Court finds that it has jurisdiction pursuant to Section 1113(c) to approve an application for rejection of a collective bargaining agreement where the agreement has expired by its terms but the provisions of the agreement remain in effect due to the employer's *status quo* obligations under the NLRA.

## B. Section 1113 Requirements

The Court will now focus on whether the Debtors have met their burden of establishing that it is necessary to reject the CBA and that they have satisfied a debtor's requirements under Section 1113, which provides that:

> The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that –
>
> (1)    the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

> (2)   the authorized representative of the employees has refused to accept such proposal without good cause; and
>
> (3)   the balance of the equities clearly favors rejection of such agreement.

Section 1113(c).  The reference in subsection (c) to subsection 1113(b)(1) incorporates the Debtors' burden to:

> (A)   make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and
>
> (B)   provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

Therefore, preliminary to rejection of a collective bargaining agreement, a debtor must (1) make a proposal " based on the most complete and reliable information available," (2) have provided a union with relevant information which is necessary for the union to evaluate the proposal, and (3) make certain the proposal treats all parties "fairly and equitably."  Section 1113(b)(1)(A).  The proposal must also be "necessary to permit the reorganization of the debtor."  *Id.*  The inquiry then turns to whether the union "refused to accept such proposal without good cause," Section 1113(c)(2), and whether the "balance of the equities clearly favors rejection of the collective bargaining agreement,"  Section 1113(c)(3).  Finally, between the proposal having been made and the hearing on the

rejection motion, a debtor must meet "at reasonable times, with the [union] to confer in good faith" in attempting to arrive at "mutually satisfactory modifications" of the collective bargaining agreement. Section 1113(b)(2). The Court is required to schedule a hearing on the Motion "not later than fourteen days after the date of the filing" of the motion. Section 1113(d)(1).

### 1. Necessary to Reorganization

The source of the law in the Third Circuit on rejection of a collective bargaining agreement is found in *Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of Am. AFL-CIO-CLC*, 791 F.2d 1074 (3d Cir. 1986). *Wheeling* instructs the Court that the "necessary" standard requires a showing that the modifications are not merely "desirable" but essential to reorganization. *Wheeling*, 791 F.2d at 1088-89. The emphasis is on promoting reorganization and avoiding liquidation. *Id.* at 1089.

Here, the Debtors have established that they are suffering losses at the Casino which are prohibitive to continuing the business and the Union has presented no evidence challenging such evidence. It is absolutely clear to the Court that the Debtors have sufficient cash to fend off the losses for less than two months. Mr. Hardie, Debtors' investment advisor, provided uncontroverted testimony that without relief from the CBA, Debtors will be forced to liquidate in which event all of the Casino employees, both union and non-union, will lose their jobs and all of the benefits which are at issue. 10/2 Tr. 38. The only alternative before the Court to liquidation is the Proposal and therefore the modifications are indeed essential to the Debtors' short-term survival. In *Bowen Enters.,*

*Inc. v. United Food & Commercial Workers Int'l Union* (*In re Bowen Enters., Inc.*), 196 B.R. 734 (Bankr. W.D. Pa. 1996), the court approved the Section 1113 rejection because the debtor's dire financial situation clearly meant that the debtor would be forced to liquidate otherwise.

The Union questioned Debtors' maintaining the Trump Plaza Hotel and Casino at a cost of $9.2 million per year, money which the Union argues could be used to honor the terms of the CBA. The Union does not take into account that the Debtors do not own the Trump Plaza Hotel and Casino free and clear. It is encumbered by the secured creditor's lien and the Debtors can not dispose of the Trump Plaza Hotel and Casino without the secured creditor's cooperation and not quickly enough in any event to avoid the present cash emergency. The minimal spending on the Trump Plaza Hotel and Casino is only for such essentials as heat and air conditioning, some electric and security. 10/14 Tr. 147.

