## <u>EXHIBIT 1</u>

Full Blackline

**THIS DISCLOSURE STATEMENT IS IN DRAFT FORM, REMAINS SUBJECT TO FURTHER NEGOTIATION WITH PARTIES IN INTEREST AND REMAINS SUBJECT TO FURTHER CHANGE. THE DEBTORS RESERVE THE RIGHT TO FURTHER SUPPLEMENT THIS DISCLOSURE STATEMENT, AND ALL RIGHTS OF THE DEBTORS IN CONNECTION HEREWITH ARE EXPRESSLY PRESERVED. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT, AND SHOULD NOT BE RELIED UPON BY ANY PERSON OR ENTITY, NOR MAY IT BE USED IN CONNECTION WITH ANY SOLICITATION OF VOTES.**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------------x
                                        :
                                        :
In re:                                  :   Chapter 11
                                        :
TRUMP ENTERTAINMENT RESORTS,            :   Case No. 14–12103  (KG)
INC., et al.,¹                          :
                                        :   Jointly Administered
                Debtors.                :
                                        :
------------------------------------------------------------------x
```

---

### DISCLOSURE STATEMENT FOR DEBTORS' THIRD AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

Dated:    Wilmington, Delaware
          January ~~5,~~**26,** 2015

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square, 1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

STROOCK & STROOCK & LAVAN LLP

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Trump Entertainment Resorts, Inc. (8402), Trump Entertainment Resorts Holdings, L.P. (8407), Trump Plaza Associates, LLC (1643), Trump Marina Associates, LLC (8426), Trump Taj Mahal Associates, LLC (6368), Trump Entertainment Resorts Development Company, LLC (2230), TER Development Co., LLC (0425) and TERH LP Inc. (1184).  The mailing address for each of the Debtors is 1000 Boardwalk at Virginia Avenue, Atlantic City, NJ 08401.

180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006
*Counsel for the Debtors and Debtors in Possession*

<u>IMPORTANT NOTICE</u>

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE CHAPTER 11 PLAN OF REORGANIZATION FOR TRUMP ENTERTAINMENT RESORTS, INC. AND ITS AFFILIATED DEBTORS (THE "**PLAN**"). NO REPRESENTATIONS HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTORS, THEIR BUSINESS OPERATIONS OR THE VALUE OF THEIR ASSETS, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT.

THE DEBTORS URGE YOU TO READ THIS DISCLOSURE STATEMENT CAREFULLY FOR A DISCUSSION OF VOTING INSTRUCTIONS, RECOVERY INFORMATION, CLASSIFICATION OF CLAIMS, THE HISTORY OF THE DEBTORS AND THE CHAPTER 11 CASES, THE DEBTORS' BUSINESSES, PROPERTIES AND RESULTS OF OPERATIONS, HISTORICAL AND PROJECTED FINANCIAL RESULTS AND A SUMMARY AND ANALYSIS OF THE PLAN.

ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT NOT OTHERWISE DEFINED HEREIN HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN, A COPY OF WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS <u>EXHIBIT 1</u>.

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE A FURTHER AMENDED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN. THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL, OR THE SOLICITATION OF AN OFFER TO BUY, NOR WILL THERE BE ANY DISTRIBUTION OF ANY OF THE SECURITIES DESCRIBED HEREIN UNTIL THE EFFECTIVE DATE OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE. THE PLAN AND THIS DISCLOSURE STATEMENT WERE NOT REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW. DISSEMINATION OF THIS DISCLOSURE STATEMENT IS CONTROLLED BY BANKRUPTCY RULE 3017. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. PERSONS TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF THE DEBTORS SHOULD EVALUATE THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH IT WAS PREPARED.

THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN INTEREST IN THESE CASES WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) SO THAT THOSE CREDITORS WHO ARE ENTITLED TO VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT REGARDING SUCH VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN; RATHER THIS DISCLOSURE STATEMENT IS INTENDED ONLY TO AID AND SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN SUPPLEMENT (WHICH WILL BE FILED NO LATER THAN TEN (10) CALENDAR DAYS PRIOR TO THE VOTING DEADLINE (DEFINED BELOW)), AND THE EXHIBITS ATTACHED THERETO AND THE AGREEMENTS AND DOCUMENTS DESCRIBED THEREIN. IF THERE IS A CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN. YOU ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND PLAN SUPPLEMENT AND TO READ CAREFULLY THE ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING HOW TO VOTE WITH RESPECT TO THE PLAN.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS **4:00 P.M. (PREVAILING EASTERN TIME) ON [____], 2015**, UNLESS EXTENDED BY THE DEBTORS (THE "**VOTING DEADLINE**"). TO BE COUNTED, BALLOTS MUST BE RECEIVED BY THE VOTING AGENT (AS DEFINED HEREIN) ON OR BEFORE THE VOTING DEADLINE.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY, AND THE SECURITIES TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF, OR REGISTERED PURSUANT TO, A REGISTRATION STATEMENT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR WITH ANY OTHER SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY OTHER SECURITIES REGULATORY AUTHORITY, OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR

SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS BELIEVE THAT THE SOLICITATION OF VOTES ON THE PLAN MADE BY THIS DISCLOSURE STATEMENT, AND THE OFFER OF THE NEW SECURITIES THAT MAY BE DEEMED TO BE MADE PURSUANT TO THE SOLICITATION, ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE EXEMPTION PROVIDED BY SECTION 1145(a)(1) OF THE BANKRUPTCY CODE AND/OR OTHER APPLICABLE EXEMPTIONS (INCLUDING SECTION 4(A)(2) OF THE SECURITIES ACT), AND EXPECT THAT THE OFFER AND ISSUANCE OF THE SECURITIES UNDER THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE APPLICABILITY OF SECTION 1145(a)(1) OF THE BANKRUPTCY CODE AND/OR OTHER APPLICABLE EXEMPTIONS (INCLUDING SECTION 4(A)(2) OF THE SECURITIES ACT).

EXCEPT AS OTHERWISE SET FORTH HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF OR CREATE ANY DUTY TO UPDATE SUCH INFORMATION.

NO PERSON HAS BEEN AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS, NOTICES AND SCHEDULES ATTACHED TO OR INCORPORATED BY REFERENCE OR REFERRED TO IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS,

FINANCIAL OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISOR(S) WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, THE PLAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

THE DISCLOSURE STATEMENT DESCRIBES AND/OR SUMMARIZES VARIOUS DOCUMENTS, PLEADINGS, ORDERS, AND AGREEMENTS.  TO THE EXTENT THERE IS A CONFLICT BETWEEN THE DESCRIPTIONS OR SUMMARIES OF SUCH DOCUMENTS, PLEADINGS, ORDERS, AND AGREEMENTS IN THIS DISCLOSURE STATEMENT AND THE ACTUAL TERMS OF SUCH DOCUMENTS, PLEADINGS, ORDERS, AND AGREEMENTS, INCLUDING THE PLAN AND THE DEBTORS' PLEADINGS, THE TERMS OF SUCH DOCUMENTS, PLEADINGS, ORDERS, AND AGREEMENTS SHALL CONTROL.

FORWARD-LOOKING STATEMENTS:

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS BASED PRIMARILY ON THE CURRENT EXPECTATIONS OF THE DEBTORS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTORS' AND THE REORGANIZED DEBTORS' BUSINESSES. IN PARTICULAR, STATEMENTS USING WORDS SUCH AS "BELIEVE," "MAY," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER ARTICLE XI. IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THE DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. CONSEQUENTLY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN SHOULD NOT BE REGARDED AS REPRESENTATIONS BY ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, THEIR ADVISORS OR ANY OTHER PERSON THAT THE PROJECTED FINANCIAL CONDITIONS OR RESULTS OF OPERATIONS CAN OR WILL BE ACHIEVED. EXCEPT AS OTHERWISE REQUIRED BY LAW, NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS UNDERTAKE ANY OBLIGATION TO UPDATE OR REVISE PUBLICLY ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE FOLLOWING APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT.

THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

## TABLE OF CONTENTS

**Page**

ARTICLE I.

INTRODUCTION..............................................................................1
1.1.    General..............................................................................1
1.2.    The Confirmation Hearing.....................................................2
1.3.    Classification of Claims and Interests....................................3
1.4.    Voting; Holders of Claims Entitled to Vote.............................3
1.5.    Important Matters...............................................................6

ARTICLE II.

SUMMARY OF PLAN AND CLASSIFICATION AND
TREATMENT OF CLAIMS AND INTERESTS THEREUNDER...........6
2.1.    General..............................................................................6
2.2.    Summary of Treatment of Claims and Interests Under the Plan...~~7~~8

ARTICLE III.

BUSINESS DESCRIPTION; HISTORICAL INFORMATION..............9
3.1.    The Debtors' Businesses......................................................9
(a)    The Debtors.......................................................................9
3.2.    Prior Bankruptcy Filings...............................................~~9~~10
3.3.    Summary of Corporate Structure.........................................10
3.4.    The Debtors' Operations...............................................~~10~~11
(a)    Taj Mahal..................................................................~~10~~11
(b)    Plaza................................................................................11
(c)    Online Gaming.............................................................~~11~~12
(d)    CRDA Obligations.............................................................12
3.5.    Debtors' Prepetition Capital and Debt Structure..............~~12~~13
(a)    First Lien Credit Agreement........................................~~12~~13
(b)    Trade Debt.................................................................~~13~~14
(c)    Equity........................................................................~~13~~14

ARTICLE IV.

EVENTS LEADING TO CHAPTER 11 FILING..............................14
4.1.    High Debt Burden..............................................................14

| | | |
|---|---|---|
| 4.2. | Declining Atlantic City Market | 14 |
| 4.3. | Lingering Effects of Superstorm Sandy and Other Storms | 15 |
| 4.4. | Disappointing Internet Gaming Results | ~~15~~**16** |
| 4.5. | Declining Performance | ~~15~~**16** |
| 4.6. | Inflexible Cost Structure | ~~16~~**17** |
| 4.7. | Certain Default Notices and Third Party Litigation | ~~16~~**17** |
| (a) | Online Gaming Agreements | ~~16~~**17** |
| (b) | Trademark Litigation | ~~17~~**18** |
| (c) | Levine Staller Litigation | ~~17~~**18** |
| ARTICLE V. | | |
| | DESCRIPTION AND HISTORY OF CHAPTER 11 CASES | ~~18~~**19** |
| 5.1. | General Case Background | ~~18~~**19** |
| 5.2. | Retention of Professionals | ~~18~~**19** |
| 5.3. | Employee Obligations | ~~19~~**20** |
| (a) | Prepetition Employee Compensation ~~19~~ | **20** |
| 5.4. | Stabilization of Debtors' Business Operations | ~~19~~**20** |
| (a) | Customer Programs ~~19~~ | **20** |
| (b) | Vendors ~~19~~ | **20** |
| (c) | Cash Management ~~19~~ | **20** |
| (d) | Use of Cash Collateral ~~20~~ | **21** |
| (e) | DIP Financing ~~21~~ | **22** |
| 5.5. | Disposition of Equity Securities | ~~22~~**23** |
| 5.6. | Utilities | ~~22~~**23** |
| 5.7. | Taxes | ~~22~~**23** |
| 5.8. | Insurance | ~~22~~**24** |
| 5.9. | Closure of the Plaza | ~~23~~**24** |
| (a) | Issuance of WARN Notices ~~23~~ | **24** |
| (b) | Rejection of Plaza Contracts ~~23~~ | **24** |
| 5.10. | Operations at the Taj Mahal | ~~23~~**24** |
| 5.11. | Appointment of a Creditors' Committee | ~~24~~**25** |
| 5.12. | Section 341 Meeting | ~~25~~**26** |
| 5.13. | Schedules and Statements and Bar Dates | ~~25~~**26** |
| (a) | Schedules and Statements ~~25~~ | **26** |
| (b) | Bar Date ~~25~~ | **26** |

| | | |
|---|---|---|
| 5.14. | NRF Claim | 2627 |
| 5.15. | Sale of Certain Assets | 2627 |
| 5.16. | Assertions of the Trump Parties | 2728 |
| 5.17. | The CBA Motion | 2729 |
| 5.18. | Levine Staller Litigation | 2930 |
| 5.19. | Online Gaming Agreements Litigation | 2931 |
| 5.20. | Atlantic City Tax Claims | 2931 |
| 5.21. | Creditors Committee's Motion to Terminate Exclusivity 30 | 32 |
| 5.22. | Order for Rule to Show Cause 30 | 32 |
| 5.23. | Negotiations with the City of Atlantic City and the State of New Jersey 31 | 32 |
| 5.24. | Preferences and Fraudulent Conveyances | 3132 |
| 5.25. | Deadline Extensions | 3233 |
| (a) | Extension of Deadline for Removal of Prepetition Non-Bankruptcy Actions | 3233 |
| (b) | Extension of Deadline to Assume or Reject Unexpired Leases of Nonresidential Real Property | 3233 |
| (c) | Extension of Debtors' Exclusive Periods 32 | 34 |
| 5.26. | Events Leading to Formulation of Plan | 3234 |
| ARTICLE VI. | | |
| | REASONS FOR THE SOLICITATION; RECOMMENDATION | 3335 |
| ARTICLE VII. | | |
| | THE PLAN | 3435 |
| 7.1. | Overview of Chapter 11 | 3435 |
| 7.2. | Resolution of Certain Inter-Debtor Issues | 3436 |
| 7.3. | Overview of the Plan | 3536 |
| (a) | Unclassified Claims 36 | 38 |
| (i) | DIP Claims | 3638 |
| (ii) | Administrative Expense Claims 36 | 38 |
| (iii) | Fee Claims 37 | 39 |
| (iv) | U.S. Trustee Fees 38 | 40 |
| (v) | Priority Tax Claims 38 | 40 |
| (b) | Classification and Treatment of Claims and Interests 39 | 40 |
| (i) | Priority Non-Tax Claims (Class 1) 39 | 40 |

| | | | |
|---|---|---|---|
| (ii) | Other Secured Claims (Class 2) 39 | | **41** |
| (iii) | First Lien Credit Agreement Claims (Class 3) 40 | | **42** |
| (iv) | General Unsecured Claims (Class 4) 40 | | **42** |
| (v) | Existing Securities Law Claims (Class 5(a)) 41 | | **42** |
| (vi) | Equitably Subordinated Claims (Class 5(b)) 41 | | **43** |
| (vii) | Existing TER Interests (Class 6) 41 | | **43** |
| 7.4. | Acceptance or Rejection of the Plan; Effect of Rejection by One or More Classes of Claims or Interests. | | 41**43** |
| (a) | Class Acceptance Requirement 41 | | **43** |
| (b) | Voting of Claims | | 42**43** |
| (c) | Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown." | | 42**43** |
| (d) | Elimination of Vacant Classes 42 | | **44** |
| (e) | Voting Classes; Deemed Acceptance by Non-Voting Classes 42 | | **44** |
| (f) | Confirmation of All Cases 42 | | **44** |
| 7.5. | Summary of Capital Structure of Reorganized Debtors. | | 43**45** |
| (a) | Post-Emergence Capital Structure 43 | | **45** |
| (b) | Description of New Common Stock 44 | | **45** |
| (i) | Issuance 44 | | **45** |
| (ii) | Organizational Documents 44 | | **46** |
| (iii) | Restrictions on Transfer 44 | | **46** |
| 7.6. | Means for Implementation. | | 45**46** |
| (a) | Continued Corporate Existence and Vesting of Assets in Reorganized Debtors 45 | | **46** |
| (b) | Plan Funding 46 | | **47** |
| (c) | Cancellation of Existing Securities and Agreements 46 | | **47** |
| (d) | Cancellation of Certain Existing Security Interests 46 | | **48** |
| (e) | Officers and Boards of Directors 46 | | **48** |
| (f) | Corporate Action 47 | | **48** |
| (g) | Authorization, Issuance and Delivery of New Common Stock 47 | | **49** |
| (h) | New Credit Agreement 48 | | **49** |
| (i) | Intercompany Interests 48 | | **49** |
| (j) | Insured Claims 48 | | **50** |
| (k) | Distribution Trust 48 | | **50** |
| (i) | Execution of the Distribution Trust Agreement | | 48**50** |

| | | | |
|---|---|---|---|
| (ii) | Purpose of the Distribution Trust | | 48 50 |
| (iii) | Distribution Trust Assets | | 49 50 |
| (iv) | Governance of the Distribution Trust | | 49 51 |
| (v) | Role of Distribution Trustee | | 49 51 |
| (vi) | Distribution Trust Distributions | | 49 51 |
| (vii) | Costs and Expenses of the Distribution Trust | | 50 51 |
| (viii) | Authority to Prosecute and Settle Avoidance Actions | | 50 51 |
| (ix) | Reorganized Debtors' Cooperation and Supply of Information and Documentation | | 50 52 |
| 7.7. | Treatment of Executory Contracts and Unexpired Leases | | 50 52 |
| (a) | General Treatment 50 | | 52 |
| (b) | Claims Based on Rejection of Executory Contracts or Unexpired Leases 51 | | 52 |
| (c) | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases 51 | | 53 |
| (d) | Compensation and Benefit Programs 52 | | 54 |
| (e) | Trademark License Agreement | | 53 54 |
| (f) | Termination of Plaza Collective Bargaining Agreements 53 | | 55 |
| (g) | Assumption of Donnelly & Clark Agreement 53 | | 55 |
| (h) | Employment Agreements 53 | | 55 |
| (i) | Insurance Policies 53 | | 55 |
| 7.8. | Conditions Precedent to Consummation of the Plan | | 55 57 |
| (a) | Conditions Precedent to Confirmation 55 | | 57 |
| (b) | Conditions Precedent to the Effective Date 56 | | 58 |
| 7.9. | Waiver of Conditions Precedent and Bankruptcy Rule 3020(e) Automatic Stay | | 57 59 |
| 7.10. | Effect of Failure of Conditions | | 57 59 |
| 7.11. | Binding Effect | | 58 60 |
| 7.12. | Vesting of Assets | | 58 60 |
| 7.13. | Discharge of Claims Against and Interests in the Debtors | | 59 60 |
| 7.14. | Term of Pre-Confirmation Injunctions or Stays | | 59 61 |
| 7.15. | Injunction Against Interference With Plan | | 59 61 |
| 7.16. | Injunction | | 59 61 |
| 7.17. | Releases | | 60 62 |
| (a) | Released Parties 60 | | 62 |

(b)          Releases by the Debtors 61.................................................... 62

(c)          Releases by Certain Holders of Claims 61.......................... 63

(d)          Exculpation and Limitation of Liability 62........................ 64

7.18.        Injunction Related to Releases and Exculpation.................. 6365

7.19.        Termination of Subordination Rights and Settlement of Related Claims. 6365

7.20.        Retention of Causes of Action/Reservation of Rights............ 6465

7.21.        Indemnification Obligations; Cooperation and Insured Current Director & Officer Claims................................................ 6466

ARTICLE VIII.

             CONFIRMATION OF THE PLAN OF REORGANIZATION............ 6567

8.1.         Confirmation Hearing.......................................................... 6567

8.2.         Confirmation......................................................................... 6668

(a)          Confirmation Requirements 66............................................ 68

(i)          Acceptance 67......................................................................... 69

(ii)         Unfair Discrimination and Fair and Equitable Test 68......... 70

(iii)        Feasibility; Financial Projections 68.................................... 70

(b)          Valuation of the Reorganized Debtors................................. 6971

(c)          Best Interests Test 69............................................................. 71

8.3.         Classification of Claims and Interests.................................. 7173

8.4.         Consummation....................................................................... 7173

8.5.         Dissolution of the Creditors' Committee.............................. 7173

8.6.         Post-Confirmation Jurisdiction of the Bankruptcy Court.... 7273

ARTICLE IX.

             ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN........................................................................... 7375

9.1.         Alternative Plan(s) of Reorganization.................................. 7375

9.2.         Liquidation Under Chapter 7 of the Bankruptcy Code....... 7375

9.3.         Dismissal of the Debtors' Chapter 11 Cases....................... 7475

ARTICLE X.

             SUMMARY OF VOTING PROCEDURES................................. 7476

ARTICLE XI.

             CERTAIN RISK FACTORS TO BE CONSIDERED.................. 7577

11.1.        Certain Bankruptcy Considerations..................................... 7577

| (a) | General 75 | 77 |
| (b) | Failure to Receive Requisite Acceptances 76 | 77 |
| (c) | Failure to Secure Confirmation of the Plan 76 | 78 |
| (d) | Failure to Consummate the Plan 77 | 78 |
| (e) | Objections to Classification of Claims 77 | 79 |
| (f) | The Debtors May Object to the Amount or Classification of Your Claim 78 | 79 |
| (g) | The Debtors May Adjourn Certain Deadlines 78 | 79 |
| 11.2. | Risks Relating to the Capital Structure of the Reorganized Debtors 78 80 | |
| (a) | Variances From Financial Projections 78 | 80 |
| (b) | Leverage 78 | 80 |
| (c) | Ability to Service Debt 79 | 80 |
| (d) | Obligations Under the New Term Loan 79 | 81 |
| (e) | Restrictive Covenants 79 | 81 |
| (f) | Lack of a Trading Market 80 | 81 |
| (g) | Restrictions on Transfer 80 | 82 |
| (h) | The Implied Valuation of New Common Stock is Not Intended to Represent the Trading Value of the New Common Stock 81 | 82 |
| 11.3. | Risks Relating to Tax and Accounting Consequences of the Plan 81 82 | |
| (a) | Certain Tax Consequences of the Plan Raise Unsettled and Complex Legal Issues and Involve Factual Determinations 81 | 82 |
| (b) | Use of Historical Financial Information 81 | 83 |
| 11.4. | Risks Associated With the Debtors' Business 81 83 | |
| (a) | Unforeseen Events 81 | 83 |
| (b) | State Gaming Laws and Regulations May Require Holders of the New Common Stock to Undergo a Suitability Investigation 81 | 83 |
| (c) | Declining Atlantic City Gaming and Hotel Industry 82 | 83 |
| (d) | Increased Regional Competition 82 | 84 |
| (e) | Collective Bargaining Agreements 83 | 84 |
| (f) | Cash Flows are Seasonal in Nature and Excess Cash that is Typically Used to Subsidize Non-Peak Seasons May not be Available 83 | 84 |
| (g) | Atlantic City Casinos Operate in a Highly Taxed Industry 83 | 85 |
| (h) | Atlantic City Casinos are Subject to Extensive Regulation 84 | 85 |
| (i) | The Debtors May Be Unable to Assume or Assume and Assign the Trademark License Agreement 85 | 86 |

ARTICLE XII.

CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .................................................................. 8687

12.1.    Introduction ......................................................................... 8687

12.2.    Federal Income Tax Consequences to the Debtors ............................. 8788

    (a)    Cancellation of Indebtedness and Reduction of Tax Attributes 87 .......... 88

    (b)    Section 382 Limitation on NOLs 87 ....................................... 89

        (i)    General Section 382 Annual Limitation 88 ........................... 89

        (ii)    Chapter 11 Exceptions 88 ......................................... 90

    (c)    Alternative Minimum Tax 90 .............................................. 91

12.3.    Federal Income Tax Consequences to Holders of Certain Claims ............... 9091

    (a)    The Exchange under the Plan in General 90 .............................. 92

        (i)    Exchange of First Lien Debt for New Common Stock – Treatment if the First Lien Debt is a Security 90 ................................ 92

        (ii)    Treatment if the First Lien Debt is Not a Security 91 ............. 92

    (b)    New Common Stock 91 ................................................... 92

    (c)    New Term Loan 91 ..................................................... 93

    (d)    Other Considerations 92 ............................................... 94

    (e)    Information Reporting and Backup Withholding 93 ....................... 95

12.4.    Consequences of the Distribution Trust .................................... 9495

ARTICLE XIII.

SECURITIES LAW MATTERS ...................................................... 9597

13.1.    General .................................................................. 9597

13.2.    Initial Offer and Sale of Securities Under Federal Securities Laws ........ 9597

13.3.    New Common Stock ......................................................... 9698

    (a)    Issuance of New Common Stock 96 ....................................... 98

    (b)    Resale of New Common Stock 96 ......................................... 98

        (i)    Securities Law Restrictions 96 .................................... 98

        (ii)    Restrictions in the Amended Certificates of Incorporation and Amended By-Laws .................................................... 9899

        (iii)    Legend 98 ....................................................... 99

ARTICLE XIV.

PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN ................................ 98100

| 14.1. | Distributions. | ~~98~~**100** |
| 14.2. | No Postpetition Interest on Claims. | ~~98~~**100** |
| 14.3. | Date of Distributions. | ~~98~~**100** |
| 14.4. | Distribution Record Date. | ~~99~~**100** |
| 14.5. | Disbursing Agent. | ~~99~~**100** |
| 14.6. | Delivery of Distribution. | ~~99~~**101** |
| 14.7. | Unclaimed Property. | ~~100~~**101** |
| 14.8. | Satisfaction of Claims. | ~~100~~**101** |
| 14.9. | Manner of Payment Under Plan. | ~~100~~**102** |
| 14.10. | Fractional Shares/De Minimis Cash Distributions. | ~~100~~**102** |
| 14.11. | No Distribution in Excess of Amount of Allowed Claim. | ~~101~~**102** |
| 14.12. | Exemption From Securities Laws. | ~~101~~**102** |
| 14.13. | Setoffs and Recoupments. | ~~101~~**103** |
| 14.14. | Rights and Powers of Disbursing Agent. | ~~101~~**103** |
| (a) | Powers of Disbursing Agent ~~101.~~ | **103** |
| (b) | Expenses Incurred on or After the Effective Date ~~102.~~ | **103** |
| 14.15. | Withholding and Reporting Requirements. | ~~102~~**103** |
| 14.16. | Cooperation With Disbursing Agent. | ~~103~~**104** |
| 14.17. | Compliance with Gaming Laws and Regulations | ~~103~~**104** |
| ARTICLE XV. | | |
| | PROCEDURES FOR RESOLVING CLAIMS | ~~103~~**105** |
| 15.1. | Objections to Claims. | ~~103~~**105** |
| 15.2. | Amendment to Claims. | ~~104~~**106** |
| 15.3. | Disputed Claims. | ~~104~~**106** |
| (a) | No Distributions or Payments Pending Allowance ~~104.~~ | **106** |
| (b) | Establishment of Disputed Priority Claims Reserve ~~105.~~ | **106** |
| (c) | Establishment of Disputed General Unsecured Claims Reserve | ~~105~~**107** |
| (d) | Plan Distributions to Holders of Subsequently Allowed Claims ~~105.~~ | **107** |
| (e) | Distribution of Reserved Plan Consideration Upon Disallowance ~~106.~~ | **107** |
| 15.4. | Estimation of Claims. | ~~106~~**107** |
| 15.5. | The CBA Order | ~~106~~**108** |

Annexed as exhibits (the "**Exhibits**") to this Disclosure Statement are copies of the following documents:

- Plan (Exhibit 1);

- Valuation Analysis (Exhibit 2);

- Liquidation Analysis (Exhibit 3);

- Reorganized Debtors' Projected Financial Information (Exhibit 4);

- Disclosure Statement Order (without exhibits) (Exhibit 5);

# ARTICLE I.

# INTRODUCTION

1.1.    *General.*

Trump Entertainment Resorts, Inc. ("**TER**") along with its subsidiaries (collectively, the "**Debtors**" or, the "**Company**"), as debtors and debtors in possession in chapter 11 cases pending before the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), jointly administered under Case No. 14-12103 (KG), pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**"), transmit this Disclosure Statement, in connection with the Debtors' solicitation of votes to confirm the Plan, dated as of [*], 2015. ***All Plan Documents are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan), which may result in material changes to the terms of the Plan Documents.*** On the Effective Date, the Plan, all Plan Documents and all other agreements entered into or instruments issued in connection with the Plan and any Plan Document, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto and shall be deemed to become effective simultaneously.

On January [__], 2015, after notice and a hearing, the Bankruptcy Court entered an order (the "**Disclosure Statement Order**"), which, among other things: (i) approved this Disclosure Statement as containing "adequate information" to enable a hypothetical, reasonable investor typical of holders of Claims against or Interests in the Debtors to make an informed judgment as to whether to accept or reject the Plan; and (ii) authorized the Debtors to use this Disclosure Statement in connection with the solicitation of votes to accept or reject the Plan. **The Disclosure Statement Order establishes [_____], 2015 at 4:00 p.m. (prevailing Eastern Time) as the Voting Deadline for the return of Ballots accepting or rejecting the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE MERITS OF THE PLAN.**

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan, for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement and the Exhibits hereto, including the Plan and the Disclosure Statement Order, as well as the instructions accompanying the Ballot in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Plan, holders of Claims entitled to vote on the Plan should not rely on any information relating to the Debtors and their businesses other than the information contained in this Disclosure Statement, the Plan and all Exhibits hereto and thereto.

**THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS IN CLASSES 3 AND 4 VOTE TO ACCEPT THE PLAN, AS THE PLAN PROVIDES FOR THE BEST AVAILABLE RECOVERY TO CREDITORS IN SUCH CLASSES.**

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN. THIS DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN HEREIN IS ONLY A SUMMARY. HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED EXHIBITS AND ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.

Additional copies of this Disclosure Statement (including the Exhibits hereto) are available upon request made to the Debtors' Claims Agent, Prime Clerk LLC ("**Prime Clerk**"), at the following address: Trump Entertainment Resorts, Inc., c/o Prime Clerk LLC 830 Third Avenue, 9th Floor, New York, NY 10022. They may also be obtained by contacting Prime Clerk via telephone at (212) 257-5450. Additional copies of this Disclosure Statement (including the Exhibits hereto) can also be accessed free of charge from the following website: http://cases.primeclerk.com/ter/

In addition, a Ballot for voting to accept or reject the Plan is enclosed with this Disclosure Statement for the holders of Claims that are entitled to vote to accept or reject the Plan. If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please contact Prime Clerk at the address above.

Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the other Exhibits attached hereto and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes.

1.2.    ***The Confirmation Hearing.***

In accordance with the Disclosure Statement Order and section 1128 of the Bankruptcy Code, a hearing will be held before the Honorable Kevin Gross, United States Bankruptcy Judge for the District of Delaware, United States Bankruptcy Court, 824 N. Market St. Wilmington, Delaware 19801, Sixth (6th) Floor, Courtroom 3, on **[_____], 2015 at [     ] (prevailing Eastern Time)**, to consider confirmation of the Plan. The Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and they have reserved the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, subject to the terms of the Plan. Objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before **[_____], 2015 at 4:00 p.m. (prevailing Eastern Time)**, in the manner set forth in the Disclosure Statement Order. The hearing on confirmation of the

Plan, may be adjourned from time to time without further notice except for the announcement of the adjourned date and time at the hearing on confirmation or any adjournment thereof or an appropriate filing with the Bankruptcy Court.

At the Confirmation Hearing, the Bankruptcy Court will, among other things:

- determine whether sufficient majorities in number and amount from each Class entitled to vote on the Plan have delivered properly executed votes accepting the Plan to approve the Plan;

- hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of;

- determine whether the Plan meets the confirmation requirements of the Bankruptcy Code; and

- determine whether to confirm the Plan.

1.3.    ***Classification of Claims and Interests.***

The following table designates the Classes of Claims against and Interests in the Debtors, and specifies which Classes are: (a) impaired or unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, or (c) deemed to accept or reject the Plan.

| **Class** | **Designation** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | No | No (Deemed to accept) |
| Class 2 | Other Secured Claims | No | No (Deemed to accept) |
| Class 3 | First Lien Credit Agreement Claims | Yes | Yes |
| Class 4 | General Unsecured Claims | Yes | Yes |
| Class 5(a) | Existing Securities Law Claims | Yes | No (Deemed to reject) |
| Class 5(b) | Equitably Subordinated Claims | Yes | No (Deemed to reject) |
| Class 6 | Existing TER Interests | Yes | No (Deemed to reject) |

1.4.    ***Voting; Holders of Claims Entitled to Vote.***

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a chapter 11 plan are entitled to vote to accept or reject such proposed plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are altered under such plan. Classes of claims or equity interests under a chapter 11 plan in which the holders of claims or equity interests are unimpaired are deemed to have accepted such plan and are not entitled to vote to accept or reject the proposed plan. In addition, classes of claims or equity interests in which the holders of claims or equity interests will not receive or retain any property on account of their claims or equity interests are deemed to have rejected the chapter 11 plan and are not entitled to vote to accept or reject such plan.

