**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TRUMP ENTERTAINMENT | ) | Case No. 14-12103 (KG) |
| RESORTS, INC., *et al.*, | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | **Re: Dkt. No. 111** |

**OPINION REGARDING MOTION OF TRUMP AC CASINO MARKS, LLC FOR AN**
**ORDER MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)**
**TO ALLOW TERMINATION OF A LICENSE AGREEMENT WITH THE DEBTORS**

KEVIN GROSS                                        Wilmington, Delaware
UNITED STATES BANKRUPTCY JUDGE           February 20, 2015

The Court is deciding the motion of Trump AC Casino Marks, LLC ("Trump AC") which seeks relief from the automatic stay pursuant to Section 362(d)(1) of the Bankruptcy Code[1] in order to proceed with an action in the Superior Court of New Jersey (the "State Court Action").  Trump AC is attempting to terminate the Trademark License Agreement (defined below) under which Trump Entertainment Resorts., Inc. and certain of its affiliates (collectively, the "Debtors") are licensees. Because, for the reasons set forth below, under Section 365(c)(1) of the Bankruptcy Code the Debtors may not assume or assign the Trademark License Agreement absent Trump AC's consent and Trump AC has withheld such consent, the Court finds that cause exists pursuant to Section 362(d)(1) to lift the automatic stay. *See In re West Elecs. Inc.*, 852 F.2d 79, 82-84 (3d Cir. 1988). Accordingly, the Court will grant Trump AC's motion and lift the automatic stay in order to allow it to proceed with the State Court Action.

## JURISDICTION

The Court has jurisdiction over this matter and the judicial authority to issue a final order pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND

The limited facts which are material to the resolution of this matter are not the subject of genuine dispute. Prior to the Petition Date (defined below), Donald and Ivanka Trump (the "Trumps") and the Debtors entered into the Second Amended and Restated

---

[1] 11 U.S.C. §§ 101 *et seq.*

Trademark License Agreement (the "Trademark License Agreement"), dated July 16, 2010. The Trumps subsequently assigned all of their rights and obligations thereunder to Trump AC. Under the terms of the Trademark License Agreement, the Trumps granted the Debtors a royalty-free license to use the Trumps' names, likenesses, and other enumerated marks (the "Trump Marks") in connection with the operation of three hotel casinos located in Atlantic City, New Jersey. The Trademark License Agreement provides for three categories of uses of the Trump Marks: (1) over 200 "current uses," for which the Debtors need no prior approval and which cover a wide range of products and activities associated with the operation of a hotel casino; (2) "similar uses," which are similar to the 200+ current uses and for which the Debtors need no prior approval but which are subject to Trump AC's 10-day right to object; and (3) "proposed uses," which are neither current nor similar uses and for which the Debtors must obtain prior approval.

The Trademark License Agreement is exclusive as to a defined, six-state territory[2] and perpetual, subject to the parties' termination rights as defined therein. Under the terms of the Trademark License Agreement, the Debtors may terminate at any time on 30 days' notice. The process by which Trump AC may terminate the Trademark License Agreement is somewhat more complex. In simple terms, the Trademark License Agreement requires that the Debtors use the Trump Marks in a manner consistent with a certain standard of quality and provides a mechanism for Trump AC to exercise quality control over the Debtors' use of the Trump Marks. Under the terms of the Trademark

---

[2] The states are New York, New Jersey, Connecticut, Pennsylvania, Maryland, and Delaware.

3

License Agreement, upon Trump AC's request, the parties must cooperate to appoint a neutral third party to conduct a review of the quality of the Debtors' properties (a "Quality Assurance Review"). If a property fails a Quality Assurance Review and the Debtors fail to cure any deficiencies within the applicable cure period (or if the Debtors breach any other provision of the Trademark License Agreement), Trump AC has the right to initiate an action in the Superior Court of New Jersey which, setting aside certain complexities not relevant here, could ultimately result in the termination of the Trademark License Agreement.

