## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TRUMP ENTERTAINMENT | ) | Case No. 14-12103 (KG) |
| RESORTS, INC., *et al.*, | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | **Re: Dkt. No. 251** |

### <u>OPINION</u>

The Court is ruling on the motion of Trump Entertainment Resorts, Inc. and certain of its affiliates (collectively, the "Debtors") seeking entry of an order against UNITE HERE Local 54 (the "Union") "enforcing" the automatic stay of Section 362 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, and certain other related relief (the "Stay Motion"). For the reasons set forth below, the Court will deny the Stay Motion.

### JURISDICTION

The Court has jurisdiction over this matter and the judicial authority to issue a final order pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### BACKGROUND

The limited facts relevant to the Stay Motion are undisputed.[1] The Debtors own and operate the Trump Taj Mahal Hotel Casino (the "Taj Mahal") in Atlantic City, New

---

[1] The Court takes the vast majority of the facts set forth below from the Joint Stipulation of Facts submitted by the parties in connection with this matter [D.I. 1238], as well as the Section 1113 Opinion (defined below), *In re Trump Entertainment Resorts, Inc.*, 519 B.R. 76 (Bankr. D. Del. 2014), of which the Court takes judicial notice.

Jersey, at which certain members of the Union are employed.[2] On September 9, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. At all times relevant herein, the Union had actual notice of the Debtors' bankruptcy petition. On September 14, 2014, just five days after the Petition Date, the collective bargaining agreement in effect between the Debtors[3] and the Union (the "CBA") expired by its own terms. Even though the CBA expired, under the National Labor Relations Act (the "NLRA") the Debtors were required to maintain the *status quo* (generally defined by the terms of the CBA) pending the negotiation of a new collective bargaining agreement (or in this case, rejection of the CBA). *See In re Trump Entertainment Resorts, Inc.*, 519 B.R. 76, 83 (Bankr. D. Del. 2014).

On September 17, 2014, the Debtors made a proposal to the Union regarding certain changes to the CBA, which included significant proposed concessions by the Union regarding the Debtors' pension contribution and healthcare obligations (the "Proposal"). The Union rejected the Proposal.

Beginning on or about September 26, 2014, the Union began contacting potential customers of the Debtors to discuss its ongoing dispute with the Debtors and encouraging the customers to boycott the Taj Mahal. The Union organized a phone bank for the purpose of making such communications with potential Taj Mahal customers. The Union also e-mailed or sent letters directly to organizations which had

---

[2] The Debtors also own and operated the Trump Plaza Hotel and Casino, which was shuttered post-petition.

[3] Specifically, the contracting parties under the CBA were the Union and debtor Trump Taj Mahal Associates, LLC. For simplicity's sake, the Court refers broadly to the Debtors.

contracted to hold conventions at the Taj Mahal, informing them of the Union's dispute with the Debtors, the Union's dissatisfaction with the terms of the Proposal, and encouraging the organizations to cancel their contracts and hold their conventions elsewhere. The Union sent similar communications to prospective individual convention attendees, encouraging them to demand that their organizations relocate conventions scheduled to be held at the Taj Mahal. At least one organization cancelled its contract with the Debtors to hold a convention or similar event at the Taj Mahal on account of the Union's communications.

On September 26, 2014, around the time the Union initiated the above-described communications with potential Taj Mahal customers, the Debtors filed a motion to reject the CBA pursuant to Section 1113 of the Bankruptcy Code (the "Section 1113 Motion") [D.I. 134], which the Union opposed. On October 2 and 14, 2014, the Court held an evidentiary hearing regarding the Section 1113 Motion. On October 17, 2014, the Court entered an order granting the Section 1113 Motion (the "Section 1113 Order") for the reasons set forth in an opinion dated October 20, 2014 (the "Section 1113 Opinion"). In the Section 1113 Opinion, the Court first found that it had jurisdiction to enter an order rejecting the CBA in spite of its expiration due to the Debtors' ongoing *status quo* obligations under the NLRA. *See Trump*, 519 B.R. at 83-88. The Court then found that the Debtors satisfied the requirements of Section 1113 and authorized the rejection of the CBA and the Debtors' unilateral implementation of the terms of the Proposal. *See id.* at 88-92. The Union eventually filed a proof of claim, dated November 24, 2014, in the

approximate amount of $10 million, which is comprised predominately of damages arising out of the rejection of the CBA. Exhibit 4.

