**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-4807
_____

IN RE: TRUMP ENTERTAINMENT RESORTS

UNITE HERE Local 54,

                    Appellant

_____

On Appeal from the United States Bankruptcy Court
for the District of Delaware
(D. Del. Bankruptcy No. 14-12103)
Bankruptcy Judge:  Honorable Kevin Gross
_____

Argued on March 4, 2015

Before:  SHWARTZ, SCIRICA and ROTH, Circuit Judges

(Opinion filed:  January 15, 2016)

Kathy L. Krieger, Esquire          **(Argued)**
Darin M. Dalmat, Esquire
Evin F. Isaacson, Esquire
James & Hoffman
1130 Connecticut Avenue, N.W.
Suite 950
Washington, DC 20001

William T. Josem, Esquire
Cleary, Josem & Trigiani
325 Chestnut Street
Constitution Place, Suite 200
Philadelphia, PA 19106

                Counsel for Appellant

Roy T. Englert, Jr., Esquire          **(Argued)**
Joshua S. Bolian, Esquire
Robbins, Russell, Englert, Orseck, Untereiner & Sauber
1801 K Street, NW
Suite 411-L
Washington, DC 20006

                Counsel for Appellees Trump
                Entertaiment Resorts Inc, TER
                Development Co LLC, TERH LLP Inc.,
                Trump Entertainment Resorts
                Development Company LLC, Trump
                Entertainment Resorts Holdings LP,
                Trump Marina Associates, Trump Plaza
                Associates LLC and Trump Taj Mahal
                Associates

Mark B. Conlan, Esquire
Gibbons
One Gateway Center
Newark, NJ 07102

      Counsel for Appellee Official Committee
      of Unsecured Creditors of Trump
      Entertainment Resorts

James T. Bentley, Esquire
Lawrence V. Gelber, Esquire
Schulte, Roth & Zabel
919 Third Avenue
New York, NY 10022

      Counsel for Appellee National
      Retirement Fund

Allan S. Brilliant, Esquire
Dechert
1095 Avenue of the Americas
New York, NY 10036

G. Eric Brunstand Jr., Esquire
Dechert
90 State House Square
Hartford, CT 06103

      Counsel for Appellee First Lien Lenders

Diana O. Embree, Esquire
Barbara A. O'Neill, Esquire
Paul A. Thomas, Esquire

National Labor Relations Board
Contempt Litigation Branch
1015 Half Street, S.E.
Washington, DC 20570

> Counsel for Amicus Appellant National
> Labor Relations Board

David M. Bass, Esquire
Michael D. Sirota, Esquire
Cole Schotz
25 Main Street
Court Plaza North
P.O. Box 800
Hackensack, NJ 07601

> Counsel for Amicus Appellees 710 Long
> Ridge Road Operating Company II,
> LLC, 240 Church Street Operating
> Company II, LLC, 1 Burr Road
> Operating Company II, LLC, 245
> Orange Avenue Operating Company II,
> LLC and 107 Osbourne Street Operating
> Company II, LLC

———————

O P I N I O N

———————

**ROTH**, <u>Circuit Judge</u>:

4

This appeal requires us to resolve the effect of two potentially conflicting provisions of federal law. Section 1113 of the Bankruptcy Code allows a Chapter 11 debtor to "reject" its collective bargaining agreements (CBAs) under certain circumstances.[1] The National Labor Relations Act (NLRA) prohibits an employer from unilaterally changing the terms and conditions of a CBA even after its expiration.[2] Thus, under the NLRA, the key terms and conditions of an expired CBA continue to govern the relationship between a debtor-employer and its unionized employees until the parties reach a new agreement or bargain to impasse. This case presents a question of first impression among the courts of appeals: is a Chapter 11 debtor-employer able to reject the continuing terms and conditions of a CBA under § 1113 after the CBA has expired?

UNITE HERE Local 54 (Union) appeals the Bankruptcy Court's order granting the Debtors' motion to reject their CBA with the Union pursuant to § 1113(c). The Union contends that the Bankruptcy Court lacked subject matter jurisdiction to approve the Debtors' motion because the CBA had expired. The Debtors, Trump Entertainment

---

[1] 11 U.S.C. § 1113.

[2] *See* 29 U.S.C. § 158(a)(5); *NLRB v. Katz*, 369 U.S. 736, 743 (1962) (holding that an employer commits an unfair labor practice if, without bargaining to impasse, it unilaterally changes existing terms or conditions of employment); *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198 (1991) (citing *Laborers Health & Welfare Trust Fund for N. Cal. v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 544 n.6 (1988) (applying the *Katz* doctrine to expired CBAs)).

Resorts, Inc., and its affiliated debtors,[3] contend that § 1113(c) governs all CBAs, expired and unexpired, and that the Bankruptcy Court's interpretation of § 1113 is consistent with the policies underlying the Bankruptcy Code.