### 2. *Most Complete and Reliable Information*

As discussed above, Section 1113(b)(1)(A) requires the debtor to make a proposal "based on the most complete and reliable information available at the time of the proposal." The requirement contemplates the debtor will provide comprehensive information and make an honest effort to compile all relevant data. It need not be a perfect compilation but a good faith, best efforts one. *Karykeion, Inc.*, 435 B.R. at 667; and *Ass'n of Flight Attendants-CWA, AFL-CIO v. Mesaba Aviation, Inc.*, 350 B.R. 435, 454 (D. Minn. 2006).

Debtors have fully satisfied this requirement. On September 17, 2014, the Debtors provided the Union with the Proposal accompanied by a presentation prepared by

Houlihan Lokey which contained the proposed modifications, the estimated economic impact of each of the proposed modifications, a cash flow forecast through November 13, 2014, and forecasts showing the financial conditions incorporating the proposed modifications and the need to obtain relief. Ex. 5. Such information was the most complete and reliable information available. *In re 710 Long Ridge*, 2014 WL 407528 (Bankr. D.N.J. Feb. 3, 2014). The Union does not claim otherwise.

### 3. *Relevant Information Necessary to Evaluate the Proposal*

A debtor must provide "such relevant information as is necessary to evaluate the proposal." Section 1113(b)(1)(B). There is no question that Debtors satisfied this requirement. Debtors provided the Union with numerous documents, established a data room and responded promptly to every request for information. Having met its burden of establishing Debtors provided the relevant and necessary information, the burden shifted to the Union to rebut such compliance. The Union presented no evidence and voiced no complaint that Debtors had not provided all relevant information necessary for the Union's evaluation.

### 4. *All Parties Treated Fairly and Equitably*

The question posed for this requirement is "whether the . . . proposal would impose a disproportionate burden on the employees." *Wheeling*, 791 F.2d at 1091. In other words, the employees should not "bear either the entire financial burden of making the reorganization work or a disproportionate share of that burden, but only their fair and equitable share of the necessary sacrifices." *Id.*

22

Here, it is clear from the evidence presented that all constituencies will suffer greatly, not just the Union. The secured creditor is being asked to forego $286 million in debt and unpaid interest of $6 million, and to invest $100 million for the reorganization. Trade creditors will receive nothing. Atlantic City and the State of New Jersey are being asked for substantial financial concessions. Non-union employees will receive the same health and welfare benefits. Management's compensation is tied to pre-petition equity which will be worthless. Debtors have asked tenants of the Casino to make concessions. 10/14 Tr. 111-13. Every constituency will suffer significant losses.

The Union argues that there is no "snap-back" provision in the Proposal and that such a provision is required by *Wheeling*. A "snap back" provision increases employees' wages or benefits in the event its employer has greater financial success than expected. *Wheeling* did, indeed, discuss and find that the absence of a snap back provision in that case precluded rejection. The Court concludes that the absence of the snap back is not fatal to rejection in this case.

First, Section 1113 does not include such a requirement. Second, other cases have not denied rejection because of the absence of a snap back provision. *Bowen*, 196 B.R. at 742 (court not aware of a binding precedent requiring snap back); *United Food & Commercial Workers Local Union v. Appletree Mkts., Inc.* (*In re Appletree Mkts., Inc.*), 155 B.R. 431, 440 (S.D. Tex. 1993); *In re Sierra Steel Corp.*, 88 B.R. 337, 342 (Bankr. D. Colo. 1988). Third, as in *Bowen* where the court rejected the concept that a snap back is required in every case, the Union never requested in negotiations that the Debtors provide a snap back clause. In *Wheeling*,

the union made the request.  The Third Circuit found that the debtor did not provide a credible explanation for the failure to include such a provision.  But ultimately, the overriding answer to the Union's belated suggestion that the snap back had to be offered in the Proposal is the fact that the Proposal is not imposing a disproportionate burden on the Union.  The suffering is spread across all parties associated with Debtors.