In connection with the Plan:

- Claims in Classes 3 and 4 are impaired, will receive a distribution on account of such Claims to the extent provided in the Plan and are entitled to vote to accept or reject the Plan;

- Claims in Classes 1 and 2 are unimpaired and, as a result, holders of such Claims are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan; and

- Claims and Interests in Classes 5(a), 5(b) and 6 are impaired, will not receive a distribution on account of such Claims and Interests, respectively, under the Plan, are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims in that class that cast ballots for acceptance or rejection of the chapter 11 plan. **Your vote on the Plan is important.** The Bankruptcy Code requires as a condition to confirmation of a chapter 11 plan that each class that is impaired and entitled to vote under a plan vote to accept such plan, unless the requirements of section 1129(b) of the Bankruptcy Code are satisfied.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan and/or to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the non-acceptance of such plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept such plan (excluding any votes of insiders). Under that section, a chapter 11 plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. This Disclosure Statement, the Exhibits attached hereto, the Plan and the related documents are the only materials the Debtors are providing to creditors for their use in determining whether to vote to accept or reject the Plan, and it is the Debtors' position that such materials may not be relied upon or used for any purpose other than to vote to accept or reject the Plan.

Please complete and sign your Ballot(s) and return such Ballot(s) to the Debtors' claims and voting agent (the "**Voting Agent**") at the applicable address below:

*If by First-Class Mail, Hand Delivery or Overnight Mail:*
Trump Entertainment Resorts, Inc. Ballot Processing
c/o Prime Clerk LLC
830 Third Avenue, 9th Floor
New York, NY 10022

- 4-

Please note that the pre-paid, pre-addressed envelope included in your solicitation package may reference a different return address than the return address provided above.

In addition to accepting submitted hard copy Ballots via first class mail, overnight courier and hand delivery, holders of Claims entitled to vote, may submit their Ballots via electronic, online transmission through a customized "E-Ballot" section on the Debtors' case website (http://cases.primeclerk.com/ter/) on or before the Voting Deadline.

TO BE COUNTED, YOUR ORIGINAL BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY <u>RECEIVED</u> BY THE VOTING AGENT NO LATER THAN **4:00 P.M., PREVAILING EASTERN TIME, ON [____], 2015**, UNLESS EXTENDED BY THE DEBTORS. YOUR BALLOT MAY BE SENT VIA MAIL, OVERNIGHT COURIER OR MESSENGER. FAXED COPIES AND VOTES SENT ON OTHER FORMS WILL NOT BE ACCEPTED EXCEPT IN THE DEBTORS' SOLE DISCRETION. ALL BALLOTS MUST BE SIGNED.

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from the Classes entitled to vote with respect thereto. Accordingly, in voting on the Plan, please use only the Ballots sent to you with this Disclosure Statement or provided by the Voting Agent.

The Debtors have fixed **[_____], 2015** (the "**Voting Record Date**"), as the date for the determination of Persons who are entitled to receive a copy of this Disclosure Statement and all of the related materials and to vote whether to accept or reject the Plan. Accordingly, only holders of record of Claims as of the Voting Record Date that are entitled to vote on the Plan will receive a Ballot and may vote on the Plan.

All properly completed Ballots received prior to the Voting Deadline will be counted for purposes of determining whether a voting Class of impaired Claims has accepted the Plan. **Under the Bankruptcy Code, for the Plan to be "accepted," a specified majority vote is required for each Class of impaired Claims entitled to vote on the Plan. If no votes are received with respect to any Class of impaired Claims entitled to vote on the Plan, then such Class shall be deemed to have accepted the Plan. If any impaired Class fails to have any Allowed Claims or a Claim temporarily Allowed by the Court as of the date of the Confirmation Hearing, such Class or Classes will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class or Classes pursuant to section 1129(a)(8) of the Bankruptcy Code.** The Voting Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Class entitled to vote.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF ALL HOLDERS OF CLAIMS AND RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

1.5.    *Important Matters.*

This Disclosure Statement contains projected financial information and certain other forward-looking statements, all of which are based on various estimates and assumptions and will not be updated to reflect events occurring after the date hereof. Such information and statements are subject to inherent uncertainties and to a wide variety of significant business, economic and competitive risks, including, among others, those described herein. Consequently, actual events, circumstances, effects and results may vary significantly from those included in or contemplated by such projected financial information and such other forward-looking statements. The projected financial information contained herein and in the exhibits annexed hereto, therefore, is not necessarily indicative of the future financial condition or results of operations of the Debtors, which in each case may vary significantly from those set forth in such projected financial information. Consequently, the projected financial information and other forward-looking statements contained herein should not be regarded as representations by any of the Debtors, the Reorganized Debtors, their advisors or any other Person that the projected financial conditions or results of operations can or will be achieved.

## ARTICLE II.

## SUMMARY OF PLAN AND CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS THEREUNDER

2.1.    *General.*

The overall purpose of the Plan is to provide for the restructuring of the Debtors' liabilities in a manner designed to maximize recovery to stakeholders, to enhance the financial viability of the Reorganized Debtors, and, most importantly, preserve the Debtors' businesses and operations on a go-forward basis. The Plan reflects the agreement in ~~principle~~**principal**, subject to confirmation of the Plan and the satisfaction or waiver of the terms and conditions to both confirmation and effectiveness of the Plan, by the First Lien Lenders to fully equitize their existing senior secured debt ~~[and~~ ~~to provide~~**the formal commitment,** subject to the conditions set forth in Section 11.1 of the Plan being satisfied or waived, **to fund the New Term Loan in the aggregate principal amount of (a)** $~~[13.5]~~ million in new-money exit financing ~~in the form of a New Term Loan~~**, plus (b) the aggregate outstanding principal amount of loans under the DIP Credit Agreement and the accrued interest, unpaid fees and costs and expenses thereon outstanding on the Effective Date**, subject to the satisfaction or waiver of the terms and conditions set forth in the New Term Loan Commitment Letter and the New Credit Agreement~~].~~  **The Debtors estimate that the proceeds of the New Term Loan and cash-on-hand on the Effective Date will be sufficient to fund distributions under the Plan (including the payment of Allowed Administrative Expense Claims and Priority Claims in accordance with the terms of the Plan).**

Upon confirmation of the Plan and satisfaction of the conditions contained in the Plan, the holders of Allowed First Lien Credit Agreement Claims shall receive, in the aggregate, 100% of the shares of the New Common Stock to be issued by Reorganized TER on a fully diluted basis. Additionally, notwithstanding that the holders of Allowed First Lien Credit Agreement Claims are not receiving payment in full under the Plan, holders of General

Unsecured Claims shall receive Distribution Trust Interests in full satisfaction of their Claims pursuant to the Plan, which shall include $1 million in Cash and the proceeds, if any, of certain Avoidance Actions. Holders of General Unsecured Claims that do not validly exercise the Opt-Out Election **(i.e., affirmatively elect in a timely submitted Ballot to grant the releases set forth in section 12.7(b) of the Plan)** will receive Class A Distribution Trust Beneficial Interests, while holders of General Unsecured Claims that exercise the Opt-Out Election **(i.e., affirmatively elect in a timely submitted Ballot not to grant the releases set forth in section 12.7(b) of the Plan)** will only receive the Class B Distribution Trust Beneficial Interests.[2]

All Intercompany Claims will be adjusted (including by contribution, distribution in exchange for new debt or equity or otherwise), paid, continued or discharged to the extent reasonably determined appropriate by the Reorganized Debtors. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court or by the stockholders of any of the Reorganized Debtors. All Intercompany Interests shall be preserved under the Plan, and the Debtors' existing corporate structure shall be maintained.

The Plan Distributions described above and herein will be funded by, among other sources, the proceeds of the New Term Loan and the Debtors' cash-on-hand. The New Common Stock issued through the Plan will not be registered with the SEC or any state securities regulatory authority and will not trade on any exchange, or otherwise be publicly traded upon the Effective Date.

As discussed herein, the Plan contemplates the First Lien Lenders' agreement in principle, subject to confirmation of the Plan and the satisfaction or waiver of the terms and conditions to both confirmation and effectiveness of the Plan, to equitize all of their senior secured debt (thereby eliminating $38 million in annual debt-service payments). ~~[Additionally,~~ the First Lien Lenders have agreed ~~in principle~~, subject to confirmation of the Plan and the satisfaction or waiver of the terms and conditions to both confirmation and effectiveness of the Plan, to receive the new equity of Reorganized TER and (subject to the satisfaction or waiver of the conditions in the New Term Loan Commitment Letter and the New Credit Agreement) provide **(a)** $~~[13.5]~~ million**, plus (b) the aggregate outstanding principal amount of loans under the DIP Credit Agreement and the accrued interest, unpaid fees and costs and expenses thereon outstanding on the Effective Date,** upon the Effective Date to, among other things, repay obligations under the DIP Loan, pay certain administrative and priority claims, and finance the ongoing working capital and other general corporate purposes of the Reorganized Debtors. The $~~[13.5]~~ million investment coupled with the restructuring of the Debtors' secured indebtedness would enable the Taj Mahal to remain open and would provide the Reorganized Debtors with the necessary capital to operate.~~]~~

The Debtors believe that the Plan provides for appropriate treatment of all Classes of Claims and Interests, taking into account the valuation of the newly issued securities implied by the financing commitments being provided in connection with consummation of the Plan and the differing natures and priorities of the Claims and Interests.

---

[2] **A further description of the effect of the Opt-Out Election can be found in Item 2 of the Ballot that will be provided to holders of General Unsecured Claims.**

2.2.    *Summary of Treatment of Claims and Interests Under the Plan.*

      The following table classifies the Claims against and Interests in the Debtors into separate Classes and summarizes the treatment of each Class under the Plan. The table also identifies which Classes are entitled to vote on the Plan based on provisions of the Bankruptcy Code. Finally, the table indicates the estimated recovery for each Class. The summaries in this table are qualified in their entirety by the description and the treatment of such Claims and Interests in the Plan. **As described in Article XI below, the Debtors' businesses are subject to a number of risks. The uncertainties and risks related to the Reorganized Debtors make it difficult to determine a precise value of the Reorganized Debtors, the New Common Stock and other distributions under the Plan. The recoveries and estimates described in the following table represent the Debtors' best estimates given the information available on the date of this Disclosure Statement. All statements in this section relating to the amount of Claims and Interests are only estimates based on information known to the Debtors as of the date hereof, and the final amounts of Allowed Claims may vary significantly from these estimates.**

      In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified. Except as specifically noted therein, the Plan does not provide for payment of postpetition interest with respect to Allowed Claims.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired; payment in full, in Cash, of the Allowed amount of such Claim (or as otherwise agreed) | No | ~~$0.00~~**650,000.00** | 100% |
| Class 2 | Other Secured Claims | Unimpaired; payment in full, in Cash, of the Allowed amount of such Claim (or as otherwise agreed), or return of the collateral | No | $~~369,000.00~~**500,000.00** | 100% |
| Class 3 | First Lien Credit Agreement Claims | Impaired; shall receive its Pro Rata Share of 100% of the New Common Stock to be issued by TER on the Effective Date, on a fully diluted basis | Yes | $292,257,374.79 | [~~45.3 % – 56.5~~]**53**% |
| Class 4 | General Unsecured Claims | Impaired; shall receive its Pro Rata Share of the Class A Distribution Trust Beneficial Interests or the Class B Distribution Trust Beneficial Interests, as applicable, based on whether or not each such holder validly exercised the Opt-Out Election | Yes | $212,000,000.00 – ~~232,000,000.00~~[3] | |

~~3 This estimated amount of Allowed General Unsecured Claims reflects a preliminary estimate based on the initial review of the Debtors and the Claims Agent of the proofs of claim filed and Claims scheduled, adjusting for certain multi-debtor, duplicative and amended Claims, and certain litigation risk and other assumptions. The estimated amount of General Unsecured Claims includes, but is not limited to, the asserted claims of the National Retirement Fund and approximately $15 million in estimated trade claims. Additionally, certain additional General Unsecured Claims may result from the rejection of various executory contracts and/or unexpired leases. The Debtors reserve the right to object to the amount or classification of any Claim on any grounds.~~

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class | Estimated Recovery |
|-------|-------------|-----------|------------------|-------------------------------------------------|--------------------|
|       |             |           |                  | **232,000,000.00[3]** | 0.47%-0.43%[3][4] |
| Class 5(a) | Existing Securities law Claims | Impaired; Shall receive no Distribution | No | n/a | 0% |
| Class 5(b) | Equitably Subordinated Claims | Impaired; Shall receive no Distribution | No | n/a | 0% |
| Class 6 | Existing TER Interests | Impaired; Shall receive no Distribution | No | n/a | 0% |

The recoveries set forth above are estimates and are contingent upon approval of the Plan as proposed.

## ARTICLE III.

## BUSINESS DESCRIPTION; HISTORICAL INFORMATION

### 3.1. *The Debtors' Businesses.*

#### (a)    The Debtors.

The Debtors, headquartered in the City of Atlantic City, New Jersey ("**Atlantic City**"), own two casino hotels located in Atlantic City, New Jersey: the Trump Taj Mahal Casino Resort (the "**Taj Mahal**") and the Trump Plaza Hotel and Casino (the "**Plaza**"). Since emerging from their prior bankruptcy cases in 2010, the Debtors continued to face significant challenges due to the prolonged economic downturn, increased competition from within the Atlantic City market and from neighboring states and the lingering effects of Superstorm Sandy, all of which contributed to declining revenues. These factors, coupled with the seasonal and capital-intensive nature of the Debtors' businesses, high debt load, significant labor costs and double-digit real estate tax increases hindered the Debtors' ability to operate successfully and negatively impacted the Debtors' liquidity position. Consequently, as described in more detail below, the Debtors determined to commence these Chapter 11 Cases. The Debtors believe that the commencement of these Chapter 11 Cases is in the best interests of the Debtors' creditors and stakeholders.

---

[3] **This estimated amount of Allowed General Unsecured Claims reflects a preliminary estimate based on the initial review of the Debtors and the Claims Agent of the proofs of claim filed and Claims scheduled, adjusting for certain multi-debtor, duplicative and amended Claims, and certain litigation-risk and other assumptions. The estimated amount of General Unsecured Claims includes, but is not limited to, the asserted claims of the National Retirement Fund and approximately $15 million in estimated trade claims. Additionally, certain additional General Unsecured Claims may result from the rejection of various executory contracts and/or unexpired leases. The Debtors reserve the right to object to the amount or classification of any Claim on any grounds.**

[3] The estimated recovery for holders of General Unsecured Claims does not include the potential value of the non-cash portion of the Distribution Trust Assets as of the Confirmation Date and does not account for a holder's exercising of the Opt-Out Election. Actual recoveries may be materially different than the percentages identified.

[4] **The estimated recovery for holders of General Unsecured Claims does not include the potential value of the non-cash portion of the Distribution Trust Assets as of the Confirmation Date and does not account for a holder's exercising of the Opt-Out Election. Actual recoveries may be materially different than the percentages identified.**

3.2.   *Prior Bankruptcy Filings*

On November 21, 2004, TER's predecessor entity, Trump Hotels & Casino Resorts, Inc., together with 28 affiliates and subsidiaries (collectively, the "**2004 Debtors**"), filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the District of New Jersey (Case No. 04-46898 (JHW)) (the "**2004 Chapter 11 Cases**").  On April 5, 2005, the Bankruptcy Court entered an order confirming a chapter 11 plan of reorganization with respect to the 2004 Debtors, and on May 20, 2005 the plan became effective.  On March 17, 2009, the Bankruptcy Court issued its final decree and order closing the 2004 Chapter 11 Cases.

The 2004 Debtors emerged from the 2004 Chapter 11 Cases with a $500 million secured credit facility and $1.25 billion in principal amount of second lien notes issued by TER's predecessor-in-interest ("**Second Lien Notes**").  Following their emergence from bankruptcy, the 2004 Debtors' operating results were negatively affected by the global recession, intense competition within the Atlantic City market and adjoining states and certain other factors.

Consequently, on February 17, 2009, TER and its direct and indirect subsidiaries (collectively, the "**2009 Debtors**") filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the District of New Jersey (Case No. 09-13654 (JHW)) (the "**2009 Cases**").  On May 7, 2010, the Bankruptcy Court entered an order (the "**2010 Confirmation Order**") confirming a chapter 11 plan of reorganization with respect to the 2009 Debtors (the "**2010 Plan**"), and on July 16, 2010 the 2010 Plan became effective.  On January 10, 2012, the Bankruptcy Court issued its final decree and order closing the 2009 Cases.

Pursuant to the 2010 Plan, TER received $225 million in new capital in connection with an equity rights offering backstopped by former holders of the Second Lien Notes issued by TER's predecessor in interest.  Additionally, five (5) percent of the newly issued and outstanding stock of TER was distributed to holders of the Second Lien Notes on a pro-rata basis, and five (5) percent of the newly issued and outstanding stock of TER, together with warrants to acquire an additional five (5) percent of TER's stock, were issued to Donald J. Trump.  The holders of approximately $486.3 million in first lien debt previously issued by TER's predecessor-in-interest received a cash payment of $125 million as well new debt (as described below).

3.3.   *Summary of Corporate Structure.*

TER, the ultimate parent company of the Debtors, is a Delaware corporation that holds a 99% interest in, and is a general partner of, Trump Entertainment Resorts Holdings, L.P. ("**TER Holdings**"), a Delaware limited partnership.  The remaining one percent of TER Holdings is held by TERH LP Inc., a Delaware corporation, as a limited partner.  As the sole general partner of TER Holdings, TER has the exclusive rights, responsibilities and discretion as to the management and control of TER Holdings and its subsidiaries.  TER Holdings, in turn, holds 100% of the equity interests in each of the various subsidiaries of the Debtors, including (a) Trump Plaza Associates LLC ("**Plaza Associates**"), a New Jersey limited liability company, which owns the Plaza, and (b) Trump Taj Mahal Associates LLC ("**Taj Associates**"), also a New

Jersey limited liability company, which owns the Taj Mahal.[45]  The Debtors derive revenue primarily from casino operations, room rental, food and beverage sales and/or entertainment revenue.

3.4.    ***The Debtors' Operations***

(a)    **Taj Mahal**

The Taj Mahal is located on the northern end of Atlantic City's boardwalk and is situated on 35.9 acres of beachfront property.  The Taj Mahal features over 2,000 hotel rooms, including the 782-room Chairman Tower (which includes 66 suites and 8 penthouse suites) and the original 1,228-room hotel tower (which includes 243 suites and 7 penthouse suites), sixteen (16) dining locations (including Il Mulino New York), and five (5) cocktail lounges.  The Taj Mahal also features approximately 162,000 square feet of gaming space that includes approximately 2,500 slot machines and 180 table games (including poker tables), a high-end gaming salon, an approximately 12,500 square-foot Poker and Keno room and an Asian-themed table game area offering popular Asian table games.  The Taj Mahal also features the following: an approximately 20,000 square-foot multi-purpose entertainment complex known as the "**Xanadu Theater,**" with seating capacity for up to approximately 1,200 people, which can be used as a theater, concert hall, boxing arena or exhibition hall; a 35,000 square-foot Scores gentleman's club;  the Casbah nightclub; the Mark G. Etess Arena, featuring approximately 63,000 square feet of exhibition and entertainment space which can accommodate over 5,000 people; and a health club, spa and fitness center with an indoor pool.  The Taj Mahal also has a parking garage for approximately 6,750 cars, a six (6) bay bus terminal and a roof-top helipad.

The Taj Mahal's net revenues for the 2013 fiscal year were approximately $257.9 million and the unaudited net revenues for the six months ended June 30, 2014 were approximately $108.5 million.

(b)    **Plaza**

The Plaza is located at the center of the boardwalk at the end of the Atlantic City Expressway (the main highway into the city), and is situated on 10.9 acres with direct access to Boardwalk Hall (an entertainment and sporting venue owned and operated by the New Jersey Sports and Exposition Authority that can accommodate up to approximately 13,000 people).  The Plaza features approximately 906 hotel rooms (including 140 suites) and approximately 87,000 square feet of casino space with approximately 1,600 slot machines and 63 table games.  The Plaza also features approximately 18,000 square feet of conference space, a 750-seat cabaret theater, two (2) cocktail lounges, seven (7) restaurants, a players club, a seasonal beach bar and

---

[45] Until May 24, 2011, the Debtors owned and operated the Marina, which was located on approximately 14 acres in Atlantic City's marina district and featured a 27-story hotel with approximately 728 guest rooms, approximately 79,000 square feet of gaming space (including approximately 1,980 slot machines and 70 table games), approximately 30,500 square feet of convention, ballroom and meeting space and other amenities.  On May 24, 2011, the Marina was sold to Golden Nugget Atlantic City, LLC, an affiliate of Landry's Restaurants, Inc., for gross cash proceeds of approximately $37.3 million.  Although the Marina was sold, as of the Petition Date, Trump Marina Associates, LLC, the legal entity that owned the Marina is inactive and has not yet been dissolved.

restaurant, health spa, an indoor pool and retail outlets.  Additionally, the Plaza has a parking garage that can accommodate thirteen (13) buses and approximately 2,700 cars.

The Plaza's net revenues for the 2013 fiscal year was approximately $76.3 million and the unaudited net revenues for the six months ended June 30, 2014 were approximately $28.1 million.

### (c)    Online Gaming

In 2013, the New Jersey Legislature passed, and Governor Christie signed, a bill legalizing online gambling in the State of New Jersey and restricting the operation of the online gaming websites to Atlantic City's casinos.  In October 2013, the DGE issued an internet gaming permit to each of Taj Associates and Plaza Associates to conduct internet gaming in the State of New Jersey.

On June 24, 2013, Taj Associates entered into a ten (10) year online gaming operation agreement (the "**UG Online Gaming Agreement**") with Fertitta Acquisitionsco LLC, doing business as Ultimate Gaming ("**UG**").  On June 27, 2013, Plaza Associates also entered into a ten (10) year online gaming operation agreement (the "**Betfair Online Gaming Agreement**", and together with the UG Online Gaming Agreement, the "**Online Gaming Agreements**") with Betfair Interactive US LLC ("**Betfair**").

Pursuant to the Online Gaming Agreements, each of UG and Betfair agreed to host, manage, operate and support internet gambling games in New Jersey under the internet gaming permits granted to the Company.  In exchange, each of UG and Betfair agreed to share certain percentages of the online gaming revenues (after the deduction of certain player-related costs, gaming taxes and obligations owed to the CRDA) with the Company.  In addition, UG and Betfair each contributed $8 million and $7.5 million, respectively, to the Company and also agreed to pay an additional $8 million and $7.5 million, respectively, to the Company.

### (d)    CRDA Obligations

Atlantic City casinos generally pay an 8.0% tax rate on gross gaming revenues and 1.25% of gross gaming revenues as a statutorily-imposed investment alternative obligation, for an effective gaming tax rate of 9.25% of gross gaming revenues.  Specifically, pursuant to a contract with the Casino Reinvestment Development Authority (the "**CRDA**"), the Debtors are required to pay their investment alternative obligations to the CRDA in the form of quarterly deposits.  Such deposits fund qualified investments as defined in the Casino Control Act, which may include the purchase of bonds issued by the CRDA at a below-market rate of interest, direct investment in projects or donation of funds to projects, all as determined by the CRDA.  As of October 31, 2014, the Debtors had approximately $5.5 million of CRDA deposits and held approximately $25.4 million of CRDA bonds outstanding.

3.5.    *Debtors' Prepetition Capital and Debt Structure.*

(a)    **First Lien Credit Agreement**

Pursuant to the 2010 Plan, on July 16, 2010, each of TER, TER Holdings and certain subsidiaries of TER (the "**Subsidiary Guarantors**") entered into the First Lien Credit Agreement, pursuant to which TER issued $356.4 million principal amount of first lien debt to the First Lien Lenders.  In connection with a settlement of certain disputes between the Company and the First Lien Lenders, on September 21, 2010, the Amended and Restated Credit Agreement was subsequently amended, retroactive to July 16, 2010, to reduce the total principal amount outstanding as of such date from approximately $356.4 million to approximately $346.5 million (the "**First Lien Debt**") and to provide that interest would be payable on all principal amounts outstanding.

The First Lien Credit Agreement requires quarterly principal amortization payments in the amount of $866,000 and requires the Debtors to pay interest on the unpaid principal amount outstanding at an annual rate of 12%, payable quarterly in arrears.  Under the First Lien Credit Agreement, the Company is subject to certain affirmative and negative covenants, and thus is required to make mandatory prepayments of the First Lien Debt under certain circumstances.    Amounts outstanding under the First Lien Credit Agreement are guaranteed by the Subsidiary Guarantors and are secured by first priority liens on and security interests in all of the Debtors' assets.  The 2010 Confirmation Order provides, in part, as follows:

> Notwithstanding anything to the contrary in the Plan, the Plan Documents or this Order, on the Effective Date, the First Lien Agent(s) and/or Lenders shall continue to have valid, perfected, and first priority liens on, and pledges and security interests in, all of the Debtors' and reorganized Debtors' assets (of every kind and nature whatsoever), including, for the avoidance of doubt, cage cash, and all proceeds of any and all of the foregoing and this Order shall be sufficient and conclusive evidence of the first priority, perfection and validity of such liens, pledges and security interests without the need for any further action including, without limitation, the filing or recording of any financing statements or other documents that may otherwise be required under federal or state law in any jurisdiction.

2010 Confirmation Order at § 19(b).  All indebtedness outstanding under the First Lien Credit Agreement matures on December 31, 2015.  As of the Petition Date, the total aggregate principal amount outstanding under the First Lien Credit Agreement was approximately $285.6 million plus accrued but unpaid interest of approximately $6.6 million.

In light of various potential defaults or events of default that might have occurred, or were anticipated to occur, under the First Lien Credit Agreement, on June 28, 2014, the Debtors, First Lien Lenders and the First Lien Agent entered into a forbearance agreement, pursuant to which the First Lien Lenders agreed to forbear from enforcing their rights under the First Lien Credit Agreement until August 18, 2014 (the "**Forbearance Agreement**"). Thereafter,

on August 20, 2014, the First Lien Lenders and First Lien Agent agreed to extend the term of the Forbearance Agreement until September 16, 2014, and, on August 21, 2014, the Debtors amended the First Lien Credit Agreement to add Trump Entertainment Resorts, Inc. as a Borrower under the First Lien Credit Agreement. The Debtors determined that such amendment to the First Lien Credit Agreement would have no negative impact on the Debtors.

(b)    **Trade Debt**

As noted above, the Debtors estimate that there are approximately $15 million in trade claims.

(c)    **Equity**

As of August 20, 2014, there were approximately 200 holders of record of TER's common stock, many of whom may include former holders of the Second Lien Notes who purchased and/or received common stock under the 2010 Plan (as described above). Upon information and belief, Donald J. Trump holds approximately 5% of the TER common stock as well as warrants to purchase approximately 5% of TER's common stock.

## ARTICLE IV.

## EVENTS LEADING TO CHAPTER 11 FILING

Since emergence from bankruptcy in 2010, the Debtors' management team undertook a number of in an attempt to restore the Debtors' financial footing, which are further described in the *Declaration of Robert Griffin in Support of Debtors' Chapter 11 Petitions and First-Day Motions and Applications* [Docket No. 2]. The Debtors had hoped that those measures would restore the Debtors to profitability and long-term stability. Unfortunately, the Debtors' operating results and financial condition continued to decline due to a variety of factors, including those described below.

4.1.    *High Debt Burden*

Although the Debtors were able to significantly reduce the principal balance of the First Lien Debt since 2010 through asset sale pay downs and amortization payments, the Debtors remain highly leveraged, with a current principal balance of $285.6 million and annual debt service expense of approximately $38 million (as compared with negative LTM EBITDA).

4.2.    *Declining Atlantic City Market*

Since 2010, the Atlantic City gaming market has experienced significant contractions. Total 2013 gross gaming revenues in the Atlantic City market (as reported to the DGE) was down over 6.2% from 2012 levels. These declines are a result of a variety of factors, including (a) increased competition within the Atlantic City market (*i.e.*, (i) the opening of the Revel Casino Hotel ("**Revel**") in April 2012, which resulted in decreased market share for the Debtors' properties, (ii) the significant property improvements made by the Golden Nugget in 2011 and (iii) the recent expansion and rebranding of Resorts Casino as Jimmy Buffet's Margaritaville), (b) competition from adjoining states (*i.e.*, the opening of casinos in

Pennsylvania, Maryland, Delaware and New York), (c) the general economic decline in Southern New Jersey and surrounding areas and (d) the change in spending patterns in the region due to decreased disposable income. This decline is likely to be further exacerbated by, among other things, the legislative effort currently underway to legalize gambling in New Jersey outside of Atlantic City.

Indeed, this market decline has resulted in significant over-supply in the Atlantic City casino market, as evidenced by the recently-announced closures or bankruptcies of several other casinos, including the Showboat Casino Hotel (the "**Showboat**"), the Atlantic Club, and, most notably, Revel after less than two years in operation. ~~Additionally, initial~~**Initial** operational results following the Showboat and Revel closures suggest that the closures will result in decreased foot traffic to the north end of the boardwalk, where the Taj Mahal is located, and that any "bounce" for the Taj Mahal may be muted, non-existent or even negative as a result of the closures.

**Moreover, in January 2015, the operating company for three separate casinos in Atlantic City, Caesars Atlantic City, Bally's and Harrah's, commenced its own bankruptcy cases.**

**The ongoing market decline in Atlantic City has recently resulted in various legislative and executive efforts to support the Atlantic City gaming industry. Specifically, on December 1, 2014, legislation to create a payment-in-lieu of taxes (PILOT) mechanism in lieu of traditional ad valorem property taxes, known as the "Casino Property Taxation Stabilization Act," was introduced in the New Jersey State Senate as Bill No. S2572. As proposed, the legislation in its current form would set collective casino property tax payments at $150 million for two years and at $120 million for each of the following 13 years. On December 15, 2014, the legislation passed the full Senate and was introduced in the General Assembly as Bill No. A3981 on the same day. The Debtors cannot predict whether the legislation, in its current or modified form, will ultimately pass the General Assembly and/or become enacted into law, if at all.**

**Additionally, on January 22, 2015, Governor Christie issued Executive Order 171 appointing an Emergency Manager for Atlantic City in the Department of Community Affairs, Division of Local Government Services, and authorizing and directing such Emergency Manager to, among other things, (a) "analyze and assess the financial condition of Atlantic City, (b) "prepare and recommend, within 60 days of appointment, a plan to place the finances of Atlantic City in stable condition on a long-term basis by any and all lawful means," and (c) "negotiate with parties affected by the recommended plan for an adjustment of Atlantic City's debts and the restructuring of its municipal operations and, in his discretion, to recommend modifications of the plan as a result of such negotiations." A copy of the Executive Order can be downloaded from the following link: http://nj.gov/infobank/circular/eocc171.pdf.**

4.3.    *Lingering Effects of Superstorm Sandy and Other Storms*

During late October 2012, an unusual mix of a hurricane and winter storm ("**Superstorm Sandy**") caused widespread property damage and flooding to numerous regions

along the Eastern United States.  On October 27, 2012, in anticipation of Superstorm Sandy, the Governor of New Jersey ordered the closure of all businesses and the evacuation of Atlantic City, New Jersey.  On October 28, 2012, the DGE ordered the temporary suspension of all twelve (12) Atlantic City gaming licenses.  The DGE vacated its order on November 2, 2012. The Taj Mahal and the Plaza closed to the public on October 28, 2012.  Superstorm Sandy caused some physical damage to the Debtors' casinos, which were able to reopen on November 2, 2012.

Furthermore, in June 2012, a fast moving, severe thunderstorm (derecho) tracked into the mid-Atlantic states. Sections of Virginia, Maryland, Pennsylvania, Washington D.C., Delaware and southern New Jersey suffered overturned trees, roof damage and power outages. Over 200,000 people in southern New Jersey lost power.

Finally, in August 2011, Hurricane Irene made landfall in New Jersey and continued up the east coast.  Mandatory evacuation of certain of the Debtors' feeder markets began on August 24, 2011.  A state of emergency was declared for New Jersey on August 25, 2011 and a mandatory evacuation was ordered for Atlantic City shore communities.  Atlantic City casinos closed on August 26, 2011 and reopened with limited services on August 29, 2011. The Taj Mahal and the Plaza sustained minimal physical damage.

The Debtors' results of operations were negatively impacted due to the closure and extensive damage sustained within its primary feeder markets in the Mid-Atlantic Region in the wake of these storms.  Additionally, as a result of the effects of Superstorm Sandy, the Debtors submitted a $14 million business interruption claim to its insurance company, but the insurance company has disputed this claim and the Debtors cannot predict when (if at all) the payment will be recovered.