Finally, the Trademark License Agreement provides with respect to "Assignments and Sublicenses" that "without the prior written consent of [Trump AC], in their sole and absolute discretion, none of the [Debtors] may assign, sublicense or pledge any of their rights or obligations under [the Trademark License Agreement]" subject to certain exceptions not applicable here.[3]

On July 16, 2010, the same day the Trumps and the Debtors executed the Trademark License Agreement, the Trumps, the Debtors, and the Debtors' most significant secured creditor (the "First Lien Lender")[4] entered into an agreement ancillary to the Trademark License Agreement styled "Consent and Agreement" (the "Consent Agreement"). As of the Petition Date, the Debtors owed the First Lien Lender

---

[3] The foregoing is a simplified summary of certain core terms of the Trademark License Agreement which are relevant herein. As the Court's decision does not turn on the minutiae of the Trademark License Agreement, a more complete recitation of its terms is not necessary.

[4] The First Lien Lender is actually three lenders under common control: Icahn Partners LP, Icahn Partners Master Fund LP, and IEH Investments I LLC.

approximately $292 million under the terms of a pre-petition credit facility (the "Pre-Petition Credit Agreement"). Amounts due under the Pre-Petition Credit Agreement are secured by a lien on substantially all of the Debtors' assets and make up the vast majority of the Debtors' pre-petition capital structure and total outstanding debt. As is relevant here, under the terms of the Consent Agreement, Trump AC consented to "transfers . . . from time to time of the rights of any one or more of the [Debtors] under the [Trademark License Agreement] upon and following the enforcement by the [First Lien Lender] of its rights under the [Pre-Petition Credit Agreement] (each, an "***Enforcement Action***"). . . ." (emphasis in original). Under the terms of the Consent Agreement, following an "Enforcement Action," Trump AC "shall recognize" the First Lien Lender as a licensee under the Trademark License Agreement in the place of the Debtor or  Debtors which were the subject of the Enforcement Action.

On August 5, 2014, Trump AC initiated the State Court Action alleging that the Debtors had failed a Quality Assurance Review and failed to timely cure any deficiencies, as well as other breaches of the Trademark License Agreement. Ultimately, in the State Court Action Trump AC seeks to terminate the Trademark License Agreement in accordance with the procedure contemplated therein.[5]

---

[5] As the Court's decision does not turn on the merits of the State Court Action, a more detailed summary of Trump AC's allegations is unnecessary. The Court notes that the Debtors refute the allegations set forth in the State Court Action complaint.

Stepping back, on September 9, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thus staying the State Court Action. As of the Petition Date, the Debtors operated two of the three hotel casinos which were originally subject to the Trademark License Agreement: the Trump Plaza Hotel and Casino (the "Plaza") and the Trump Taj Mahal Casino Resort (the "Taj Mahal").[6] Shortly after the Petition Date, on September 16, 2014, the Debtors closed the Plaza. The Taj Mahal remains open for business and the Debtors have represented that they have no immediate plans for its closure. According to the Debtors, use of the Trump Marks is "ubiquitous" throughout the Taj Mahal and it would be costly and problematic to remove the Trump Marks. The Debtors' proposed but not yet confirmed chapter 11 plan of reorganization (the "Plan") does not contemplate any sort of significant asset transfer. Instead, the Plan contemplates cancellation of pre-existing equity, a nominal distribution to unsecured creditors, and a debt-for-equity swap of substantially all amounts owing under the Pre-Petition Credit Agreement. The Plan further contemplates assumption of the Trademark License Agreement.

On September 24, 2014, Trump AC filed its motion seeking relief from the automatic stay to proceed with the State Court Action (the "Stay Motion"). On October 16, 2014, the Debtors filed an objection the Stay Motion, to which the First Lien Lender filed a joinder. On December 11, 2014, the Court held a hearing on the Stay Motion (the "Stay Motion Hearing") and thereafter took the matter under advisement.

---

[6] The Debtors sold the third hotel casino, the Trump Marina Hotel Casino, in 2011.

## ANALYSIS

### A.  Stay Relief Under Section 362(d)(1)

In the Stay Motion, Trump AC seeks relief from the automatic stay pursuant to Section 362(d)(1), which provides that the Court "shall" grant relief from the automatic stay "for cause." "Except for lack of adequate protection, 'cause' is not defined by § 362(d)(1). Cause is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay." *In re The SCO Group, Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007) (citing cases).  In a Section 362(d)(1) analysis, the Court would look to the three-pronged *Rexene* balancing test:

> 1.  Whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit;
>
> 2.  Whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and
>
> 3.  The probability of the creditor prevailing on the merits.