The Court made the following factual findings in the Section 1113 Opinion which are relevant to the Stay Motion:

> [W]hile Debtors were imploring the Union to engage with them in discussions, offering to meet "24/7" . . . , the Union was engaging in picketing, a program of misinformation . . . *and, most egregiously, communicating with customers who had scheduled conferences at the [Taj Mahal] to urge them to take their business elsewhere* . . . . It is thus clear that the Union was not focusing its efforts on negotiating to reach agreement with Debtors. . . .

> [T]he Union refused to negotiate, delayed negotiations or did not negotiate earnestly, and presented only a partial counterproposal at the last minute. The Union was in essence intransigent in its position. Instead, the Union took a "fight rather than switch" stance even in the face of Debtors' submission of information that they were facing liquidation and would close the Casino unless negotiations led to a new collective bargaining agreement. . . .

> [T]he Debtors "stood on their head" to negotiate and were rebuffed time and time again. The Union presented no evidence that the Debtors did not confer in good faith. . . .

*Id.* at 82, 90-91 (emphasis added). The Court further commented that, while the Debtors were allowed to unilaterally implement the terms of the Proposal, they remained subject to their labor law obligations to bargain in good faith with the Union in hopes of coming to a new collective bargaining agreement. *Id.* at 91-92. The Section 1113 Order was immediately effective upon its entry; the Court denied the Union's oral motion for a stay pending appeal. The Union timely appealed the Section 1113 Order and Opinion, which appeal is currently pending before the United States Court of Appeals for the

4

Third Circuit. After the Court's entry of the Section 1113 Order, and through the date of the hearing on the Stay Motion, the Union continued to communicate with potential Taj Mahal customers and urge a boycott.

On October 8, 2014, after the Union began communicating with potential Taj Mahal customers but before the Court entered the Section 1113 Order and Opinion, the Debtors filed the Stay Motion. In the Stay Motion, the Debtors argue that the Union's communications with potential Taj Mahal customers violate the automatic stay contained in Section 362 of the Bankruptcy Code, in particular Section 362(a)(3).[4] The Debtors requested the entry of an order: (1) finding that the Union's conduct violates Section 362(a)(3); (2) requiring the Union to send a letter to the potential Taj Mahal customers it contacted informing them that its communications were misleading and in violation of the automatic stay; (3) requiring that the Union provide the Debtors with a list of all potential Taj Mahal customers contacted; and (4) awarding attorneys' fees and expenses pursuant to Section 362(k) for a willful violation of the automatic stay.

On October 22, 2014, the Union filed its objection to the Stay Motion, arguing that its communications with potential Taj Mahal customers do not violate the automatic stay or are otherwise protected by federal labor law, specifically the Norris-LaGuardia Act (the "NLA"), 29 U.S.C. § 101 *et seq.*, and the First Amendment, U.S. CONST. amend. I.

---

[4] The Debtors also made certain allegations regarding the Union's improper use of the Debtors' customer lists in the Stay Motion, but abandoned those claims as of the hearing on the Stay Motion. Stay Motion Hr'g Tr. 33, 41, Apr. 22, 2015.

The Debtors and the Union thereafter continued the Stay Motion for several months. In the intervening time, the Debtors achieved confirmation of a chapter 11 plan of reorganization (the "Plan"). The Order confirming the Plan [D.I. 1123] is dated March 12, 2015. Confirmation of the Plan was largely consensual; the Debtors reached settlements with every major creditor constituency. The Union did not press any objection to confirmation of the Plan and did not meaningfully participate in the confirmation hearing. The Plan has yet to go effective pending, among other requirements, a favorable (to the Debtors) resolution of the Union's appeal of the Section 1113 Order and Opinion.

On April 17, 2015, the Debtors filed a reply to the Union's Stay Motion objection generally rebutting the Union's arguments and arguing, without formally amending the Stay Motion, that the Union's conduct violates Section 362(a)(6) in addition to Section 362(a)(3). On April 22, 2015, the Court held a hearing (the "Hearing") on the Stay Motion, entertaining argument and accepting into evidence the parties' joint stipulation as to the key facts underlying the Stay Motion as well as several documentary exhibits.

At the Hearing, the Debtors abandoned their requests for most of the relief initially sought in the Stay Motion, asking the Court only for what amounts to a declaratory judgment that the Union's contact with potential Taj Mahal customers violates the automatic stay. Stay Motion Hr'g Tr. 42, 64, Apr. 24, 2015. According to the Debtors, they would seek to fashion a remedy at a later stage, perhaps after more discovery. Hr'g Tr. 93-94, 102-103. After the Hearing, the Court took the matter under advisement.