We conclude that § 1113 does not distinguish between the terms of an unexpired CBA and the terms and conditions that continue to govern after the CBA expires. Thus, we will affirm the order of the Bankruptcy Court.

## I.

### A.

The facts giving rise to this appeal are undisputed. The Debtors own and operate the Trump Taj Mahal casino in Atlantic City, New Jersey. The casino employs 2,953 employees, 1,467 of whom are unionized. UNITE HERE Local 54 is the largest of the employee unions, representing 1,136 employees. The most recent CBA between the Union and Taj Mahal was negotiated in 2011 for a three-year term. It contained a duration provision – titled "term of contract" – that provided:

> The collective bargaining agreement shall remain in effect until 11:59 p.m. on September 14, 2014 and shall continue in full force and effect from year to year thereafter, unless either party serves sixty (60) days written notice of its

---

[3] The affiliated debtors include Trump Taj Mahal Associates, LLC, the Union's counter-party to the CBA.

6

intention to terminate, modify, or amend the
Collective Bargaining Agreement.

In early 2014, due to the casino's deteriorating
financial health,[4] the Debtors attempted to negotiate a new
agreement. Specifically, on March 7, the Debtors gave the
Union notice of their "intention to terminate, modify or
amend" the CBA and asked the Union to begin negotiations
for a new agreement. The Union did not respond. On April
10, the Debtors followed up on their request. On April 30,
the Union responded that "while [it is] also anxious to
commence bargaining, the Union is simply not ready, some
five months out [from expiration of the CBA], to commence
negotiations" but it would "contact [the Debtors] within the
next several months."

On August 20, at the Debtors' request, the Union met
with the Debtors to discuss terms for a new agreement.
Although the Debtors emphasized their critical financial
situation, the Union was not receptive to negotiations. On
August 28, the Debtors proposed modifications to the CBA,
including replacing the pension contributions with a 401(k)
program, and replacing the health and welfare program with
subsidized coverage under the Affordable Care Act. The
Union responded that it was prepared to work with the
Debtors on workers' pensions, but not on the health and
welfare proposal. No agreement was reached.

---

[4] In 2011, Taj Mahal's earnings before interest, taxes,
depreciation, and amortization (EBITDA) were
approximately $32 million. The casino's earnings plummeted
to a loss of $6.1 million in 2013. As of June 30, 2014, Taj
Mahal's twelve-month EBITDA was a loss of $25.7 million.

On September 9, 2014, the Debtors filed for Chapter 11 bankruptcy protection.  On September 11, the Debtors asked the Union to extend the term of the CBA, but the Union refused, unless the Debtors agreed to terminate the extension upon the filing of a § 1113 motion.  It is undisputed that, with no new agreement in place and with the Debtors having served notice to modify the agreement, the CBA expired on September 14, 2014.

On September 17, the Debtors sent the Union a proposal with supporting documentation to demonstrate the Debtors' "dire" financial condition, and requested to meet "on any day and at any place" within the next seven days.  The Union proposed to meet on September 24, for the first bargaining session.  After the meeting on September 24, the Union requested additional information, which the Debtors promptly provided.  Two days later, the Union sent a "counter-proposal" to the Debtors, which consisted largely of more information requests.  Also on September 26, the Debtors filed a motion pursuant to 11 U.S.C. § 1113 seeking to reject the CBA and implement the terms of the Debtors' last proposal to the Union.  The Debtors asserted that rejection of the CBA was necessary to their reorganization based on a three-part business plan, which anticipated concessions from the first lien lenders, local and state authorities, and the Union.

On October 17, 2014, following evidentiary hearings, the Bankruptcy Court granted the Debtors' motion to reject the expired CBA and authorized the Debtors to implement their last proposal.

**B.**

     In granting the Debtors' motion, the Bankruptcy Court addressed three issues. First, the court considered whether it had the authority to grant the motion to reject the CBA, given that the CBA had expired after the Debtors filed for bankruptcy but before the Debtors filed the rejection motion. The court concluded that § 1113 permits rejection of expired CBAs, reasoning that § 1113 is not limited to "unexpired" or "executory" CBAs. The court observed that, in passing § 1113 as a whole, Congress "recognized the need for an expedited process by which debtors could restructure labor obligations" and "provided several checks" to protect union employees.[5] The court could not discern a reason for distinguishing between expired and unexpired CBAs because granting the union the power to delay the bankruptcy process would subvert the "policy and bargaining power balances Congress struck in Section 1113."[6]

     Having decided that § 1113 encompasses expired CBAs, the Bankruptcy Court determined that the Debtors satisfied the requirements of § 1113. Specifically, the court found that the Debtors' proposal provided "for those necessary modifications . . . that are necessary to permit the reorganization of the debtor;" that the Union rejected the proposal without good cause; and that the balance of the equities clearly favored rejection of the CBA.[7] The Bankruptcy Court noted that, based on "uncontroverted

---

[5] *In re Trump Entm't Resorts, Inc.*, 519 B.R. 76, 86 (Bankr. D. Del. 2014).