### 5.  Union Rejection Without Good Cause

A court will not approve the rejection of a collective bargaining agreement unless the Union has rejected a proposal without good cause.  Section 1113(c)(2); and *Bowen*, 197 B.R. at 745.  When the debtor establishes that the union has refused to accept its proposal, the union then bears the shifted burden to prove that its refusal was not without good cause.  *In re Am. Provision Co.*, 44 B.R. 907, 910 (Bankr. D. Minn. 1984).

The Debtors have established that the Union refused to negotiate, delayed negotiations or did not negotiate earnestly, and presented only a partial counterproposal at the last minute.  The Union was in essence intransigent in its position.  Instead, the Union took a "fight rather than switch" stance even in the face of Debtors' submission of information that they were facing liquidation and would close the Casino unless negotiations led to a new collective bargaining agreement.  The Union's refusal to negotiate qualifies for the finding that it rejected the Proposal without good cause.  *See, e.g., In re Garafalo's Finer Foods*, 117 B.R. 363, 371 (Bankr. N.D. Ill. 1990).

### 6. Balance of the Equities

Section 1113(c)(3) provides that rejection of a collective bargaining agreement is appropriate if "the balance of the equities clearly favor rejection of such agreement."    In making the determination, courts will consider the following factors:

> (1) the likelihood and consequences of liquidation if rejection is not permitted; (2) the likely reduction in the value of creditors' claims if the bargaining agreement remains in force; (3) the likelihood and consequences of a strike if the bargaining agreement is voided; (4) the possibility and likely effect of any employees claims for breach of contract if rejection is approved; (5) the cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and how various employees' wages and benefits compare to those of others in the industry; and (6) the good or bad faith of the parties in dealing with the debtors' financial dilemma.

*Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d 82, 93 (2d Cir. 1987).  These factors clearly militate in favor of rejection.  Most importantly, liquidation will result if the Court denies the Motion.  *Bowen*, 196 B.R. at 745 (the fact that the debtor would be forced to liquidate unless relieved of onerous labor costs advised that the equities favored rejection). The Court also cannot  ignore the Union campaign of misinformation, refusal to negotiate in earnest and effort to drive business away, all of which show bad faith.

### 7. Meetings at Reasonable Times to Confer in Good Faith

Section 1113(b)(2) requires the debtor to "confer in good faith in attempting to reach mutually satisfactory modifications" of the collective bargaining agreement.  Once the debtor shows it has complied, the union must produce evidence that the debtor did not confer in good faith.  *Am. Provision*, 44 B.R. at 909.

Debtors provided evidence through Mr. Keyser and Mr. Hardie that they went to great lengths and were relentless in their efforts to bring the Union to the bargaining table. They managed eventually to draw the Union into negotiations but the Union did not make a comprehensive counterproposal and continued to raise rather than discuss issues. By then, the Debtors had run out of time after more than seven months of trying to engage the Union in discussions. The Court finds that the Debtors "stood on their head" to negotiate and were rebuffed time and time again. The Union presented no evidence that the Debtors did not confer in good faith. Thus, Debtors have satisfied their burden.

### C.  Effect of Rejection

In addition to disagreeing over whether rejection of the CBA is appropriate at all, the parties disagree as to the effect of rejection . In the Debtors' view, the Court can and should enter an order which modifies the CBA and implements the terms of its proposal. *See, e.g., Garofalo's Finer Foods*, 117 B.R. at 369-70 ("the Court concludes that not only may such agreements be rejected under section 1113(c), but that if all the requirements are met, such agreements can be alternatively modified in the exercise of the Court's discretion in balancing the equities under section 1113(c) and rendering its judgment as deemed necessary and appropriate under section 105(a)"). The Union, on the other hand, argues that nothing in Section 1113 grants the Court the authority to specifically implement the terms of the Proposal. *See, e.g., Northwest Airlines Corp. v. Ass'n of Flight Attendants–CWA* (*In re Northwest Airlines Corp.*), 483 F.3d 160, 171 n.5 (2nd Cir. 2007) (reserving judgment but noting that "the text of § 1113 is not explicit on this score, cf. 11 U.S.C. § 1113(e) (explicitly

26

permitting the bankruptcy court to impose 'interim changes'), and that the bankruptcy court must look elsewhere in the Bankruptcy Code to find such authority").