## 4.4.    *Disappointing Internet Gaming Results*

As noted above, the Debtors became licensed to conduct online gaming in 2013. Initially thought to be a major boon to Atlantic City casino operators, actual results have thus far fallen short of expectations.

## 4.5.    *Declining Performance*

As a result of the foregoing, the Debtors have experienced significant EBITDA declines since their emergence from the prior bankruptcy cases.  EBITDA, including discontinued operations, for the 2013 fiscal year was negative $5.1 million.  The Debtors' gaming revenues declined from approximately $394.8 million in 2012 to approximately $330 million in 2013 (representing a 16.4% decline); hotel room revenues declined from approximately $73.3 million in 2012 to approximately $67.2 million in 2013 (representing an 8.3% decline) and food and beverage sales declined from approximately $57.1 million in 2012 to approximately $44.3 million in 2013 (representing a 22.5% decline).

The Debtors' declining performance continued into 2014.  EBITDA, including discontinued operations, for the first six months of the 2014 fiscal year was negative $25.7

million.[56]  The Debtors' gaming revenues declined from approximately $164.6 million in the first half of 2013 to approximately $134.6 million in the first half of 2014 (representing an 18.2% decline); hotel room revenues declined from approximately $30.8 million in the first half of 2013 to approximately $30.2 million in the first half of 2014 (representing a 1.9% decline) and food and beverage sales declined from approximately $21 million in the first half of 2013 to approximately $16 million in the first half of 2014 (representing a 23.8% decline).

Notably, while nearly all Atlantic City casinos reported a decline in net revenue across the board, the Debtors' casinos, in particular, suffered greater revenue declines than their peers.  The Atlantic City casino industry has experienced an average annual decrease in net revenue of 4.7% over the past two fiscal years (as reported to the DGE), whereas the Plaza and Taj Mahal have experienced average annual net revenue decreases of 24.7% and 12.7%, respectively, over the same time period.

Entering fiscal year 2014, the Debtors were optimistic that their strong brand name and the pent up gaming demand due to Superstorm Sandy would result in a meaningful earnings recovery.  Unfortunately, the first eight months of 2014 have resulted in EBITDA below management's projections, due to a variety of factors, including the abnormally cold 2014 winter weather, frequent snowstorms in the Mid-Atlantic United States, increased utility costs related to the cold, intense competition in the Atlantic City market and surrounding regional gaming markets and current economic conditions in southern New Jersey and elsewhere.

### 4.6.    *Inflexible Cost Structure*

The Debtors' flexibility in its cost structure is limited by high taxes and labor costs.  In July 2014, Atlantic City announced a 29% increase in property tax rates.  Additionally, prior to the entry of the CBA Order and the closure of the Plaza, the CBAs covering the Debtors' businesses required pension plan contributions of approximately $5.4 million each year, coupled with $15 million in health, welfare and other benefit payments each year, thus imposing an unsustainable cost structure upon the Debtors given their current size and financial condition.

### 4.7.    *Certain Default Notices and Third Party Litigation.*

In the weeks prior to the Petition Date, the Debtors were confronted with third party litigation and notices of default with respect to certain of their material contracts.

#### (a)    Online Gaming Agreements

On July 16, 2014 and July 30, 2014, Betfair  delivered written notices of a purported default under the Betfair Online Gaming Agreement (though Betfair stopped short of terminating such agreement).  Thereafter, Betfair unilaterally took steps to sweep into a new bank account controlled by Betfair certain online gaming revenue collected by the Company pursuant to the Betfair Online Gaming Agreement, and, on September 4, 2014, Betfair purported to terminate the Betfair Online Gaming Agreement.

---

[56] This amount includes a $7.8 million expense related to CRDA asset donation.

Separately, on August 22, 2014, UG delivered a written notice of default under the UG Online Gaming Agreement.  Thereafter, through a letter dated September 3, 2014, UG purported to terminate the UG Online Gaming Agreement.

### (b)    Trademark Litigation

In connection with the Company's emergence from the 2009 Cases (as described below), on July 16, 2010, each of TER, TER Holdings and certain of its subsidiaries (collectively, the "**Licensee Entities**") entered into the Second Amended and Restated Trademark License Agreement (the "**Trademark License Agreement**") with Donald J. Trump and Ivanka Trump (the "**Trump Parties**"), which amended and restated the previous trademark license agreement that the Company had entered into with Mr. Trump in 2005.  Pursuant to the Trademark License Agreement, the Trump Parties granted, subject to certain terms and conditions, the Licensee Entities a perpetual royalty-free license to use certain trademarks, service marks, names, domain names and related intellectual property associated with the name "Trump" and the Trump Parties in connection with TER Holdings' casino and gaming activities related to the Company's three then-existing casino properties in Atlantic City, New Jersey.  On July 1, 2011, the Licensee Entities entered into the First Amendment to the Trademark License Agreement, pursuant to which, among other things, the Trump Parties were replaced as "Licensors" with Trump AC Casino Marks LLC ("**Trump AC Casino Marks**"), a Delaware limited liability company.  Upon information and belief, Trump AC Casino Marks is controlled by one or more of the Trump Parties.

On August 5, 2014, Trump AC Casino Marks commenced a lawsuit in state Superior Court in Atlantic County, New Jersey (Case No. C00005014), against the Company and the First Lien Agent (the "**DJT Action**") alleging various breaches of the Trademark License Agreement.  Plaintiff also seeks the imposition of a mandatory injunction to compel the Licensee Entities to cure the alleged breaches under the Trademark License Agreement or, in the alternative, a declaratory judgment that the Trademark License Agreement has already terminated by reason of the alleged breaches.

The Debtors dispute the assertions made in the DJT Action.  The termination of the Trademark License Agreement, or the entry of an injunction or similar order against any of the Licensee Entities, would have constituted an event of default under the First Lien Credit Agreement and might otherwise have an adverse impact on the Debtors' businesses.

### (c)    Levine Staller Litigation

On August 5, 2014, the law firm that previously assisted the Company with respect to certain real estate tax litigation for the tax years 2008 through 2012 (the "**2008-2012 Tax Appeals**"), Levine, Staller, Sklar, Chan & Brown, P.A. ("**Levine Staller**"), filed a motion with the Tax Court of New Jersey seeking to enforce an attorney's charging lien with respect to a $1.25 million contingency fee allegedly owed to the firm, and to issue judgment and a writ of execution in its favor against the assets of the Debtors.  On August 26, 2014, the Tax Court of New Jersey granted the motion and issued an Order (the "**Enforcement Order**").  The Enforcement Order constituted an event of default under the First Lien Credit Agreement, and the attachment of the Debtors' funds would have further exacerbated the Debtors' liquidity

position.  The Enforcement Order was stayed as a result of the commencement of the Chapter 11 Cases.  On October 10, 2014, Debtors filed an appeal of the Enforcement Order with the New Jersey Appellate Division.  A more detailed description of Levine Staller's Charging Lien (defined below) is set forth at Section 5.18 herein.

# ARTICLE V.

## DESCRIPTION AND HISTORY OF CHAPTER 11 CASES

### 5.1.    *General Case Background.*

On September 9, 2014, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On September 10, 2014, the Bankruptcy Court entered an order [Docket No. 3] authorizing the joint administration of the Chapter 11 Cases, for procedural purposes only, under Case No. 14-12103 (KG). The Honorable Kevin Gross is presiding over the Chapter 11 Cases. The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. As of the date hereof, no request has been made for the appointment of a trustee or examiner in the Chapter 11 Cases.

The following is a brief description of certain significant events that have occurred during the pendency of the Chapter 11 Cases.

### 5.2.    *Retention of Professionals.*

To assist them in carrying out their duties as debtors in possession, and to otherwise represent their interests in the Chapter 11 Cases, the Debtors filed with the Bankruptcy Court applications seeking entry of orders authorizing the Debtors to retain: (a) Stroock & Stroock & Lavan LLP as their restructuring counsel [Docket No. 78]; (b) Houlihan Lokey Capital Inc. as their investment banker and financial advisor [Docket No. 73] and (c) Young Conaway Stargatt & Taylor, LLP as their local bankruptcy counsel [Docket No. 72].  On October 6, 2014, the Bankruptcy Court entered orders [Docket Nos. 226, 231, and 220, respectively] approving the applications.

On September 9, 2014, the Bankruptcy Court entered an order [Docket No. 43] approving the Debtors' application, pursuant to 28 U.S.C. § 156(c), authorizing the Debtors to retain Prime Clerk as the Debtors' claims, noticing and balloting agent. On October 6, 2014, the Bankruptcy Court entered an order approving the Debtors' application, pursuant to section 327(a) of the Bankruptcy Code, authorizing the Debtors to retain Prime Clerk as administrative agent for the Debtors [Docket No. 219].

Additionally, on October 6, 2014, the Bankruptcy Court entered an order [Docket No. 221] approving the Debtors' motion seeking authority, pursuant to sections 105(a), 327, 328, and 330 of the Bankruptcy Code, to employ certain additional professionals, utilized in the ordinary course, to assist the Debtors in their day-to-day business operations [Docket No. 76].

Furthermore, in connection with the Debtors' attempts to obtain certain relief from various governmental and quasi-governmental entities as set forth in the Plan, the Debtors

filed with the Bankruptcy Court an application to retain Sills Cummis & Gross P.C. as special counsel and government affairs/regulatory services provider for the Debtors [Docket No. 250]. Thereafter, on October 30, 2014, the Bankruptcy Court entered an order [Docket No. 383] approving the Debtors' application to retain Sills Cummis & Gross P.C.

5.3.    ***Employee Obligations.***

(a)    **Prepetition Employee Compensation.**

The Debtors believed that the continued efforts of their employees were critical to a successful reorganization. Accordingly, on the Petition Date, the Debtors filed with the Bankruptcy Court a motion (the "**Employee Wage Motion**") for entry of an order authorizing the Debtors to pay, among other items, prepetition employee wages, salaries and other compensation, prepetition employee business expenses, withholding taxes, payroll-related taxes and other miscellaneous prepetition employee expenses and employee benefits [Docket No. 11]. On September 10, 2014, the Bankruptcy Court entered an order granting final approval of the Employee Wage Motion [Docket No. 50].

5.4.    ***Stabilization of Debtors' Business Operations.***

(a)    **Customer Programs.**

The Debtors believed that maintaining good relationships with their customers was necessary to the continuity of the Debtors' business operations during the Chapter 11 Cases. To that end, on the Petition Date, the Debtors filed with the Bankruptcy Court a motion seeking entry of an order authorizing the Debtors to continue, maintain, implement new and/or terminate any of the certain prepetition customer programs, to satisfy, in the ordinary course of business, certain prepetition claims arising from such programs [Docket No. 9].  On September 10, 2014, the Bankruptcy Court entered an order approving the motion [Docket No. 48].

(b)    **Vendors.**

In addition, the Debtors sought entry of an order granting administrative expense status to obligations arising from postpetition delivery of goods and services ordered prepetition and authorizing the Debtors to pay such obligations in the ordinary course of business [Docket No. 8].  On September 10, 2014, the Bankruptcy Court entered an interim order approving the motion [Docket No. 47].  On October 6, 2014, the Bankruptcy Court entered a final order approving the motion [Docket No. 218].

(c)    **Cash Management.**

The Debtors believed it would be disruptive to their operations if they were forced to significantly change their cash management system upon the commencement of the Chapter 11 Cases.  Accordingly, on the Petition Date, the Debtors filed with the Bankruptcy Court a motion seeking entry of an order authorizing the continued use of their cash management system and procedures, the continued use of all of their existing bank accounts and the continuation of intercompany transactions and accordance of administrative expense status to

claims for such transactions [Docket No. 10]. On September 10, 2014, the Bankruptcy Court entered an order granting the motion [Docket No. 49].

(d)    **Use of Cash Collateral.**[67]

The Debtors could not meet their ongoing postpetition obligations without authorization to use cash claimed as collateral by the First Lien Lenders ("**Cash Collateral**"). On September 10, 2014, Bankruptcy Court entered an agreed interim order authorizing the Debtors to use Cash Collateral, subject to certain terms and conditions, and granting adequate protection [Docket No. 52] (the "**Interim Cash Collateral Order**"). A final order (the "**Final Cash Collateral Order**") authorizing the use of Cash Collateral through December 31, 2014, was entered by the Bankruptcy Court on October 23, 2014 [Docket No. 342]. Thereafter, ~~on December 23, 2014, the Debtors and the First Lien Lenders executed and filed the~~**the Court entered that certain** *Stipulation and Order Extending Debtors' Authorization to Use Cash Collateral* [Docket No. ~~688~~**699**], which, among other things, authorized the Debtors to use Cash Collateral through and including January 12, 2015 (or such later date as the Debtors and the Secured Parties may agree in writing in a further stipulation filed with the Court). **Subsequently the Court entered further stipulations and orders further extending the Debtors' authorization to use Cash Collateral through and including January 19, January 26, and January 30, 2015 [Docket Nos. 736, 784, ___].**

The Final Cash Collateral Order provides the First Lien Lenders with various measures of adequate protection against diminution in value of the First Lien Lenders' Prepetition Collateral[78] (including the Cash Collateral). Such adequate protection consists of additional and replacement valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests in and liens on all property, whether owned as of the Petition Date or thereafter acquired, of the Debtors' Estates (the "**Adequate Protection Liens**"). The Adequate Protection Liens are, subject to the terms of the Final Cash Collateral Order, junior only to the (A) Carve-Out,[89] (B) the First Lien Lenders' prepetition liens and (C) other unavoidable liens, if any, existing as of the Petition Date that are senior in priority to the First Lien Lenders' prepetition liens on the Prepetition Collateral. The Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on or claims against any of the Prepetition Collateral (including any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code). The First Lien Lenders were granted further adequate protection by granting the First Lien Agent, for the benefit of itself and the First Lien Lenders, subject to the Carve-Out, and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, an allowed administrative expense claim in these Chapter 11 Cases ahead of and senior to any and all the administrative expense claims in these Chapter 11 Cases (the "**Adequate Protection Superpriority Claim**"). In addition to the Adequate Protection Liens and the Adequate Protection Superpriority Claim, the First Lien

---

[67] The terms described herein regarding the cash collateral order are qualified in their entirety by terms of the Final Cash Collateral Order. If there is a conflict between the descriptions contained herein and the terms of the Final Cash Collateral Order, the terms of the Final Cash Collateral Order shall control.

[78] "Prepetition Collateral" is defined in the Final Cash Collateral Order. *See Final Cash Collateral Order* ¶ E(c). [Docket No. 342]

[89] "Carve-Out" is defined in the Interim Cash Collateral Order. *See Final Cash Collateral Order* ¶ 8(b). [Docket No. 342].

Agent and First Lien Lenders were also provided with adequate protection with regards to fees and expenses incurred by their professionals during these Chapter 11 Cases (the "**Adequate Protection Fees**").  After delivery of a monthly statement for such fees and expenses (which shall include the number of hours billed and a reasonably detailed description of services provided redacted for privilege), the Debtors are authorized and directed to the Adequate Protection Fees within ten (10) business days of delivery of an invoice to the Debtors.

**Initially, pursuant to the Final Cash Collateral, the deadline by which the Creditors' Committee could challenge the prepetition liens of the First Lien Lenders expired on November 21, 2014.  However, with the agreement of the Debtors and the First Lien Lenders, the Creditors' Committee's challenge period was ultimately extended through and including February 13, 2015.**

(e)     **DIP Financing.**[910]

On November 26, 2014, the Debtors filed the *Debtors' Motion for Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (III) Granting Liens and Superpriority Claims, and (IV) Modifying the Automatic Stay* [Docket No. 565] (the "**DIP Motion**").  Initially, through the DIP Motion, the Debtors sought entry of a final order that authorized the Debtors to obtain senior secured priming and superpriority financing in the form of a $5 million multiple draw term loan facility.  Thereafter, as a result of ongoing negotiations with the DIP Secured Parties (defined below), the Debtors and the DIP Secured Parties agreed to increase the principal amount of the DIP Loan (defined below) to $20 million to allow the Debtors' operations at the Taj Mahal to remain open through consummation of the Plan as set forth and subject to the terms of that certain *Superpriority Senior Secured Priming Debtor-in-Possession Credit Facility Commitment Letter*, dated December 21, 2014, which was filed with the Bankruptcy Court on December 22, 2014 [Docket No. 681].

Accordingly, through the DIP Motion (as modified), the Debtors sought entry of a final order that, among other things, (i) authorizes the Debtors to obtain senior secured priming and superpriority postpetition financing, which consists of a multiple draw term loan facility in an aggregate principal amount not to exceed $20 million (the "**DIP Loan**"); (ii) approves the terms of, and authorizes the Debtors to execute and deliver, and perform under, a Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement by and among the Debtors, Icahn Agency Services, as administrative agent and collateral agent (in such capacities, the "**DIP Agent**"), and IEH Investments I LLC as lender (the "**DIP Lender**," and together with the DIP Agent and any other party to which DIP Obligations (as defined in the DIP Motion) are owed, the "**DIP Secured Parties**"), and (c) any and all other Loan Documents (as defined in the DIP Credit Agreement, and together with the DIP Credit Agreement, collectively, the "**DIP Loan Documents**") and the other DIP Loan Documents; (iii) grants (a) to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, priming liens, security interest and pledges on

---

[910] The terms described herein regarding the DIP Loan are qualified in their entirety by terms of the Final DIP Order and the DIP Loan Documents . If there is a conflict between the descriptions contained herein and the terms of the Final DIP Order and/or the DIP Loan Documents, the terms of the Final DIP Order and/or the DIP Loan Documents, as applicable, shall control.

all of the DIP Collateral (as defined in the DIP Motion) and (b) to the DIP Agent, for the benefit of the DIP Secured Parties, pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative claim having recourse to all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired, except Avoidance Actions (as defined in the DIP Motion); and (iv) grants the Prepetition Secured Parties the Prepetition Secured Parties' Adequate Protection (each as defined in the DIP Motion).

On January [_], 2015, the Bankruptcy Court entered an order [Docket No. __] (the "**Final DIP Order**") approving the DIP Motion and the DIP Loan Documents. Pursuant to the Final DIP Order, the Debtors are required to: (i) obtain entry of an order of the Bankruptcy Court approving the Disclosure Statement in form and substance acceptable to the DIP Secured Parties by January ~~22,~~**29,** 2015; (ii) commence solicitation of the Disclosure Statement by ~~January 28,~~**[February 5],** 2015; (iii) obtain a hearing to consider confirmation of the Plan by March 12, 2015; and (iv) obtain entry of an order of the Bankruptcy Court in form and substance acceptable to the DIP Secured Parties confirming a plan of reorganization pursuant to section 1129 of the Bankruptcy Code by March 13, 2015. Additionally, pursuant to the Final DIP Order, the Debtors are required to maintain at least $2.5 million in total Cash and cash equivalents.

### 5.5. *Disposition of Equity Securities.*

On the Petition Date, the Debtors filed with the Bankruptcy Court a motion for an order establishing notification procedures for: (a) certain dispositions of equity securities in TER or of any beneficial ownership thereof that must be complied with before dispositions of such stock are deemed effective and (b) asserting a claim of worthless stock deduction with respect to the Debtors' prepetition common stock, that must be complied with before such claims of worthless stock deductions are deemed effective. On September 10, 2014, the Bankruptcy Court entered an interim order approving the motion [Docket No. 51]. On October 6, 2014, the Bankruptcy Court entered a final order approving the motion [Docket No. 222]

### 5.6. *Utilities.*

On the Petition Date, the Debtors filed with the Bankruptcy Court a motion for an order: (a) prohibiting utilities from altering, refusing or discontinuing services; (b) establishing procedures for providing deposits to requesting utility companies; (c) deeming utility companies adequately assured of future performance and (d) establishing procedures for resolving requests for additional assurance of payment [Docket No. 5]. On September 10, 2014, the Bankruptcy Court entered an interim order approving the motion [Docket No. 44]. On October 6, 2014, the Bankruptcy Court entered a final order approving the motion [Docket No. 229].

### 5.7. *Taxes.*

On the Petition Date, the Debtors filed with the Bankruptcy Court a motion for an order authorizing: (a) the Debtors to pay taxes and fees related to the period prior to the petition Date, including those taxes and fees subsequently determined upon audit, or otherwise, to be owed for periods prior to the Petition Date, to certain government and regulatory authorities and (b) the Debtors' banks to honor and process check and electronic transfer requests related thereto

[Docket No. 6].  On September 10, 2014, the Bankruptcy Court entered an order approving the motion [Docket No. 45].

5.8.    *Insurance.*

On the Petition Date, the Debtors filed with the Bankruptcy Court a motion for an order authorizing: (a) payment of prepetition obligations incurred in the ordinary course of business in connection with liability, property and other insurance programs, including payment of policy premiums, (b) continuation of insurance premium financing programs and (c) the Debtors' banks to honor and process check and electronic transfer requests related thereto [Docket No. 7].  On September 10, 2014, the Bankruptcy Court entered an order approving the motion [Docket No. 46].

5.9.    *Closure of the Plaza.*

(a)    **Issuance of WARN Notices.**

On July 14, 2014, the Debtors issued notices pursuant to the Worker Adjustment and Retraining Notification Act (the "**WARN Notices**"), notifying Plaza employees of the expected closure of the Plaza.  On August 29, 2014, the Debtors received the necessary conditional approvals from the DGE to close the Plaza, and on September 16, 2014, the Debtors completed the closure of the Plaza.

(b)    **Rejection of Plaza Contracts.**

On October 30, 2014, the Debtors filed a motion (the "**Rejection Motion**") [Docket No. 387] for entry of an order, pursuant to sections 105(a) and 365(a) of the Bankruptcy Code, authorizing the Debtors to reject certain executory contracts and unexpired leases, effective as of the date of the Rejection Motion.  A hearing to consider the Rejection Motion was held on November 24, 2014 and, on that same day, the Court entered an order granting the relief requested therein.

5.10.    *Operations at the Taj Mahal.*

In connection with the commencement of these Chapter 11 Cases, on the Petition Date, the Debtors issued WARN Notices to the employees of the Taj Mahal and TER in order to prepare for the potential closure of the Taj Mahal on or shortly after November 13, 2014.  Thereafter, following the relief the Debtors received through the CBA Order, the Debtors issued amended WARN Notices extending the potential date of closure of the Taj Mahal to on or shortly after December 1, 2014.

Due to the fact that the Debtors had not obtained the tax relief and incentives they sought and did not expect that they would receive assistance prior to the Confirmation Hearing, on November 10, 2014, the Debtors advised the Division of Gaming Enforcement of their intention to wind down operations of the Taj Mahal and to close the property on or about December 12, 2014.  The Debtors initiated appropriate steps to cease operations at the Taj Mahal consistent with that timeframe.  The Debtors' Board of Directors has approved the taking of these steps to prepare for closing the Taj Mahal on or about December 12, 2014.

The Debtors again issued amended WARN Notices extending the potential date of closure of the Taj Mahal to on or shortly after December 19, 2014.  However, as a result of ongoing negotiations with the First Lien Lenders, the Debtors have obtained a financing commitment from the First Lien Lenders that would permit the Taj Mahal to remain open.  Accordingly, out of an abundance of caution, on December 29, 2014, the Debtors issued further amended WARN notices extending the potential date of closure of the Taj Mahal to January 12, 2015.  As of the date of this Disclosure Statement, the Debtors expect that the Taj Mahal will remain open through consummation of the Plan.

5.11.  ***Appointment of a Creditors' Committee.***

Pursuant to section 1102(a)(1) of the Bankruptcy Code, on September 23, 2014, the U.S. Trustee appointed the Creditors' Committee. The members of the Creditors' Committee are set forth below:

Thermal Energy Limited Partnership I
Attn: Patrick Towbin
1825 Atlantic Ave.
Atlantic City, NJ 08401
Phone: 609-572-7107
Fax: 609-572-7200


Bally Gaming, Inc.
Attn: A.C. Ansani
6650 El Camino Rd.
Las Vegas, NV 89118
Phone: 702-532-7515
Fax: 702-532-5326


Unite Here Local 54
Attn: Donna DeCaprio
1014 Atlantic Ave.
Atlantic City, NJ 08401
Phone: 609-344-5400x139


National Retirement Fund
Attn: Richard N. Rust
6 Blackstone Valley Place
Lincoln, RI 02865
Phone: 401-334-4155
Fax: 401-334-5133


Atlantic City Linen Supply, LLC
Attn: Eric Goldberg

18 N. New Jersey Ave.
Atlantic City, NJ 08401
Phone: 609-345-5888


South New Jersey Paper Products
Attn: Martin Spector
2400 Industrial Way
Vineland, NJ 08360
Phone: 856-691-2605,
Fax: 856-794-8978


Conner Strong & Buckelew Companies, Inc.
Attn: Heather A. Steinmiller, Esq.
50 S. 16th St., Ste. 3600,
Philadelphia, PA 19102
Phone: 267-702-1366
Fax: 856-552-4784


On October 15, 2014, the Creditors' Committee filed with the Bankruptcy Court applications seeking entry of orders authorizing the Creditors' Committee to retain (i) Gibbons P.C. [Docket No. 286] and (ii) The Law Office of Nathan A. Schultz, P.C. [Docket No. 287] as co-counsel, *nunc pro tunc* to September 23, 2014, and PricewaterhouseCoopers LLP as financial advisor [Docket No. 289], *nunc pro tunc* to September 26, 2014.  On October 30, 2014, the Bankruptcy Court approved the retention of PricewaterhouseCoopers LLP [Docket No. 386]. Thereafter, on November 2, 2014, the Bankruptcy Court approved the retentions of Gibbons P.C. and The Law Office of Nathan A. Schultz [Docket Nos. 429 and 428].

5.12.    *Section 341 Meeting.*

On October 16, 2014, the U.S. Trustee convened a meeting of creditors (the "**341 Meeting**") pursuant to section 341(a) of the Bankruptcy Code.  Daniel McFadden, the Chief Financial Officer of the Debtors attended the 341 Meeting on behalf of the Debtors. The 341 Meeting was closed on October 16, 2014.

5.13.    *Schedules and Statements and Bar Dates.*

(a)    **Schedules and Statements.**

On October 9, 2014, each Debtor filed with the Bankruptcy Court its Schedules of Assets and Liabilities ("**Schedules**") and Statement of Financial Affairs ("**SoFAs**"). The Schedules and SoFAs are available electronically free of charge at http://cases.primeclerk.com/ter/

(b)    **Bar Date.**

On October 1, 2014, the Debtors filed with the Bankruptcy Court a motion seeking an order establishing the bar dates for filing proof of certain claims against the Debtors that arose on or prior to the Petition Date, and approving the form and manner of notice of each bar date (the "**Bar Date Motion**") [Docket No. 178].  An order establishing the General Bar Date as November 24, 2014 and the Government Bar Date (each as defined in the Bar Date Motion) as March 9, 2015 was entered on October 22, 2014 [Docket No. 336].

Moreover, pursuant to the *Debtors' Motion for Order (I) Approving the Disclosure Statement; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan, Including (A) Approving Form and Manner of Solicitation Procedures, (B) Approving the Form and Notice of the Confirmation Hearing, (C) Establishing Record Date and Approving Procedures for Distribution of Solicitation Packages, (D) Approving Form of Ballot, (E) Establishing Deadline for Receipt of Ballots, and (F) Approving Procedures for Vote Tabulations; (III) Establishing Deadline and Procedures for Filing Objections to (A) Confirmation of The Plan, and (B) the Debtors' Proposed Cure Amounts for Unexpired Leases and Executory Contracts to be Assumed Pursuant to the Plan; and (IV) Granting Related Relief* [Docket No. 175], the Debtors have sought the establishment of [   ], 2015 as the date by which holders of certain Administrative Expense Claims that are incurred or arise during the period from and after the Petition Date through and including [*   ], 2015, are required to have filed an application for allowance and payment therefor.

Over 730 proofs of claim had been filed against the Debtors' estates in the Chapter 11 Cases.  The Debtors have commenced reviewing the various claims filed.

5.14.   *NRF Claim.*

On November 21, 2014, the National Retirement Fund filed a proof of claim in each of the Debtors' Chapter 11 Cases, asserting a general unsecured claim in the amount of $196,739,527.00, as well as a priority claim of an unknown amount under section 507(a)(5) of the Bankruptcy Code, as a result of the Debtors' complete withdrawal from the National Retirement Fund [Claim Nos. 469, 475, 509, 517, 543, 544, 546, 578] (the "**NRF Claims**").  The National Retirement Fund asserts that such withdrawal liability was triggered as a result of the rejection of the Local 54 Taj Collective Bargaining Agreement pursuant to the CBA Order and therefore the cessation of Taj Mahal's obligation to make further contributions to the multi-employer pension plan, as well as the closing of the Plaza and the resultant cessation of contributions to the multi-employer pension plan.  All rights and defenses of the Debtors and the National Retirement Fund with respect to the NRF Claims are expressly reserved.

5.15.   *Sale of Certain Assets.*

On September 22, 2014, the Debtors filed a motion for entry of an order, pursuant to sections 105 and 363 of the Bankruptcy Code, establishing procedures for the sale of certain of the Debtors' miscellaneous assets outside the ordinary course of business, free and clear of all liens, claims, interests and encumbrances (the "**Miscellaneous Asset Sales Motion**") [Docket No. 94].  As set forth in the Miscellaneous Asset Sales Motion, due to the wind-down and

closure of the Plaza, the Debtors determined that the prompt sale of certain assets, including gaming equipment, equipment, furniture, supplies, fixtures, and other miscellaneous personal property that are not necessary for the operation of the Debtors' business, was in the best interest of their stakeholders.  On October 6, 2014, the Bankruptcy Court entered an order granting the Miscellaneous Asset Sales Motion [Docket No. 224].

In accordance with the procedures established by the order granting Miscellaneous Asset Sales Motion, on October 24, 2014 and October 31, 2014, the Debtors filed notices to sell certain slot machines that were located at the Plaza.  The Court entered an order approving the proposed sale on November 3, 2014 [Docket No. 401].

Further to those efforts, in the beginning of October 2014, the Debtors commenced an informal process to solicit interest for the sale of non-core assets located at the Plaza.  As of the date hereof, that process remains ongoing, and if a purchaser or purchasers are selected by the Debtors, the Debtors intend to seek approval of such sale (or sales) from the Bankruptcy Court.

5.16.  *Assertions of the Trump Parties.*

On September 24, 2014, Trump AC Casino Marks filed the *Motion of Trump AC Casino Marks, LLC for an Order Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362(d) to Allow Termination of a License Agreement with the Debtors* (the "**DJT Lift Stay Motion**") [Docket No. 111]. Through the DJT Lift Stay Motion, Trump AC Casino Marks seeks relief from the automatic stay to terminate the Trademark License Agreement based on certain alleged uncured and incurable defaults and Trump AC Casino Marks' assertion that the Trademark License Agreement cannot be assumed and/or assigned under the Plan. Trump AC Casino Marks further asserts (but the Debtors dispute) that the Debtors continue to incur post-petition monetary obligations as a result of the Debtors' alleged post-petition breaches of the Trademark License Agreement. On October 16, 2014, the Debtors filed an objection [Docket No. 307] to the DJT Lift Stay Motion.  The hearing to consider the DJT Lift Stay Motion was held on December 11, 2014.  The Bankruptcy Court has indicated that it is taking the matter under advisement.

In addition, Trump AC Casino Marks asserts (but the Debtors dispute) that, as a result of Trump AC Casino Marks' inability to enforce its rights, its Administrative Expense Claim continues to increase. The Debtors dispute Trump AC Casino Marks' and the Trump Parties' assertions and reserve all rights in connection therewith, including with respect to the amount, priority and validity of any claim that may be asserted by Trump AC Casino Marks or the Trump Parties.

Furthermore, Donald J. Trump has asserted that he holds an additional Administrative Expense Claim for $147,638.40 as a result of a rent payment that he asserts he has made on behalf of Plaza Associates with respect to a ground lease related to the driveway leading to the Plaza. ~~To the extent this claim~~ **Additionally, Donald J. Trump has asserted that he holds an Administrative Expense Claim for $24,578.25 as a result of his redemption of a real property tax sale certificate on behalf of the Debtors.  To the extent these claims** or any other claims asserted by the Trump Parties are deemed Allowed in accordance with the Plan, such claims will be treated according to the terms of the Plan.

- 28-

The Trump Parties reserve all of their rights to object to confirmation of the Plan or any other Plan. The Debtors will determine whether or not to seek to assume any ground lease to which the Debtors are a party in connection with the filing of the Cure Schedule.