*Izzarelli v. Rexene Prods. Co.* (*In re Rexene Prods. Co.*), 141 B.R. 574, 576 (Bankr. D. Del 1992). As stated on the record of the Stay Motion Hearing, the Court finds that Trump AC is not entitled to relief from the automatic stay under a traditional *Rexene* analysis. The Court's finding is based predominantly on Trump AC's failure to demonstrate that any significant hardship would result from maintenance of the stay as well as the Court's observation that continuation of the State Court Action would impose a substantial burden on the Debtors' reorganizational efforts.

Cause under Section 362(d)(1), though, is a flexible concept and not confined solely to the *Rexene* factors. In addition to its *Rexene*-based arguments, Trump AC argues that cause exists for the Court to lift the automatic stay under the decision of the United States Court of Appeals for the Third Circuit in *West Electronics*, 852 F.2d at 82-84, because the Trademark License Agreement is not assignable absent Trump AC's consent under applicable non-bankruptcy law and thus is not assumable or assignable by the Debtors under Section 365(c)(1) of the Bankruptcy Code. For the reasons that follow, the Court agrees.

## B.  Application of Section 365

Section 365(a) of the Bankruptcy Code provides that the Debtors, "subject to the court's approval, may assume or reject any executory contract or unexpired lease." While the term "executory contract" is not defined in the Bankruptcy Code, the Third Circuit has adopted the following definition: "[An executory contract is] a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989) (citing Countryman, *Executory Contracts in Bankruptcy, Part 1*, 57 MINN. L. REV. 439, 460 (1973)).

The Trademark License Agreement is an executory contract of the kind generally subject to assumption under Section 365(a), a point neither the Debtors nor Trump AC has disputed. Indeed, this Court has previously found patent and copyright licenses to be executory contracts within the meaning of Section 365. *See In re Valley Media, Inc.*, 279

8

B.R. 105, 135 (Bankr. D. Del. 2002); *In re Golden Books Entm't, Inc.*, 269 B.R. 311, 314 (Bankr.

D. Del. 2001); *In re Access Beyond Techs., Inc.*, 237 B.R. 32, 42-45 (Bankr. D. Del. 1999). The

reasoning in those decisions with respect to whether an intellectual property license is an

executory contract applies with equal force in the context of a trademark license.

The Debtors' right to assume the Trademark License Agreement, however, is

subject to the limitation set forth in Section 365(c)(1), which provides:

> (c) The trustee may not assume or assign any executory
> contract or unexpired lease of the debtor, whether or not such
> contract or lease prohibits or restricts assignment of rights or
> delegation of duties, if—
>
>> (1) (A) applicable law excuses a party, other than the
>> debtor, to such contract or lease from accepting
>> performance from or rendering performance to an
>> entity other than the debtor or the debtor in possession,
>> whether or not such contract or lease prohibits or
>> restricts assignment of rights or delegation of duties;
>> and
>>
>> (B) such party does not consent to such assumption or
>> assignment . . . .

The Section 365(c)(1) limitation on the assumption of executory contracts applies

whenever the contract is "subject to a legal prohibition against assignment" to a third

party and the non-debtor party to the contact does not consent to assignment. *West Elecs.*,

852 F.2d at 83. Ultimately, the Third Circuit concluded in *West Electronics* that where an

executory contract is subject to the limitation on assumption set forth in Section 365(c)(1),

the non-debtor party to the contract is entitled to relief from the automatic stay pursuant

to Section 362(d)(1) in order to seek termination of the contract. *Id.* at 83-84. *Accord Valley*

*Media*, 279 B.R. at 138 ("The remedy of the non-debtor party is a motion to lift the automatic stay in order to terminate the non-assumable contract.").