## ANALYSIS

### A.    The Norris-LaGuardia Act

The most logical place to begin the Court's analysis of the Stay Motion is with the NLA. Section 1 of the NLA provides that "[n]o court of the United States . . . shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter." 29 U.S.C. § 101. Section 4 of the NLA then defines specific acts which shall not be subject to a federal-court-issued injunction, including:

> **(e)** Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence; . . .
>
> **(g)** Advising or notifying any person of an intention to do any of the acts heretofore specified; . . . .

29 U.S.C. § 104. Section 13(c) of the NLA defines "labor dispute" to include "any controversy concerning terms or conditions of employment." 29 U.S.C. § 113(c). Finally, section 7 of the NLA provides a limited exception, allowing federal courts to enjoin labor activities when "unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained" and certain other conditions are satisfied. 29 U.S.C. § 107.

In its seminal *Burlington Northern* decision, the Supreme Court of the United States outlined the purpose and significance of the NLA. The Supreme Court began its analysis by noting that "[t]he Norris-LaGuardia Act . . . expresses a basic policy against the injunction of activities of labor unions." *Burlington N. R.R. Co. v. Bhd. of Maint. of*

7

*Way Emps.*, 481 U.S. 429, 437 (1987). The Supreme Court further observed that Congress

took the "extraordinary step of divesting federal courts of equitable jurisdiction" due to

its belief that federal courts were improperly intruding into labor disputes and favoring

management in the process. *Id.* at 438-39. The NLA's purpose is captured in

Representative LaGuardia's oft-quoted comments during House debate:

> Gentlemen, there is one reason why this legislation is before
> Congress, and that one reason is disobedience of the law on
> the part of whom? On the part of organized labor? No.
> Disobedience of the law on the part of a few Federal judges.
> If the courts had been satisfied to construe the law as
> enacted by Congress, there would not be any need of
> legislation of this kind. If the courts had administered even
> justice to both employers and employees, there would be no
> need of considering a bill of this kind now. If the courts had
> not emasculated and purposely misconstrued the Clayton
> Act, we would not today be discussing an anti-injunction
> bill.

*Id.* (quoting 75 CONG. REC. 5478 (1932)).[5] *See also* Michael C. Duff, *Labor Injunctions in*

*Bankruptcy: the Norris-LaGuardia Firewall*, 2009 MICH. ST. L. REV. 669, 681 (2009) ("the

---

[5] While not as pointed as Representative LaGuardia's comments, the NLA itself contains a public policy provision, which states:

> Whereas under prevailing economic conditions, developed with the aid
> of governmental authority for owners of property to organize in the
> corporate and other forms of ownership association, the individual
> unorganized worker is commonly helpless to exercise actual liberty of
> contract and to protect his freedom of labor, and thereby to obtain
> acceptable terms and conditions of employment, wherefore, though he
> should be free to decline to associate with his fellows, it is necessary that
> he have full freedom of association, self-organization, and designation of
> representatives of his own choosing, to negotiate the terms and
> conditions of his employment, and that he shall be free from the
> interference, restraint, or coercion of employers of labor, or their agents,
> in the designation of such representatives or in self-organization or in
> other concerted activities for the purpose of collective bargaining or
> other mutual aid or protection; therefore, the following definitions of

legislative history of the [NLA] evinces a widespread, generalized congressional hostility to the federal judiciary that must not be forgotten when considering questions of legislative intent surrounding the [NLA].")

At base, the NLA "was designed primarily to protect working men in the exercise of organized, economic power, which is vital to collective bargaining." *Bhd. of R.R. Trainmen v. Chicago River & Indiana R.R. Co.*, 353 U.S. 30, 40 (1957). By enacting the NLA, "Congress acted to prevent the injunctions of the federal courts from upsetting the natural interplay of the competing economic forces of labor and capital." *Id.* In furtherance of this protective purpose, the provisions of the NLA are to be construed broadly. *See Burlington N.*, 481 U.S. at 441. "The [NLA's] language is broad because Congress was intent upon taking the federal courts out of the labor injunction business except in the very limited circumstances . . . ." *Marine Cooks & Stewards v. Panama S.S. Co.*, 362 U.S. 365, 369 (1960).