[6] *Id.* at 87.

[7] *See id.* at 88-92; *see generally* 11 U.S.C. § 1113(b)(1).

evidence" at the hearing, the Debtors would be forced to close the casino and liquidate if the requested relief were not granted.[8] The Bankruptcy Court also expressed concern that "while [the] Debtors were imploring the Union to engage with them in discussions, offering to meet '24/7,' . . . the Union was engaging in picketing, a program of misinformation . . . and, most egregiously, communicating with customers who had scheduled conferences at the Casino to urge them to take their business elsewhere."[9] It was "clear" to the Bankruptcy Court that "the Union was not focusing its efforts on negotiating to reach agreement with Debtors."[10]

Finally, the Bankruptcy Court determined that, under § 1113, it could authorize the Debtors to modify the expired CBA and implement the terms of Debtor's proposal. The court observed that the text of § 1113 did not explicitly grant the court authority to implement the proposed terms, but the "reasoned view" is that a debtor in possession is authorized "to implement changes to the terms and conditions of employment that were included in the section 1113 proposals approved by the bankruptcy court."[11]

The parties petitioned this Court for direct appeal,[12] which we granted on December 15, 2014. The Union challenges only the first issue addressed by the Bankruptcy

---

[8] *Id.* at 87.

[9] *Id.* at 82.

[10] *Id.*; *see id.* at 81 ("The correspondence admitted into evidence is alarming in showing the Debtors were literally begging the Union to meet while the Union was stiff-arming the Debtors.").

Court, whether a Bankruptcy Court may grant a motion to reject an expired CBA under § 1113.[13]

## II.

The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 157(b) and 1334(a).[14] We have jurisdiction under

---

[11] *Id.* at 92 (citing *7 Collier on Bankruptcy* ¶ 1113.06[1][b] (16th ed. 2014)).

[12] *See* 28 U.S.C. § 158(d)(2).

[13] The Union raises the issue of whether the Bankruptcy Court had the authority to "implement changes in the post-expiration terms and conditions of employment" in its Statement of Issue Presented for Review and in a single footnote in the Argument section of its brief, but does not articulate any arguments in support of review. Because the Union does not pursue this argument in its briefing, we assume, without deciding, that the Bankruptcy Court had the authority to implement the terms of the § 1113 proposal.

[14] Although the Union contends that the Bankruptcy Court erred in finding that it has jurisdiction under 11 U.S.C. § 1113, this case concerns the scope of a non-jurisdictional statute. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515-16 (2006). The Bankruptcy Court's interpretation of § 1113 did not violate the statute vesting the NLRB with exclusive jurisdiction to administer the NLRA. *See* 29 U.S.C. § 160. As the Bankruptcy Court recognized, § 1113 allows the debtor only to terminate or modify its ongoing obligations to its employees; it does not give a bankruptcy court the authority to interpret or administer the NLRA. *See Trump Entm't Resorts, Inc.*, 519 B.R. at 87 ("This is a no greater

28 U.S.C. § 158(d)(2)(A). We review the Bankruptcy Court's legal determinations *de novo*.[15]

### III.

The question before us is whether § 1113 authorizes a Chapter 11 debtor to reject the continuing terms and conditions of a CBA after its expiration. Two statutory schemes are at issue: the NLRA and Chapter 11 of the Bankruptcy Code. We read these two statutory frameworks *seriatim*, and assume that Congress passed each subsequent law with full knowledge of the existing legal landscape.[16]

---

intrusion on the NLRB's jurisdiction than if the Court were to apply Section 1113 to a [CBA] which has not expired by its terms.").

[15] *In re Makowka*, 754 F.3d 143, 147 (3d Cir. 2014).

[16] *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990).

Our role in interpreting a statute is to give effect to Congress's intent.[17] Because we presume that Congress expresses its intent through the ordinary meaning of its language, we begin our analysis by examining the plain language of the statute.[18] When statutory "language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."[19]

Bankruptcy courts are divided on whether § 1113 permits debtors to reject expired CBAs.[20] But a mere

---

[17] *See Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 202 (3d Cir. 1998) (citing *Negonsott v. Samuels*, 507 U.S. 99, 104 (1993)).

[18] *See id.* (citations omitted).

[19] *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (internal quotation marks omitted); *see Parker v. NutriSystem, Inc.*, 620 F.3d 274, 277 (3d Cir. 2010).