Nothing in the text of Section 1113 gives the Court the authority to implement the terms of the Debtors' proposal and there is little judicial guidance on the issue. The more reasoned view, and the view which best harmonizes the goals of both bankruptcy law and labor law is that:

> [F]ollowing rejection, a [debtor in possession] remains subject to its labor law duty to bargain in good faith, but is permitted to implement changes to the terms and conditions of employment that were included in the section 1113 proposals approved by the bankruptcy court. Such implementation, without further bargaining, will not constitute a violation of the duty to bargain under the NLRA, because this result is a necessary accommodation of the NLRA to section 1113.

7 *Collier on Bankruptcy* ¶ 1113.06[1][b] (16th ed. 2014) (citing Memorandum from the General Counsel of the NLRB regarding *Mile-Hi Metal Systems, Inc.*, 1997 WL 731480 (N.L.R.B.G.C. July 30, 1986)). *See also In re Alabama Symphony Ass'n*, 155 B.R. 556, 573 (Bankr. N.D. Ala. 1993), *aff'd in part, rev'd in part on other grounds*, 211 B.R. 65 (N.D. Ala. 1996) ("The Court is here merely to decide whether they shall be divorced, subject to further out-of-court negotiations, and not to decide the terms under which they shall live together.").

Accordingly, and to be clear, the Court approves the terms of the Proposal only in the sense that the Court finds that the Proposal and terms therein satisfy the requirements of Section 1113 and is authorizing the Debtors to implement the Proposal.

## CONCLUSION

The Court will not speculate why the Union failed to negotiate in good faith with the Debtors and did not present witnesses at the evidentiary hearing.[4]  The Union had ample opportunity to do both.  The Court continues to be concerned that whatever the Union's reasons, the Union did not take action to advance the interests of Taj Mahal employees despite the protections which Section 1113 provides.  Nor did the Union present a single witness in rebuttal.

The Court finds that it has jurisdiction to approve rejection of an expired collective bargaining agreement under Section 1113(c).  Further, based on the extensive evidence, the Court finds that the Debtors have satisfied their responsibilities under Section 1113(b) and Section 1113(c).  Accordingly, the Court will grant the Motion.  The Court has entered an Order.

Dated: October 20, 2014

KEVIN GROSS, U.S.B.J.

---

[4] Debtors and the Union discussed at the hearing, at some length, the existence of "most favored nation" or "most favored employer" provisions in collective bargaining agreements at other casinos in Atlantic City.  The Court has not reached any conclusion whether such provisions – which give an employer the benefit of employer beneficial amendments in another casino's collective bargaining agreement – played a role in the Union's failure to negotiate.

# ATTACHMENT A

CONFIDENTIAL
10-10-14

**PROPOSALTHE FOLLOWING PROPOSAL IS MADE ON BEHALF OF TRUMP ENTERTAINMENT RESORTS, INC. AND TRUMP TAJ MAHAL ASSOCIATES, LLC (THE "DEBTOR") WITH RESPECT TO MODIFIED TERMS TO BE INCLUDED IN A NEW COLLECTIVE BARGAINING AGREEMENT ("CBA") FOR A FOUR-YEAR TERM BETWEEN TRUMP TAJ MAHAL ASSOCIATES, LLC AND UNITE HERE LOCAL 54. THE DEBTOR RESERVES THE RIGHT TO MODIFY, DELETE FROM OR ADD PROPOSALS AT ANY TIME.**

## ARTICLE 3—CONTROL, DISCHARGE AND SENIORITY

The Debtor proposes to expand its right to direct and control employees, such as by consolidating jobs, by determining and re-determining job content and determining the assignment of work, in order to allow for a more flexible use of staff and generate cost-savings.