5.17.   ***The CBA Motion.***

The Bankruptcy Code provides a process for rejection of CBAs.  In particular, section 1113 of the Bankruptcy Code permits a debtor to reject a CBA if the debtor satisfies a number of statutorily prescribed substantive and procedural prerequisites and obtains Bankruptcy Court approval. The Debtors commenced the section 1113(c) process with Local 54 shortly after the commencement of these Chapter 11 Cases, provided Local 54 with significant amounts of discovery and attempted to negotiate in good faith toward consensual agreements that would achieve the necessary level of labor cost reductions.

On September 17, 2014, the Debtors presented Local 54 with a formal proposal (the "**Proposal**") detailing proposed modifications to its CBA and describing the economic impact of and rationale behind each those changes.  The Debtors also shared with Local 54 financial data, including a cash flow forecast and two sets of projections that depict the Debtors' performance trajectory, both with and without the requested concessions.  The Debtors also requested that authorized Local 54 representatives with decision-making authority meet with the Debtors' to address the dwindling liquidity position and the imminent risk of the closure of the Taj Mahal.  The Union agreed to meet the Debtors on September 24, 2014.

At the September 24, 2014 meeting, Local 54 did not take a position as to whether it was accepting or rejecting various material terms of the Debtors' Proposal, and, thereafter, on September 26, 2014, the *Debtors filed the Debtors' Motion for Entry of Order (I) Rejecting the Continuing Economic Terms of the Expired Collective Bargaining Agreement Between Trump Taj Mahal Associates, LLC and Unite Here Local 54 Pursuant to 11 U.S.C. § 1113(C) and (II) Implementing Terms of Debtors' Proposal Under 11 U.S.C. § 1113(B)* (the "**CBA Motion**") [Docket No. 134].  In an effort to reach a consensual resolution with respect to the labor concessions set forth in the Proposal, the Debtors met with Local 54 again on September 30 and October 10, 2014, and promptly fulfilled all of Local 54's requests for further information regarding the Proposal.  At the October 10 bargaining session, in order to facilitate negotiations, the Debtors also submitted to Local 54 a revised proposal that addressed certain of the concerns expressed previously by the union.

Following a telephonic status conference with the Bankruptcy Court held on September 30, 2014, the Debtors submitted a letter (the "**Letter Brief**") to the Bankruptcy Court in support of the Debtors' request for an emergency hearing pursuant to section 1113(c) of the Bankruptcy Code for immediate withdrawal from the Debtors' obligation under Local 54's CBA to contribute to the Local 54 multi-employer pension plan, the National Retirement Fund [Docket No. 167].  On October 2, 2014, an evidentiary hearing was conducted on an emergency basis with respect to immediate relief the Debtors sought with respect to Local 54's pension obligations and certain jurisdictional issues that were briefed in the Letter Brief.  On October 3, 2014, the Court denied the Debtors' request for immediate withdrawal from the National Retirement Fund.

On October 10, 2014, the Debtors filed the *Debtors' Reply to Objection of Unite Here Local 54 to Debtors' Motion for Entry of Order Rejecting Collective Bargaining Agreement Pursuant to 11 U.S.C. § 1113(c) and Implementing Terms of Debtors' Proposal Under 11 U.S.C. § 1113(b)* [Docket No. 273]. Thereafter, the Debtors filed a supplemental reply on October 13, 2014 [Docket No. 279]. The Court held a second evidentiary hearing with respect to the CBA Motion on October 14, 2014. On October 17, 2014, the Bankruptcy Court entered an order granting the CBA Motion (the "**CBA Order**") [Docket No. 318]. On October 20, 2014, the Bankruptcy Court entered its memorandum opinion (the "**Opinion**") [Docket No. 325].

Local 54 filed a notice of appeal regarding the CBA Order and Opinion on October 23, 2014 [Docket No. 339]. On November 3, 2014, the Debtors and Local 54 jointly sought to have Local 54's appeal of the CBA Order and Opinion determined by the United States Court of Appeals for the Third Circuit (the "**Court of Appeals**") [Docket No. 403]. By order dated November 7, 2014 [Docket No. 445], the Bankruptcy Court ordered the certification to the Court of Appeals. By petition dated November 17, 2014, the Debtors and Local 54 sought the Court of Appeals' permission to appeal pursuant to Fed. R. App. P. 5. Thereafter, on December 15, 2014, the Court of Appeals issued an order granting the petition and authorizing Local 54's appeal to the Court of Appeals. Local 54's appeal of the CBA Order and Opinion is currently pending in the Court of Appeals, No. 14-8137.

On October 22, 2014, Local 54 filed an unfair labor practice charge (the "**ULP**") with the National Labor Relations Board. The ULP, which was subsequently re-filed to assert charges against the Debtors as well as the First Lien Lenders, asserts that the Debtors failed and refused to bargain in good faith with Local 54 and, specifically, that the Debtors unilaterally and without first bargaining to impasse changed the terms and conditions of employment of Local 54 employees. The Debtors believe that the issues raised in the ULP were already addressed and decided by the Bankruptcy Court and that the ULP represents an inappropriate collateral attack on the Bankruptcy Court's ruling. All rights and defenses of the Debtors and Local 54 with respect to the ULP are expressly reserved.

**On January 1, 2015, UNITE HERE HEALTH ("UHH"), the entity that provided health and welfare benefits to Local 54 employees at the Taj Mahal pursuant to Local 54's collective bargaining agreement, filed the *Motion of UNITE HERE HEALTH for Allowance of Administrative Claim of Pursuant to 11 U.S.C. § 503(b)(1)(A)* [Docket No. 759] (the "UHH Motion"). Through the UHH Motion, UHH seeks allowance and payment of an Administrative Expense Claim in the amount of $806,365.24 on account of the health and welfare benefit coverage it provided to Local 54 employees of the Taj Mahal from the Petition Date through October 31, 2014. The Debtors intend to object to the UHH Motion and expressly reserve all rights and defenses thereto.**

5.18. *Levine Staller Litigation.*

As discussed above, Levine Staller formerly represented the Debtors in connection with the 2008-2012 Tax Appeals. On October 15, 2014, Levine Staller filed the *Motion of Levine, Staller, Sklar, Chan & Brown, P.A. for Entry of an Order Fixing the Value and Priority of, and Allowing Its Claim as Secured in Full, Pursuant to 11 U.S.C. § 506(a) and*

*Rule 3012 of the Federal Rules of Bankruptcy Procedure* (the "**Lien Motion**") [Docket No. 295] seeking the allowance of a first priority, perfected attorney's charging lien (the "**Charging Lien**") in the amount of $1.25 million, plus interests and costs, on the proceeds of and cash derived from the judgment entered by the Tax Court of New Jersey on June 22, 2012 in whosesoever hands they may come.  Levine Staller further argued that the Charging Lien related back to the commencement of the 2008-2012 Tax Appeals in 2008 and therefore ranked senior in priority relative to the liens of the First Lien Lenders.

A hearing to consider the Lien Motion was held on November 24, 2014.  On December 5, 2014, the Court entered an order [Docket No. 601] and memorandum opinion [Docket No. 600] granting Levine Staller a fully secured claim in the Debtors' cash, in the amount of $1.25 million with respect to the Charging Lien, and providing that such claim shall be enforced with priority over all subsequently perfected liens, but junior to any liens that may or have been granted to the First Lien Parties under the First Lien Credit Agreement.

### 5.19.  *Online Gaming Agreements Litigation.*

As set forth above, since the Petition Date, the Debtors have engaged in extensive negotiations with Betfair and Ultimate Gaming, the providers of certain online gaming operations licensed through each of Taj Associates and Plaza Associates.  As a result of those efforts, on December 4, 2014, the Debtors filed separate motions seeking the Court's approval to enter into certain settlement agreements with each of Betfair and Ultimate Gaming [Docket Nos. 591, 595] (collectively, the "**Settlement Motions**").  On December 19, 2014, the Bankruptcy Court entered orders approving each of the Settlement Motions [Docket Nos. 669, 670].

### 5.20.  *Atlantic City Tax Claims.*

In 2014, the Debtors filed appeals against Atlantic City in the Tax Court of New Jersey in connection with the Debtors' real property tax assessments for the real properties related to the Taj Mahal and the Plaza for tax years 2014 and 2015 (the "**2014-2015 Tax Appeals**").  For the 2014 and 2015 tax years, Atlantic City had preliminarily assessed the real properties related to the Taj Mahal and the Plaza at $1.0 billion and $248 million, respectively. Atlantic City asserts, but the Debtors dispute, that in 2014, the Debtors and Atlantic City had come to an agreement on the form of a settlement of the Tax Appeal and 2015 assessments. However, an agreement was never finalized.  Although that arrangement was never finalized, the Debtors assert that Atlantic City reduced the final assessments for the Debtors' properties for the 2014 tax year to $825 million for the Taj Mahal and $210 million for the Plaza.  In July 2014, Atlantic City announced a further 32% city-wide increase in property tax rates as compared to 2013, thereby exacerbating the Debtors' tax burden.  Prior to the Petition Date, the Debtors did not make the full real estate tax payment for the second quarter of 2014 due on May 1, 2014, nor did they make the real estate tax payment for the third quarter of 2014 due on August 1, 2014. The Debtors also did not make the real estate tax payment for the fourth quarter of 2014 due on November 1, 2014.  Atlantic City has asserted first priority liens on the Debtors' respective properties for the amount of the unpaid second- and third-quarter tax payments plus statutory interest, which, according to Atlantic City, totaled $9,891,045.28 for the Taj Mahal, and $2,475,339.75 for the Plaza (subject to increase on a daily basis).  Atlantic City has also asserted first priority liens on the Debtors' real properties, and superpriority unsecured claims against the

Debtors' estates, for the amount of the unpaid fourth quarter tax payments, totaling $7,426,151.17 for the Taj Mahal and $1,929,854.59 for the Plaza. The Debtors dispute these assertions, and reserve all rights in connection therewith, including, without limitation, all rights and remedies with respect to the validity, amount, security and priority of any amounts asserted by or that may be due to or from Atlantic City. Any claims held by Atlantic City, to the extent Allowed, shall be treated in accordance with the Plan.

On a related note, on November 10, 2014, counsel for Atlantic City filed a motion for stay relief to sell tax sale certificates related to the Debtors' unpaid 2014 real property taxes [Docket No. 449], and the Court entered an agreed-upon order granting such relief on November 25, 2014 [Docket No. 560], which incorporated various reservations of rights of the Debtors.

5.21. *Creditors Committee's Motion to Terminate Exclusivity.*

On November 14, 2014, the Committee filed a *(I) Motion Pursuant to 11 U.S.C. § 1121(d) to Terminate Exclusivity to Permit the Official Committee of Unsecured Creditors to File and Solicit Acceptances of a Chapter 11 Plan and (II) Supplemental Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Order (A) Approving the Disclosure Statement; (B) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan; (C) Establishing Deadline and Procedures for Filing Objections; and (D) Granting Related Relief* [Docket No. 482] (the "**Exclusivity Termination Motion**"). The hearing to consider the Exclusivity Termination Motion has been adjourned to a date to be set by the Bankruptcy Court.

5.22. *Order for Rule to Show Cause.*

On November 19, 2014, in light of the Bankruptcy Court's concerns with respect to the uncertainty surrounding the Debtors' operations and liquidity, the Bankruptcy Court entered an *Order for Rule to Show Cause Why the Court Should Not Convert the Case to One Under Chapter 7* [Docket No. 512] (the "**OSC**"). [UPDATE]

5.23. *Negotiations with the City of Atlantic City and the State of New Jersey.*

Since the Petition Date the Debtors have engaged in extensive negotiations with representatives of the City of Atlantic City and the State of New Jersey in an effort to obtain certain tax relief and governmental and quasi-governmental concessions. As of the date hereof, the Debtors have not obtained the various forms of relief they have sought.

5.24. *Preferences and Fraudulent Conveyances.*

Under the Bankruptcy Code, a debtor may seek to recover, through adversary proceedings in the bankruptcy court, certain transfers of the debtor's property, including payments of cash, made while the debtor was insolvent during the 90 days immediately before the commencement of the bankruptcy case (or, in the case of a transfer to or on behalf of an "**insider,**" one year before the commencement of the bankruptcy case) in respect of antecedent debts to the extent the transferee received more than it would have received on account of such preexisting debt had the debtor been liquidated under chapter 7 of the Bankruptcy Code. Such transfers include cash payments, pledges of security interests or other transfers of an interest in

property. In order to be preferential, such payments must have been made while the debtor was insolvent; debtors are rebuttably presumed to have been insolvent during the 90-day preference period. The Bankruptcy Code's preference statute can be very broad in its application because it allows the debtor to recover payments regardless of whether there was any impropriety in such payments.

However, there are certain defenses to such claims. For example, transfers made in the ordinary course of a debtor's and the transferee's business or transfers made in accordance with ordinary business terms are not recoverable. Furthermore, if the transferee extended credit contemporaneously with or subsequent to the transfer, and before the commencement of the bankruptcy case, for which the transferee was not repaid, such extension constitutes an offset against an otherwise recoverable transfer of property. If a transfer is recovered by a debtor, the transferee has a general unsecured claim against the debtor to the extent of the recovery.

Under the Bankruptcy Code and under various state laws, a debtor may also recover or set aside certain transfers of property (fraudulent transfers), including grants of security interests in property, made while the debtor was insolvent or which rendered the debtor insolvent or undercapitalized, if the debtor received less than reasonably equivalent value for such transfer. The Debtors and their professionals have undertaken a preliminary analysis of whether they have claims against any persons or entities for preferences or fraudulent conveyances, and, based on such analysis to date, have not identified any claims for preferences or fraudulent conveyances that would result in any significant or meaningful net recovery for the Debtors' estates.

5.25.  ***Deadline Extensions.***

      **(a)**      **Extension of Deadline for Removal of Prepetition Non-Bankruptcy Actions**

The Debtors' original deadline to remove prepetition non-bankruptcy actions to federal court (the "**Removal Deadline**") pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rules 9006 and 9027 was December 8, 2014.  On December 16, 2014, the Bankruptcy Court entered an order [Docket No. 637] extending the Removal Deadline through and including April 7, 2015.

      **(b)**      **Extension of Deadline to Assume or Reject Unexpired Leases of Nonresidential Real Property**

As of the Petition Date, the Debtors were party to approximately ten unexpired leases of nonresidential real property under which the Debtors were lessees.  Section 365(d)(4) of the Bankruptcy Code provides that any unexpired lease of nonresidential real property under which a debtor is a lessee shall be deemed rejected on the date that is 120 days after the petition date.  Such deadline (the "**365(d)(4) Deadline**") may be extended by the Bankruptcy Court for 90 days, once, for cause.  On December 19, 2014, the Bankruptcy Court entered an order [Docket No. 668] extending the 365(d)(4) Deadline by 90 days, from January 7, 2015, through and including April 7, 2015.

**(c)        Extension of Debtors' Exclusive Periods.**

On December 16, 2014, the Debtors filed a motion [Docket No. 639] (the "**Exclusivity Motion**") for the entry of an order, pursuant to section 1121(d) of the Bankruptcy Code, (i) extending the period in which the Debtors have the exclusive right to file a plan of reorganization by (90) ninety days through and including April 7, 2015; and (ii) extending the period in which the Debtors have the exclusive right to solicit a plan of reorganization by ninety (90) days, through and including June 8, 2015.  A hearing to consider the Exclusivity Motion is currently scheduled for January 16, 2015.

5.26.    *Events Leading to Formulation of Plan.*

In the months leading up to the Petition Date and the weeks since the Petition Date, the Debtors have engaged in numerous discussions with the First Lien Lenders regarding potential restructuring alternatives and the future of the Debtors' businesses.  These discussions were complicated, in part, by the onerous provisions imposed upon the Debtors' businesses by collective bargaining agreements to which certain of the Debtors are a party.  Recognizing this, the Debtors also engaged in negotiations with representatives of their largest union, Local 54.

As a result of these discussions, the Debtors formulated the Plan, which provides for the conversion and exchange of hundreds of millions of dollars in prepetition indebtedness for equity interests in the Reorganized Debtors.  Furthermore, as a result of ongoing negotiations with the First Lien Lenders, the First Lien Lenders have agreed to fund the Debtors' ongoing operations at the Taj Mahal through consummation of the Plan.  Accordingly, subject to confirmation of the Plan and the satisfaction or waiver of the terms and conditions to both confirmation and effectiveness of the Plan, the First Lien Lenders have agreed, in principle, to receive the new equity of Reorganized TER and ~~provide~~**have entered into a formal commitment letter with the Debtors to fund the New Term Loan in the aggregate principal amount of (a)** $[13.5] million**, plus (b) the aggregate outstanding principal amount of loans under the DIP Credit Agreement and the accrued interest, unpaid fees and costs and expenses thereon outstanding on the Effective Date,** to, among other things, repay obligations under the DIP Loan, pay certain administrative and priority claims, operate the Taj Mahal and enable the Taj Mahal to remain open.

The Plan will provide the Debtors with greater financial flexibility through a significant deleveraging of the Debtors' capital structure and a feasible, long-term cost structure and, subject to satisfaction of the conditions contained in the Plan, allow the Debtors to continue to operate as a going concern upon emergence from bankruptcy.  ~~[~~The Debtors believe that without the First Lien Lenders' ~~agreement in principle,~~**formal commitment letter with respect to the New Term Loan, which is** subject to confirmation of the Plan and the satisfaction or waiver of the terms and conditions to both confirmation and effectiveness of the Plan~~, to provide New Term Loan~~, the Debtors would be unable to confirm the Plan and may be forced to liquidate under chapter 7 of the Bankruptcy Code.~~]~~

For these reasons and others, the Debtors believe that confirmation of the Plan is in the best interests of their estates and creditors.

## ARTICLE VI.

## REASONS FOR THE SOLICITATION; RECOMMENDATION

Chapter 11 of the Bankruptcy Code provides that unless the terms of section 1129(b) of the Bankruptcy Code are satisfied, for the Bankruptcy Court to confirm the Plan as a consensual plan, the holders of impaired Claims against the Debtors in each Class of impaired Claims entitled to vote on the Plan must accept the Plan by the requisite majorities set forth in the Bankruptcy Code. An impaired Class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds (2/3) in amount of the Claims in such Class actually voting on the Plan have voted to accept it and (b) more than one-half (1/2) in number of the holders in such Class actually voting on the Plan have voted to accept it (such votes, the "**Requisite Acceptances**").

In light of the significant benefits to be attained by the Debtors and their creditors if the transactions contemplated by the Plan are consummated, the Debtors recommend that all holders of Claims entitled to do so, vote to accept the Plan. The Debtors reached this decision after considering available alternatives to the Plan and their likely effect on the Debtors' business operations, creditors, and shareholders. These alternatives included alternative restructuring options under chapter 11 of the Bankruptcy Code and liquidation of the Debtors under chapter 7 of the Bankruptcy Code. The Debtors determined, after consulting with their legal and financial advisors, that the Plan, if consummated, will maximize the value of these estates for stakeholders under the circumstances of these Chapter 11 Cases, as a result of the compromises and settlements embodied therein, as compared to any other chapter 11 reorganization strategy or a liquidation under chapter 7. For all of these reasons, the Debtors support the Plan and urge the holders of Claims entitled to vote on the Plan to accept and support it.

## ARTICLE VII.

## THE PLAN

### 7.1.    *Overview of Chapter 11.*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to restructure its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the bankruptcy filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a chapter 11 plan is the principal objective of a chapter 11 reorganization case. A chapter 11 plan sets forth the means for satisfying claims against and

interests in a debtor. Confirmation of a chapter 11 plan by the bankruptcy court makes that plan binding upon the debtor, any issuer of securities under the plan, any Person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

In general, a chapter 11 plan of reorganization: (a) divides claims and equity interests into separate classes, (b) specifies the property, if any, that each class is to receive under the plan and (c) contains other provisions necessary to the restructuring of the debtor and that are required or permitted by the Bankruptcy Code.

Pursuant to section 1125 of the Bankruptcy Code, acceptance or rejection of a chapter 11 plan may not be solicited after the commencement of a chapter 11 case until such time as the court has approved the disclosure statement as containing adequate information. Pursuant to section 1125(a) of the Bankruptcy Code, "adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the chapter 11 plan. To satisfy applicable disclosure requirements, the Debtors submit this Disclosure Statement to holders of Claims that are impaired and not deemed to have rejected the Plan.

## 7.2.    *Resolution of Certain Inter-Debtor Issues.*

Notwithstanding anything to the contrary in the Plan or in this Disclosure Statement, on or after the Effective Date, any and all Intercompany Claims will be adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid, continued, or discharged to the extent reasonably determined appropriate by the Reorganized Debtors. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court or by the stockholders of any of the Reorganized Debtors.

## 7.3.    *Overview of the Plan.*

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN AND THE EXHIBITS AND SCHEDULES THERETO.**

The Plan classifies Claims and Interests separately in accordance with the Bankruptcy Code and provides different treatment for different Classes of Claims and Interests. Claims and Interests shall be included in a particular Class only to the extent such Claims or Interests qualify for inclusion within such Class. The Plan separates the various Claims and Interests (other than those that do not need to be classified) into seven (7) separate Classes. These Classes take into account the differing nature and priority of Claims against, and Interests in, the Debtors. Unless otherwise indicated, the characteristics and amounts of the Claims or Interests in the following Classes are based on the books and records of the Debtors.

This Section summarizes the treatment of each of the Classes of Claims and Interests under the Plan and describes other provisions of the Plan. Only holders of Allowed Claims — Claims that are not in dispute, contingent or unliquidated in amount and are not subject to an objection or an estimation request — are entitled to receive distributions under the Plan. For a more detailed description of the definition of "Allowed Claim," see Article I of the Plan. Until a Disputed Claim becomes an Allowed Claim, no distributions of New Common Stock, Cash or otherwise will be made.

The Plan is intended to enable the Debtors to continue present operations without the likelihood of a subsequent liquidation or the need for further financial reorganization. The Debtors believe that they will be able to perform their obligations under the Plan. The Debtors also believe that the Plan permits fair and equitable recoveries.

The Confirmation Date will be the date that the Confirmation Order is entered by the Clerk of the Bankruptcy Court. The Effective Date will be the first business day on or after the Confirmation Date on which all of the conditions to the Effective Date specified in Section 11.2 of the Plan have been satisfied or waived, including the consummation of the transactions contemplated by the Plan.

Resolution of any challenges to the Plan may take time and, therefore, the actual Effective Date cannot be predicted with certainty. However, the Debtors anticipate that the Effective Date will occur in or around December 2015.

Other than as specifically provided in the Plan, the treatment under the Plan of each Claim and Interest will be in full satisfaction, settlement, release and discharge of all Claims or Interests. The Debtors will make all payments and other distributions to be made under the Plan unless otherwise specified.

All Claims, Interests, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims, are placed in the Classes set forth in Article IV of the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified, and the holders thereof are not entitled to vote on the Plan. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

A Claim or Interest also is placed in a particular Class for all purposes, including voting, confirmation and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. However, a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

---

**Interest Will Not Accrue After Petition Date**

Unless otherwise specified in the Plan or by order of the Bankruptcy Court, no interest will accrue or be paid on an Allowed Claim, for any purpose, on or after the Petition Date.

---

(a)    **Unclassified Claims.**

(i)    **DIP Claims**

In full satisfaction, settlement, release and discharge of the Allowed DIP Claims, on the Effective Date, all Allowed DIP Claims shall be paid in full in Cash. Upon payment and satisfaction in full of all Allowed DIP Claims, all Liens and security interests granted to secure such obligations shall be terminated and of no further force or effect.

(ii)    **Administrative Expense Claims.**

Time for Filing Administrative Expense Claims: Unless required to have been filed by the First Administrative Bar Date, the holder of an Administrative Expense Claim, other than the holder of: (A) a DIP Claim; (B) a Fee Claim; (C) a 503(b)(9) Claim; (D) an Administrative Expense Claim that has been Allowed on or before the Effective Date; (E) an Administrative Expense Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) not required to be filed pursuant to section 503(b)(1)(D) of the Bankruptcy Code; (F) an Administrative Expense Claim on account of fees and expenses incurred on or after the Petition Date by ordinary course professionals retained by the Debtors pursuant to an order of the Bankruptcy Court; or (G) an Administrative Expense Claim arising, in the ordinary course of business, out of the employment by one or more Debtors of an individual from and after the Petition Date, but only to the extent that such Administrative Expense Claim is solely for outstanding wages, commissions or reimbursement of business expenses, *provided*, *however*, that any requests for payment and allowance of an Administrative Expense Claim for severance obligations, pension obligations, healthcare obligations and/or vacation obligations must be filed as provided for in the Plan by the Administrative Bar Date (as defined below), must file with the Bankruptcy Court and serve on the Debtors or the Reorganized Debtors (as the case may be), the Claims Agent and the Office of the U.S. Trustee, proof of such Administrative Expense Claim **within thirty (30) calendar days after the Effective Date** (the "**Administrative Bar Date**"). Such proof of Administrative Expense Claim must include at a minimum: (V) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim and if the Administrative Expense Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (W) the name of the holder of the Administrative Expense Claim; (X) the amount of the Administrative Expense Claim; (Y) the basis of the Administrative Expense Claim and (Z) supporting documentation for the Administrative Expense Claim.  For the avoidance of doubt, any deadline for filing Administrative Expense Claims shall not apply to fees payable pursuant to section 1930 of title 28 of the United States Code. **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED AND**

**DISCHARGED WITHOUT THE NEED FOR FURTHER ACTION, ORDER OR APPROVAL OF OR NOTICE TO THE BANKRUPTCY COURT.**

Treatment of Administrative Expense Claims: Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date an Administrative Expense Claim becomes an Allowed Claim, the holder of such Allowed Administrative Expense Claim shall receive from the applicable Reorganized Debtor Cash in an amount equal to such Allowed Claim; *provided*, *however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as debtors in possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities.

(iii)    **Fee Claims.**

Time for Filing Fee Claims: Any Professional Person seeking allowance by the Bankruptcy Court of a Fee Claim shall file its respective final application for allowance of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date no later than thirty (30) calendar days after the Effective Date. Objections to such Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than fifty (50) calendar days after the Effective Date or such other date as established by the Bankruptcy Court.

Treatment of Fee Claims: All Professional Persons seeking allowance by the Bankruptcy Court of a Fee Claim shall be paid in full in Cash in such amounts as are approved by the Bankruptcy Court by Final Order: (i) upon the later of (x) the Effective Date, and (y) fourteen (14) calendar days after the date upon which the Bankruptcy Court's order relating to the allowance of any such Fee Claim is entered, or (ii) upon such other terms as may be mutually agreed upon between the holder of such Fee Claim and the Reorganized Debtors.

Professional Fee Escrow Account: On the Effective Date, the Debtors shall fund a Professional Fee Escrow Account with Cash equal to the lesser of (x) the Professional Fee Estimated Amount for all Professional Persons and (y) the amount on the Fee Schedule less any postpetition payments made prior to the Effective Date on account of Fee Claims, which Professional Fee Escrow Account shall be an account maintained by counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP. The Professional Fee Escrow Account shall be maintained in trust for the Professional Persons. Such funds shall not be considered property of the Debtors' Estates or of the Reorganized Debtors. The amount of Allowed Fee Claims owing to the Professional Persons shall be paid in Cash to such Professional Persons from funds held in the Professional Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court. When all Allowed Fee Claims are paid in full in Cash, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Reorganized Debtors. Notwithstanding anything to the contrary in the Cash Collateral Order or otherwise, to the extent the Professional Fee Escrow Account does not have sufficient funds to satisfy all Allowed Fee

Claims, any Allowed Fee Claims not paid with funds in the Professional Fee Escrow Account shall be held in reserve by the Reorganized Debtors and satisfied and paid in Cash by the Reorganized Debtors immediately upon entry of the order of the Bankruptcy Court approving such Allowed Fee Claims.

Post-Effective Date Fees and Expenses: On and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional (with the exception of Professional Persons retained by or on behalf of the Creditors' Committee) or other fees and expenses incurred by any Professional Person or the Claims Agent related to implementation and consummation of the Plan, including without limitation, reconciliation of, objection to, and settlement of Claims; provided, however, that the Professional Persons retained by or on behalf of the Creditors' Committee will solely have the rights to payment set forth in Section 14.4 of the Plan. Upon the Effective Date, any requirement that Professional Persons comply with sections 327 through 331, and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional Persons in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(iv)    **U.S. Trustee Fees.**

The Debtors or Reorganized Debtors, as applicable, shall pay all outstanding U.S. Trustee Fees of a Debtor on an ongoing basis on the later of: (i) the Effective Date and (ii) the date such U.S. Trustee Fees become due, until such time as a final decree is entered closing the applicable Chapter 11 Case, the applicable Chapter 11 Case is converted or dismissed or the Bankruptcy Court orders otherwise.

(v)    **Priority Tax Claims.**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to different treatment, each holder of an Allowed Priority Tax Claim shall receive, in the Debtors' or Reorganized Debtors' discretion, either: (i) on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date a Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Claim, or (ii) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the holder of such Priority Tax Claim may be entitled to be calculated in accordance with section 511 of the Bankruptcy Code); *provided*, *however*, that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become due.

**(b)**    **Classification and Treatment of Claims and Interests.**

(i)    **Priority Non-Tax Claims (Class 1).**

Treatment Under the Plan: The legal, equitable and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to different treatment, on the later of the Effective Date and the first Distribution Date after the applicable Priority Non-Tax Claim becomes an Allowed Claim, or as soon after such date as is reasonably practicable, each holder of an Allowed Priority Non-Tax Claim shall receive**, in full satisfaction, settlement, release and discharge of, and in exchange for, such Claims,** Cash from the applicable Reorganized Debtor in an amount equal to such Allowed Claim.

Voting: The Priority Non-Tax Claims are not impaired Claims. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Priority Non-Tax Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

(ii)    **Other Secured Claims (Class 2).**

Treatment Under the Plan: The legal, equitable and contractual rights of the holders of Other Secured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the first Distribution Date after the applicable Other Secured Claim becomes an Allowed Claim, or as soon after such date as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive, **in full satisfaction, settlement, release and discharge of, and in exchange for, such Claims,** at the election of the Reorganized Debtors: (i) Cash in an amount equal to such Allowed Claim; (ii) the return of the Collateral securing such Allowed Other Secured Claim; or (iii) such other treatment that will render the Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the applicable Debtor or Reorganized Debtor, without further notice to or action, order, or approval of the Bankruptcy Court. Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until payment or other satisfaction of such Allowed Other Secured Claim is made as provided herein. On the payment or other satisfaction of such Claims in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or action, order, or approval of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

Voting: The Other Secured Claims are not impaired Claims. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Other Secured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Other Secured Claims.

Deficiency Claims: To the extent that the value of the Collateral securing each Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as an Allowed General Unsecured Claim and shall be classified as a General Unsecured Claim.

(iii)    **First Lien Credit Agreement Claims (Class 3).**

Allowance: On the Effective Date, the First Lien Credit Agreement Claims shall be deemed Allowed Claims in the amount of $292,257,374.79.

Treatment Under the Plan: On the Effective Date, or as soon as reasonably practicable thereafter, each holder of an Allowed First Lien Secured Claim shall receive, subject to the terms of the Plan, in full satisfaction, settlement, release and discharge of, and in exchange for, such Claims, its Pro Rata Share of 100% of the shares of New Common Stock to be issued by Reorganized TER on the Effective Date on a fully-diluted basis.

Voting: The First Lien Credit Agreement Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such Allowed First Lien Credit Agreement Claims.

(iv)    **General Unsecured Claims (Class 4).**

Treatment Under the Plan: Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the later of the Effective Date and the first Distribution Date after the applicable General Unsecured Claim becomes an Allowed Claim, or as soon after such date as is reasonably practicable, subject to Section 7.10 of the Plan, if applicable, each holder of an Allowed General Unsecured Claim shall receive**, in full satisfaction, settlement, release and discharge of, and in exchange for, such Claims,** such holder's Pro Rata Share of the Class A Distribution Trust Beneficial Interests or the Class B Distribution Trust Beneficial Interests as applicable based on whether or not each such holder validly exercised the Opt-Out Election; *provided*, *however*, that in no event shall such distribution be in excess of 100% of the amount of such holder's Allowed General Unsecured Claim.

Voting: The General Unsecured Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan and the votes of such holders will be solicited with respect to such General Unsecured Claims.

(v)    **Existing Securities Law Claims (Class 5(a)).**

Treatment:  Subject to Section 7.10 of the Plan, if applicable, holders of Existing Securities Law Claims shall not receive or retain any distribution under the Plan on account of such Existing Securities Law Claims.

Voting:  The Existing Securities Law Claims are impaired Claims. In accordance with section 1126(g) of the Bankruptcy Code, the holders of Existing Securities Law Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan,

and the votes of such holders will not be solicited with respect to such Existing Securities Law Claims.