It is important to note that Section 365(c)(1) limits a debtor in possession's ability to *assume* an executory contract based on its ability to *assign* that executory contract to a third party and makes no reference to whether a debtor or debtor in possession actually intends to assign the executory contract to a third party. *See In re Catapult Entm't, Inc.*, 165 F.3d 747, 750 (9th Cir. 1999). Thus, the plain language of Section 365(c)(1) establishes what courts have come to refer to as the "Hypothetical Test." *See, e.g., id.* at 750; *West Elecs.*, 852 F.2d at 83. In other words, "a debtor in possession may not assume an executory contract over the nondebtor's objection if applicable law would bar assignment to a hypothetical third party, *even where the debtor in possession has no intention of assigning the contract in question to any such third party.*" *Catapult*, 165 F.3d at 750 (emphasis added). The Third Circuit has adopted the Hypothetical Test. *See West Elecs.*, 852 F.2d at 83 ("the relevant inquiry is not whether [applicable non-bankruptcy law] would preclude an assignment from . . . a debtor to . . . a debtor in possession, but whether it would foreclose an assignment by [a debtor] to [a third party]").

It is also important to read Section 365(c)(1) in conjunction with Section 365(f)(1), which provides:

> Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, *or in applicable law*, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection (emphasis added).

Under Section 365(f)(1), a debtor may assign a contract notwithstanding any provision in the contract or applicable non-bankruptcy law which would prohibit such an assignment. Section 365(f)(1), though, is expressly subject to any alternative rule provided in Section 365(c). As set forth above, Section 365(c)(1) provides that a debtor may not assume or assign an executory contract if assignment is prohibited by applicable non-bankruptcy law, seemingly eviscerating the rule with respect to "applicable law" set forth in Section 365(f)(1). *See Rieser v. The Dayton Country Club Co.* (*In re Magness*), 972 F.2d 689, 698 (6th Cir. 1992) (Guy, J., concurring) ("section 365(c), the recognized exception to 365(f), appears at first to resuscitate in full the very anti-assignment 'applicable law' which 365(f) nullifies"); *In re ANC Rental Corp.*, 277 B.R. 226, 235 (Bankr. D. Del. 2002).

The United States Court of Appeals for the Ninth Circuit recognized the internal inconsistency of Section 365 in its *Catapult* decision and persuasively reconciled the conflict as follows:

> The Sixth Circuit has credibly reconciled the warring provisions by noting that "each subsection recognizes an 'applicable law' of markedly different scope." Subsection (f)(1) states the broad rule—a law that, as a general matter, "prohibits, restricts, or conditions the assignment" of executory contracts is trumped by the provisions of subsection (f)(1). Subsection (c)(1), however, states a carefully crafted exception to the broad rule—where applicable law does not merely recite a general ban on assignment, but instead more specifically "excuses a party . . . from accepting performance from or rendering performance to an entity" different from the one with which the party originally contracted, the applicable law prevails over subsection (f)(1). In other words, in determining whether an "applicable law" stands or falls under § 365(f)(1), a court must ask *why* the "applicable law" prohibits assignment.

*Catapult*, 165 F.3d at 752 (citations omitted). *Accord City of Jamestown v. James Cable Partners, L.P.* (*James Cable Partners, L.P.*), 27 F.3d 534, 538 (11th Cir. 1994); *Magness*, 972 F.2d at 695-96; *ANC Rental*, 277 B.R. at 235-36. In line with the Ninth Circuit's reasoning, the Court is persuaded that "for section 365(c)(1) to apply, the applicable law must specifically state that the contracting party is excused from accepting performance from a third party under circumstances where it is clear from the statute that the identity of the contracting party is crucial to the contract . . . ." *ANC Rental*, 277 B.R. at 236.

## C.  Application to Trademarks

In applying the forgoing principles, the Court must first determine what the "applicable law" is in this instance. "The term 'applicable law' means any law applicable to a contract, other than bankruptcy law . . . ." *In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir. 2011). Since the Trademark License Agreement is just that, a trademark license agreement, it is clear that the applicable law here is federal trademark law.[7] Based on the Court's research and cases cited by Trump AC, it appears that the substantial weight of authority holds that under federal trademark law, trademark licenses are not assignable in the absence of some express authorization from the licensor, such as a clause in the license agreement itself. *See, e.g.*, *XMH*, 647 F.3d at 695 ("as far as we've been able to determine, the universal rule is that trademark licenses are not assignable in the absence of a clause expressly authorizing assignment"); *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d

---

[7] Under the heading "Governing Law," the Trademark License Agreement provides that "ANY QUESTIONS GOVERNED BY THE TRADEMARK STATUTES OF THE UNITED STATES OF AMERICA SHALL BE GOVERNED BY AND DETERMINED PURSUANT TO AND/OR UNDER SUCH STATUTES." (emphasis in original).