With these principles in mind, it is clear to the Court that the dispute between the Union and the Debtors, which centers mainly on the reduction of pension and healthcare benefits, qualifies as a "labor dispute" under the terms of the NLA. Similarly, the Court has no difficulty in finding that the Union's communications with potential Taj Mahal customers are protected under section 4 of the NLA as "[g]iving publicity to the existence of, or the facts involved in, any labor dispute." The Debtors did not

---

and limitations upon the jurisdiction and authority of the courts of the United States are enacted.

29 U.S.C. § 102.

genuinely dispute that the Union's activities fall squarely within the protection of the NLA. Accordingly, absent the Debtors' bankruptcy filing, no federal court would have jurisdiction to enter an order enjoining the Union's activities.

But, since the Debtors have filed for bankruptcy protection, the Union's protections under the NLA arguably run headlong into the Bankruptcy Code's automatic stay, 11 U.S.C. § 362. "The scope of the automatic stay is undeniably broad." *Cuffee v. Atlantic Bus. & Cmty. Dev. Corp. (In re Atlantic Bus. & Cmty. Dev. Corp.)*, 901 F.2d 325, 327 (3d Cir. 1990).

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. . . . The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally.

*Id.* (quoting H.R. Rep. No. 95-595, at 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6296-97). As is relevant here, the automatic stay protects against "any act to obtain possession . . . or to exercise control over property of the estate," 11 U.S.C. § 362(a)(3), as well as "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case . . . ," 11 U.S.C. § 362(a)(6).

The Debtors argue that by communicating with potential Taj Mahal customers and urging a boycott, resulting in the loss of at least one event under contract, the Union violated and continues to violate Sections 362(a)(3) and (a)(6). The Debtors

further argue that a finding that the Union's activities violate the stay does not conflict with the NLA as the NLA speaks only to court-issued injunctions. The automatic stay, on the other hand, is a statutory injunction which arises automatically upon the filing of a bankruptcy petition, without the need of a court order. In other words, the automatic stay is a congressionally mandated injunction and since the NLA is primarily concerned with keeping "courts out of the labor injunction business," *Marine Cooks*, 362 U.S. at 369, there is no conflict.

The Debtors cite a line of Circuit-level authority, including a decision from the Third Circuit, which tends to support their distinction between court-issued and statutory injunctions. *See Sunshine Dev. Inc. v. FDIC*, 33 F.3d 106, 113-14 (1st Cir. 1994); *FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 137 (2d Cir. 1992); *Gross v. Bell Savings Bank*, 974 F.2d 403, 407 (3d Cir. 1992). Each of these decisions dealt with the interplay between the anti-injunction provision contained in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") and the Bankruptcy Code's automatic stay. FIRREA was enacted in response to the savings and loan crisis of the late 1980s. *See, e.g., Sunshine*, 33 F.3d at 111. FIRREA, as is relevant here, "gives the FDIC unprecedented powers so that it may function efficaciously as a receiver or conservator of insolvent financial institutions." *Id.* FIRREA also contains an anti-injunction provision prohibiting any court from interfering with the FDIC's duties as a conservator or receiver. *Id.* at 111-12. *See also* 12 U.S.C. § 1821(j). The *Sunshine, Colonial Realty*, and *Gross* courts all concluded that since the automatic stay is a statutory rather than court-ordered injunction, it applies to the FDIC in spite of the FIRREA anti-

injunction provision. *See, e.g., Sunshine*, 33 F.3d at 113-14 ("the perceived conflict is more apparent than real. . . . We see no basis for exempting the FDIC from the strictures" of the automatic stay because "it operates without the necessity for judicial intervention").[6]

Conversely, the Union argues that the automatic stay may not operate to enjoin their NLA-protected activities. While case law addressing the intersection between the automatic stay and the NLA is relatively sparse, two Circuit Courts have addressed the issue directly and their decisions support the Union's position. *Crowe & Assocs., Inc. v. Bricklayers & Masons Union Local No. 2 (In re Crowe & Assocs., Inc.)*, 713 F.2d 211, 214 (6th Cir. 1983); *Petrusch v. Teamsters Local 317 (In re Petrusch)*, 667 F.2d 297, 299-300 (2d Cir. 1981). Neither the *Crowe* nor the *Petrusch* court conducted a thorough analysis before reaching the conclusion that the automatic stay may not operate to enjoin union activities protected by the NLA. Each court simply recognized the import of the NLA, as well as the damage enforcing the automatic stay could do to NLA-protected rights, before finding that Congress could not have meant for the automatic stay to supersede the NLA without so much as a word regarding such intention. *See Crowe*, 713 F.2d at 214-15; *Petrusch*, 667 F.2d at 299-300.[7]