[20] *Compare In re 710 Long Ridge Rd. Operating Co., II*, 518 B.R. 810, 830 (Bankr. D.N.J. 2014) (holding that § 1113(c) applies to CBAs that had expired prepetition), *In re Karykeion, Inc.*, 435 B.R. 663, 675 (Bankr. C.D. Cal. 2010) (same), *In re Ormet Corp.*, No. 2:04-CV-1151, 2005 WL 2000704, at *2 (S.D. Ohio 2005) (same), *In re Hoffman Bros. Packing Co.*, 173 B.R. 177, 184 (9th Cir. BAP 1994) (holding that the CBA "continues 'in effect,' as recognized by § 1113(e) and as was implicit in § 1113(c)"), *Accurate Die Casting Co.*, 292 N.L.R.B. 982, 987-88 (1989) (dicta), *with In re Hostess Brands, Inc.*, 477 B.R. 378, 382-83 (Bankr. S.D.N.Y. 2012) (holding that § 1113(c) is only applicable to current CBAs), *In re San Rafael Baking Co.*, 219 B.R. 860,

divergence in statutory construction does not render § 1113 ambiguous.[21] Instead, we must determine whether § 1113 is ambiguous by examining "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."[22] "Specifically, in interpreting the Bankruptcy Code, the Supreme Court has been reluctant to declare its provisions ambiguous, preferring instead to take a broader, contextual view, and urging courts to 'not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'"[23] A provision is ambiguous, "when, despite a studied examination of the statutory context, the

---

866 (9th Cir. BAP 1998) (same), *In re Sullivan Motor Delivery, Inc.*, 56 B.R. 28, 29, 31 (Bankr. E.D. Wis. 1985) (same), *In re Charles P. Young Co.*, 111 B.R. 410, 413 (Bankr. S.D.N.Y. 1990) (noting that rejection of a CBA pursuant to § 1113(c) is a moot issue if the agreement expired by its own terms and before the bankruptcy court holds a hearing on rejection).

[21] *See In re Price*, 370 F.3d 362, 369 (3d Cir. 2004).

[22] *Marshak v. Treadwell*, 240 F.3d 184, 192 (3d Cir. 2001) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)); *see King v. Burwell*, 576 U.S. __, 135 S. Ct.2480, 2489 (2015) ("But oftentimes the meaning–or ambiguity–of certain words or phrases may only become evident when placed in context." (quotation marks omitted)).

[23] *Price*, 370 F.3d at 369; *see Official Comm. of Unsecured Creditors of Cybergenics Corp., ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 559 (3d Cir. 2003) ("Statutory construction is a holistic endeavor, and this is especially true of the Bankruptcy Code." (quotation marks, alterations and citations omitted)).

natural reading of a provision remains elusive."[24]   In that case, and as a last resort, we turn to pre-Code practice and legislative history to find meaning.[25]  \

**A.**

Section 1113 of the Bankruptcy Code governs the means by which a debtor may assume, reject, or modify a CBA.  It establishes an expedited negotiation process for modifying a CBA and allows for judicial evaluation of a petition to reject a CBA if negotiations are unsuccessful. Specifically, § 1113 provides that a debtor may "reject a collective bargaining agreement" if the bankruptcy court determines that (1) the debtor has "ma[de] a proposal" to its employees "which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization," (2) "the authorized representative of the employees has refused to accept such proposal without good cause," and (3) "the balance of the equities clearly favors rejection of such agreement."[26] Section 1113 explicitly forbids debtors from "terminat[ing] or alter[ing] any provisions of a collective bargaining agreement prior to compliance with the provisions" of § 1113.[27]

The Union argues that the plain meaning of a "collective bargaining agreement" is a "contract between an employer and a labor union."  Therefore, because the CBA has expired, there is no "contract" to be rejected under § 1113.  The Union further contends that Debtors are required

---

[24] *Price*, 370 F.3d at 369.

[25] *See id*.

[26] 11 U.S.C. § 1113(a), (b)(1), (c).

[27] *Id.* § 1113(f).

to bargain to impasse before making any changes to the key terms and conditions of the expired CBA. The Union's position is based on the NLRA's requirement that "[o]nce a collective bargaining relationship has been established, an employer may not make a change affecting [the] mandatory bargaining subjects without affording the Union the opportunity to bargain over the change."[28] Even when a CBA expires, the employer must maintain the status quo with respect to mandatory subjects of bargaining until it either enters into a new contract or bargains to impasse.[29]

While § 1113 prescribes a process for rejection of a "collective bargaining agreement," it does not mention the continuing obligations imposed by the NLRA. However, neither does it restrict its prescription to "executory" or "unexpired" CBAs.[30] Following the lead of the Supreme Court to take a broad, contextual view of the Bankruptcy

---

[28] *Champion Parts Rebuilders, Inc. v. NLRB*, 717 F.2d 845, 852 (3d Cir. 1983) (citing *Katz*, 369 U.S. at 743)); *see* 29 U.S.C. § 158(a)(5) (providing that it "shall be an unfair labor practice for an employer" to "refuse to bargain collectively with the representatives of [its] employees"); *id.* § 158(d) (defining the employer's duty to bargain as part of a mutual duty between the employer and the union to "meet . . . and confer in good faith with respect to wages, hours, and other terms and conditions of employment").

[29] *See Litton*, 501 U.S. at 199; *Citizens Publ'g & Printing Co. v. NLRB*, 263 F.3d 224, 233 (3d Cir. 2001).