Article 3.7(a): House seniority is an employee's length of continuous service in years, months and days from his/her first day paid in the bargaining unit by the Debtor."

Article 3.7(b): Classification seniority is an employee's length of continuous service within the department (as defined by the Debtor), in years, months and days from his/her first day paid in his/her present classification within his/her respective department/outlet.

## ARTICLE 6—MEAL AND LOCKER FACILITY

The Debtor proposes to eliminate paid meal times. Rather than a paid meal time, the Debtor proposes that all employees working on a shift of six (6) hours or more will be provided with an unpaid, uninterrupted thirty (30) minute meal period. Accordingly, the Debtor would also require that employees clock out prior to the commencement of their assigned unpaid break and clock in upon the conclusion of their break and return to work. This modification would ensure that amounts paid will match actual work performed.

## ARTICLE 11—HOLIDAYS

The Debtor proposes to reduce the amount of pay employees receive for working on a holiday. Rather than receiving straight pay (or in some cases, 1.5 times regular pay) for hours actually worked plus holiday pay, the employee would only receive a more market-standard time-and-a-half for hours actually worked on the holiday, thereby matching the amount paid to work actually performed. Employees would still receive holiday pay, at straight time, for the portion of the employee's usual shift which the employee does not work due to the holiday.

## ARTICLE 12—HOURS OF WORK

The Debtor proposes to eliminate the guarantee that employees will be paid for a full shift if they are sent home at the direction of the employer after the completion of more than half their shift. Instead, the Debtor proposes that employees who are sent home at the direction of the employer prior to the completion of their full shift shall be guaranteed pay for half of their scheduled shift or the hours actually worked, whichever is greater. This would more closely link the amount paid to the time worked.

1

CONFIDENTIAL
10-10-14

## ARTICLE 15—H&W AND PENSION & SEVERANCE

The Debtor proposes to withdraw from the Health and Welfare Fund and, instead, substitute with health care coverage under the 2010 Patient Protection and Affordable Care Act (commonly referred to as "Obamacare").  Full-time employees, however, would receive additional compensation of $2,000 per year which will enable them to offset and, in some cases, completely defray the cost of obtaining health insurance now available to them and their families under Obamacare.  Notably, it is intended that non-union employees (including management) would receive identical treatment in this regard.

The Debtor further proposes to cease making contributions to, and permanently withdraw from, the Pension Fund (National Retirement Fund) and, instead institute an employer sponsored 401(k) plan with the employer matching employee contributions up to 1% of each employee's compensation per year.  This modification would result in substantial cost-savings to the Debtor and enable the Debtor to attract new capital.

Also, in line with market standards, the Debtor also proposes to eliminate future contributions to the Severance Fund, which in turn will result in cost-savings to the Debtor.

## ARTICLE 20—MISCELLANEOUS PROVISIONS

The Debtor further proposes to expand the exception for utilizing subcontractors, as set forth in set forth in Article 20.8, to include restaurants owned, operated by and/or affiliated with national restaurateurs.  This modification will enable the Debtor to contract with national restaurateurs to open destination restaurants and attract new customers.

The Debtor also proposes to increase the minimum number of rooms a housekeeper will clean in a day from fourteen (14) to sixteen (16).  This modification, which is in line with market standards, will enable internal efficiencies and result in cost-savings to the Debtor.

## ARTICLE 22—TERM OF CONTRACT

The Debtor proposes to enter into a Four (4) year agreement such that the benefits of the proposed modifications are realized over a necessary period of time.

### Miscellaneous:

Conforming changes to the dates contained in the Survival of Article provisions of Attachment 5 and the Wage Progression Examples of Attachment 11 upon entering into a new Collective Bargaining Agreement.

Any Union proposal not specifically addressed by the Debtor in this Proposal is hereby rejected.

2