### (vi) **Equitably Subordinated Claims (Class 5(b)).**

<u>Treatment Under the Plan</u>: Subject to Section 7.10 of the Plan, if applicable, holders of Equitably Subordinated Claims shall not receive or retain any distribution under the Plan on account of such Equitably Subordinated Claims.

<u>Voting</u>: The Equitably Subordinated Claims are impaired Claims. In accordance with section 1126(g) of the Bankruptcy Code, the holders of Equitably Subordinated Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Equitably Subordinated Claims.

### (vii) **Existing TER Interests (Class 6).**

<u>Treatment Under the Plan</u>: Holders of Existing TER Interests shall not receive or retain any distribution under the Plan on account of such Existing TER Interests.  On the Effective Date, all Existing TER Interests shall be deemed cancelled and extinguished.

<u>Voting</u>: The Existing TER Interests are impaired Interests. In accordance with section 1126(g) of the Bankruptcy Code, the holders of Existing TER Interests are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Existing TER Interests.

**7.4.** ***Acceptance or Rejection of the Plan; Effect of Rejection by One or More Classes of Claims or Interests.***

### (a) **Class Acceptance Requirement.**

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount of the Allowed Claims in such Class and more than one-half (1/2) in number of the Allowed Claims in such Class, of holders of such Claims that have voted on the Plan.

### (b) **Voting of Claims**

Each holder of an Allowed Claim in an Impaired Class of Claims other than holders of Claims in Classes 5(a) and 5(b) shall be entitled to vote to accept or reject the Plan as provided in such order as may be entered by the Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Court.

**(c)**      **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown."**

Because certain Classes are deemed to have rejected the Plan and certain other Classes may vote to reject the Plan, the Debtors will request confirmation of the Plan, as it may be modified and amended from time to time subject to the consent of the Consenting First Lien Lenders, under section 1129(b) of the Bankruptcy Code with respect to such Classes.  The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Document, subject to the consent of the Consenting First Lien Lenders, in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary. The Debtors also reserve the right to request confirmation of the Plan, as it may be modified subject to the consent of the Consenting First Lien Lenders, supplemented or amended from time to time, with respect to any Class that affirmatively votes to reject the Plan.

**(d)**      **Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**(e)**      **Voting Classes; Deemed Acceptance by Non-Voting Classes.**

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of such Claims or Interests in such Class.

**(f)**      **Confirmation of All Cases.**

Except as otherwise specified in the Plan, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors; *provided*, *however*, that the Debtors may at any time waive the foregoing condition.

---

**Important Note on Estimates**

The estimates in the tables and summaries in this Disclosure Statement may differ from actual distributions because of variations in the asserted or estimated amounts of Allowed Claims, the existence of Disputed Claims and other factors. Statements regarding projected amounts of Claims or distributions (or the value of such distributions) are estimates by the Debtors based on current information and are not representations as to the accuracy of these amounts. Except as otherwise indicated, these statements are made as of the date of this Disclosure Statement, and the delivery of this Disclosure Statement will not, under any circumstances, imply that the information contained in this Disclosure Statement is correct at any other time. Any estimates of Claims or Interests in this

---

> Disclosure Statement may vary from the final amounts of Claims or Interests allowed by the Bankruptcy Court.
>
> In addition, the estimated valuation of Reorganized TER and the New Common Stock and the estimated recoveries to holders of Claims are not intended to represent the value at which the New Common Stock could be sold if a market for such securities emerges. See the risk factor regarding the anticipated lack of an active trading market for the New Common Stock, located in Section 11.2(f) of this Disclosure Statement.

7.5.    ***Summary of Capital Structure of Reorganized Debtors.***

(a)    **Post-Emergence Capital Structure.**

The following table summarizes the capital structure of the Reorganized Debtors, including the post-Effective Date financing arrangements the Reorganized Debtors expect to enter into to fund their obligations under the Plan (subject to the satisfaction of the conditions in the Plan) and provide for, among other things, their post-Effective Date working capital needs. The summary of the Reorganized Debtors' capital structure is qualified in its entirety by reference to the Plan and the applicable Plan Documents.

| Instrument | Description |
|---|---|
| *[New Term Loan]* | [On the Effective Date, subject to the terms and conditions contained in the New Term Loan Commitment Letter, Reorganized TER, as borrower, and those entities identified as "guarantors" in the New Credit Agreement, will enter into the New Term Loan, pursuant to the New Credit Agreement. The New Term Loan shall, to the extent the conditions set forth in Section 11.1 of the Plan have been satisfied or waived: (a) be in the original principal amount of **(i)** $[13.5] million**, plus (ii) the aggregate outstanding principal amount of loans under the DIP Credit Agreement and the accrued interest, unpaid fees and costs and expenses thereon outstanding on the Effective Date,** to pay certain Allowed Administrative Expense Claims and Allowed Priority Non-Tax Claims; (b) be funded on the Effective Date; (c) provide for the payment of payable-in-kind interest only; and (d) have a five (5) year maturity.] |
| *New Common Stock* | On the Effective Date, Reorganized TER will issue up to 1,000 shares of common stock of Reorganized TER, par value $0.01, to be issued by Reorganized TER in connection with the implementation of, and as authorized by, the Plan. |

- 45-

(b)    **Description of New Common Stock.**

(i)    **Issuance.**

The New Common Stock will be issued to holders of Allowed Class 3 First Lien Credit Agreement Claims in accordance with the terms of the Plan.  On the Effective Date, Reorganized TER will issue the New Common Stock, and such shares will be issued pursuant to section 1145 of the Bankruptcy Code and/or section 4(a)(2) of the Securities Act.

(ii)    **Organizational Documents.**

On the Effective Date, the Amended Certificates of Incorporation and Amended By-Laws, each substantially in the form to be contained in the Plan Supplement, will be automatically authorized, approved and adopted by the Reorganized Debtors.

(iii)    **Restrictions on Transfer.**

In order to avoid the expense and administrative burden of complying with the reporting obligations under the U.S. Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), the Amended Certificates of Incorporation and Amended By-Laws will contain restrictions on transfer of the New Common Stock, designed to ensure that there will be less than 2,000 record holders (inclusive of no more than 500 record holders that are not Accredited Investors) of New Common Stock (determined pursuant to the Exchange Act) and the Amended Certificates of Incorporation and Amended By-Laws of Reorganized TER will provide that all holders of Common Stock will automatically be bound by the Amended Certificates of Incorporation and the Amended By-Laws without any further action by such holder. These transfer restrictions contained in the Amended Certificates of Incorporation and the Amended By-Laws will remain in place until the Amended Certificates of Incorporation and the Amended By-Laws are amended to provide otherwise; *provided*, *however*, that the board of directors of Reorganized TER may waive such transfer restrictions with respect to any particular transfer. As such, the Amended Certificates of Incorporation and the Amended By-Laws of Reorganized TER will require notice of any proposed transfer of New Common Stock and will restrict such transfer on certain grounds to be provided therein, including if the transfer would, if effected, require Reorganized TER to register or qualify such New Common Stock under the Securities Act or Exchange Act. Such restrictions will be in addition to other restrictions on transfer to be set forth in the Amended Certificates of Incorporation and the Amended By-Laws.

7.6.    *Means for Implementation.*

(a)    **Continued Corporate Existence and Vesting of Assets in Reorganized Debtors.**

Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Certificates of Incorporation and Amended By-Laws of the Reorganized Debtors, for the purposes of satisfying their obligations under the Plan and the continuation of their businesses. On or after the Effective Date, each Reorganized Debtor, in its sole and exclusive

discretion, may take such action as permitted by applicable law and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, but not limited to, causing: (i) a Reorganized Debtor to be merged into another Reorganized Debtor, or its Subsidiary and/or affiliate; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's case on the Effective Date or any time thereafter.

Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Estates of the Debtors, including all claims, rights and Causes of Action and any property acquired by the Debtors under or in connection with the Plan, but excluding the Distribution Trust Assets, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances and Interests; *provided*, *however*, that the Debtors and the Reorganized Debtors waive and release any Causes of Action against any of the Released Parties as provided for in Section 12.7(a) of the Plan. Subject to Section 7.1(a) of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order. Subject to Section 7.1(a) the Plan, on and after the Effective Date, the Reorganized Debtors may maintain, prosecute, settle, dismiss, abandon or otherwise dispose of Causes of Action (excluding the Avoidance Actions and those Causes of Action released under the Plan) without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to affect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable entities may agree, including, without limitation, the New Credit Agreement and the New First Lien Collateral Documents; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

(b)     **Plan Funding.**

The distributions of Cash under the Plan shall be funded from: (a) the Debtors' Cash on hand as of the Effective Date; and (b) to the extent that the conditions set forth in the

New Credit Agreement and New Term Loan Commitment Letter are satisfied or waived, the proceeds of the New Term Loan.}

### (c)    Cancellation of Existing Securities and Agreements.

Except for the purpose of evidencing a right to distribution under the Plan, and except as otherwise set forth herein, on the Effective Date all agreements, instruments, and other documents evidencing any Claim or Interest, including, without limitation, all obligations of the Debtors to indemnify, defend, reimburse, exculpate, or advance fees and expenses to any and all directors and officers who were directors or officers of any of the Debtors at any time prior to the Effective Date, other than Intercompany Interests, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged and of no force or effect. Notwithstanding the foregoing, the First Lien Credit Agreement shall continue in effect solely to the extent necessary to allow the Reorganized Debtors and the First Lien Agent to make distributions pursuant to the Plan on account of the First Lien Credit Agreement Claims, and to effectuate any charging liens permitted under the First Lien Credit Agreement. The holders of or parties to such cancelled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights expressly provided for pursuant to the Plan. Except as provided pursuant to the Plan, the First Lien Agent and its respective agents, successors and assigns shall be discharged of all of their obligations associated with the First Lien Credit Agreement.

### (d)    Cancellation of Certain Existing Security Interests.

Upon the payment or other satisfaction of an Allowed Other Secured Claim, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors (as applicable) any Collateral or other property of the Debtors held by such holder, and any termination statements, instruments of satisfactions, or releases of all security interests with respect to its Allowed Other Secured Claim that may be required in order to terminate any related financing statements, mortgages, mechanic's liens, or *lis pendens*.

### (e)    Officers and Boards of Directors.

On the Effective Date, the initial board of directors of each of the Reorganized Debtors shall consist of those individuals identified in the Plan Supplement. The initial board of directors of Reorganized TER will consist of five (5) members, comprised of individuals to be designated by the Consenting First Lien Lenders.  On the Effective Date, the officers of each of the Reorganized Debtors shall consist of those individuals identified in the Plan Supplement. The compensation arrangement for any insider of the Debtors that shall become an officer of a Reorganized Debtor will be disclosed in the Plan Supplement.

The members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Debtors or the Reorganized Debtors on or after the Effective Date, and each such member will be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date. Commencing on the Effective Date, each of the directors of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable organizational documents of such

Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### (f)      Corporate Action.

On the Effective Date, the Amended Certificates of Incorporation and the Amended By-Laws, and any other applicable corporate organizational documents of each of the Reorganized Debtors shall be amended and restated and deemed authorized in all respects.

Any action under the Plan to be taken by or required of the Debtors or the Reorganized Debtors, including, without limitation, the adoption or amendment of certificates of incorporation and by-laws, the issuance of securities and instruments, the assumption of the Executive Severance Plan and the Executive Severance Benefits or the selection of officers or directors, shall be authorized and approved in all respects, without any requirement of further action by any of the Debtors' or Reorganized Debtors' boards of directors or managers, as applicable or security holders.

The Debtors, the Reorganized Debtors, and the Distribution Trustee, as applicable, shall be authorized to execute, deliver, file and record such documents (including the Plan Documents), contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan, without the necessity of any further Bankruptcy Court, corporate, board or shareholder approval or action. In addition, the selection of the Persons who will serve as the initial directors, officers and managers of the Reorganized Debtors as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of directors, board of managers or stockholders of the applicable Reorganized Debtor.

### (g)      Authorization, Issuance and Delivery of New Common Stock.

On the Effective Date, Reorganized TER is authorized to issue or cause to be issued the New Common Stock for distribution in accordance with the terms of the Plan and the Amended Certificate of Incorporation of Reorganized TER, without the need for any further corporate or shareholder action. Certificates, if any, of New Common Stock will bear a legend restricting the sale, transfer, assignment or other disposal of such shares, as more fully set forth in the Amended Certificate of Incorporation of Reorganized TER.

As of the Effective Date, the New Common Stock shall not be registered under the Securities Act of 1933, as amended, and shall not be listed for public trading on any securities exchange.  The distribution of New Common Stock pursuant to the Plan may be made by delivery of one or more certificates representing such shares as described herein, by means of book-entry registration on the books of the transfer agent for shares of New Common Stock or by means of book-entry exchange through the facilities of the AST in accordance with the customary practices of the AST, as and to the extent practicable.

(h)      **New Credit Agreement.**

On the Effective Date, subject to terms and conditions contained in the New Term Loan Commitment Letter, Reorganized TER and the New Term Loan Lenders will enter into the New Credit Agreement and the New First Lien Collateral Documents in accordance with the terms of the Plan without the need for any further corporate or shareholder action.

(i)      **Intercompany Interests.**

No Intercompany Interests shall be cancelled pursuant to the Plan, and all Intercompany Interests shall continue in place following the Effective Date, solely for the purpose of maintaining the existing corporate structure of the Debtors and the Reorganized Debtors.

(j)      **Insured Claims.**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed with the Bankruptcy Court and without any further notice to or action, order, or approval of the Court.

(k)      **Distribution Trust.**

(i)      **Execution of the Distribution Trust Agreement**

On the Effective Date, the Debtors, on their own behalf and on behalf of the holders of General Unsecured Claims, shall execute the Distribution Trust Agreement and shall take all other steps necessary to establish the Distribution Trust in accordance with and pursuant to the terms of the  Distribution Trust Agreement.  Upon the Effective Date, the Distribution Trustee shall distribute the Distribution Trust Interests in accordance with the Plan.  The Distribution Trust Interests shall be non-transferable.

(ii)      **Purpose of the Distribution Trust**

The Distribution Trust shall be established for the sole purpose of liquidating (including by prosecution and settlement of claims constituting Distribution Trust Assets) the Distribution Trust Assets, in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.  All parties are required to treat the Distribution Trust as a liquidating trust, subject to contrary definitive guidance from the Internal Revenue Service.  For U.S. federal income tax purposes, the Debtors, the Distribution Trustee and the Distribution Trust Beneficiaries will treat the transfer of assets to the Distribution Trust as a transfer by the Debtors of the Distribution Trust Assets to the Distribution Trust Beneficiaries, followed by a transfer of such Distribution Trust Assets by the Distribution Trust Beneficiaries to the Distribution Trust.  Accordingly, for U.S. federal income

- 50-

tax purposes, it is intended that the Distribution Trust shall be treated as one or more grantor trusts, and the Distribution Trust Beneficiaries receiving Distribution Trust Interests shall be treated as the grantors and deemed owners of the Distribution Trust.

(iii)    **Distribution Trust Assets**

On the Effective Date, the Distribution Trust Assets shall be transferred (and deemed transferred) to the Distribution Trust without the need for any person or Entity to take any further actions or obtain any approval.  Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax.

(iv)    **Governance of the Distribution Trust**

The Committee shall designate the Distribution Trustee, who shall govern the Distribution Trust.   Replacement of the Distribution Trustee shall be governed by the Distribution Trust Agreement.

(v)    **Role of Distribution Trustee**

In furtherance of and consistent with the purpose of the Distribution Trust and the Plan, the Distribution Trustee shall (i) distribute the Distribution Trust Interests to holders of Allowed General Unsecured Claims in accordance with the terms of the Plan and the Distribution Trust Agreement, (ii) have the power and authority to hold, manage, convert to Cash, and distribute the Distribution Trust Assets, including prosecuting and resolving the Avoidance Actions (excluding those Avoidance Actions released under the Plan), (iii) hold the Distribution Trust Assets for the benefit of the Distribution Trust Beneficiaries and (iv) have the power and authority to hold, manage, and distribute Cash or non-Cash assets obtained through the exercise of its power and authority.  In all circumstances, the Distribution Trustee shall act in the best interests of all beneficiaries of the Distribution Trust and in furtherance of the purpose of the Distribution Trust.

(vi)    **Distribution Trust Distributions**

At least annually, the Distribution Trustee shall (in consultation with the Reorganized Debtors) make distributions to the Distribution Trust Beneficiaries of all Cash on hand in accordance with the Distribution Trust Agreement (including any Cash received from the Debtors on the Effective Date) except such amounts (i) that would be distributable to a holder of a Disputed Claim if such Disputed Claim had been Allowed prior to the time of such distribution (but only until such Claim is resolved), (ii) that are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Distribution Trust during liquidation, (iii) that are necessary to pay reasonable expenses (including, but not limited to, any taxes imposed on the Distribution Trust or in respect of its assets), and (iv) that are necessary to satisfy other liabilities incurred by the Distribution Trust in accordance with the Plan or the Distribution Trust Agreement.

(vii)    **Costs and Expenses of the Distribution Trust**

The costs and expenses of the Distribution Trust, including the fees and expenses of the Distribution Trustee and its retained professionals, shall be paid from the Distribution Trust with assets of the Distribution Trust.  The Reorganized Debtors shall have no liability for such costs, fees, or expenses.

(viii)    **Authority to Prosecute and Settle Avoidance Actions**

Subject to the terms of the Distribution Trust Agreement, after the Effective Date, only the Distribution Trustee shall have the authority to maintain, prosecute, settle, dismiss, abandon or otherwise dispose of the Avoidance Actions (excluding, for the avoidance of doubt, those Avoidance Actions released under the Plan); provided that, for the avoidance of doubt, the Distribution Trustee shall not have any authority to exercise any rights of the Debtors or Reorganized Debtors to setoff or recoupment. Subject to the terms of the Distribution Trust Agreement, the Distribution Trustee may enter into and consummate settlements and compromises of the Avoidance Actions without notice to or approval by the Bankruptcy Court.

(ix)    **Reorganized Debtors' Cooperation and Supply of Information and Documentation**

Upon written request from the Distribution Trustee, the Reorganized Debtors shall provide commercially reasonable cooperation, and shall supply, at the Distribution Trust's sole expense and subject to confidentiality protections reasonably acceptable to the Reorganized Debtors, all reasonable information, records and documentation, to the Distribution Trustee that is required to promptly, diligently and effectively evaluate, file, prosecute and settle the Avoidance Actions. Additionally, upon request by the Distribution Trustee, the Reorganized Debtors shall use commercially reasonable efforts to make available personnel with information relevant to the Avoidance Actions.

7.7.    *Treatment of Executory Contracts and Unexpired Leases.*

(a)    **General Treatment.**

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases identified on the Cure Schedule shall be deemed assumed, and all other executory contracts and unexpired leases of the Debtors shall be deemed rejected, except that: (i) any executory contracts and unexpired leases that previously have been assumed or rejected pursuant to a Final Order of the Bankruptcy Court shall be treated as provided in such Final Order; and (ii) all executory contracts and unexpired leases that are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date or are the subject of an amendment to the Cure Schedule prior to the Effective Date removing any identified contract or lease shall be treated as is determined by a Final Order of the Bankruptcy Court resolving such motion or amendment to the Cure Schedule. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions and rejections described in Section 10.1 of the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to Section 10.1 of the Plan

shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable federal law.

### (b)     Claims Based on Rejection of Executory Contracts or Unexpired Leases.

All Claims arising from the rejection of executory contracts or unexpired leases, if any, will be treated as General Unsecured Claims. All such Claims shall be discharged on the Effective Date, and shall not be enforceable against the Debtors, the Reorganized Debtors or their respective properties or interests in property. In the event that the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors and the Reorganized Debtors on or before the date that is thirty (30) days after the effective date of such rejection (which may be the Effective Date, the date on which the Debtors reject the applicable contract or lease as provided in Section 10.3(c) of the Plan, or pursuant to an order of the Bankruptcy Court).

### (c)     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such executory contract or unexpired lease, any monetary defaults arising under each executory contract and unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the appropriate amount (the "**Cure Amount**") in Cash on the later of thirty (30) days after: (i) the Effective Date; or (ii) the date on which any Cure Dispute relating to such Cure Amount has been resolved (either consensually or through judicial decision).

No later than twenty-one (21) calendar days prior to the commencement of the Confirmation Hearing, the Debtors shall file a Cure Schedule and serve such Cure Schedule on each applicable counterparty. Any party that fails to object to the applicable Cure Amount listed on the Cure Schedule within seven (7) business days before the Confirmation Hearing, shall be forever barred, estopped and enjoined from disputing the Cure Amount set forth on the Cure Schedule (including a Cure Amount of $0.00) and/or from asserting any Claim against the applicable Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Cure Schedule.

In the event of a dispute (each, a "**Cure Dispute**") regarding: (i) the Cure Amount; (ii) the ability of the applicable Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (iii) any other matter pertaining to the proposed assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such Cure Dispute and approving the assumption.

To the extent a Cure Dispute relates solely to the Cure Amount, the applicable Debtor may assume and/or assume and assign the applicable contract or lease prior to the resolution of the Cure Dispute provided that such Debtor reserves Cash in an amount sufficient to pay the full amount asserted as the required cure payment by the non-Debtor party to such contract or lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the Reorganized Debtors).  To the extent the Cure Dispute is resolved or determined unfavorably to the applicable Debtor or Reorganized Debtor, as applicable, such Debtor or Reorganized Debtor, as applicable, may reject the applicable executory contract or unexpired lease after such determination.

Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume such executory contract or unexpired lease. Any Proofs of Claim Filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Court.

### (d)    Compensation and Benefit Programs.

All employment and severance policies (except as provided in Section 10.4(b) below), and all compensation and benefit plans, policies, and programs of the Debtors applicable to their respective employees, retirees and non-employee directors including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death and dismemberment insurance plans, including programs, plans and arrangements subject to sections 1113 and 1129(a)(13) of the Bankruptcy Code, entered into before the Petition Date and not since terminated or modified, shall on the Effective Date be terminated or treated as executory contracts under the Plan and rejected pursuant to the provisions of sections 365, 1113 and 1123 of the Bankruptcy Code, with such termination or rejection subject to the prior consent of the Consenting First Lien Lenders.  On the Effective Date, the Reorganized Debtors shall enter into such new employment and severance policies and compensation and benefit plans, policies, and programs, on terms and conditions and in form and substance acceptable to the Consenting First Lien Lenders, as shall be set forth in the Plan Supplement.

On the Effective Date, the Reorganized Debtors shall assume the Executive Severance Plan and the Executive Severance Benefits (it being understood that a diminution in an executive's authority, duties or responsibilities directly resulting from the closure of the Taj Mahal and/or the Plaza shall not constitute a "Good Reason" under the Executive Severance Plan provided that (i) such reduced authority, duties or responsibilities are consistent with the executive's job title taking into account the closure of the Taj Mahal and/or the Plaza and (ii) there is not a reduction in the executive's compensation or any change in the executive's job title or reporting structure).

(e)    **Trademark License Agreement**

On the Effective Date, unless previously assumed by the Debtors, the Debtors or the Reorganized Debtors, as the case may be, pursuant to section 365 of the Bankruptcy Code, shall assume the Trademark License Agreement**, subject to the terms thereof**; *provided*, *however*, that if the Court determines that the Trademark License Agreement cannot be assumed by the Debtors or Reorganized Debtors without the consent of the Trump Parties, then the automatic stay is hereby modified to permit the First Lien Agent to, and on the Effective Date the First Lien Agent shall and shall be deemed to, enforce its rights under the First Lien Security Agreement and designate the Reorganized Debtors as transferees of each of the Casino Properties (as defined in the Trademark License Agreement) as Licensee Entities (as defined in the Trademark License Agreement) under the Trademark License Agreement.

(f)    **Termination of Plaza Collective Bargaining Agreements.**

Due to the closure of the Plaza Hotel and Casino, on the Effective Date, unless previously terminated, the Plaza Collective Bargaining Agreements shall be deemed terminated and shall no longer have any force or effect.

(g)    **Assumption of Donnelly & Clark Agreement.**

On the Effective Date, unless previously assumed by the Debtors, the Debtors or the Reorganized Debtors, as the case may be, pursuant to section 365 of the Bankruptcy Code, shall assume that certain Agreement for Legal Services, dated March 20, 2013, by and among the Debtors and Donnelly & Clark, as amended, modified or supplemented from time to time; provided, however, that (in addition to either party's right to terminate such agreement on six months' prior written notice beginning April 1, 2015 as set forth therein) such agreement shall automatically terminate six (6) months after the Effective Date.

(h)    **Employment Agreements.**

On the Effective Date, any and all existing employment agreements between any of the Debtors and any employee of the Debtors shall be deemed either terminated or treated as executory contracts under the Plan and rejected pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, as determined by the Debtors, with such termination or rejection subject to the prior consent of the Consenting First Lien Lenders.  Notwithstanding the foregoing, the termination or rejection of any existing employment agreements shall not be deemed, by itself, to be a termination of any employee or affect any rights or obligations of either the Debtors, the Reorganized Debtors or any employee (as applicable) arising under the Trump Entertainment Resorts Inc. Executive Severance Plan, effective September 5, 2014.

(i)    **Insurance Policies.**

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Documents, the Plan Supplement, the Confirmation Order, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening or grants an injunction or release, including, but not limited to, the injunctions set forth in Article XII of the Plan):

(i)        on the Effective Date, the Reorganized Debtors shall assume all insurance policies issued (or providing coverage) at any time to the Debtors or their predecessors and all agreements related thereto (collectively, the "**Insurance Contracts**"), and all such Insurance Contracts shall vest in the Reorganized Debtors;

(ii)      without altering part (iii) hereof, unless otherwise determined by the Bankruptcy Court pursuant to a Final Order entered prior to the Effective Date (with the exception of the Confirmation Order) or agreed to by the parties thereto prior to the Effective Date, no payments shall be required to cure any defaults of the Debtors existing as of the Effective Date with respect to each such Insurance Contract, and to the extent that the Bankruptcy Court determines otherwise as to any such Insurance Contract, the Debtors' rights to seek the rejection of such insurance policy or agreement or other available relief within thirty (30) days of such determination are fully reserved, *provided however*, that the rights of any party that issues an Insurance Contract to object to such proposed rejection on any and all grounds are fully reserved;

(iii)     nothing in the Disclosure Statement, the Plan, the Plan Documents, the Plan Supplement or the Confirmation Order (a) alters, modifies or otherwise amends the terms and conditions of (or the coverage provided by) any of the Insurance Contracts, (b) limits the Reorganized Debtors from asserting a right or claim to the proceeds of any Insurance Contract that insures any Debtor, was issued to any Debtor or was assumed by the Reorganized Debtors by operation of the Plan or (c) impairs, alters, waives, releases, modifies or amends any of the Debtors' or Reorganized Debtors' legal, equitable or contractual rights, remedies, claims, counterclaims, defenses or Causes of Action in connection with any of the Insurance Contracts, provided that as of the Effective Date, the Reorganized Debtors shall have all the benefits, rights and remedies thereunder and shall become and remain liable for all of the Debtors' obligations and liabilities, if any, thereunder regardless of whether such obligations and liabilities arise before or after the Effective Date;

(iv)    nothing in the Disclosure Statement, the Plan, the Plan Documents, Plan Supplement, the Confirmation Order, any prepetition or administrative claim bar date order (or notice) or any other pleading, order or notice alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by the Insurance Contracts and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor, subject to any and all legal, equitable or contractual rights, remedies, claims, counterclaims, defenses or Causes of Action of the Debtors (or after the Effective Date, the Reorganized Debtors);

(v)      the rights and obligations of the insureds, the Reorganized Debtors and insurers shall be determined under (a) the Insurance Contracts which shall remain in full

force and effect subject to the terms thereof and (b) applicable non-bankruptcy law.

(vi)     insurers and third party administrators shall not need to nor be required to file or serve an objection to the Cure Schedule or a request, application, claim, proof of claim or motion for payment and shall not be subject to the any Bar Date or similar deadline governing Cure Amounts or Claims; and

(vii)    subject to section 7.10 of the Plan, the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article XII of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit:

(A)     claimants with valid workers' compensation claims covered by any of the Insurance Contracts or other claims where a claimant asserts under applicable law a claim directly against the applicable insurer and/or third party administrator covered by any of the Insurance Contracts (collectively, "**Direct Claims**") to proceed with their claims against the insurer and/or third party administrator;

(B)     insurers and/or third party administrators to administer, handle, defend, settle, and/or pay, in the ordinary course of business, in accordance with the terms of the Insurance Contracts and applicable non-bankruptcy law and without further order of the Bankruptcy Court, (1) all Direct Claims, and (2) all costs in relation to each of the foregoing;

(C)     the insurers and/or third party administrators to draw against any or all of any collateral or security provided by or on behalf of the Debtors (or the Reorganized Debtors, as applicable) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable) to the applicable insurers and/or third party administrators and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the Insurance Contracts, in such order as the applicable insurers and/or third party administrators may determine, but solely in accordance with the terms of such Insurance Contracts; and

(D)     the insurers and/or third party administrators to (1) cancel any policies under the Insurance Contracts, and (2) take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, each in accordance with the terms of the Insurance Contracts.

7.8.    *Conditions Precedent to Consummation of the Plan.*

      (a)    **Conditions Precedent to Confirmation.**

Confirmation of the Plan is subject to entry of the Confirmation Order in form and substance acceptable to the Debtors and Consenting First Lien Lenders and the satisfaction or waiver of each of the conditions precedent set forth below:

      (i)    the New Term Loan Commitment Letter having been executed and delivered, and the New Term Loan Commitment Letter having not been terminated;

      (ii)    the Debtors having ceased any obligation to contribute to and withdrawn from the National Retirement Fund with respect to those employees of Trump Taj Mahal Associates, LLC that are members of Local 54 – UNITE HERE;

      (iii)    the Bankruptcy Court having entered the CBA Order; and

      (iv)    the DIP Order and the Cash Collateral Order shall be in full force and effect in accordance with their terms and no Event of Default (as defined in the DIP Order or the Cash Collateral Order) shall have occurred and be continuing, unless otherwise waived by the Consenting First Lien Lenders.

      (b)    **Conditions Precedent to the Effective Date.**

The occurrence of the Effective Date is subject to:

      (i)    the Confirmation Order having become a Final Order;

      (ii)    the New Credit Agreement having been executed and delivered, and any conditions contained in the New Term Loan Commitment Letter and the New Credit Agreement (other than the occurrence of the Effective Date or certification by a Debtor that the Effective Date has occurred) having been satisfied or waived in accordance therewith and the New Term Loan Commitment Letter having not been terminated;

      (iii)    the Plan Documents having been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by a Debtor that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith;

      (iv)    all material governmental, regulatory and third party approvals, authorizations, certifications, rulings, no-action letters, opinions, waivers and/or consents in connection with the Plan,

if any, having been obtained and remaining in full force and effect, and there existing no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality, which would prohibit the consummation of the Plan;

(v)      any person or entity entitled to receive New Common Stock under the Plan having been licensed, qualified, or found suitable to receive New Common Stock under any applicable gaming laws and regulations in the states in which the Debtors or Reorganized Debtors, as applicable, shall operate;

(vi)     the CBA Order having become a Final Order;

(vii)    ~~either (i) the Bankruptcy Court having estimated pursuant to section 502(c) of the Bankruptcy Code, or (ii) the Consenting First Lien Lenders having been satisfied in their sole discretion (based on such evidence as may be requested by the Consenting First Lien Lenders in their sole discretion), that any and all Administrative Expense Claims and Priority Non-Tax Claims for the Debtors' withdrawal from all multi-employer pension plans shall be less than an amount satisfactory to the Consenting First Lien Lenders in their sole discretion;~~

**(vii)**   ~~(viii)~~ the amount of ~~Administrative Expense Claims and Priority Non-Tax Claims, other than real estate tax claims,~~ **Administrative Expense Claims and Priority Non-Tax Claims (in each case, other than (i) real estate tax claims, (ii) any outstanding, unpaid post-petition trade payables incurred by the Debtors in the ordinary course of business, (iii) any Cure Amounts required to be paid pursuant to the Bankruptcy Code and Section 10.3 of the Plan, and (iv) any Allowed Administrative Expense Claim or Allowed Priority Non-Tax Claim held by AC Alliance)** reasonably estimated to be Allowed Administrative Expense Claims and Priority Non-Tax Claims by the Debtors in good faith and with the Consenting First Lien Lenders' consent totaling less than $~~[7.5]~~**9** million; and

**(viii)**  ~~(ix)~~ the Consenting First Lien Lenders having ~~determined in their sole discretion~~**reasonably estimated** that the consummation of the Plan would not result in any contingent, multi-employer pension liability being assumed or imposed upon the Reorganized Debtors in excess of ~~an amount satisfactory to the Consenting First Lien Lenders in their sole discretion~~**$5 million**.