975, 988, 992-93 (9th Cir. 2006); *N.C.P. Mktg. Group, Inc. v. Billy Blanks* (*In re N.C.P. Mktg. Group, Inc.*), 337 B.R. 230, 235-37 (D. Nev. 2005); 3 *McCarthy on Trademarks* § 18:43 (4th ed. 2010).

However, as recognized in the Ninth Circuit's *Catapult* decision, it is not sufficient to simply recognize a general ban on contract assignment under the applicable non-bankruptcy law, the Court must understand *why* the applicable non-bankruptcy law bans assignment. As explained by the Seventh Circuit in *XMH*:

> Often the owner of a trademark will find that the most efficient way to exploit it is to license the production of the trademarked good to another company, which may have lower costs of production or other advantages over the trademark's owner. Normally the owner who does this will not want the licensee to be allowed to assign the license (that is, sublicense the trademark) without the owner's consent, because while the owner will have picked his licensee because of confidence that he will not degrade the quality of the trademarked product he can have no similar assurance with respect to some unknown future sublicensee.

647 F.3d at 696. "The purpose of a trademark, after all, is to identify a good or service to the consumer, and identity implies consistency and a correlative duty to make sure that the good or service really is of consistent quality, i.e., really is the same good or service." *Id.* at 695. *Accord* 4 *McCarthy on Trademarks* § 25:33 (4th ed. 2010) ("Since the licensor-trademark owner has the duty to control the quality of goods sold under its mark, it must have the right to pass upon the abilities of new potential licensees.").

In other words, federal trademark law generally bans assignment of trademark licenses absent the licensor's consent because, in order to ensure that all products bearing its trademark are of uniform quality, the identity of the licensee is crucially important to the licensor. But this is only a default rule, which the parties to a license agreement are free to contract around. *See XMH*, 647 F.3d at 696. Nothing in the Trademark License Agreement indicates that the parties intended to contract around the default rule. In fact, the terms of the Trademark License Agreement provide just the opposite. Subject to certain narrow exceptions not applicable here, the Trademark License Agreement expressly prohibits the Debtors from sublicensing or assigning their rights thereunder absent Trump AC's consent. While such a provision is unenforceable in bankruptcy pursuant to Section 365(f)(1), it certainly underscores that the parties did not intend, at least at the time the Trademark License Agreement was drafted, to alter the default rule of non-assignability.

The Debtors argue, however, that even if the default rule is that the Trademark License Agreement is not assignable absent Trump AC's consent, under the terms of the Consent Agreement, Trump AC has provided the necessary consent. In the Consent Agreement, Trump AC consented to transfer of the license agreement to the First Lien Lender "upon and following" the enforcement of its rights under the Pre-Petition Credit Agreement. The Consent Agreement applies to only a narrow class of potential assignees, and only after the First Lien Lender initiates an "Enforcement Action." It is clear to the Court that in this context "Enforcement Action" refers to the First Lien Lender's state law rights to pursue its collateral under the terms of the Pre-Petition Credit Agreement. The

14

First Lien Lender has initiated no such action. Bankruptcy is a collective proceeding initiated by the Debtors and while the First Lien Lender has taken steps to preserve its rights with respect to the Pre-Petition Credit Agreement, those actions to not rise to the level of an Enforcement Action as contemplated by the Consent Agreement.

While it appears that Trump AC viewed the First Lien Lender as a suitable licensee in the event of, for example, a state-law foreclosure, that does not change the facts that (1) the First Lien Lender has commenced no such action and (2) under the Consent Agreement, consent is only effective upon the commencement of such an action. Consent with respect to an isolated assignee, which is effective only upon the occurrence of some future event which, under the terms of the Plan, is all but certain to never occur is simply not enough to override the default rule of non-assignability applicable to trademark licenses.

Accordingly, the Court finds that under applicable non-bankruptcy law the Trademark License Agreement is not assignable. The Court further finds that federal trademark law prohibits assignment of trademark licenses under circumstances where it is clear that the identity of the licensee is crucial to the agreement. Thus, the requirement of Section 365(c)(1)(A) is satisfied.