---

[6] Courts have recognized that the automatic stay is a statutory prescription as opposed to a court order in other contexts as well. *See, e.g., Delaware Trust Co. v. Energy Future Intermediate Holding Co. (In re Energy Future Intermediate Holding Co.)*, 527 B.R. 178, 197 (Bankr. D. Del. 2015) ("The automatic stay is not a 'judgment of a court of competent jurisdiction.' It is prescribed by statute, not by any court, and applies in every bankruptcy case automatically without any court order.") (citing *In re James*, 257 B.R. 673, 678 (B.A.P. 8th Cir. 2001) ("the stay is a statutory provision and not a court order")).

[7] The *Crowe* and *Petrusch* courts each addressed situations in which the bankruptcy court below had issued an injunction to enforce a provision of the automatic stay. At least one court has distinguished the holdings on that basis. *See In re Tom Powell & Son, Inc.*, 22 B.R. 657, 660 (Bankr. W.D. Mo. 1982). The

Two other Circuit Courts, including the Third Circuit, have cited *Crowe* and

*Petrusch* approvingly in dicta. *Elsinore Shore Assocs. v. Local 54, Hotel Emps. & Restaurant*

*Emps. Int'l Union*, 820 F.2d 62, 67 n.5 (3d Cir. 1987)[8]; *Briggs Transp. Co. v. Int'l Bhd. of*

*Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 739 F.2d 341, 343-44 (8th Cir.

1984). The rationale for all four Courts' decisions, taken as a whole, has been described

as "somewhat reflexive and sparse in policy justification." Duff, *supra*, at 701. The Court

agrees.[9]

It is true that "[t]he Bankruptcy Reform Act's legislative history does not mention

the Norris-LaGuardia Act." *Crowe*, 713 F.2d at 215. In fact, it is entirely possible that "it

never occurred to Congress that a conflict could arise between [the automatic stay] and

the Norris-LaGuardia Act." *Id.* If the automatic stay and the NLA do truly conflict, it

---

Court finds this to be a distinction without a difference as any bankruptcy-court-issued injunction meant
to enforce the automatic stay is superfluous since the stay is self-executing. In any event, the Court reads
both *Crowe* and *Petrusch* more broadly as holding that the automatic stay itself does not operate to
override the NLA.

[8] In *Elsinore Shore*, the Third Circuit found that certain specific appellate procedures set forth in
the NLA override the general appellate procedures set forth in the Bankruptcy Code. *Elsinore Shore*, 820
F.2d at 66. In a footnote, the Court observed that "[t]his accommodation of the bankruptcy and labor
statutes is consistent with holdings that the anti-injunction provisions of the Norris-LaGuardia Act were
not superceded by the subsequently enacted bankruptcy laws." *Id.* at 67 n.5 (citing *Petrusch, Crowe*, and
*Briggs*).

[9] While the decision was not cited by the Debtors in support of their position, it is worth noting
that at least one bankruptcy court took a different approach than the *Crowe* and *Petrusch* courts,
seemingly reserving some power for the bankruptcy court to enjoin labor activities. *See Tom Powell*, 22
B.R. at 660 ("Section 362(b) of the Code provides for exceptions to the automatic stay in situations where
Congress balanced the policy underlying the stay against the continuation of certain kinds of procedures,
such as a criminal prosecution. Few of those exceptions permit an action for the recovery of a pre-petition
debt. None mention Norris-LaGuardia. It may well be that Congress simply did not consider the
relationship between the two statutes. . . . Where the activity is intended to collect a [pre-petition debt] as
opposed to an effort to vindicate statutory [labor law] rights, outright abdication of jurisdiction seems
inappropriate. There should be a balancing of the policy considerations underlying the prohibitions
against self-help and preferences contained in the Code against the anti-injunction provisions of the
Norris-LaGuardia Act."). *See also supra* note 7.

seems odd that Congress would have done such violence to unionized employees' post-petition collective bargaining rights *sub silentio*. *See Petrusch*, 667 F.2d at 300 ("we cannot believe the Norris-La Guardia Act was to superseded [sic], sub silentio"). Further, while the words of the NLA speak only to court-issued injunctions, the application of the automatic stay is in substance no different than that of a court-issued injunction. While the stay arises automatically, parties bound by the stay must seek stay relief from the Court and may be sanctioned by the Court for violation of the stay. 11 U.S.C. § 362(d), (k). *See also* Duff, *supra*, at 696. Interpreting the automatic stay to broadly apply to NLA-protected activities could cause the Court to wade frequently into the murky waters of labor relations, the exact result Congress wished to avoid by enacting the NLA.