[30] *Cf.* 11 U.S.C. § 365. Section 365 permits unilateral rejection of any executory contracts or unexpired leases burdensome to the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989).

16

Code, we will not embark, as the parties do, on a hyper-technical parsing of the words and phrases that comprise § 1113,[31] or focus on a meaning that may seem plain when considered in isolation.  We will turn instead to the situation in which § 1113 was enacted and examine the provision in the context of the Bankruptcy Code as a whole.[32]

**B.**

Section 1113 was a product of the organized labor movement's push to overturn the Supreme Court's decision in

---

[31] The Union argues that we should attach significance to the textual contrast between § 1113(e), which allows for emergency interim relief "when the collective bargaining agreement continues in effect," and § 1113(c).  The Union also contends that the word "terminate" within the context of § 1113(d)(2) suggests that there must be an unexpired CBA that can be "terminated."

[32] *In re Price*, 370 F.3d at 369 ("Statutory context can suggest the natural reading of a provision that in isolation might yield contestable interpretations."); *see King*, 135 S. Ct. at 2495 ("But while the meaning of the phrase . . . may seem plain 'when viewed in isolation,' such a reading turns out to be 'untenable in light of [the statute] as a whole.' . . .  In this instance, the context and structure of the [statute] compel us to depart from what would otherwise be the most natural reading of the pertinent statutory phrase." (citation omitted)); *Kelly v. Robinson*, 479 U.S. 36, 43 (1986) ("In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'" (quotation marks omitted)).

*National Labor Relations Board v. Bildisco & Bildisco.*[33]
There, the Supreme Court addressed what standard governed
rejection of CBAs in bankruptcy. The Court first held that
CBAs were "executory contracts" under § 365 of the
Bankruptcy Code, and could therefore be rejected under §
365 if the debtor showed that they "burden[ed] the estate, and
. . . the equities balance[d] in favor of rejecting the labor
contract[s]."[34] In recognizing national labor policy, the Court
included a bargaining component in the process of rejection,
requiring an employer to make reasonable efforts to negotiate
a voluntary modification of the CBA before acting on a

---

[33] 465 U.S. 513 (1984); *see* 130 Cong. Rec. 20,092 (1984)
(statement of Sen. Kennedy) (stating that the intent of the new
law is "to overturn the *Bildisco* decision which had given the
trustee all but unlimited discretionary power to repudiate
labor contracts and to substitute a rule of law that encourages
the parties to solve their mutual problems through the
collective bargaining process"); *id.* at 20,091 (statement of
Sen. Packwood) (stating that "the agreement reached by the
Conferees on the labor provisions in the bill brings to an end
the effort to assure that labor contracts, which are negotiated
in good faith, are properly protected"); *see also Wheeling-
Pittsburgh Steel Corp. v. United Steelworkers of Am., AFL-
CIO-CLC*, 791 F.2d 1074, 1086 (3d Cir. 1986) ("[While we]
are aware . . . that the most authoritative source of legislative
intent lies in committee reports . . . [, here] there was no
committee report, and we must seek guidance from the
sequence of events leading to adoption of the final version of
the bill, and the statements on the House and Senate floor of
the legislators most involved in its drafting." (citation
omitted)).

[34] *Bildisco*, 465 U.S. at 526.

petition to modify or reject a CBA.[35]  This first holding of *Bildisco* – establishing the standard for rejecting a CBA – was unanimous.

The Court then addressed whether the debtor's noncompliance with the CBA after filing for bankruptcy but before contract rejection constituted an unfair labor practice. Justice Rehnquist, writing for the majority, found that "from the filing of a petition in bankruptcy until formal acceptance, the [CBA] is not an enforceable contract within the meaning of NLRA § 8(d)."  Thus, it was not an unfair labor practice for an employer to unilaterally change the terms of a CBA after filing for bankruptcy but before the court approved rejection.[36]  Justice Rehnquist reasoned that the trustee was "empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have employed absent a bankruptcy filing."[37]  A rule, requiring trustees to adhere to a CBA's terms after filing, "would run directly counter to the express provisions of the Bankruptcy Code and to the Code's overall effort to give the debtor-in-possession some flexibility and breathing space."[38]  He noted:

---

[35] *Id.*

[36] *Id.* 529-33 ("Since the filing of a petition in bankruptcy under Chapter 11 makes the contract unenforceable, § 8(d) procedures have no application to the employer's unilateral rejection of an already unenforceable contract. . . .  Our rejection of the need for full compliance with § 8(d) procedures of necessity means that any corresponding duty to bargain to impasse under § 8(a)(5) and § 8(d) before seeking rejection must also be subordinated to the exigencies of bankruptcy.").

[37] *Id.* at 528.

[38] *Id.* at 532.