- 59-

7.9.    ***Waiver of Conditions Precedent and Bankruptcy Rule 3020(e) Automatic Stay.***

The Debtors, with the consent of the Consenting First Lien Lenders, shall have the right to waive any condition precedent set forth in Section 11.1 and 11.2 of the Plan at any time without leave of or notice to the Bankruptcy Court and without formal action other than proceeding with consummation of the Plan. Further, the stay of the Confirmation Order, pursuant to Bankruptcy Rule 3020(e), shall be deemed waived by the Confirmation Order.

If any condition precedent to the Effective Date is waived pursuant to Section 11.3 of the Plan and the Effective Date occurs, the waiver of such condition shall benefit from the "mootness doctrine," and the act of consummation of the Plan shall foreclose any ability to challenge the Plan in any court.

7.10.    ***Effect of Failure of Conditions.***

The Debtors or the Consenting First Lien Lenders shall have the right at any time to seek to vacate the Confirmation Order upon any modification or reversal of the CBA Order. In addition, the Debtors or the Consenting First Lien Lenders shall have the right to seek to vacate the Confirmation Order if the Debtors or the Consenting First Lien Lenders, as the case may be, reasonably believe that one or more conditions to effectiveness and the occurrence of the Effective Date is not capable of being satisfied and the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived (as provided in Section 11.3 of the Plan) on or before the first business day after the date that is sixty (60) days after entry of the order confirming such plan of reorganization; provided, however, that such sixty (60) day period shall not be extended or modified under any circumstances without the consent of both the Debtors and the Consenting First Lien Lenders.

Notwithstanding the Debtors' or the Consenting First Lien Lenders' seeking to vacate the Confirmation Order, the Confirmation Order shall not be vacated if all of the conditions to effectiveness and the occurrence of the Effective Date set forth in Section 11.2 of the Plan are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated pursuant to this Section 11.4, the Plan shall be null and void in all respects, the Confirmation Order shall be of no further force or effect, no distributions under the Plan shall be made, the Debtors and all holders of Claims and Interests in the Debtors shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against or Interest in the Debtors; or (c) constitute an admission, acknowledgment, offer or undertaking by any Debtor or any other entity with respect to any matter set forth in the Plan.

7.11.    ***Binding Effect.***

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtors and

inure to the benefit of and be binding on such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

7.12.   *Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, and except as otherwise provided in the Plan, the property of each Estate (excluding the Distribution Trust Assets) shall vest in the applicable Reorganized Debtor, free and clear of all Claims, Liens, encumbrances, charges, and other Interests, except as provided herein or in the Confirmation Order.   On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, and except as otherwise provided in the Plan, the Distribution Trust Assets shall vest in the Distribution Trust, free and clear of all Claims, Liens, encumbrances, charges, and other Interests, except as provided herein or in the Confirmation Order.   The Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as provided herein.

7.13.   *Discharge of Claims Against and Interests in the Debtors*

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise provided in the Plan or in the Confirmation Order, each Person that is a holder (as well as any trustees and agents on behalf of such Person) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date (including, without limitation, any Claim related to any "withdrawal liability" arising from any of their multi-employer pension plans to the maximum extent permitted under applicable law, including, but not limited to the National Retirement Fund). Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any Reorganized Debtor.

Upon the Effective Date, all Claims and Causes of Action against any Debtor related to or arising from any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to a non-Debtor affiliate and/or Subsidiary of the Debtors, shall receive the classification and treatment provided for such Claims in the Plan and shall be discharged and all holders thereof forever precluded and enjoined, pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim and Cause of Action against any Reorganized Debtor.

7.14.   *Term of Pre-Confirmation Injunctions or Stays.*

Unless otherwise provided herein, all injunctions or stays arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise,

and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### 7.15. *Injunction Against Interference With Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

### 7.16. *Injunction.*

**Except as otherwise expressly provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors or the Debtors' Estates are, with respect to any such Claims or Interests, permanently enjoined after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtors, the Distribution Trustee, the Distribution Trust, the Distribution Trust Assets, the Debtors' Estates or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Reorganized Debtors, the Distribution Trustee, the Distribution Trust, the Distribution Trust Assets, or the Debtors' Estates or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtors, the Distribution Trustee, the Distribution Trust, the Distribution Trust Assets, or the Debtors' Estates or any of their property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided*, *however*, that nothing contained herein shall preclude such Persons from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Plan.**

By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest will be deemed to have specifically consented to the Injunctions set forth in this Section.

7.17.  ***Releases.***

(a)     **Released Parties.**

The Plan contains certain release and exculpation provisions applicable to certain Released Parties. As used herein and in the Plan, the term "Released Parties" means, collectively: (a) each of the following:  (i) the First Lien Agent, (ii) the First Lien Lenders, and (iii) with respect to each of the foregoing entities in clauses (a)(i) and (a)(ii), such entity's current and former shareholders, affiliates, partners, subsidiaries, members, officers, directors, principals, employees, agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective predecessors, successors, and assigns; and (b) each of the following solely in their capacity as such:  (i) the Creditors' Committee, (ii) the Debtors and the Reorganized Debtors, and (iii) with respect to each of the foregoing entities in clauses (b)(i) and (b)(ii), such entity's current and former shareholders, affiliates, partners, subsidiaries, members, officers, directors, principals, employees, agents, managed funds, advisors, attorneys (except for the law firm of Levine, Staller, Sklar, Chan & Brown, P.A.), accountants, investment bankers, consultants, representatives, and other professionals, solely in their respective capacities as such, together with their respective predecessors, successors, and assigns.

(b)     **Releases by the Debtors.**

**For good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise provided in the Plan or the Confirmation Order, as of and subject to the occurrence of the Effective Date, the Debtors and Reorganized Debtors, in their individual capacities and as debtors in possession, on behalf of themselves and the Debtors' Estates, shall be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, remedies, Causes of Action and liabilities (other than the rights of the Debtors or Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder) that could have been asserted by or on behalf of the Debtors or their Estates or Reorganized Debtors, whether directly, indirectly, derivatively or in any representative or any other capacity, against the Released Parties (and each such Released Party shall be deemed forever released, waived and discharged by the Debtors and Reorganized Debtors), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, their affiliates and former affiliates, the Reorganized Debtors, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of claims and equity interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the DIP Credit Agreement, the DIP Commitment Letter, the Plan Documents, or related agreements, instruments, or other documents; *provided*, *however*, that the foregoing provisions of this release shall not operate**

to waive or release (i) any Causes of Action expressly set forth in and preserved by the Plan or the Plan Supplement; (ii) any Causes of Action arising from fraud, gross negligence, or willful misconduct as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (iii) the rights of such Debtor or Reorganized Debtor to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered under or in connection with the Plan or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court.  The foregoing release shall be effective as of and subject to the occurrence of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any person and the Confirmation Order will permanently enjoin the commencement, prosecution or continuation by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this release.

(c)    **Releases by Certain Holders of Claims.**

Except as otherwise provided in the Plan or the Confirmation Order, as of and subject to the occurrence of the Effective Date: (i) each of the Released Parties; (ii) each holder of  an Allowed General Unsecured Claim entitled to vote on the Plan that did not validly exercise the Opt-Out Election in a timely submitted Ballot; and (iii) each holder of a Claim deemed hereunder to have accepted the Plan, in consideration for the obligations of the Debtors, the Reorganized Debtors and the Distribution Trust under the Plan, the New Common Stock, and other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, will be deemed to have consented to the Plan for all purposes and the restructuring embodied herein and deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge all claims, demands, debts, rights, Causes of Action or liabilities against the Released Parties (and each such Released Party shall be deemed forever released, waived and discharged by such holder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, their affiliates and former affiliates, the Reorganized Debtors, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of claims and equity interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the DIP Credit Agreement, the DIP Commitment Letter, the Plan Documents, or related agreements, instruments, or other documents; *provided*, *however*, that the foregoing provisions of this release shall not operate to waive or release (i) any Causes of Action expressly set forth in and preserved by the Plan or the Plan Supplement; (ii) any causes of action arising from fraud, gross negligence, or willful misconduct as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (iii) the rights of such holder to enforce the obligations of any party under the Plan and the contracts, instruments, releases and other agreements or documents delivered under or in

- 64-

connection with the Plan or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court.  The foregoing release shall be effective as of and subject to the occurrence of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any person and the Confirmation Order will permanently enjoin the commencement, prosecution or continuation by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this release.

(d)     **Exculpation and Limitation of Liability.**

None of the Released Parties shall have or incur any liability to any holder of any Claim or Interest or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, or arising out of or related to any act taken or omitted to be taken in connection with the Debtors' restructuring, including without limitation, the formulation, negotiation, preparation, dissemination, implementation, confirmation and execution of the Plan, the Chapter 11 Cases, the Disclosure Statement, the Plan Documents, the DIP Credit Agreement, the DIP Commitment Letter, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, including, without limitation, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including, without limitation, all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of the Plan except for fraud, gross negligence or willful misconduct, each as determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction; *provided, however,* that each Released Party will be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; provided, further, however, that the foregoing provisions will not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or Plan Supplement.

7.18.   *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement, prosecution or continuation in any manner by any Person or entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, equity interests, Causes of Action or liabilities released pursuant to the Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, equity interests, Causes of Action or liabilities released in Sections 12.7 and 12.8 of the Plan.  By accepting distributions pursuant to the Plan, each holder of an Allowed Claim that does not validly exercise the Opt-Out Election will be deemed to have specifically consented to this injunction.

7.19.    *Termination of Subordination Rights and Settlement of Related Claims.*

Except as expressly provided in the Plan, the classification and manner of satisfying all Claims and Interests and the respective distributions, treatments and other provisions under the Plan take into account or conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, sections 510(a) and 510(b) of the Bankruptcy Code or otherwise, and any and all such rights are settled, compromised and released pursuant to the Plan. The Confirmation Order shall permanently enjoin, effective as of the Effective Date, all Persons and entities from enforcing or attempting to enforce any such contractual, legal and equitable rights satisfied, compromised and settled pursuant to the Plan. Any disagreement with the priorities or distributions set forth in the Plan and all issues with respect to contractual subordination not raised or resolved at the Confirmation Hearing shall be governed pursuant to the Plan or, if the decision of the Bankruptcy Court at the Confirmation Hearing differs from the Plan, then such decision shall govern.  Notwithstanding anything to the contrary in the Plan, no holder of an Equitably Subordinated Claim shall receive any distribution on account of such Equitably Subordinated Claim, and all Equitably Subordinated Claims shall be extinguished on the Effective Date.

Pursuant to Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a holder of a Claim or Interest may have or any distribution to be made pursuant to the Plan on account of such Claim or Interest. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, the Reorganized Debtors, the Distribution Trust, their respective properties and holders of Claims and Interests, and is fair, equitable and reasonable.

7.20.    *Retention of Causes of Action/Reservation of Rights.*

Subject to Section 12.7 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims or Causes of Action, rights of setoff or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law. Subject to section 7.11 of the Plan, the Reorganized Debtors shall have, retain, reserve and be entitled to assert all such claims, Causes of Action (excluding those Causes of Action released under the Plan), rights of setoff or other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and/or equitable rights respecting any Claim left unimpaired, as set forth in Section 4.2 of the Plan, may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.  For the avoidance of doubt, all the Debtors and the Reorganized Debtors waive and release any Causes of Action against any of the Released Parties.

7.21. ***Indemnification Obligations; Cooperation and Insured Current Director & Officer Claims.***

Notwithstanding anything contained herein to the contrary, on and after the Effective Date, the Reorganized Debtors shall, pursuant to the terms and conditions of the Indemnity Agreement, indemnify, defend, reimburse, and exculpate from any claims, liabilities, or damages, and advance the amount of any deductibles, reasonable and documented legal and other professional fees, court costs or other out-of-pocket costs or expenses, incurred by the directors or officers of any of the Debtors who were directors or officers of any of the Debtors at any time after the Petition Date in each case solely arising from any unpaid severance obligations required to be paid by the Debtors to the Debtors' employees who are or were members of Local 54 – Unite Here pursuant to, or as a result of, the Lump Sum Payment provisions contained in Attachment 5 to the Local 54 Taj Collective Bargaining Agreement or Attachment 5 to that certain collective bargaining agreement by and between Trump Plaza Associates and Local 54 – Unite Here (including, without limitation, any fees, costs, interest, or penalties payable under, or as a result of, such collective bargaining agreements in connection with such indemnified claims).

On and after the Effective Date, any and all directors and officers liability and fiduciary insurance or tail policies in existence as of the Effective Date shall be reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed and/or assumed and assigned by the applicable Debtor or Reorganized Debtor, pursuant to section 365 of the Bankruptcy Code and the Plan.  Each insurance carrier under such policies shall continue to honor and administer the policies with respect to the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors prior to the Effective Date.  None of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any directors' and officers' insurance policies in effect on the Petition Date, and all directors and officers of the Debtors at any time after the Petition Date shall be entitled to the full benefits of any such policy for the full term of such policy, regardless of whether such directors and/or officers remain in such positions after the Effective Date.

From the Effective Date, the Debtors and the Reorganized Debtors shall cooperate with any Person that served as a director or officer of a Debtor at any time on and after the Petition Date, and make available to any such Person, subject to applicable confidentiality and privilege concerns, such documents, books, records or information relating to the Debtors' activities prior to the Effective Date that such Person may reasonably require in connection with the defense or preparation for the defense of any claim against such Person relating to any action taken in connection with such Person's role as a director or officer of a Debtor.

On and after the Effective Date, any Person that served as a director or officer of a Debtor at any time on and after the Petition Date shall be entitled on a first-priority basis access to proceeds of any available insurance policy of the Debtors as set forth in section 12.12(b) of the Plan to the extent permissible by applicable law.

# ARTICLE VIII.

## CONFIRMATION OF THE PLAN OF REORGANIZATION

8.1.    *Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires the bankruptcy court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan. The Confirmation Hearing with respect to the Plan is scheduled to commence on **[              ], 2015 at [        ] (prevailing Eastern Time)**. The hearing may be adjourned or continued from time to time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned or continued date made at the Confirmation Hearing (or an appropriate filing with the Bankruptcy Court) or any subsequent adjourned or continued Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a chapter 11 plan of reorganization. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor and must be filed with the Clerk of the Bankruptcy Court electronically using the Bankruptcy Court's Case Management/Electronic Case File ("**CM/ECF**") System at https://ecf.deb.uscourts.gov (a CM/ECF password will be required),[10][11] and by mailing a hard copy of such objection to the chambers of the Honorable Kevin Gross of the Bankruptcy Court at 824 N. Market St. Wilmington, Delaware 19801 together with proof of service, and served upon: (i) Stroock & Stroock & Lavan LLP, co-counsel for the Debtors, 180 Maiden Lane, New York, NY 10038, Attn: Kristopher M. Hansen, Esq. and Erez E. Gilad, Esq.; (ii) Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Jane M. Leamy, Esq.); (iii) Gibbons P.C., counsel to the Creditors Committee, One Gateway Center, Newark, NJ 07102 (Attn: Karen A. Giannelli, Esq.); and (iv) counsel to the First Lien Lenders, Dechert LLP, 1095 Avenue of the Americas New York, New York 10036 (Attn: Allan S. Brilliant, Esq.). Bankruptcy Rule 9014 governs objections to confirmation of the Plan. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

8.2.    *Confirmation.*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.

### (a)    Confirmation Requirements.

Confirmation of a chapter 11 plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

---

[10][11] A CM/ECF password may be obtained via the Bankruptcy Court's CM/ECF website at https://ecf.nysb.uscourts.gov.

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor or a successor to the debtor under the plan. The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- subject to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, each class of claims or interests has either accepted the plan or is not impaired under the plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date (except that if a class of priority claims has voted to accept the plan, holders of such claims may receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims and that holders of priority tax claims may receive on account of such claims deferred cash payments, over a period not exceeding five (5) years after the date of assessment of such claims, of a value, as of the effective date, equal to the allowed amount of such claims);

- if a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Subject to satisfying the standard for any potential "cramdown" of Classes that vote to reject the Plan, the Debtors believe that:

• the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

• the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

• the Plan has been proposed in good faith.

Set forth below is a summary of the relevant statutory confirmation requirements.

(i)    **Acceptance.**

Classes 3 and 4 are impaired under the Plan and are entitled to vote to accept or reject the Plan. Classes 1 and 2 are unimpaired and, therefore, are conclusively presumed to have voted to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Classes 5 and 6 are impaired and not receiving any property under the Plan, and thus are deemed to have rejected the Plan.

Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan, any exhibit, or schedules thereto or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary, subject to the terms of the Plan. The Debtors believe that the Plan will satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code with respect to Claims and Interests in Classes 4, 5(a), 5(b) and 6.

The Debtors also will seek confirmation of the Plan over the objection of any individual holders of Claims who are members of an accepting Class. However, there can be no assurance that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

(ii)    **Unfair Discrimination and Fair and Equitable Test.**

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors and holders of equity interests. In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired Class if that Class and all junior Classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan.

A chapter 11 plan does not "discriminate unfairly" with respect to a non-accepting class if the value of the cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions

to other classes whose legal rights are the same as those of the non-accepting class. The Debtors believe the Plan will not discriminate unfairly against any non-accepting Class.

(iii)   **Feasibility; Financial Projections.**

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors, unless such liquidation or reorganization is proposed in the Plan. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business. Under the terms of the Plan, the Allowed Claims potentially being paid in whole or part in cash are the Allowed Administrative Expense Claims, Allowed Other Secured Claims, Allowed Fee Claims, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims. The Debtors and expect to have sufficient liquidity from cash on hand as of the Effective Date, the New Term Loan and/or operations (as applicable) to fund these cash payments on the Effective Date or as and when they become due.

In connection with developing the Plan, the Debtors have prepared detailed financial projections (the "**Financial Projections**"), attached as Exhibit 4 hereto and described more fully below, which detail, among other things, the financial feasibility of the Plan. The Financial Projections indicate, on a pro forma basis, the projected level of cash flow is sufficient to satisfy all of the Debtors' working capital needs, future capital expenditures and other obligations during the projection period. Accordingly, the Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.

The Financial Projections are based on the assumption that the Plan will be confirmed by the Bankruptcy Court and that the Effective Date will occur on or about December 2015.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS. THE PROJECTIONS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER ARTICLE XI. IN LIGHT OF THESE RISKS AND UNCERTAINTIES, ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FINANCIAL PROJECTIONS.

The Debtors prepared the Financial Projections based upon certain assumptions that they believe to be reasonable under the circumstances. The Financial Projections have not been examined or compiled by independent accountants. Moreover, such information is not prepared in accordance with accounting principles generally accepted in the United States

("**GAAP**"). The Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved may vary from the projected results and the variations may be material. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

(b)    **Valuation of the Reorganized Debtors**

In conjunction with formulating the Plan, the Debtors requested that their financial advisor, Houlihan Lokey Capital Inc. ("**Houlihan Lokey**"), advise them with respect to the reorganization value of the Reorganized Debtors (the "**Valuation Analysis**"). The Valuation Analysis is attached hereto as Exhibit 2.

(c)    **Best Interests Test.**

The "best interests" test requires that the Bankruptcy Court find either:

- that all members of each impaired class have accepted the plan; or

- that each holder of an allowed claim or interest of each impaired class of claims or interests will under the plan receive or retain on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To determine what holders of Claims and Interests in each impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of liquidation under chapter 7 of the Bankruptcy Code. The Cash amount that would be available for satisfaction of Claims and Interests would consist of the proceeds resulting from the disposition of the assets and properties of the Debtors, augmented by the Cash held by the Debtors at the time of the commencement of the liquidation case. Such Cash amount would be: (i) first reduced by the secured portion of the Allowed First Lien Credit Agreement Claims and other Secured Claims; (ii) second, reduced by the costs and expenses of liquidation under chapter 7 (including the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage) and such additional administrative claims that might result from the termination of the Debtors' business; and (iii) third, reduced by the amount of the Allowed Administrative Expense Claims, U.S. Trustee Fees, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims. Any remaining net cash would be allocated to creditors and stakeholders in strict order of priority of claims contained in section 726 of the Bankruptcy Code. In addition, claims would arise by

reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors prior to the filing of the chapter 7 cases.

To determine if the Plan is in the best interests of each impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtors' assets and properties, after subtracting the amounts attributable to the foregoing Claims, must be compared with the value of the property offered to each such Class of Claims under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive pursuant to the liquidation of the Debtors under chapter 7.

Moreover, the Debtors believe that the value of any distributions to each Class of Allowed Claims in a chapter 7 case would be materially less than the value of distributions under the Plan and any distribution in a chapter 7 case would not occur for a substantial period of time. It is likely that distribution of the proceeds of the liquidation could be delayed for up to twelve (12) months after the completion of such liquidation in order to resolve claims and prepare for distributions. In the likely event litigation was necessary to resolve claims asserted in the chapter 7 case, the delay could be prolonged.

The Debtors, with the assistance of Houlihan Lokey, have prepared a liquidation analysis that summarizes the Debtors' best estimate of recoveries by creditors and equity interest holders in the event of liquidation as of ~~November 30, 2014~~**January 28, 2015** (the "**Liquidation Analysis**"), which is attached hereto as Exhibit 3. The Liquidation Analysis provides: (a) a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates and (b) the expected recoveries of the Debtors' creditors and equity interest holders under the Plan.

The Liquidation Analysis contains a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Accordingly, the values reflected might not be realized. The chapter 7 liquidation period is assumed to last six to twelve months following the appointment of a chapter 7 trustee, allowing for, among other things, the discontinuation and wind-down of operations, the sale of the operations, the sale of assets, the collection of receivables and the finalization of tax affairs. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

8.3.    ***Classification of Claims and Interests.***

        The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code, which require that a chapter 11 plan place each claim and interest into a class with other claims or interests that are "substantially similar."

8.4.    ***Consummation.***

        The Plan will be consummated on the Effective Date. The Effective Date will occur on the first business day on which the conditions precedent to the effectiveness of the Plan, as set forth in Section 11.2 of the Plan, have been satisfied or waived pursuant to the Plan.

        The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

8.5.    ***Dissolution of the Creditors' Committee.***

        The Creditors' Committee shall be automatically dissolved on the Confirmation Date and, on the Confirmation Date, each member (including each officer, director, employee or agent thereof) of the Creditors' Committee and each Professional Person retained by the Creditors' Committee shall be released and discharged from all rights, duties, responsibilities and obligations arising from, or related to, the Debtors, their membership on the Creditors' Committee, the Plan or the Chapter 11 Cases, except with respect to any matters concerning any Fee Claims held or asserted by any Professional Person retained by the Creditors' Committee.

8.6.    ***Post-Confirmation Jurisdiction of the Bankruptcy Court.***

        Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 157 and 1334, over all matters arising in, arising under or related to the Chapter 11 Cases for, among other things, the following purposes:

        (a)    To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the Cure Disputes resulting therefrom;

        (b)    To determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date;

        (c)    To hear and resolve any disputes arising from or relating to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

        (d)    To ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

        (e)    To consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim, including any Administrative Expense Claim;

(f)      To enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(g)      To issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(h)      To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)      To hear and determine all Fee Claims;

(j)      To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)      To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated by the Plan, or any agreement, instrument or other document governing or relating to any of the foregoing (including, without limitation, the Distribution Trust Agreement);

(l)      To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of the Plan, as may be necessary to construe, enforce, implement, execute and consummate the Plan, including any release or injunction provisions set forth in the Plan, or to maintain the integrity of the Plan following consummation;

(m)      To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)      To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)      To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)      To resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement Hearing, the Confirmation Hearing, any applicable Bar Date or the deadline for responding or objecting to a Cure Amount, for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose;

(q)      To recover all Assets of the Debtors and property of the Estates, wherever located and

- 75-

(r)    To enter a final decree closing each of the Chapter 11 Cases.

## ARTICLE IX.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not consummated, the Debtors' capital structure will remain over-leveraged and the Debtors will be unable to satisfy in full their debt obligations. Accordingly, if the Plan is not confirmed and consummated, the alternatives include:

9.1.    ***Alternative Plan(s) of Reorganization.***

If the Plan is not confirmed, the Court could confirm a different plan, which might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of the Debtors' assets.   Such alternatives could involve diminished recoveries, significant delay, uncertainty and substantial additional administrative costs and could also face additional opposition from the Debtors' constituencies. The Debtors believe that the Plan, as described herein, enables creditors to realize the highest and best value under the circumstances.

9.2.    ***Liquidation Under Chapter 7 of the Bankruptcy Code.***

The Debtors could be liquidated under chapter 7 of the Bankruptcy Code. A discussion of the effect a chapter 7 liquidation would have on the recoveries of the holders of Claims is set forth in Article VII of this Disclosure Statement. The Debtors believe that liquidation would result in lower aggregate distributions being made to creditors than those provided for in the Plan, which is demonstrated by the Liquidation Analysis set forth in Article VII and attached as Exhibit 3 to this Disclosure Statement.

9.3.    ***Dismissal of the Debtors' Chapter 11 Cases.***

Dismissal of the Debtors' Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*. Upon dismissal of the Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time consuming process of negotiations with their creditors, and possibly resulting in costly and protracted litigation in various jurisdictions. Moreover, holders of Secured Claims may be permitted to foreclose upon the assets that are subject to their Liens, which is likely all of the Debtors' assets, including all of their Cash. Dismissal may also permit certain unpaid unsecured creditors to obtain and enforce judgments against the Debtors. The Debtors believe that these actions would seriously undermine their ability to operate on a go-forward basis and could lead ultimately to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Therefore, the Debtors believe that dismissal of the Chapter 11 Cases is not a viable alternative to the Plan.

# ARTICLE X.

## SUMMARY OF VOTING PROCEDURES

This Disclosure Statement, including all exhibits hereto and the related materials included herewith, is being furnished to the holders of Claims in Classes 3 and 4, which are the only Classes entitled to vote on the Plan.

All votes to accept or reject the Plan must be cast by using the Ballot enclosed with this Disclosure Statement. No other votes will be counted. Consistent with the provisions of Bankruptcy Rule 3018, the Debtors have fixed [_____], 2015 as the Voting Record Date. Ballots must be RECEIVED by the Voting Agent no later than the Voting Deadline, **4:00 p.m. (prevailing Eastern Time) on [ ], 2015**, unless the Debtors, at any time, in their sole discretion, extend such date by oral or written notice to the Voting Agent, in which event the period during which Ballots will be accepted will terminate at 4:00 p.m. (prevailing Eastern Time) on such extended date. See Section 1.4 "*Voting; Holders of Claims Entitled to Vote*" above for additional disclosures regarding voting.

Ballots previously delivered may be withdrawn or revoked at any time prior to the Voting Deadline by the beneficial owner on the Voting Record Date who completed the original Ballot. Only the person or nominee who submits a Ballot can withdraw or revoke that Ballot. A Ballot may be revoked or withdrawn either by submitting a superseding Ballot or by providing written notice to the Voting Agent.

Acceptances or rejections may be withdrawn or revoked prior to the Voting Deadline by delivering a written notice of withdrawal or revocation to the Voting Agent. To be effective, notice of revocation or withdrawal must: (a) be received on or before the Voting Deadline by the Voting Agent at its address specified in Section 1.4 above; (b) specify the name of the holder of the Claim whose vote on the Plan is being withdrawn or revoked; (c) contain the description of the Claim as to which a vote on the Plan is withdrawn or revoked and (d) be signed by the holder of the Claim who executed the Ballot reflecting the vote being withdrawn or revoked, in the same manner as the original signature on the Ballot. The foregoing procedures should also be followed with respect to a person entitled to vote on the Plan who wishes to change (rather than revoke or withdraw) its vote.

In addition to accepting submitted hard copy Ballots via first class mail, overnight courier and hand delivery, holders of Claims entitled to vote, may submit their Ballots via electronic, online transmission through a customized "E-Ballot" section on the Debtors' case website (http://cases.primeclerk.com/ter/) on or before the Voting Deadline.

# ARTICLE XI.

## CERTAIN RISK FACTORS TO BE CONSIDERED

---

**Important Risks to Be Considered**

Holders of Claims against the Debtors should read and consider carefully the following risk factors and the other information in this Disclosure Statement, the Plan, the Plan Supplement and the other documents delivered or incorporated by reference in this Disclosure Statement and the Plan, before voting to accept or reject the Plan.

These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

---

11.1.  *Certain Bankruptcy Considerations.*

(a)    **General.**

Although the Plan is designed to implement the restructuring transactions contemplated thereby and provide distributions to creditors in an expedient and efficient manner, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.

If the Debtors are unable to obtain confirmation of the Plan on a timely basis because of a challenge to confirmation of the Plan or a failure to satisfy the conditions to consummation of the Plan, they may be forced to operate in bankruptcy for an extended period while they try to develop a different chapter 11 plan that can be confirmed. Such a scenario could jeopardize the Debtors' relationships with their key vendors and suppliers, customers and employees, which, in turn, would have an adverse effect on the Debtors' operations. A material deterioration in the Debtors' operations likely would diminish recoveries under any subsequent chapter 11 plan. Further, in such event, the Debtors may not have sufficient liquidity to operate in bankruptcy for any extended period.

(b)    **Failure to Receive Requisite Acceptances.**

Classes 3 and 4 are the only Classes that are entitled to vote to accept or reject the Plan. If the Requisite Acceptances are not received for at least one of these Classes, the Debtors will not be able to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code because at least one impaired Class will not have voted in favor of the Plan as required by section 1129(a)(10) of the Bankruptcy Code. In such a circumstance, the Debtors may seek to accomplish an alternative restructuring of their capitalization and obligations to creditors and obtain acceptances of an alternative plan of reorganization for the Debtors, or otherwise. Such an alternative restructuring may require the Debtors to liquidate their estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement, plan or liquidation would be similar to, or as favorable to the Debtors' creditors as, those proposed in the Plan.

### (c)    Failure to Secure Confirmation of the Plan.

Even if the Requisite Acceptances are received (excluding insider votes for at least one impaired accepting class), the Debtors cannot provide assurances that the Bankruptcy Court will confirm the Plan. A non-accepting creditor or equity security holder of the Debtors might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or the Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distributions to non-accepting holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. While the Debtors cannot provide assurances that the Bankruptcy Court will conclude that these requirements have been met, the Debtors believe that the Plan will not be followed by a need for further financial reorganization and that non-accepting holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and the costs and uncertainty associated with any such chapter 7 case.

In addition, Section 11.1 of the Plan contains various conditions to confirmation of the Plan. As of the date of this Disclosure Statement, there can be no assurance that these or the other conditions to confirmation will be satisfied or waived.

If the Plan is not confirmed, the Plan will need to be revised and it is unclear whether a restructuring of the Debtors could be implemented and what distribution holders of Claims ultimately would receive with respect to their Claims. If an alternative reorganization could not be agreed to, it is possible that the Debtors would have to liquidate their assets, in which case it is likely that holders of Claims would receive substantially less favorable treatment than they would receive under the Plan. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

### (d)    Failure to Consummate the Plan.

Section 11.2 of the Plan contains various conditions to consummation of the Plan, including, in substance, among others, (a) the Confirmation Order having become final and non-appealable, (b) the Debtors having entered into the Plan Documents, all conditions precedent to effectiveness of such agreements having been satisfied or waived, (c) the CBA Order having become final and non-appealable, (d) either (i) the Bankruptcy Court having estimated pursuant to section 502(c) of the Bankruptcy Code, or (ii) the Consenting First Lien Lenders having been satisfied in their sole discretion (based on such evidence as may be requested by the Consenting First Lien Lenders in their sole discretion), that any and all Administrative Expense Claims and Priority Non-Tax Claims for the Debtors' withdrawal from all multi-employer pension plans shall be less than an amount satisfactory to the Consenting First

~~Lien Lenders in their sole discretion, (e)~~ the amount of Administrative Expense Claims and Priority Non-Tax Claims, other than real estate tax claims, reasonably estimated to be Allowed Administrative Expense Claims and Priority Non-Tax Claims by the Debtors in good faith and with the Consenting First Lien Lenders' consent totaling less than $~~[7.5]~~**9** million, and (~~f~~**e**) the Consenting First Lien Lenders ~~having determined in their sole discretion~~**shall have reasonably estimated** that the consummation of the Plan would not result in any contingent, multi-employer pension **withdrawal** liability being assumed or imposed upon the Reorganized Debtors in excess of ~~an amount satisfactory to the Consenting First Lien Lenders in their sole discretion~~**$5 million**, which conditions the Debtors believe are achievable.  As of the date of this Disclosure Statement, there can be no assurance that these or the other conditions to consummation will be satisfied or waived.  Moreover, while the Debtors intend to contest Local 54's appeal of the CBA Order, the Debtors cannot assure when such appeal will be fully adjudicated or whether the Debtors will be successful in dismissing the appeal.