As for Section 365(c)(1)(B), Trump AC clearly does not consent to the assumption or assignment of the Trademark License Agreement, as is evident from its filing of the Stay Motion. The Debtors argue again that Trump AC has provided the necessary consent under the terms of the Consent Agreement. First, as set forth above, under the terms of the Consent Agreement, consent is not effective unless and until the First Lien Lender

initiates an Enforcement Action, which it has not. Second, the Consent Agreement deals with consent to assignment in the context of a state law enforcement action and not with consent to assumption and assignment under Section 365, which is a technical process specific to bankruptcy. And finally, even if the consent set forth in the Consent Agreement was effective, it would merely operate to override the default rule with respect to the non-assignability of trademark licenses thus making the Trademark License Agreement assignable under applicable law and obviating the need to apply Section 365(c)(1) at all.

For these reasons, the Court finds that under the Section 365(c)(1) Hypothetical Test adopted by the Third Circuit, the Debtors are prohibited from assuming or assigning the Trademark License Agreement, despite the fact that the Debtors have no immediate plans to assign the agreement to a third party. Consequently, under the Third Circuit's *West Electronics* decision, Trump AC is entitled to relief from the automatic stay pursuant to Section 362(d)(1).

## D. Distinguishing Other Cases

Seeking a different result, the Debtors direct the Court's attention to a number of decisions which it argues support its position that the Trademark License Agreement is assumable notwithstanding Section 365(c)(1). The Court finds each of the decisions cited by the Debtors to be either unpersuasive or factually distinguishable.

First, the Debtors cite this Court's bench ruling in *Global Home Products*, issued August 14, 2006, in which the Court found that an exclusive trademark license which "did not restrict assignment to any particular entity" was assignable. The licensor sought a stay pending appeal of the Court's bench ruling, which the United States District Court for the District of Delaware denied, finding that "the Bankruptcy Court correctly concluded that the [trademark license] was not a personal services contract and was freely assignable as an exclusive license that *places no restriction on assignments*." *Regal Ware, Inc. v. Global Home Prods., LLC* (*In re Global Home Prods., LLC*), No. 06-508, 2006 WL 2381918, at *1 (D. Del. Aug 17, 2006) (emphasis added). At first blush, the *Global Home Products* decision appears to support the Debtors' position.

Upon further inspection of the trademark license agreement at issue in *Global Home Products*, though, the Court finds the decision to be distinguishable. The *Global Home Products* license agreement granted the licensee an unfettered right to sublicense its rights under the agreement to any third party. The *Global Home Products* license agreement further granted the licensee a broad right to assign its rights thereunder to any third party in connection with the transfer of substantially all of the licensee's assets "by merger, consolidation, sale of stock or assets or otherwise." In other words, the parties to the *Global Home Products* license agreement contracted around the default rule of non-assignability applicable to trademark license agreements. Thus, the Court had no occasion to apply Section 365(c)(1) in *Global Home Products* since under applicable law, *i.e.* the terms of the agreement itself, the license was assignable. It would perhaps have been more accurate for the Court and the District Court to say that the *Global Home Products*

license agreement "expressly allows assignments" as opposed to "places no restriction on assignments," but the breadth of the sublicensing and assignment clause was clearly important to both courts. The Trademark License Agreement does not contain a similar provision and therefore the Court does not find Section 365(c)(1) to be inapplicable here.

The Debtors next point to the *Rooster* decision. *See In re Rooster, Inc.*, 100 B.R. 228 (Bankr. E.D. Pa. 1989). The license agreement at issue in *Rooster* governed the use of the Bill Blass name and trademark in connection with the production of neckties. *Id.* at 229. Under the terms of the agreement, the licensee had limited authority to select patterns for the neckties as an initial matter, but each necktie was examined and approved by the licensor prior to production or distribution. *Id.* at 229-30. In practice, the licensee was subject to considerable supervision and control by the licensor; indeed, the licensor reviewed all proposed neckties and expressly approved only those which were acceptable to licensor. *Id.* at 230. The *Rooster* court did not examine whether the license was non-assignable as a matter of trademark law, but instead examined whether the license was non-assignable as a personal services contract under state law. *Id.* at 231-35. The *Rooster* court ultimately found that, due to the extreme level of oversight exercised by the licensor, the license agreement did not "bespeak of any personal ability, integrity, credit or responsibility" and was thus not a personal services contract nor subject to the limitation on assumption set forth in Section 365(c)(1).