The Court is also mindful that "repeals by implication are not favored." *Morton v. Mancari*, 417 U.S. 535, 549 (1974). "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Id.* at 551. "When there are two acts upon the same subject, the rule is to give effect to both if possible . . . . The intention of the legislature to repeal 'must be clear and manifest.'" *Id.* (quoting *United States v. Borden Co.*, 308 U.S. 188, 198 (1939)).

The Court recognizes the strong policy against court interference with labor relations underlying the NLA. The Court also recognizes the strong policy concerns underlying the automatic stay. While a technical reading of the words of the automatic stay and NLA statutes may not give rise to direct conflict, in substance, if the statutes

14

are read to cover the same conduct, application of the automatic stay will essentially work to repeal the NLA in the bankruptcy context. It is incumbent upon the Court to adopt an interpretation that would, if possible, avoid such a result while giving effect to both statutes. While the Court finds that a somewhat more searching analysis is required than that conducted by the *Crowe* and *Petrusch* courts, it ultimately reaches a similar conclusion which preserves the Union's right to proceed with peaceful labor activity unimpeded by federal courts.

**B.**     <u>11 U.S.C. § 362(a)(3)</u>

Section 362(a)(3) operates as a stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." "Section 362(a)(3) is generally viewed as a provision designed to prevent the 'dismemberment' of the bankruptcy estate until the bankruptcy process permits either a financial reorganization of the debtor or an orderly liquidation of the assets of the bankruptcy estate." *Allentown Ambassadors, Inc. v. Ne. Am. Baseball, LLC (In re Allentown Ambassadors, Inc.)*, 361 B.R. 422, 435-36 (Bankr. E.D. Pa. 2007). "By its plain text, the scope of § 362(a)(3) is dependent on the meaning of the terms 'property of the estate,' 'obtain possession' and 'exercise control.'" *Id.* at 436.

As for "property of the estate," the Bankruptcy Code itself provides a definition. With certain limited exceptions, property of the estate encompasses "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The House and Senate Reports on the Bankruptcy Code indicate that § 541(a)(1)'s scope is broad." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 (1983).

Courts have construed property of the estate to include both tangible and intangible property, including rights arising out of ordinary contractual relationships, and have even gone so far as to find that the expectation of continuity of business relationships qualifies as property of the estate. *See, e.g., ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260 (3d Cir. 2006); *Robinson v. Watts Detective Agency*, 685 F.2d 729, 734 (1st Cir. 1982); *Allentown Ambassadors*, 361 B.R. at 436 n.30. With these principles in mind, the Court has no difficulty concluding that the contractual relationships between the Debtors and potential Taj Mahal customers qualify as property of the Debtors' bankruptcy estate.

Whether the Union's activities qualify as acts to "obtain possession" or "exercise control" over those contractual relationships, as the Debtors argue, is a much closer question. The Debtors direct the Court's attention to the recent *Allentown Ambassadors* decision out of the United States Bankruptcy Court for the Eastern District of Pennsylvania for guidance as to the proper scope of the terms "obtain possession" and "exercise control." In *Allentown Ambassadors*, the court tackled the question of when a party acts to obtain possession or exercise control over intangible property of the estate, the exact issue before the Court. The court surveyed the reported case law on the subject and ultimately concluded that in analyzing whether a party is acting to obtain possession or exercise control over estate property, courts must consider "(1) the nexus between the conduct at issue and the property interests of the bankruptcy estate, (2) the degree of impact on the bankruptcy estate and (3) the competing legal interests of the non-debtor parties." *Allentown Ambassadors*, 361 B.R. at 440 (footnote omitted).