The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources. . . . [A] beneficial recapitalization could be jeopardized if the debtor-in-possession were saddled automatically with the debtor's prior collective-bargaining agreement. Thus, the authority to reject an executory contract is vital to the basic purpose to a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization.[39]

In response to *Bildisco*, Congress swiftly[40] passed § 1113 to overturn the second part of *Bildisco*'s holding and

---

[39] *Id.* at 528.

[40] *See* Rosalind Rosenberg, *Bankruptcy and the Collective Bargaining Agreement – A Brief Lesson in the Use of the Constitutional System of Checks and Balances*, 58 Am. Bankr. L.J. 293, 313 (1984) ("On the same day *Bildisco* was decided, Congressman Rodino introduced H.R. 4908 to clarify the circumstances under which collective bargaining agreements may be rejected." (footnotes and quotation marks omitted)); 130 Cong. Rec. 6191 (statement of Rep. Hyde) (describing the House as taking action with "mind boggling speed"); 130 Cong. Rec. 13,205 (statement of Sen. Denton) (stating that "[i]t is notable that the *Bildisco* provision was introduced only 2 days before it was taken up on the floor, was never considered by the House Judiciary Committee in hearings or committee markups, and was brought to the

prohibit unilateral changes in debtors' CBAs without bankruptcy court approval.[41]   In crafting the stringent requirements of § 1113, Congress was focused on preventing employers from terminating negotiated labor contracts and avoiding burdensome obligations to employees merely by entering bankruptcy.[42]

As enacted, § 1113 balances the concerns of economically-stressed debtors in avoiding liquidation and the unions' goals of preserving labor agreements and maintaining

---

House floor under a rule that did not permit the House to vote on it separately from the bankruptcy bill.").

[41] *See* 11 U.S.C. § 1113(f).

[42] *In re Roth Am., Inc.*, 975 F.2d 949, 956 (3d Cir. 1992); *see In re Maxwell Newspapers, Inc.*, 981 F.2d 85, 89 (2d Cir. 1992) ("[Section] 1113 also imposes requirements on the debtor to prevent it from using bankruptcy as a judicial hammer to break the union."); *In re Century Brass Prods., Inc.*, 795 F.2d 265, 272 (2d Cir. 1986) ("[Section 1113] created an expedited form of collective bargaining with several safeguards designed to insure that employers did not use Chapter 11 as medicine to rid themselves of corporate indigestion."); *Sullivan Motor Delivery, Inc.*, 56 B.R. at 30 ("The elaborate procedure established under § 1113 is a conscious effort by Congress to slow down the potential for an avalanche of attempted rejections of [CBAs] by debtor employers."); 130 Cong. Rec. 20,092 (1984) (statement of Sen. Packwood) (noting that "the debtor will not be able to exploit the bankruptcy procedure to rid itself of unwanted features of the labor agreement that have no relation to its financial condition and its reorganization and which earlier were agreed to by the debtor").

influence in the reorganization process. Unlike § 365, which does not constrain a debtor's rejection of burdensome executory contracts, § 1113 prescribes strict procedural and substantive requirements before a CBA can be rejected. Specifically, before the bankruptcy court will consider an application to reject, the debtor must make a proposal, provide relevant information, meet at reasonable times, and confer in good faith. The debtor's modifications must be "necessary" to permit reorganization and must treat all creditors, the debtor, and all affected parties "fairly and equitably." The balance of equities must "clearly favor" rejection of the CBA. The language of § 1113 was designed to foreclose all but the essential modifications of the working conditions integral to a successful reorganization.[43] In other words, by requiring compliance with the stringent provisions of § 1113, Congress sought to ensure that, when the NLRA yields to the Bankruptcy Code, it does so only for reasons that will permit the debtor to stay in business.[44]

This case exemplifies the process that Congress intended. Rejection of the Debtors' continuing labor obligations, as defined by the expired CBA, is necessary to permit the Debtors' reorganization – indeed it is essential to

---

[43] *See Wheeling-Pittsburgh Steel Corp.*, 791 F.2d at 1088.

[44] *See* 130 Cong. Rec. 20,231 (1984) (statement of Rep. Morrison) ("[T]he conference report strikes the necessary balance between the threat to companies in risk of being liquidated because of financial problems and the possibility of abuse of chapter 11 bankruptcy proceedings merely to vitiate union contracts"); *id.* at 20,232 (statement of Rep. Morrison) ("[A] chapter 11 reorganization case that is brought for the sole purpose or [sic] repudiating or modifying a [CBA] is a case brought in 'bad faith.'").

the Debtors' survival. As the Bankruptcy Court repeatedly emphasized, the Debtors' "financial situation is desperate. Not only are their losses large, but they have been unable to obtain debtor in possession financing for their bankruptcy cases and are operating with cash collateral. Debtors' cash will run out in less than two months."[45] The Debtors' expert, whom the Bankruptcy Court found "highly credible," testified that the