Additionally, as a result of the CBA Order, the Debtors have withdrawn from the National Retirement Fund.  As a result of this withdrawal, the National Retirement Fund has asserted the NRF Claims and may assert additional claims against the Debtors' estates, which may include a request for an Administrative Expense Claim.  The size of any potential Administrative Expense Claim asserted by the National Retirement Fund may affect the Debtors' ability to satisfy the conditions set forth in Section 11.2 of the Plan.

Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed. If the Plan is not consummated and the restructuring is not completed, these Chapter 11 Cases will be prolonged and the Debtors may lack sufficient liquidity to effect a successful restructuring under chapter 11 of the Bankruptcy Code.

### (e)    Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### (f)    The Debtors May Object to the Amount or Classification of Your Claim.

The Debtors reserve the right to object to the amount or classification of any Claim. It is the Debtors' position that the estimates set forth in this Disclosure Statement cannot be relied on by any creditor whose Claim or Interest is subject to an objection. Any such Claim holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

**(g)** **The Debtors May Adjourn Certain Deadlines.**

In certain circumstances, the Debtors may deem it appropriate to adjourn either or both of the Voting Deadline and/or the Confirmation Hearing. While the Debtors estimate that the Effective Date will occur in or around December 2015, they cannot provide assurances that applicable dates related to the foregoing will not be extended and the Effective Date will not be delayed.

**11.2.** *Risks Relating to the Capital Structure of the Reorganized Debtors.*

**(a)** **Variances From Financial Projections.**

The Financial Projections included as Exhibit 4 to this Disclosure Statement reflect numerous assumptions, which involve significant levels of judgment and estimation concerning the anticipated future performance of the Reorganized Debtors, as well as assumptions with respect to the prevailing market, economic and competitive conditions, which are beyond the control of the Reorganized Debtors, and which may not materialize, particularly given the current difficult economic environment. Any significant differences in actual future results versus estimates used to prepare the Financial Projections, such as lower sales, lower volume, lower pricing, increases in production costs, technological changes, competition or changes in the regulatory environment, could result in significant differences from the Financial Projections. Negative deviations, if any, could have a material and adverse impact on the value of the Reorganized Debtors and may therefore reduce the anticipated value of the New Common Stock of Reorganized TER to be issued to the holders of Allowed First Lien Credit Agreement Claims in Class 3.

**(b)** **Leverage.**

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have indebtedness. [On the Effective Date, after giving effect to the transactions contemplated by the Plan, in addition to payment of Claims, if any, that require payment beyond the Effective Date and ordinary course debt the Reorganized Debtors will, on a consolidated basis, have **(a)** $[13.5] million**, plus (b) the aggregate outstanding principal amount of loans under the DIP Credit Agreement and the accrued interest, unpaid fees and costs and expenses thereon outstanding on the Effective Date,** in secured indebtedness under the New Term Loan.]

The degree to which the Reorganized Debtors will be leveraged could have important consequences because:

- it could affect the Reorganized Debtors' ability to satisfy their obligations under the New Term Loan and the Reorganized Debtors' other obligations;

- the Reorganized Debtors' ability to obtain additional debt financing or equity financing in the future may be limited; and

- the Reorganized Debtors' operational flexibility in planning for, or reacting to, changes in their businesses may be severely limited.

(c)        **Ability to Service Debt.**

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have significant non-cash interest expense obligations. The Reorganized Debtors' ability to make payments on and to refinance their debt, including the obligations under the New Term Loan and the Reorganized Debtors' other obligations, will depend on their future financial and operating performance and their ability to generate cash in the future. This, to a certain extent, is subject to general economic, business, financial, competitive, legislative, regulatory and other factors that are beyond the control of the Reorganized Debtors.

Although the Debtors believe the Plan is feasible, there can be no assurance that the Reorganized Debtors will be able to generate sufficient cash flow from operations or that sufficient future borrowings will be available to pay off the Reorganized Debtors' debt obligations, including, among other obligations, those under the New Term Loan. The Reorganized Debtors may need to refinance all or a portion of their debt on or before maturity; however, there can be no assurance that the Reorganized Debtors will be able to refinance any of their debt on commercially reasonable terms or at all.

(d)        **Obligations Under the New Term Loan.**

The Reorganized Debtors' obligations under the New Term Loan will be secured by a first lien on substantially all of the assets of the Reorganized Debtors. If the Reorganized Debtors become insolvent or are liquidated, or if there is a default under the New Term Loan, and payment on any obligation thereunder is accelerated, the lenders under the New Term Loan would be entitled to exercise the remedies available to a secured lender under applicable law, including foreclosure on the collateral that is pledged to secure the indebtedness thereunder, and they would have a claim on the assets securing the obligations under the applicable facility that would be superior to any claim of the holders of unsecured debt.

(e)        **Restrictive Covenants.**

The documents governing the New Term Loan likely will contain various covenants that may limit the discretion of the Reorganized Debtors' management by restricting the Reorganized Debtors' ability to, among other things, incur additional indebtedness, incur liens, pay dividends or make certain restricted payments, consummate certain asset sales, enter into certain transactions with affiliates, merge, consolidate and/or sell or dispose of all or substantially all of their assets. In addition, the New Term Loan may require the Reorganized Debtors to meet certain financial covenants. As a result of these covenants, the Reorganized Debtors will be limited in the manner in which they conduct their business and they may be unable to engage in favorable business activities or finance future operations or capital needs.

Any failure to comply with the restrictions of the New Term Loan or any other subsequent financing agreements may result in an event of default. An event of default may allow the creditors to accelerate the related debt as well as any other debt to which a cross-acceleration or cross-default provision applies. If the Reorganized Debtors are unable to repay amounts outstanding under the New Term Loan when due, the lenders thereunder could,

- 82-

subject to the terms of the New Term Loan Agreement, seek to foreclose on the collateral that is pledged to secure the indebtedness outstanding under such facility.

### (f)     Lack of a Trading Market.

It is anticipated that Reorganized TER will be a private company and that there will be no active trading market for the New Common Stock to be issued to holders of Allowed First Lien Credit Agreement Claims. The New Common Stock will be subject to restrictions on transfer, and Reorganized TER has no present intention to register any of the New Common Stock Securities under the Securities Act, or to apply to quote or list any of the foregoing on any securities exchange or quotation system or otherwise take any actions that would allow for the New Common Stock to be traded (publicly or otherwise). Accordingly, there can be no assurance that any market will develop or as to the liquidity of any market that may develop for any such securities. Consequently, holders of the New Common Stock may bear certain risks associated with holding securities for an indefinite period of time, including, but not limited to, the risk that the New Common Stock will lose some or all of its value.

### (g)     Restrictions on Transfer.

The issuance of the New Common Stock pursuant to the Plan shall be exempt from registration pursuant to section 1145 of the Bankruptcy Code and/or section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder to the maximum extent permitted thereunder. Subject to any transfer restrictions contained in the Amended Certificates of Incorporation and the Amended By-Laws, the New Common Stock may be resold by the holders thereof without restriction, except to the extent that any such holder is deemed to be an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code. See Section 13.3(b)(ii), "*Restrictions in the Amended Certificates of Incorporation and the Amended By-Laws.*" Reorganized TER has no current plans to register any of its securities (including the New Common Stock) under the Securities Act or under equivalent state securities laws such that the holders of Allowed First Lien Credit Agreement Claims receiving the New Common Stock would be able to resell their securities pursuant to an effective registration statement.

*See* Article XIII "*Securities Law Matters*" for additional information regarding restrictions on resale of the New Common Stock.

### (h)     The Implied Valuation of New Common Stock is Not Intended to Represent the Trading Value of the New Common Stock.

The valuation of the newly issued securities implied by the debt and equity commitment being provided in connection with consummation of the Plan is not intended to represent the trading values of New Common Stock in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Accordingly, the implied value stated herein and the Plan of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that would be attained for the New Common Stock in the public or private markets.

11.3.   *Risks Relating to Tax and Accounting Consequences of the Plan.*

(a)    **Certain Tax Consequences of the Plan Raise Unsettled and Complex Legal Issues and Involve Factual Determinations.**

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors currently do not intend to seek any ruling from the Internal Revenue Service ("**IRS**") on the tax consequences of the Plan. Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the tax treatment in the Plan, or that a court would not sustain such a challenge.

(b)    **Use of Historical Financial Information.**

As a result of the consummation of the Plan and the transactions contemplated thereby, the Reorganized Debtors believe they will be subject to the fresh-start accounting rules. The fresh-start accounting rules allow for the assessment of every balance sheet account for possible fair value adjustment, resulting in the emergence of a new company recapitalized and revalued. This process is guided by purchase price allocation standards under GAAP.

11.4.   *Risks Associated With the Debtors' Business.*

(a)    **Unforeseen Events.**

Future performance of the Reorganized Debtors is, to a certain extent, subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond their control.  While no assurance can be provided, based upon the current level of operations, the Debtors believe that the cash flow from operations and available cash combined with the transactions contemplated by the Plan, will be adequate to fund the Plan and meet their future liquidity needs.

(b)    **State Gaming Laws and Regulations May Require Holders of the New Common Stock to Undergo a Suitability Investigation.**

Many jurisdictions require any entity that acquires a beneficial ownership of debt or equity securities of a gaming company to apply for qualification or a finding of suitability. Any Entity that had acquired New Common Stock (or has the right to acquire such securities pursuant to the Plan) and that is found unsuitable or unqualified by a state gaming regulator may be required to divest such securities (or may be barred from receiving such securities).  Failure to comply with these laws and regulations may be a criminal offense.  The Plan provides that New Common Stock will be issued only in compliance with state gaming laws and regulations.  In addition, the Amended Certificates of Incorporation and the Amended By-Laws for Reorganized TER will provide that Reorganized TER may redeem Reorganized TER securities from holders thereof to ensure compliance with applicable gaming laws and regulations.  The failure by a holder of an Allowed First Lien Credit Agreement Claim to comply with these laws and regulations may result in such holder not receiving New Common Stock pursuant to the Plan, or Reorganized TER redeeming such securities pursuant to the Amended Certificates of Incorporation and the Amended By-Laws.

- 84-

(c)     **Declining Atlantic City Gaming and Hotel Industry.**

Since 2010, the Atlantic City gaming market has experienced significant contractions.  Total 2013 gross gaming revenues in the Atlantic City market was down over 6.2% from 2012 levels.  These declines are a result of a variety of factors, including (a) increased competition within the Atlantic City market, (b) competition from adjoining states, (c) the general economic decline in southern New Jersey and surrounding areas and (d) the change in spending patterns in the region due to decreased disposable income.  This decline is likely to be further exacerbated by, among other things, the legislative effort currently underway to legalize gambling in New Jersey outside of Atlantic City.

(d)     **Increased Regional Competition.**

The Debtors primarily compete with casino and gaming facilities located in Atlantic City, Pennsylvania, New York, Maryland, Delaware and Connecticut.  Since 2010, competition with the Atlantic City market has increased with Pennsylvania and Delaware commencing live table game operations in fiscal 2010; the opening of a new casino in a Philadelphia suburb in 2012 and the re-bidding of the second Philadelphia Category 2 license; five casinos currently operating in Maryland with plans for additional casinos to open in the near future, and the addition of table games and two (2) video lottery terminal casinos operating in the New York metropolitan area with up to an additional seven (7) commercial gaming facilities and two (2) additional video lottery terminal facilities planned for the eastern parts of New York in the coming years.

This expansion of existing casino entertainment properties, the increase in the number of gaming opportunities, the emergence of legal internet gaming and the aggressive marketing strategies of many of the Debtors' competitors has also increased competition in many markets in which the Debtors compete, and the Debtors expect this intense competition to continue.

If the Debtors' competitors operate more successfully than the Debtors do, if they are more successful than the Debtors in attracting and retaining employees, if their properties are enhanced or expanded, if additional hotels and casinos are established in and around Atlantic City or if on-line gaming continues to increase, the Debtors may lose market share or the ability to attract or retain employees or customers.  In particular, the expansion of casino gaming in or near any geographic area from which the Debtors attract or expect to attract a significant number of customers could materially adversely affect the Debtors' businesses, financial condition and results of operations.

(e)     **Collective Bargaining Agreements.**

Certain of the Debtors are party to CBAs with various unions operating in Atlantic City.  Pursuant to certain of their CBAs, the Debtors have an obligation to contribute to multiemployer pension plans.  In addition, the CBAs require the Debtors to provide various health, welfare and other benefits to all employees covered by the CBAs (as applicable).  Although the Debtors were successful in modifying the terms of their largest and most costly

CBA through the CBA Order, Local 54 has appealed the CBA Order, and the Debtors cannot assure that they will succeed in dismissing the appeal.

(f)    **Cash Flows are Seasonal in Nature and Excess Cash that is Typically Used to Subsidize Non-Peak Seasons May not be Available.**

Historically, spring and summer have been the peak seasons for the Debtors' business, while autumn and winter are non-peak seasons. Consequently, in the past, excess cash from operations during peak season was used, in part, to subsidize non-peak seasons. However, the Debtors are using such excess cash to operate during these Chapter 11 Cases. Thus, since the Debtors are scheduled to emerge from these Chapter 11 Cases on or around December 2015, they will have to navigate six (6) months without the use of such excess cash. Since performance in non-peak seasons is usually dependent on favorable weather, a repeat of last winter, which brought several snow storms and frigid temperatures, could further exacerbate the Reorganized Debtors' financial condition during the weeks and months immediately following emergence from these Chapter 11 Cases.

(g)    **Atlantic City Casinos Operate in a Highly Taxed Industry.**

The casino entertainment industry represents a significant source of tax revenue to the various jurisdictions ins which casinos operate. Gaming companies are currently subject to significant state and local taxes and fees in addition to the federal and state income taxes that typically apply to corporations. Such taxes and fees could increase at any time. Atlantic City casinos generally pay an 8.0% tax rate on gross gaming revenues and an investment alternative obligations equal to 1.25% of gross gaming revenues, for an effective gaming tax rate of 9.25% of gross gaming revenues. The online gaming revenue tax is 15% plus annual fees for the online gaming permit and contribution to a compulsive gambling fund. Additionally, Atlantic City casinos are required to pay 2.5% of gross revenue as an investment alternative tax. In addition, Reorganized TER could be subject to other taxes and fees including (i) federal and New Jersey state income taxes, (ii) property taxes, (iii) sales and use taxes, (iv) payroll taxes, (v) luxury taxes, (vi) room taxes, (vii) parking fees, (viii) investigative fees and (ix) payments associated with a legislatively-mandated not-for-profit corporation for marketing Atlantic City and our proportionate share of regulatory costs. Reorganized TER's profitability will depend on generating enough revenues to pay gaming taxes and other largely variably expenses, such as payroll and marketing, as well as fixed expenses, such as property taxes and interest expense.

Moreover, in February 2011, as part of the State of New Jersey's plan to revitalize Atlantic City's casino and tourism industries, a law was enacted requiring the creation of a tourism district (the "**Tourism District**") to be administered and managed by the CRDA. The Tourism District includes each of the Atlantic City casino properties, along with certain other tourism related areas of Atlantic City. The law requires, among other things, the creation of a public-private partnership between the CRDA and a private entity that represents existing and future casino licensees. The private entity, known as The Atlantic City Alliance (the "**ACA**"), was established in the form of a not-for-profit corporation, of which the Company is a member. The public-private partnership established between the ACA and the CRDA is for an initial term of five (5) years. Its general purpose is to revitalize and market the Tourism District. The law

requires the casinos to make an annual contribution of $30 million commencing January 1, 2012 for a term of five (5) years. Each casino's portion of the annual contributions will equate to the percentage representing its gross gaming revenue for the prior calendar quarter compared to the aggregate gross gaming revenues for that period for all casinos.

### (h)    Atlantic City Casinos are Subject to Extensive Regulation.

Gaming in New Jersey is regulated extensively by, among others, the Casino Control Commission, Department of Gaming Enforcement (collectively, the "**New Jersey Gaming Authorities**"), state and federal taxing authorities and liquor control agencies. Pursuant to various state laws and regulations, the New Jersey Gaming Authorities will require the Reorganized Debtors to, among other things, (i) establish and maintain effective controls over financial practices including the safeguarding of assets and revenues; (ii) maintain effective recordkeeping systems; (iii) file periodic reports with and account to the New Jersey Gaming Authorities regarding the Reorganized Debtors' operations, internal controls, vendors and other financial data; and (iv) meet minimum facility requirements. The New Jersey Gaming Authorities may revoke, suspend, or otherwise limit the Reorganized Debtors' gaming or other licenses, impose substantial fines, temporarily suspend casino operations, and take other actions such as forfeiture of assets, any one of which would adversely affect the Reorganized Debtors' business, financial condition, and results of operations.

The New Jersey Gaming Authorities also have broad powers with respect to Reorganized Debtors' financing arrangements. Such authorities have the power to request detailed financial and other information and to review, pre-approve and require amendments to our financings and the documentation governing the Reorganized Debtors' debt, including the Plan and any financing contemplated by the Plan. The approval process in connection with a financing transaction involved a review of the transaction documents, a financial stability determination, as well as, in certain circumstances, the qualification of each lender. Such authorities will also require the Reorganized Debtors to disclose the identity of its lenders (including lenders who may purchase the Reorganized Debtors' debt on the secondary market) on an ongoing basis, and to disclose the amounts of their respective holdings. The foregoing process may delay the Reorganized Debtors' ability to effectively and timely finance our operations or meet obligations as they come due. In the event that the Reorganized Debtors failed to demonstrate financial stability, the New Jersey Gaming Authorities may take such action as they deem necessary to fulfill the purposes of the New Jersey Casino Control Act, including: (i) issuing conditional license determinations, (ii) establishing an appropriate cure period, (iii) imposing reporting requirements, (iv) placing restrictions on the transfer of cash or the assumption of liability or requiring reasonable reserved or trust accounts, or (v) in rare cases, revoking licensure or appointing a conservator. Furthermore, the New Jersey Gaming Authorities must approve all issuances of securities, and in their discretion, require the holder of any securities that the Reorganized Debtors issue to file applications and/or undergo a suitability investigation.

In addition, on October 17, 2014, New Jersey Governor Chris Christie signed the 2014 Sports Wagering Law, which partially repealed New Jersey's sports betting prohibitions and cleared the way for state-approved casinos and racetracks to begin taking sports bets. However, On October 24, 2014, at the request of the National Football League, the National

Basketball Association, the National Hockey League, Major League Baseball and the NCAA, a U.S. District Judge issued a temporary restraining order delaying the implementation of this law while the core issues surrounding sports wagering in New Jersey are fully considered by the court. As a result of these developments, the Debtors are unable to predict the net impact of the 2014 Sports Wagering Law or the content or timing of future legislation and its impact on the Reorganized Debtors.

### (i)     The Debtors May Be Unable to Assume or Assume and Assign the Trademark License Agreement.

As discussed further herein, Trump AC Casino Marks has sought to lift the automatic stay to proceed with the DJT Action in an attempt to terminate the Trademark License Agreement. Additionally, Trump AC Casino Marks has asserted that, due to certain alleged breaches of the Trademark License Agreement and the specific terms of the Trademark License Agreement, the Trademark License Agreement may not be assumed or assumed and assigned by the Debtors pursuant to the Plan. As set forth in the Debtors' objection to the DJT Lift Stay Motion [Docket No. 307], the Debtors dispute Trump AC Casino Marks' assertions that the Trademark License Agreement cannot assumed and/or assigned under applicable law. See DJT Lift Stay Motion [Docket No. 111].

If Trump AC Casino Marks is ultimately successful in the DJT Lift Stay Motion and the DJT Action, and if the Trademark License Agreement is ultimately terminated, the Debtors or the Reorganized Debtors (as applicable) will not be permitted to use the Trump Marks going forward. Under such a scenario, the Debtors or the Reorganized Debtors (as applicable) will be required to remove the Trump Marks from the Taj Mahal property and potentially engage in a rebranding effort, at potentially significant costs to the estates. The Trump Parties reserve all rights against, among others, the Debtors, with respect to the foregoing.

Additional information with respect to certain provisions of the Trademark License Agreement and the respective positions of the Debtors and Trump AC Casino Marks related to the Debtors' assumption or assumption and assignment of the Trademark License Agreement may be found in the Debtors' and Trump AC Casino Marks' respective pleadings filed with the Bankruptcy Court [Docket Nos. 111, 112, 119, 305, 307, 308, 324 and 376].

As set forth in Section 10.5 of the Plan, the Debtors currently intend to seek to assume the Trademark License Agreement, and the Trump Parties have indicated that they intend to object to that assumption.

## ARTICLE XII.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### 12.1.  *Introduction.*

The following discussion summarizes certain federal income tax consequences expected to result from the consummation of the Plan. This discussion is only for general information purposes and only describes the expected tax consequences to Claim holders entitled

to vote on the Plan (that is, holders of First Lien Credit Agreement Claims). It is not a complete analysis of all potential federal income tax consequences and does not address any tax consequences arising under any state, local or foreign tax laws or federal estate or gift tax laws. This discussion is based on the Internal Revenue Code of 1986, as amended ("**IRC**"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the IRS, all as in effect on the date of this Disclosure Statement. These authorities may change, possibly retroactively, resulting in federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary position regarding the federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

This discussion assumes that holders of Claims have held such property as "capital assets" within the meaning of IRC section 1221 (generally, property held for investment).

This discussion does not address all federal income tax considerations that may be relevant to a particular holder in light of that holder's particular circumstances or to holders subject to special rules under the federal income tax laws, such as financial institutions, insurance companies, brokers, dealers or traders in securities, commodities or currencies, tax-exempt organizations, tax-qualified retirement plans (including IRAs), partnerships and other pass-through entities, foreign corporations, foreign trusts, foreign estates, holders who are not citizens or residents of the U.S., holders subject to the alternative minimum tax, holders holding Claims as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment, holders who have a functional currency other than the U.S. dollar and holders that acquired the Claims in connection with the performance of services.

This discussion does not address the treatment of any fees to be paid pursuant to the Plan. In addition, this discussion assumes that, for federal income tax purposes, TER is properly treated as an obligor under the First Lien Credit Agreement and that the New Term Loan is properly treated as indebtedness. An assertion by the IRS of a position contrary to those assumptions could result in U.S. federal income tax consequences materially different than those described herein.

HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL OR FOREIGN TAX LAWS, OR ANY OTHER FEDERAL TAX LAWS.

### 12.2. *Federal Income Tax Consequences to the Debtors.*

#### (a)      **Cancellation of Indebtedness and Reduction of Tax Attributes.**

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in

general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid, (ii) the issue price of any new debt instrument, and (iii) the fair market value of any other consideration, in each case, given in satisfaction of such indebtedness.

However, COD Income realized by a debtor will be excluded from income if the discharge of debt occurs in a case brought under the Bankruptcy Code, the debtor is under the court's jurisdiction in such case and the discharge is granted by the court or is pursuant to a chapter 11 plan approved by the court (the "**Bankruptcy Exception**").  Because the Bankruptcy Exception will apply to the transactions consummated pursuant to the Plan, the Debtors should not be required to recognize (in other words, include in income for federal income tax purposes) any COD Income realized as a result of the implementation of the Plan.

A debtor that does not recognize COD Income under the Bankruptcy Exception generally must reduce certain tax attributes by the amount of the excluded COD Income. Attributes subject to reduction include net operating losses and NOL carryforwards (collectively, "**NOLs**") and certain other losses, credits and carryforwards, and the debtor's tax basis in its assets (including stock of subsidiaries and its basis in any partnerships in which it is a partner).

The Debtors believe that as of December 31, 2013, for federal and state income tax purposes, the Debtors' consolidated group had approximately $450 million of consolidated federal NOLs and approximately $840 million of state NOLs, which would expire on a rolling basis beginning in 2029.  However, the Debtors' NOLs are subject to audit and possible challenge by the IRS or state taxing authorities.  Accordingly, the amount of the Debtors' NOLs ultimately may vary from the amounts set forth above.  The ultimate effect of the attribute reduction rules under the Bankruptcy Exception is uncertain because, among other things, the effect will depend on the amount of COD Income realized by the Debtors. The Debtors currently anticipate that the Bankruptcy Exception will cause them to reduce tax attributes, including NOLs, but that the Debtors will not be required to reduce the tax basis of their assets under the Bankruptcy Exception.

### (b)    Section 382 Limitation on NOLs.

Under section 382 of the IRC, if a corporation undergoes a direct or indirect "ownership change," the amount of its NOLs and built-in losses (collectively, "**Pre-Change Losses**") that may be utilized to offset future taxable income generally is subject to an annual limitation. As discussed in greater detail herein, the Debtors anticipate that the issuance of the New Common Stock pursuant to the Plan will result in an "ownership change" of TER and TERH LP Inc. (the "**Corporate Debtors**") for these purposes, and that the Corporate Debtors' use of their Pre-Change Losses (which are anticipated to include substantial built-in losses) will be subject to limitation unless an exception to the general rules of section 382 of the IRC applies.

### (i)    General Section 382 Annual Limitation.

This discussion refers to the limitation determined under section 382 of the IRC from an "ownership change" as the "section 382 Limitation."  In general, the annual section 382 Limitation on a corporation's use of Pre-Change Losses in any "post-change year" is equal to the

product of (a) the fair market value of the stock of the corporation multiplied by (b) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs. The fair market value of the stock is determined, for these purposes, immediately before the "ownership change" (with certain adjustments). If the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two (2) years after the ownership change, the Section 382 Limitation resulting from the ownership change will be reduced to zero (0), thereby generally precluding any utilization of the corporation's Pre-Change Losses. In any event, the section 382 Limitation may be increased to the extent that the corporation recognizes certain built-in gains in its assets during the five (5) year period following the ownership change, or is treated as recognizing built-in gains pursuant to certain safe harbors provided by the IRS. Corresponding rules may reduce a corporation's ability to use losses if it has built-in losses in its assets at the time of an ownership change. Section 383 of the IRC applies a limitation, similar to the Section 382 Limitation, to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

The issuance under the Plan of the New Common Stock, along with the cancellation of Existing TER Interests through the Plan, is expected to cause an ownership change with respect to the Corporate Debtors on the Effective Date. As a result, unless an exception applies, section 382 of the IRC will apply to limit the Corporate Debtors' use of any remaining Pre-Change Losses after the Effective Date. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

(ii)     **Chapter 11 Exceptions.**

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in a chapter 11 proceeding receive, in respect of their Claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in the relevant chapter 11 proceeding) pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**"). Although not entirely clear, the Debtors believe that the 382(l)(5) Exception should be available to TER, if the relevant requirements are met. Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three (3) year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses effectively would be eliminated in their entirety for all periods after the second ownership change. In addition, under Treasury Department regulations, the use of NOLs may be eliminated upon consummation of the plan of reorganization, despite the 382(l)(5) Exception, if the debtor does not carry on more than an insignificant amount of an active trade or business during and subsequent to the bankruptcy proceeding. The requirement of carrying on

- 91-

more than an insignificant amount of an active trade or business may be met even though all trade or business activities temporarily cease for a period of time to address business exigencies.

Where the 382(l)(5) Exception is not applicable to a corporate debtor in a chapter 11 proceeding (either because the debtor does not qualify for it or the debtor elects not to utilize the 382(l)(5) Exception), a second special rule under section 382(l)(6) of the IRC will generally apply with respect to the calculation of the section 382 Limitation (the "**382(l)(6) Exception**"). As discussed above, the section 382 Limitation is equal to the product of (a) the fair market value of the stock of the corporation multiplied by (b) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs.  When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally determines the fair market value of its stock as the lesser of (1) the value of its stock immediately after the ownership change and (2) the gross value of its assets before the ownership change.   This generally has the effect of taking into account the increase in value resulting from any surrender or cancellation of creditors' Claims in the chapter 11 proceeding, but not taking into account any cash or other property contributed to a debtor or exchanged for stock of a debtor. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.   In addition if the 382(l)(5) Exception is inapplicable, IRC section 382(c) provides that the debtor must continue the business enterprise of the debtor for two (2) years following the ownership change or its NOLs will be reduced to zero (0) as of the date of the ownership change.

If the Corporate Debtors do utilize the 382(l)(5) Exception and another ownership change were to occur within the two (2) year period after consummation, then the Corporate Debtors' Pre-Change Losses would effectively be eliminated. As described in this Disclosure Statement under Section 7.6(g), the Reorganized Debtors' Amended Certificates of Incorporation will contain restrictions on the transfer of New Common Stock to minimize the likelihood of another ownership change following consummation of the Plan.  It is not clear, however, whether the Corporate Debtors will satisfy the requirements for qualification under the 382(l)(5) Exception or, if they do, if they will avail themselves of its provisions.  If the 382(l)(5) Exception does not apply, the Corporate Debtors expect that the Corporate Debtors' use of their NOLs will be subject to limitation based on the rules discussed above, taking into account the 382(l)(6) Exception.   Regardless of whether the Corporate Debtors take advantage of the 382(l)(5) Exception or the 382(l)(6) Exception, the Corporate Debtors' use of the Pre-Change Losses after the Effective Date may be adversely affected if a subsequent "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date.

### (c)    Alternative Minimum Tax.

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the taxable year.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated, with further

adjustments required if AMTI, determined without regard to adjusted current earnings ("**ACE**"), differs from ACE. For example, only 90% of a corporation's AMTI generally may be offset by available NOLs.  The effect of this rule could cause a Corporate Debtor to be liable for federal income taxes in connection with gain, if any, arising in connection with the transactions contemplated by the Plan, even if such Corporate Debtor has NOLs in excess of the amount of any such gain.  A corporation that pays AMT generally is later allowed a nonrefundable credit (equal to a portion of its prior year AMT liability) against its regular federal income tax liability in future taxable years when it is no longer subject to the AMT.

12.3.    *Federal Income Tax Consequences to Holders of Certain Claims.*

As noted above, this discussion describes only the expected federal income tax consequences to certain Claim holders that are entitled to vote under the Plan (that is, holders of First Lien Credit Agreement claims).

### (a)    The Exchange under the Plan in General.

The tax consequences of the Plan to a holder of a Claim may depend in part upon: (1) whether such Claim is based on an obligation that constitutes a "security" for federal income tax purposes and (2) whether such Claim is a Claim against a Corporate Debtor. Regarding factor (1), the determination of whether a debt obligation constitutes a security for federal tax purposes is complex and depends on the facts and circumstances surrounding the origin and nature of the claim. Generally, obligations arising out of the extension of trade credit have been held not to be tax securities, while corporate debt obligations evidenced by written instruments with original maturities of ten (10) years or more have been held to be tax securities. Regarding factor (2), although not entirely clear, the Debtors believe that, for federal income tax purposes, TER should be treated as an obligor under the First Lien Credit Agreement and the First Lien Debt should be treated as debt of TER since the inception of the First Lien Credit Agreement because TER was liable for the First Lien Debt as a matter of law by reason of being the general partner of the First Lien Debt's initial obligor.  The Debtors assume such treatment for purposes of the discussion below.

### (i)    Exchange of First Lien Debt for New Common Stock – Treatment if the First Lien Debt is a Security.

If the First Lien Debt constitutes a "security" for federal income tax purposes, the exchange of the First Lien Debt for New Common Stock will constitute a tax-free recapitalization, subject to the rules discussed below under Section 12.3(d)  "*Other Considerations—Accrued Interest*." A First Lien Lender would take an aggregate basis in the New Common Stock equal to the holder's basis in its First Lien Debt exchanged therefor.  A First Lien Lender's holding period in its New Common Stock would include the First Lien Lender's holding period in its First Lien Debt exchanged therefor.

### (ii)    Treatment if the First Lien Debt is Not a Security.

If the First Lien Debt is not a security for federal income tax purposes, the holders of such debt will generally recognize gain or loss on the exchange of their claims. Subject to the

rules discussed below under Section 12.3(d) "*Other Considerations—Accrued Interest,*" any such loss will generally be equal to the difference between (i) the value of the New Common Stock received and (ii) such recipient's tax basis in its First Lien Debt.  A First Lien Lender's holding period in the New Common Stock would begin the day after the exchange.  Immediately after the exchange, the holder would have a basis in its New Common Stock equal to the stock's fair market value.