First, *Rooster* was decided in 1989, while the rule that trademark licenses are not assignable absent the consent of the licensor appears to have gained traction in the case law in the mid-1990's. *See Miller*, 454 F.3d at 988 (citing cases). Second, the licensee in *Rooster* was subject to a level of oversight by the licensor which is not present here. And finally, the Court is simply not persuaded that the *Rooster* court conducted the proper analysis. The term "applicable law" as used in Section 365(c)(1) clearly encompasses federal trademark law. *See XMH*, 647 F.3d at 695. The Court finds the general prohibition against assignment in trademark law to be well reasoned and within the scope of applicable law as contemplated by Section 365(c)(1).

The remaining cases cited by the Debtors in support of their position deal with either patent or copyright license agreements and are thus distinguishable. *See Catapult*, 165 F.3d at 750-51 (non-exclusive patent license); *Golden Books*, 269 B.R. at 316-19 (exclusive copyright license). Non-exclusive patent and copyright licenses create only personal and not property rights in the licensed intellectual property and so are not assignable. *See Golden Books*, 269 B.R. at 314-16; 4 *McCarthy on Trademarks* § 25:33 (4th ed. 2010) ("The rule as to nonexclusive licenses of patents and copyrights is the same: the license is a personal right and cannot be transferred by the licensee to another without the permission of the licensor."). However, at least one court in this district has found an exclusive copyright license to be assignable. *Golden Books*, 269 B.R. at 318-19. The Debtors urge the Court to apply such a rule to trademark licenses, distinguishing between exclusive and non-exclusive, and ask the Court to find that the Trademark License Agreement is assignable as an exclusive trademark license.

The distinction between exclusive and non-exclusive licenses is simply not relevant in the trademark context. The general prohibition against the assignment of trademark licenses absent the licensor's consent is equally applicable to both exclusive and non-exclusive trademark licenses. A trademark licensor would have the same concerns with respect to the identity of the licensee and the quality of products bearing its trademark whether the trademark license is exclusive or non-exclusive. Thus, a rule distinguishing between exclusive and non-exclusive licenses for purposes of assignability makes little sense in the trademark context. Further, trademarks, copyrights, and patents are governed by different sets of laws and influenced by different policy concerns. "[W]hile the basic policies underlying copyright and patent protection are to encourage creative authorship and invention, the purposes of trademark protection are to protect the public's expectation regarding the source and quality of goods." *Miller*, 454 F.3d at 938. The *Catapult* and *Golden Books* decisions, while persuasive so far as they apply, simply address different circumstances than are before the Court here.

## CONCLUSION

For the reasons set forth above, the Court finds that the Trademark License Agreement is not assignable under applicable non-bankruptcy law and is thus not assumable or assignable under Section 365(c)(1). Accordingly, under the Third Circuit's *West Electronics* decision, Trump AC is entitled to relief from the automatic stay pursuant to Section 362(d)(1) in order to proceed with the State Court Action. The Court will enter a separate order.[8]


Dated: February 20, 2015

KEVIN GROSS, U.S.B.J.

---

[8] With respect to the assumption of the Trademark License Agreement, the Plan provides as follows: "if the Court determines that the Trademark License Agreement cannot be assumed by the Debtors or Reorganized Debtors without the consent of [Trump AC], then the automatic stay is hereby modified to permit the [First Lien Lender] to, and on the Effective Date the [First Lien Lender] shall and shall be deemed to, enforce its rights under the [Pre-Petition Credit Agreement] and designate the Reorganized Debtors as transferees of each of the Casino Properties (as defined in the Trademark License Agreement) as Licensee Entities (as defined in the Trademark License Agreement) under the Trademark License Agreement" (the "Assumption Provision"). Plan § 10.5. In essence, the Assumption Provision provides that if the Court determines that under the facts currently before it the Trademark License Agreement is not assumable, the Debtors will simply change the facts to make it assumable. While not addressed in the Stay Motion or at the Stay Motion Hearing, the Court is aware of the Assumption Provision and will address any issues related thereto at the Plan confirmation hearing.