The analysis which led the *Allentown Ambassadors* court to adopt the foregoing

three-factor test is particularly instructive here:

> I perceive and can identify a policy issue underlying these
> decisions that merits consideration. In the cases restricting §
> 362(a)(3), the courts acknowledge the Code's goal of
> protecting the property interests of the bankruptcy estate.
> When the courts limit the scope of § 362(a), *they do so to avoid
> giving the bankruptcy estate an undue legal advantage in its
> relationship with other parties.* Though perhaps not explicitly,
> the courts are engaging in a process of balancing competing
> interests — the interests of the bankruptcy system in
> protecting the value of the bankruptcy estate against the
> interests of other parties who seek to engage in ordinary-
> course commercial conduct which may engender negative
> consequences for the bankruptcy estate after a bankruptcy
> case has commenced. To the extent that a determination of
> the scope of § 362(a)(3) requires the balancing of competing
> interests, as I read the cases to suggest, the determination
> becomes, essentially, a public policy decision. The court
> must weigh bankruptcy policy, which seeks to protect estate
> assets in order to promote the rehabilitation of distressed
> businesses or the orderly and effective liquidation of failed
> enterprises, against other competing societal interests. *Put
> another way, there may be a narrow sphere in which the nexus
> between the non-debtor conduct and the adversely affected
> property interests of the estate is so attenuated in comparison to
> the competing legal interests of the non-debtor, that it would be
> inappropriate to apply § 362(a)(3) to the non-debtor's conduct.*

*Id.* at 439-40 (emphasis added) (footnote omitted). While the court's three-factor test has

not yet been adopted by any court in this jurisdiction, its treatment of Section 362(a)(3)

is thoughtful and comprehensive and the Court agrees with the Debtors that the

*Allentown Ambassadors* decision provides the proper framework for analyzing the

Union's actions here.

In light of the apparent conflict between the automatic stay and the NLA, the Court's application of the *Allentown Ambassadors* standard will not be a "pure" application in the sense that the Court will endeavor to adopt an interpretation of Section 362(a)(3) within the *Allentown Ambassadors* framework which avoids any conflict with the NLA. *See Morton*, 417 U.S. at 549. Ultimately this is not a difficult task. Even assuming *arguendo* that the first two *Allentown Ambassadors* factors, nexus and degree of impact, weigh in favor of applying the stay to the Union's actions, the Court finds that the third factor, competing legal interests, weighs so much against application of the stay as to render Section 362(a)(3) inapplicable to the Union's actions.

The Debtors do not contend that they would be entitled to injunctive relief based on the Union's boycott-seeking activities outside of bankruptcy. Indeed, based on the Court's reading of the relevant statutes and cases, it does not appear that the Debtors would in fact be entitled to such relief outside of bankruptcy. The Court's foregoing discussion of the NLA makes it abundantly clear that the Union has a strong interest in proceeding with such activities unimpeded by the federal courts. While the automatic stay is not a court-issued injunction *per se*, application of the stay here would result in significant court interference with the Union's activities. While the Debtors profess to seek only limited relief, *i.e.* cessation of the Union's contact with potential Taj Mahal customers, Hr'g Tr. 98, a finding that the Union's current activities violate the stay could have a much broader effect. Would not such a finding apply to other NLA-protected activities such as peaceful picketing or handbilling? These are "economic

weapons" meant to affect the Debtors adversely and exert pressure on them as the

parties negotiate toward a new collective bargaining agreement.

In *NLRB v. Insurance Agents' International Union*, the Supreme Court expounded

on the importance and protected status of such economic weapons:

> *The presence of economic weapons in reserve, and their actual
> exercise on occasion by the parties, is part and parcel of the system
> that the Wagner and Taft-Hartley Acts have recognized.* Abstract
> logical analysis might find inconsistency between the
> command of the statute to negotiate toward an agreement in
> good faith and the legitimacy of the use of economic
> weapons, frequently having the most serious effect upon
> individual workers and productive enterprises, to induce
> one party to come to the terms desired by the other. But the
> truth of the matter is that at the present statutory stage of
> our national labor relations policy, the two factors—
> necessity for good-faith bargaining between parties, and the
> availability of economic pressure devices to each to make the
> other party incline to agree on one's terms—exist side by
> side. One writer recognizes this by describing economic
> force as 'a prime motive power for agreements in free
> collective bargaining.' Doubtless one factor influences the
> other; there may be less need to apply economic pressure if
> the areas of controversy have been defined through
> discussion; and at the same time, negotiation positions are
> apt to be weak or strong in accordance with the degree of
> economic power the parties possess.

361 U.S. 477, 489 (1960) (emphasis added). *See also Truck Drivers Local Union No. 807 v.*

*Bohack Corp.*, 541 F.2d 312, 318 (2d Cir. 1976) ("The argument is made that to allow

picketing in the case of this financially troubled debtor is to put it out of business. That

is, unfortunately, sometimes the sad outcome when a union and an employer cannot

come to terms. But the policy of our labor laws is simply to provide rules for the

handling of labor disputes, not to prohibit the use of economic power in the resolution of such disputes.")