> Debtors must have relief from the CBA without which they can not avoid closing the Casino and liquidating their businesses. . . . [T]he situation is so grim that without the Court granting the Motion and Debtors obtaining other concessions, Debtors would have to give notice to the New Jersey Department of Gaming Enforcement not later than October 20, 2014, that Taj Mahal will close the Casino.[46]

The Debtors sold assets and closed one of their casinos, the Trump Plaza Hotel and Casino, to raise cash and reduce their obligations. As of September 5, 2014, the Debtors' working capital cash was approximately $12 million, and its secured debt was approximately $286 million. Under the relevant terms of the CBA, however, the Debtors were required to make more than $3.5 million per year in pension contributions, and $10 to $12 million per year in health and welfare contributions. After the CBA expired, the Debtors were required to sustain those payments at the same levels. To avoid liquidation, the Debtors moved to reject the

---

[45] *Trump Entm't Resorts, Inc.*, 519 B.R. at 80.

[46] *Id.*

CBA. Their § 1113 proposal to the Union included annual savings of approximately $3.7 million per year in pension contributions, $5.1 million in health and welfare contributions, and $5.8 million in work rule changes, including elimination of paid meal times. Instead of negotiating with the Debtors, the Union stalled the bargaining sessions, engaged in picketing, and attempted to harm the Debtors' business.[47]

Notably, the Debtors' plan of reorganization is contingent on rejection of the CBA, the obtaining of tax relief, the conversion of the first lien secured creditor's debt to equity, and a capital infusion of $100 million from the first lien secured creditor. The first lien secured creditor "has made it clear that it will perform only if the CBA and tax relief contingencies are achieved because the business will not succeed without the relief."[48] A successful reorganization, therefore, depends on the rejection of the terms that the Debtors are required to maintain under the NLRA.

The Union recognizes that the Debtors are bound by the terms and conditions of the expired CBA by virtue of their obligation to maintain the status quo. Nevertheless, the Union argues that those obligations are "entirely distinct from the parties' voluntarily assumed contractual obligation to honor their CBA prior to its expiration." The Union relies on *Laborers Health & Welfare Trust Fund for Northern California v. Advanced Lightweight Concrete Company*.[49]

---

[47] *Id.* at 81-82.

[48] *Id.* at 83.

[49] 484 U.S. 539 (1988).

This case involved the withdrawal of an employer from a multiemployer pension fund and the employer's subsequent failure to make payments to the fund as required by the expired CBA. The trustee of the fund brought suit in federal court to enforce the terms of the expired CBA. The Supreme Court distinguished an employer's obligation to make contributions to such a pension fund pursuant to the terms of a CBA from an employer's continuing obligation under the NLRA to make post-expiration contributions. The Court held that, because an employer's contractual duty to make multiemployer pension fund contributions does not survive the CBA's expiration, the employer's failure to make post-expiration contributions does not constitute a violation of § 515 of ERISA.[50] The Court concluded that § 515 was intended to cover only obligations arising under the CBA. To seek contributions from an employer after the expiration of the CBA, the trustee would have to go before the NLRB to obtain a remedy in a proceeding before that body; the district court did not have jurisdiction to hear the claim.

The Court in *Laborers Health* found Congress's intent in enacting § 515 was clear.[51] The Court added that there were three countervailing policy arguments to support its decision that the reach of § 515 was deliberate rather than inadvertent. First, if there is a gap in the enforcement scheme to enforce contributions to multiemployer funds, its incidence

---

[50] Section 515 was enacted to protect multiemployer funds and the other employers participating in them from the withdrawal of an employer from the fund. It obligates employers, even after withdrawal, to make contributions under the terms of a plan or of a CBA. 29 U.S.C. § 1145.

[51] *Laborers Health*, 484 U.S. at 551.

is unknown and, since it has not been called to the attention of Congress, "it may not be a problem of serious magnitude."[52] Second, the issues to be decided in a dispute over an employer's failure to make fund contributions are more complex when the refusal is post-CBA rather than a simple collection action during the life of the CBA.[53] Third, a violation of the duty to bargain in good faith is a labor law matter and is better decided by the NLRB than by a district court.[54]

Conversely, we find the intent of Congress here also to be clear but that intent was to incorporate expired CBAs in the language of § 1113. Our review of the decision in *Laborers Health* demonstrates to us that the three countervailing policy arguments in *Laborers Health* support our decision here. As we noted above, § 1113 was enacted to balance the needs of economically-stressed debtors in avoiding liquidation and the unions' needs in preserving labor agreements and safeguarding employment for their members. Section 1113 meets a gap in the schemes to permit reorganizations when labor obligations will prevent the success of a reorganization. The number of cases cited in footnote 20 *supra* demonstrate this gap. Section 1113 was enacted to ensure that relief from a CBA was granted only in situations where relief was necessary to permit the reorganization. It is a counter to the precedent in *Bildisco* which permitted modification of a CBA without close scrutiny by the Bankruptcy Court. Under § 1113, approval will be granted only if the debtor's modifications are

---

[52] *Id.*.
[53] *Id.* at 551-52.
[54] *Id.* at 552.

necessary to permit reorganization. In this context, when the employer's statutory obligations to maintain the status quo under the terms of an expired CBA will undermine the debtor's ability to reorganize and remain in business, it is the expertise of the Bankruptcy Court which is needed rather than that of the NLRB. For that reason, whether the CBA is in effect or is expired, it is the Bankruptcy Court which should make the review and decide on the necessity of the modification. We conclude, therefore, that § 1113 applies to a CBA after it has expired.