(b)    <strong>New Common Stock.</strong>

Distributions.  A holder of New Common Stock generally will be required to include in gross income as ordinary dividend income the amount of any distributions paid on the New Common Stock to the extent such distributions are paid out of the Reorganized Debtors' current or accumulated earnings and profits as determined for federal income tax purposes. Distributions not treated as dividends for federal income tax purposes will constitute a return of capital and will first be applied against and reduce a holder's adjusted tax basis in the New Common Stock, but not below zero (0).  Any excess amount will be treated as gain from a sale or exchange of the New Common Stock. Holders that are treated as corporations for federal income tax purposes may be entitled to a dividends received deduction with respect to distributions out of earnings and profits.  Holders that are individuals are currently subject to a reduced maximum tax rate on dividends (as compared with other ordinary income).

*Sale or Other Taxable Disposition.*  A holder of New Common Stock will recognize gain or loss upon the sale or other taxable disposition of New Common Stock equal to the difference between the amount realized upon the disposition and the holder's adjusted tax basis in the New Common Stock.   Subject to the rules discussed below under Section 12.3(d) "*Other Considerations—Market Discount,*"  any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the holder has a holding period in the New Common Stock of more than one (1) year as of the date of disposition. Under the IRC section 108(e)(7) recapture rules, a holder may be required to treat gain recognized on the taxable disposition of the New Common Stock as ordinary income if the holder took a bad debt deduction with respect to the First Lien Credit Agreement or recognized an ordinary loss on the exchange of the First Lien Credit Agreement for New Common Stock.  Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

(c)    <strong>New Term Loan.</strong>

*Original Issue Discount.*  A debt instrument, such as the New Term Loan, is treated as issued with original issue discount ("**OID**") for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by at least a de minimis amount. Where a substantial amount of the debt instruments in an issue is issued for money (as is expected for the issuance of the New Term Loan), the issue price of each debt instrument is the first price at which a substantial amount of the debt instruments is sold.  A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest."   Stated interest is "qualified stated interest" if it is unconditionally payable in cash or property (other than the issuer's debt

instruments) at least annually.  Interest on the New Term Loan will not be unconditionally payable in cash or property at least annually.  Accordingly, the New Term Loan will be treated as issued with OID.

A U.S. person receiving the New Term Loan will generally be required to include the OID on the New Term Loan in income over the term of such note in accordance with a constant yield-to-maturity method, regardless of whether such person is a cash or accrual method taxpayer, and regardless of whether and when the person receives cash payments of interest on the New Term Loan.

*Sale or Other Taxable Disposition*.  A holder of the New Term Loan will recognize gain or loss upon the sale or other taxable disposition of the New Term Loan equal to the difference between the amount realized upon the disposition and the holder's adjusted tax basis in the New Term Loan.   The holder's adjusted tax basis in the New Term Loan will generally equal the initial tax basis of the New Term Loan, increased by any original issue discount previously included in income and decreased by any cash payment previously made on the New Term Loan other than amounts attributable to qualified stated interest. Any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the holder has a holding period in the New Term Loan of more than one (1) year as of the date of disposition. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses.  There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

### (d)    Other Considerations.

*Accrued Interest*. There is general uncertainty regarding the extent to which the receipt of cash or other property should be treated as attributable to unpaid accrued interest.  In accordance with the Plan, the Debtors intend to take the position that property distributed pursuant to the Plan will first be allocable to the principal amount of a holder's Claim and then, to the extent necessary, to any unpaid accrued interest thereon.  The IRS, however, could take a contrary position.

To the extent any property received pursuant to the Plan is considered attributable to unpaid accrued interest, a holder will recognize ordinary income to the extent the value of the property exceeds the amount of unpaid accrued interest previously included in gross income by the holder.  A holder's tax basis in such property should be equal to the amount of interest income treated as satisfied by the receipt of the property, and its holding period in the property should begin on the day after the Effective Date.  A holder generally will be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full.   HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE EXTENT TO WHICH CONSIDERATION RECEIVED UNDER THE PLAN SHOULD BE TREATED AS ATTRIBUTABLE TO UNPAID ACCRUED INTEREST.

*Market Discount*.  A holder of First Lien Debt may be affected by the "market discount" provisions of sections 1276 through 1278 of the IRC.  Under these provisions, some or all of the gain, if any, recognized by such holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on its First Lien Debt.  In

general, a debt obligation with a fixed maturity of more than one (1) year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the IRC, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if the excess is less than a statutory de minimis amount (equal to 0.25% of the debt obligation's stated redemption price at maturity, or revised issue price in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition). Gain, if any, recognized by a holder of First Lien Debt that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the First Lien Debt was considered to be held by such holder (unless the holder elected to include market discount in income as it accrued).

If (i) as discussed above, the First Lien Debt constitutes a "security" for federal income tax purposes, (ii) the exchange of First Lien Debt for New Common Stock is a tax-free recapitalization, and (iii) a holder's First Lien Debt was acquired with "market discount," then the rules above would generally cause such market discount to carry over to the holder's New Common Stock. In such a scenario, the result would be to cause the holder of New Common Stock to recognize such market discount as ordinary income (instead of capital gain) upon a taxable disposition of the New Common Stock.

Holders should consult their tax advisors regarding the market discount rules.

### (e)    Information Reporting and Backup Withholding.

The Debtors (or their paying agent) may be obligated to furnish information to the IRS regarding the consideration received by holders pursuant to the Plan.

Holders may be subject to backup withholding (currently, at a rate of 28%) on the consideration received pursuant to the Plan. Certain holders generally are not subject to backup withholding. A holder that is not otherwise exempt generally may avoid backup withholding by furnishing to the Debtors (or their paying agent) its taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the holder has not been notified by the IRS that it is subject to backup withholding.

Backup withholding is not an additional tax. Taxpayers may use amounts withheld as a credit against their federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

THE FOREGOING DISCUSSION OF FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN. NEITHER THE DEBTORS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER

ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

### 12.4. *Consequences of the Distribution Trust*

The Distribution Trust will be organized for the primary purpose of liquidating the assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Distribution Trust. Thus, the Distribution Trust is intended to be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701- 4(d). The provisions of the Distribution Trust Agreement and the Plan are intended to satisfy the guidelines for classification as a liquidating trust that are set forth in Revenue Procedure 94-45, 1994-2 C.B. 684. Under the Plan, all parties are required to treat the Distribution Trust as a liquidating trust, subject to contrary definitive guidance from the IRS. In general, a liquidating trust is not a separate taxable entity but rather is treated as a grantor trust, pursuant to Sections 671 through 679 of the Tax Code, owned by the persons who are treated as transferring assets to the Trust.

No request for a ruling from the IRS will be sought on the classification of the Distribution Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Distribution Trust. If the IRS were to challenge successfully the classification of the Distribution Trust as a grantor trust, the federal income tax consequences to the Distribution Trust and the Beneficiaries could vary from those discussed herein (including the potential for an entity-level tax).

Each Distribution Trust Beneficiary holding a beneficial interest in the Distribution Trust must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit recognized or incurred by the Distribution Trust. None of the Debtors' loss carryforwards will be available to reduce any income or gain of the Distribution Trust. Moreover, upon the sale or other disposition (or deemed disposition) of any Distribution Trust Asset, each Distribution Trust Beneficiary holding a beneficial interest in the Distribution Trust must report on its federal income tax return its share of any gain or loss measured by the difference between (1) its share of the amount of cash and/or the fair market value of any property received by the Distribution Trust in exchange for the Distribution Trust Asset so sold or otherwise disposed of and (2) such Distribution Trust Beneficiary's adjusted tax basis in its share of the Distribution Trust Asset. The character of any such gain or loss to the holder will be determined as if such holder itself had directly sold or otherwise disposed of the Distribution Trust Asset. The character of items of income, gain, loss, deduction and credit to any holder of a beneficial interest in the Distribution Trust, and the ability of the holder to benefit from any deductions or losses, may depend on the particular circumstances or status of the holder.

Given the treatment of the Distribution Trust as a grantor trust, each Distribution Trust Beneficiary holding a beneficial interest in the Distribution Trust has an obligation to report its share of the Distribution Trust's tax items (including gain on the sale or other disposition of a Distribution Trust Asset) which is not dependent on the distribution of any cash or other Distribution Trust Assets by the Distribution Trust. Accordingly, a Distribution Trust Beneficiary holding a beneficial interest in the Distribution Trust may incur a tax liability as a

result of owning a share of the Distribution Trust Assets, regardless of whether the Distribution Trust distributes cash or other assets. Although the Distribution Trust Agreement provides that the Distribution Trust will generally make distributions of cash at least quarterly, due to the requirement that the Distribution Trust maintain certain reserves, the Distribution Trust's ability to make current cash distributions may be limited or precluded. In addition, due to possible differences in the timing of income on, and the receipt of cash from the Distribution Trust Assets, a holder of a beneficial interest in the Distribution Trust may be required to report and pay tax on a greater amount of income for a taxable year than the amount of cash received by the Beneficiary during the year.

The Distribution Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Distribution Trust Assets (e.g., income, gain, loss, deduction and credit). Each Distribution Trust Beneficiary holding a beneficial interest in the Distribution Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Distribution Trust will pertain to Distribution Trust Beneficiaries who received their interests in the Distribution Trust in connection with the Plan.

## ARTICLE XIII.

## SECURITIES LAW MATTERS

13.1.  *General.*

The Plan provides for Reorganized TER to issue New Common Stock to the holders of Allowed First Lien Credit Agreement Claims pursuant to Section 7.8 of the Plan. The Debtors believe that the New Common Stock constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

No registration statement will be filed under the Securities Act or any state securities laws relating to the initial offer and distribution on the Effective Date under the Plan of the New Common Stock to holders of Allowed First Lien Credit Agreement Claims.

13.2.  *Initial Offer and Sale of Securities Under Federal Securities Laws.*

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and under state securities laws if three principal requirements are satisfied:

(a)     the securities must be offered and sold "under a plan" of reorganization and must be securities of the debtor, of an affiliate "participating in a joint plan" with the debtor or of a successor to the debtor under the plan;

(b)     the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor or such affiliate; and

(c)    the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property.

In addition, section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder exempt the private offering of securities from registration under the Securities Act and under state securities laws. The Debtors believe that the provisions of section 1145(a)(l) of the Bankruptcy Code and section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder (as applicable) exempt the initial offer and distribution of the New Common Stock on the Effective Date under the Plan to holders of Allowed First Lien Credit Agreement Claims from federal and state securities registration requirements.

### 13.3. *New Common Stock.*

#### (a)    Issuance of New Common Stock.

The Debtors believe that the offer and sale of the New Common Stock to holders of Allowed First Lien Credit Agreement Claims pursuant to the Plan will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, state securities laws and the Bankruptcy Code. In reliance upon the exemptions discussed in Section 13.2 above, the New Common Stock and the issuance and offer thereof will not be (and is not required to be) registered under the Securities Act or any state securities laws.

#### (b)    Resale of New Common Stock.

#### (i)    Securities Law Restrictions.

The Debtors further believe that subsequent transfers of the New Common Stock by any holders thereof that are not "underwriters," as defined in section 2(a)(11) of the Securities Act and supplemented by section 1145(b)(1) of the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and applicable state securities laws.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer,": (a) purchases a claim against, an interest in or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest, (b) offers to sell securities offered or sold under a plan for the holders of such securities, (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan of reorganization, with the consummation of the plan of reorganization or with the offer or sale of securities under the plan of reorganization, or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11), is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Resales of the New Common Stock by Persons deemed to be "underwriters" (which definition includes "controlling person") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of New Common Stock who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met. However, the Reorganized Debtors do not presently intend to make publicly available the requisite current information regarding the Reorganized Debtors and, as a result, Rule 144 will not be available for resales of New Common Stock by persons deemed to be underwriters.

**Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling person") with respect to the New Common Stock will depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person will be deemed an "underwriter" with respect to the New Common Stock. In view of the complex nature of the question of whether a particular Person may be an underwriter, the Debtors make no representations concerning the right of any Person to freely resell New Common Stock.** Accordingly, the Debtors recommend that potential recipients of New Common Stock consult their own counsel concerning whether they may freely trade such securities without compliance with the federal and state securities laws.

### (ii)    Restrictions in the Amended Certificates of Incorporation and Amended By-Laws

The Amended Certificates of Incorporation and Amended By-Laws will contain restrictions on a holder's ability to transfer the New Common Stock. Among other restrictions on transfer, subject to certain limited exceptions, the Amended Certificates of Incorporation and Amended By-Laws will require notice to Reorganized TER of any proposed transfer of New

Common Stock and will restrict such transfer if the transfer would, if effected, require Reorganized TER to register or qualify such New Common Stock under the Securities Act or Exchange Act.

        (iii)    **Legend.**

        All certificates, if any, representing shares of New Common Stock shall bear a legend that is consistent with restricting the sale, transfer, assignment or other disposal of such shares, as more fully set forth in the Amended Certificates of Incorporation and the Amended By-Laws of Reorganized TER.

## ARTICLE XIV.

## PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN

14.1.   *Distributions.*

        The Disbursing Agent shall make all Plan Distributions, other than distributions of Distribution Trust Interests (which shall be distributed by the Distribution Trustee in accordance with the Distribution Trust Agreement), to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

14.2.   *No Postpetition Interest on Claims.*

        Unless otherwise specifically provided for in the Plan, Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy or non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

14.3.   *Date of Distributions.*

        Unless otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon thereafter as is reasonably practicable, provided that the Reorganized Debtors may utilize periodic distribution dates to the extent appropriate. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a business day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding business day, but shall be deemed to have been completed as of the required date.

14.4.   *Distribution Record Date.*

        As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each of the Classes, as maintained by the Debtors, or their agents, shall be deemed closed and there shall be no further changes in the record holders of any of the Claims after the Distribution Record Date. Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date. Additionally, with respect to payment of any Cure Amounts or any Cure Disputes in connection with the assumption and/or assignment of the Debtors' executory

contracts and leases, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the underlying executory contract or lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Claim for a Cure Amount.

14.5.    *Disbursing Agent.*

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent other than distributions of Distribution Trust Interests (which shall be distributed by the Distribution Trustee in accordance with the Distribution Trust Agreement) on and after the Effective Date as provided herein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties as the Disbursing Agent unless otherwise ordered by the Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by Reorganized Debtors. Furthermore, any such entity required to give a bond shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.

14.6.    *Delivery of Distribution.*

Subject to Section 8.4 of the Plan, the Disbursing Agent or the Distribution Agent, as applicable, will issue, or cause to be issued, and authenticate, as applicable, the applicable Plan Consideration, and subject to Bankruptcy Rule 9010, make all distributions or payments to any holder of an Allowed Claim as and when required by the Plan at: (a) the address of such holder on the books and records of the Debtors or their agents; or (b) at the address in any written notice of address change delivered to the Debtors or the applicable Disbursing Agent, including any addresses included on any filed proofs of Claim or transfers of Claim filed pursuant to Bankruptcy Rule 3001. In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent or the Distribution Trustee, as applicable, has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter such distribution shall be made to such holder without interest, provided, however, such distributions or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of one year from: (i) the Effective Date; and (ii) the first Distribution Date after such holder's Claim is first Allowed.

14.7.    *Unclaimed Property.*

One year from the later of: (i) the Effective Date, and (ii) the first Distribution Date after the applicable Claim is first Allowed, all unclaimed property or interests in property, other than Distribution Trust Interests, shall revert to the Reorganized Debtors or the successors or assigns of the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred without the need for notice to or action, order, or approval of the Bankruptcy Court; *provided*, *however*, that any unclaimed Distribution Trust Interests shall revert to the Distribution Trust in accordance with the Distribution Trust Agreement. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the

Debtors' books and records, or proofs of Claim filed against the Debtors, as reflected on the claims register maintained by the Claims Agent.

14.8.   ***Satisfaction of Claims.***

Unless otherwise provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

14.9.   ***Manner of Payment Under Plan.***

Except as specifically provided in the Plan, at the option of the Debtors or Reorganized Debtors (as applicable), any Cash payment to be made under the Plan may be made by a check, wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

14.10.  ***Fractional Shares/De Minimis Cash Distributions.***

No fractional shares of New Common Stock shall be distributed. When any distribution would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the shares of the New Common Stock subject to such distribution will be rounded to the next higher or lower whole number as follows: (i) fractions equal to or greater than ½ will be rounded to the next higher whole number and (ii) fractions less than ½ will be rounded to the next lower whole number. The total number of shares of New Common Stock to be distributed on account of Allowed Claims will be adjusted as necessary to account for the rounding provided for in the Plan. No consideration will be provided in lieu of fractional shares that are rounded down. Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Stock or $50.00 in Cash. Fractional shares of New Common Stock or Cash amounts that are not distributed in accordance with Section 8.10 of the Plan shall be returned to Reorganized TER.  In the event that any final Plan Distribution for an Allowed Claim is less than $50.00 in Cash, the Reorganized Debtors or the Distribution Trustee, as applicable, shall be authorized, but not required, to tender such final Plan Distribution (together with any other such final Plan Distributions) to a charity selected by the Reorganized Debtors or the Distribution Trustee, as applicable.

14.11.  ***No Distribution in Excess of Amount of Allowed Claim.***

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Plan Distribution (of a value set forth in the Plan) in excess of the Allowed amount of such Claim, to the extent such interest is permitted by Section 8.2 of the Plan.

14.12.  ***Exemption From Securities Laws.***

The issuance of and the distribution under the Plan of the New Common Stock shall be exempt from registration under the Securities Act any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code and/or Section 4(a)(2) of the Securities Act and

Regulation D promulgated thereunder, to the maximum extent permitted thereunder. Subject to any transfer restrictions contained in the Certificate of Incorporation of Reorganized TER, the New Common Stock may be resold by the holders thereof without restriction, except to the extent that any such holder is deemed to be an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code.

14.13. **Setoffs and Recoupments.**

Each Reorganized Debtor, or such entity's designee (including, without limitation, the Disbursing Agent) as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off and/or recoup against any Allowed Claim, and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any and all claims, rights and Causes of Action that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date; *provided*, *however*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder will constitute a waiver or release by a Reorganized Debtor or such entity's designee or its successor of any and all claims, rights (including, without limitation, rights of setoff and/or recoupment) and Causes of Action that a Reorganized Debtor or such entity's designee or its successor may possess against such holder. For the avoidance of doubt, the Distribution Trustee shall not have any authority to exercise any rights of the Debtors or Reorganized Debtors to setoff or recoupment.

14.14. **Rights and Powers of Disbursing Agent.**

(a)    **Powers of Disbursing Agent.**

The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (ii) make all applicable distributions or payments contemplated by the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date), pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(b)    **Expenses Incurred on or After the Effective Date.**

Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement Claims (including, without limitation, reasonable attorney and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

14.15. **Withholding and Reporting Requirements.**

In connection with the Plan and all distributions thereunder, the Reorganized Debtors, the Disbursing Agent and the Distribution Trustee, as applicable, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing

authority, and all Plan Distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors, the Disbursing Agent and the Distribution Trustee, as applicable, shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of any Plan Distribution to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms the Debtors, Reorganized Debtors or the Disbursing Agent believe are reasonable and appropriate, including requiring a holder of a Claim to submit appropriate tax and withholding certifications. Prior to making any Plan Distribution to the holder of an Allowed Claim, the Reorganized Debtors, the Disbursing Agent and the Distribution Trustee, as applicable, shall require that the holder of such Claim furnish all documents required by applicable tax law or other government regulation as a condition to the making of a Plan Distribution (the "**Required Reporting Documents**"). If (x) the holder of an Allowed Claim fails to furnish the Required Reporting Documents within ninety (90) days, or such longer period agreed to by the Reorganized Debtors, the Disbursing Agent and the Distribution Trustee, as applicable, of a written request for the Required Reporting Documents or (y) a Plan Distribution made on account of an Allowed Claim is not negotiated within ninety (90) days from the mailing of such Plan Distribution, then (a) the Reorganized Debtors, the Disbursing Agent or the Distribution Trustee, as applicable, shall treat such Plan Distribution (or Plan Distribution to be made) as forfeited and return the funds to the Reorganized Debtors and the Disbursing Agent for distribution in accordance with the terms of the Plan and (b) the holder of such Claim shall receive no further Plan Distributions and shall forfeit its rights to collect any amounts under the Plan.

Notwithstanding any other provision of the Plan: (i) each holder of an Allowed Claim that is to receive a Plan Distribution shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations on account of such distribution; and (ii) no Plan Distributions shall be required to be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Reorganized Debtors or the Distribution Trustee, as applicable, for the payment and satisfaction of such tax obligations or has, to the Reorganized Debtors' or the Distribution Trustee's satisfaction, as applicable, established an exemption therefrom.

### 14.16. *Cooperation With Disbursing Agent.*

The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent with the amount of Claims and the identity and addresses of holders of Claims, in each case, as set forth in the Debtors' and/or Reorganized Debtors' books and records. The Reorganized Debtors will cooperate in good faith with the Disbursing Agent to comply with the reporting and withholding requirements outlined in Section 8.15 of the Plan.

### 14.17. *Compliance with Gaming Laws and Regulations*

Reorganized TER shall not distribute New Common Stock to any person or entity in violation of the gaming laws and regulations of New Jersey. Consequently, no holder shall be entitled to receive New Common Stock unless and until such holder's acquisition of New Common Stock does not require compliance with such license, qualification or suitability

requirements or such holder has been licensed, qualified, found suitable, or has obtained a waiver or exemption from such license, qualification or suitability requirements.

To the extent a holder is not entitled to receive New Common Stock on the Effective Date as a result of applicable gaming laws and regulations, Reorganized TER shall not distribute New Common Stock to such holder, unless and until such holder complies with applicable gaming laws and regulations.  Until such holder has complied with applicable gaming laws and regulations, such holder shall not be a shareholder of Reorganized TER and shall have no voting rights or other rights of a stockholder of Reorganized TER.

If a holder is entitled to receive New Common Stock under the Plan and is required, under applicable gaming laws to undergo a suitability investigation and determination and such holder either (i) refuses to undergo the necessary application process for such suitability approval or (ii) after submitting to such process, is determined to be unsuitable to hold the New Common Stock or withdraws from the suitability determination prior to its completion, then, in that event, Reorganized TER shall hold the New Common Stock and (x) such holder shall only receive such distributions from Reorganized TER as are permitted by the applicable gaming authorities, and (y) the balance of the New Common Stock to which such holder would otherwise be entitled will be retained by the Reorganized Debtors as treasury stock, subject to compliance with any applicable legal requirements.  In addition, in the event that the applicable gaming authorities object to the possible suitability of any holder, the New Common Stock shall be distributed only to such holder upon a formal finding of suitability.  If a gaming authority subsequently issues a formal finding that a holder lacks suitability, or such holder withdraws from or does not fully cooperate with the suitability investigation, then the process for the sale of that holder's New Common Stock shall be as set forth in (x), (y), and (z) above.

# ARTICLE XV.

## PROCEDURES FOR RESOLVING CLAIMS

### 15.1.    *Objections to Claims.*

On and after the Effective Date, the Reorganized Debtors may object to, prosecute any objection to, request estimation of, compromise or settle Administrative Expense Claims, Priority Non-Tax Claims, Priority Tax Claims and other Claims (other than General Unsecured Claims) without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.

Subject to the terms of the Distribution Trust Agreement, after the Effective Date, only the Distribution Trustee shall have the authority to object to, prosecute any objection to, request estimation of, compromise or settle General Unsecured Claims.

Any objections to Claims (other than Administrative Expense Claims) shall be served and filed on or before the later of: (i) the date that is one (1) year after the Effective Date; and (ii) such other date as may be fixed by the Bankruptcy Court, after notice and a hearing, with notice only to those parties entitled to notice in the Chapter 11 Cases pursuant to Bankruptcy

Rule 2002, whether fixed before or after the date specified in clause (i) hereof. Any Claims filed after the Bar Date, First Administrative Bar Date or Administrative Bar Date, as applicable, shall be deemed disallowed and expunged in their entirety without further notice to or action, order, or approval of the Bankruptcy Court or any action being required on the part of the Debtors, the Reorganized Debtors or the Distribution Trustee unless the Person or entity wishing to file such untimely Claim has received Bankruptcy Court authority to do so. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the objecting party effects service in any of the following manners: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) by first class mail, postage prepaid, on the signatory on the proof of claim as well as all other representatives identified in the proof of claim or any attachment thereto; or (iii) if counsel has agreed to or is otherwise deemed to accept service, by first class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Chapter 11 Cases (so long as such appearance has not been subsequently withdrawn). From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim (other than Disputed General Unsecured Claims) without further notice to or action, order, or approval of the Bankruptcy Court.

15.2.    ***Amendment to Claims.***

From and after the Effective Date, no Claim may be filed to increase or assert additional claims not reflected in an already filed Claim (or Claim scheduled, unless superseded by a filed Claim, on the applicable Debtor's schedules of assets and liabilities filed in the Chapter 11 Cases) asserted by such claimant and any such Claim shall be deemed disallowed and expunged in its entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors or the Reorganized Debtors unless the claimant has obtained the Bankruptcy Court's prior approval to file such amended or increased Claim.

15.3.    ***Disputed Claims.***

### (a)    **No Distributions or Payments Pending Allowance.**

Except as provided in Section 9.3 of the Plan, no Disputed Claim shall be entitled to any Plan Distribution unless and until such Claim becomes an Allowed Claim.

### (b)    **Establishment of Disputed Priority Claims Reserve.**

On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors shall reserve, for the benefit of each holder of a Disputed Administrative Expense Claim, Disputed Priority Tax Claim, Disputed Priority Non-Tax Claim and Disputed Other Secured Claim, an amount equal to (i) the amount of such Claim as estimated by the Bankruptcy Court pursuant to an Estimation Order, (ii) if no Estimation Order has been entered with respect to such Claim, the amount in which such Disputed Claim is proposed to be allowed in any pending objection filed by the Debtors, (iii) if no Estimation Order has been entered with respect to such Claim, and no objection to such Claim is pending on the Effective Date, (A) the amount listed in the Debtors' Schedules or (B) if a timely filed proof of Claim or application for payment has been filed with the Bankruptcy Court or Claims Agent, as applicable, the amount

set forth in such timely filed proof of Claim or application for payment, as applicable or (iv) such amount as otherwise agreed to by the holder of such Claim and Reorganized Debtors. The Reorganized Debtors, in their reasonable discretion, may increase the amount reserved as to any particular Disputed Claim.

### (c)    Establishment of Disputed General Unsecured Claims Reserve

On the Effective Date or as soon thereafter as is reasonably practicable, the Distribution Trustee shall set aside and reserve, from the Distribution Trust Assets, for the benefit of each holder of a Disputed General Unsecured Claim, Cash in an amount equal to the Plan Distribution to which the holder of such Disputed Claim would be entitled if such Disputed Claim were an Allowed Claim, in an amount equal to (i) the amount of such Claim as estimated by the Bankruptcy Court pursuant to an Estimation Order, (ii) if no Estimation Order has been entered with respect to such Claim, the amount in which such Disputed Claim is proposed to be allowed in any pending objection filed by the Debtors, or (iii) if no Estimation Order has been entered with respect to such Claim, and no objection to such Claim is pending on the Effective Date, (A) the amount listed in the Schedules or (B) if a timely filed proof of claim or application for payment has been filed with the Bankruptcy Court or Claims Agent, as applicable, the amount set forth in such timely filed proof of claim or application for payment, as applicable. The Distribution Trustee, in its discretion, may increase the amount reserved as to any particular Disputed Claim. Such reserved amounts, collectively, shall constitute the "**Disputed General Unsecured Claims Reserve**". For the avoidance of doubt, the Distribution Trustee shall not be required to reserve any Cash or other consideration on account of any Disputed General Unsecured Claim the Distribution Trustee reasonably believes is covered by insurance.

### (d)    Plan Distributions to Holders of Subsequently Allowed Claims.

On each Distribution Date (or such earlier date as determined by the Disbursing Agent or the Distribution Trustee, as applicable, in their sole discretion but subject to Section 9.3 of the Plan), the Disbursing Agent or the Distribution Trustee, as applicable, will make distributions or payments, as applicable, on account of any Disputed Claim that has become an Allowed Claim since the occurrence of the previous Distribution Date. The Disbursing Agent or the Distribution Trustee, as applicable, shall distribute in respect of such newly Allowed Claims the Plan Distributions to which holders of such Claims would have been entitled under the Plan if such newly Allowed Claims were fully or partially Allowed, as the case may be, on the Effective Date, less direct and actual expenses, fees, or other direct costs of maintaining Plan Consideration on account of such Disputed Claims.

### (e)    Distribution of Reserved Plan Consideration Upon Disallowance.

After all Disputed General Unsecured Claims have been either Allowed or Disallowed, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of any Cash remaining in the Disputed General Unsecured Claims Reserve.

15.4.    ***Estimation of Claims.***

The Debtors and/or Reorganized Debtors may request that the Bankruptcy Court enter an Estimation Order with respect to any Claim (other than a General Unsecured Claim), pursuant to section 502(c) of the Bankruptcy Code, for purposes of determining the Allowed amount of such Claim regardless of whether any Person has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim for purposes of determining the allowed amount of such Claim at any time.   The Distribution Trustee, in accordance with the Distribution Trust Agreement, may request that the Bankruptcy Court enter an Estimation Order with respect to any General Unsecured Claim, pursuant to section 502(c) of the Bankruptcy Code, for purposes of determining the Allowed amount of such General Unsecured Claim regardless of whether any Person has previously objected to such General Unsecured Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any General Unsecured Claim for purposes of determining the allowed amount of such General Unsecured Claim at any time.   In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim for allowance purposes, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the objecting party may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.   All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, resolved or withdrawn by any mechanism approved by the Bankruptcy Court.

15.5.    ***The CBA Order***

The Plan is dependent on (i) the CBA Order and (ii) the fixing and determination of the amount, classification, and priority of any and all Claims related to any "**withdrawal liability**" arising from the Debtors' withdrawal from the National Retirement Fund in amounts that are necessary to satisfy the conditions set forth in Sections 11.2(g) and 11.2(i) of the Plan (the "**Fixing and Determination of Withdrawal Liability**").   The CBA Order, the pre-Effective Date withdrawal from the National Retirement Fund and the Fixing and Determination of Withdrawal Liability are necessary predicates for, and integral to, the Plan.   Without the CBA Order and the Fixing and Determination of Withdrawal Liability, the Plan would not be able to be consummated.

*[The remainder of this page is intentionally left blank.]*

## CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described herein because it will provide the greatest recovery to holders of Claims. Other alternatives would involve significant delay, uncertainty and substantial administrative costs and are likely to reduce any return to creditors who hold Claims. The Debtors urge the holders of impaired Claims in Classes 3 and 4 who are entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots to the Voting Agent so that they will be received not later than 4:00 p.m. (prevailing Eastern Time) on [          ], 2015.

Dated: _____, 2015
       Atlantic City, New Jersey

Respectfully submitted,

TRUMP ENTERTAINMENT RESORTS, INC.
on behalf of itself and its affiliated Debtors

By: _____
     Robert Griffin
     Chief Executive Officer

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Matthew B. Lunn
Robert F. Poppiti, Jr.
Rodney Square, 1000 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen
Erez E. Gilad
Gabriel E. Sasson
180 Maiden Lane
New York, New York 10038-4982
Telephone:  (212) 806–5400
Facsimile:  (212) 806-6006

*Counsel for the Debtors and Debtors in Possession*

## Exhibit 1

**Plan**

**(To be attached)**

**<u>Exhibit 2</u>**

**Valuation Analysis**

**<u>Exhibit 3</u>**

**Liquidation Analysis**

## Exhibit 4

**Reorganized Debtors' Projected Financial Information**

**<u>Exhibit 5</u>**

**Disclosure Statement Order**

**(To be attached)**

Document comparison by Workshare Compare on Monday, January 26, 2015
3:36:04 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://NYIWDMS/NY/75490360/1 |
| Description | #75490360v1<NY> - TER - Disclosure Statement for Third Amended Plan (FILED 1.5.15) (CLEAN) |
| Document 2 ID | interwovenSite://NYIWDMS/NY/75490360/3 |
| Description | #75490360v3<NY> - TER - Disclosure Statement for Third Amended Plan (FILED 1.5.15) (CLEAN) |
| Rendering set | Stroock-strikethru(b_n_w) |

| Legend: | |
|---|---|
| **Insertion** | |
| ~~Deletion~~ | |
| ~~Moved from~~ | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 335 |
| Deletions | 322 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 657 |