Application of the automatic stay to the Union's activities here would have a substantial negative impact on the Union's bargaining position with respect to a new collective bargaining agreement—with no corresponding obligation on the part of the Debtors to abstain from the use of the economic weapons available to them. This is the exact sort of "undue legal advantage" the court cautioned against in the *Allentown Ambassadors* decision. 361 B.R. at 440.

What, then, are the Debtor's competing legal interests? The automatic stay is meant to protect a debtor from harassment and preserve the estate for the benefit of all creditors as the debtor works in an orderly fashion toward a plan of reorganization or liquidation. Here, although the Plan has not gone effective, the Debtors have achieved plan confirmation and reached settlements with every major creditor constituency, greatly reducing the import of those interests. In reality, the Debtors are attempting to use the automatic stay to shift bargaining power with respect to a new collective bargaining agreement in their favor. The Debtors would not have that ability outside of bankruptcy and the Court sees no reason under these facts why they should be granted that ability in bankruptcy.

Accordingly, the Court finds that, based on the Union's superior competing legal interest, as embodied by the NLA and its underlying policy against court interference with labor relations, the Union has not acted to obtain possession or exercise control

over property of the Debtors' bankruptcy estate. Thus, Section 362(a)(3) is inapplicable to the Union's conduct.

### C.    11 U.S.C. § 362(a)(6)

Section 362(a)(6) acts as a stay on "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under" the Bankruptcy Code. The Debtors' argument that the Union's activities violate Section 362(a)(6) has a certain appeal, but does not hold up to close scrutiny when analyzed under the facts of the case.

The Debtors' argument is based on its assertion that the Union's actions are an attempt to force the Debtor to comply with its pre-petition obligations under the now-rejected CBA or otherwise collect on its CBA rejection damages claim. *See* 11 U.S.C. § 365(g), 502(g) (contract rejection damages claim constitutes a pre-petition claim). However, the Court had not yet approved rejection of the CBA when the Debtors filed the Stay Motion—which explains the absence of any mention of Section 362(a)(6) in the Stay Motion itself—and rejection of the CBA does not appear to have altered the Union's behavior. More to the point, since the CBA expired on September 14, 2014, the Union would have been attempting to negotiate a new collective bargaining agreement, which would likely have included exercising its economic weapons, during the time period at issue herein even absent the Debtors' bankruptcy filing.

It seems to the Court that the Union's actions are forward looking, toward a new collective bargaining agreement, as opposed to backward looking, toward the CBA and attendant rejection damages. If the Union's activities were purely collection focused,

surely it would have raised some objection to confirmation of the Plan or the settlement reached between the Debtors and the unsecured creditors committee. It did not. Nothing in Section 362(a)(6) prevents the Union from negotiating a new collective bargaining agreement with the Debtors as it would in the regular course, outside of bankruptcy.

Even if Section 362(a)(6) could plausibly be read to apply to forward-looking labor activities, when presented with two plausible interpretations, the Court is duty-bound in this instance to select the interpretation which would give effect to both the automatic stay and the NLA, as opposed to only the stay. *Morton*, 417 U.S. at 549. Cases cited by the Debtors in support of their Section 362(a)(6) argument do not involve the same sort of competing statutory and policy interests. *See, e.g., Sechuan City, Inc. v. North American Motor Inns, Inc.* (*In re Sechuan City, Inc.*), 96 B.R. 37 (Bankr. E.D. Pa. 1989) (dispute between lessor and lessee). Accordingly, the Court finds that Section 362(a)(6) is inapplicable to the Union's forward-looking labor activities.

### D.    First Amendment

Because the Court has determined that the automatic stay does not apply to the Union's conduct, it declines to address the thorny issues surrounding the Union's claim that application of the stay would result in a violation of the First Amendment.

## CONCLUSION

In the foregoing analysis, the Court attempted to walk an interpretive tightrope to arrive at a construction of the automatic stay which would give effect to both the stay and the NLA. No doubt the Debtors would argue that the Court's construction gives

more effect to the NLA than the stay. The Court's only response is that based on its review of the competing statutes and relevant case law, that is what Congress intended. Congress is where the Debtors may lodge their complaint. The Court will enter a separate order.

Dated: July 21, 2015

KEVIN GROSS, U.S.B.J.