The Union contends, however, that because a debtor may not assume or reject an expired executory contract under § 365, it may not reject an expired CBA under § 1113. This argument ignores an important distinction between a CBA and any other executory contract: the key terms and conditions of a CBA continue to burden the debtor after the agreement's expiration. Rejection of those terms, therefore, is not a moot issue as would be in the case of other contracts or leases.

## C.

To hold that a debtor may reject an expired CBA or its continuing obligations as defined by the expired CBA is also consistent with the purpose of the Bankruptcy Code, which gives debtors latitude to restructure their affairs.[55] A Chapter

---

[55] *See Perez v. Campbell*, 402 U.S. 637, 648 (1971) ("This Court on numerous occasions has stated that '(o)ne of the primary purposes of the Bankruptcy Act' is to give debtors 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-

11 reorganization provides a debtor with an opportunity to reduce or extend its debts so its business can achieve long-term viability, for instance, by generating profits which will compensate creditors for some or all of any losses resulting from the bankruptcy. Congress has recognized that "[i]t is more economically efficient to reorganize rather than to liquidate, because it preserves jobs and assets."[56] Similarly, we have held that "[t]he policy behind Chapter 11 of the Bankruptcy Code is the 'ultimate rehabilitation of the debtor.'"[57] As the Bankruptcy Court recognized, "[i]n many cases, time is the enemy of a successful restructuring" and the § 1113 rejection process is a "much quicker process than the relatively protracted process contemplated by the NLRA."[58]

Section 1113 furthers the Code's rehabilitative policies by permitting debtors to restructure their labor obligations. A

---

existing debt.'" (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934))).

[56] H.R. Rep. No. 95-595, at 220 (1977) (stating that the premise of business reorganization is that a company's assets are worth more as a going concern than if sold for scrap); *see* 130 Cong. Rec. 20,230 (1984) (statement of Rep. Lungren, discussing § 1113) ("This is an important provision in the compromise because it underscores the primary purpose of chapter 11; that is, to maintain the debtor's business so that both the debtor and his employees can keep their jobs. . . . [T]his chapter 11 allows a company to reorganize rather than going belly-up. In essence, it is the best way to protect the jobs of the workers of the company as then constituted.").

[57] *In re Exide Techs.*, 607 F.3d 957, 962 (3d Cir. 2010) (quoting *Nicholas v. United States*, 384 U.S. 678, 687 (1966).

[58] *Trump Entm't Resorts*, 519 B.R. at 86.

contrary holding, *i.e.*, that § 1113 does not allow a debtor to reject expired CBAs or its ongoing obligations, would impede that overriding goal.[59] Whether by force of contract or by operation of the NLRA, the Debtors here were bound by the key terms of the expired CBA. But those terms burdened the estate so as to preclude a successful reorganization. Just because the Debtors filed the § 1113 motion one week after the CBA expired, they should not be bound by the expired agreement's burdensome terms until the parties negotiate to impasse. That interpretation of the statute would undercut the rehabilitative function of Chapter 11.[60]

---

[59] *See* 130 Cong. Rec. 20,230 (1984) (statement of Rep. Lungren) (noting that "[a]ny labor provision which would subordinate the debtor's reorganization to a union contract . . . would impinge on the goals of the 1978 Bankruptcy Reform Act and indeed on the principal reasons for a bankruptcy procedure"); *id.* at 20,231 (statement of Rep. Hall) (asking whether "the court in balancing equities would include the union contract – *and any other matters that might make it detrimental to the debtor* for the contract to remain in force" (emphasis added)).

[60] *See King*, 135 S. Ct. 2492-93 (citing *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419-20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.")); *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 350-51 (1943) ("[C]ourts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permit so as to carry out in particular cases the generally expressed legislative policy.").

Under the policies of bankruptcy law, it is preferable to preserve jobs through a rejection of a CBA, as opposed to losing the positions permanently by requiring the debtor to comply with the continuing obligations set out by the CBA. Moreover, it is essential that the Bankruptcy Court be afforded the opportunity to evaluate those conditions that can detrimentally affect the life of a debtor, whether such encumbrances attach by operation of contract or a complex statutory framework. In light of Chapter 11's overarching purposes and the exigencies that the Debtors faced, we conclude that the Bankruptcy Court did not err in granting the Debtors' motion.

## IV.

For the reasons set forth above, we will affirm the judgment of the Bankruptcy Court.